**In re D.H. OVERMYER TELECASTING CO., INC., Debtor.**

**HADAR LEASING INTERNATIONAL CO., INC., et al., Plaintiffs,**

v.

**D.H. OVERMYER TELECASTING CO., INC., et al., Defendants.**

**Bankruptcy No. B81–00506.
Adv. No. B81–1005.**

United States Bankruptcy Court,
N.D. Ohio, E.D.

Sept. 17, 1982.
Judgment Sept. 24, 1982.

John Silas Hopkins, III, and William S. Eggeling, Ropes & Gray, Boston, Mass., and Susan B. Collins, and Joseph Patchan, Baker & Hostetler, Cleveland, Ohio, and Martin J. Bienenstock, Weil, Gotshal & Manges, New York City, for The First Nat. Bank of Boston.

William T. Smith, Calfee, Halter & Griswold, and Harry W. Greenfield, Javitch, Eisen & Greenwald Co., L.P.A., Cleveland, Ohio, for Hadar Leasing Intern. Co., Inc.

James M. Wilsman, and Kevin T. Duffy, Parks, Eisele, Bates & Wilsman, Cleveland, Ohio, for D.H. Overmyer Telecasting Co., Inc.

Ronald A. Rispo, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, Ohio, for Daniel H. Overmyer.

David O. Simon, Dettelbach & Sicherman, Cleveland, Ohio, for Creditors' Committee of D.H. Overmyer Telecasting Co., Inc.

## MEMORANDUM OF OPINION.

JOHN F. RAY, Jr., Bankruptcy Judge.

This matter came on for hearing on the complaint of plaintiff, Hadar Leasing International Co., Inc. ("Hadar"), Chapter 11

debtor, against another Chapter 11 debtor, D.H. Overmyer Telecasting Co., Inc. ("Telecasting"), for relief from stay; the complaints of intervening plaintiffs, Daniel H. Overmyer ("Mr. Overmyer"), Intermodal Systems Leasing, Inc. ("ISLI"), Overmyer Distribution Services, Inc. ("ODS") and D.H. Overmyer Co., Inc. (Ohio) ("DHO"), against defendant/intervenor, The First National Bank of Boston ("FNBB");[1] Telecasting's counterclaim against all of the plaintiffs; FNBB's counterclaim against all of the plaintiffs; the evidence; briefs of counsel; and oral argument of counsel.

This case presents for resolution:

(i) the claim of Hadar against Telecasting to the property and equipment used by Telecasting in the operation of its television station;

(ii) the purported claims of Hadar and the Overmyer plaintiffs/intervenors, Mr. Overmyer, ISLI, ODS and DHO, against defendant, FNBB, allegedly arising out of certain loan relationships with the Overmyer companies.

(iii) Telecasting's counterclaims against all of the Overmyer plaintiffs (1) for a determination that it owns the "leased" property and equipment in its possession; and (2) for all of the money wrongfully extracted from Telecasting under the purported "leases;"

(iv) FNBB's counterclaims against the Overmyer plaintiffs based upon monies owed to it and fraudulently removed from FNBB's collateral; and

(v) FNBB's countercaim for recovery of reasonable collection costs.

The Court makes the following findings of fact, conclusions of law and orders.

## FINDINGS OF FACT

### 1. *The Trial*

1.1 *Trial Witnesses.* Trial commenced in this adversary proceeding on Monday, February 22, 1982, and concluded April 9,

1982. During this period, 6,373 pages of proceedings were transcribed. The following witnesses were called by the plaintiffs:

David A. Raible, executive vice-president of Hadar (Raible, 1 Tr. 94; *see* Finding No. 4.6, *infra*)

James Bond, appraiser at Frazier, Gross & Kadlec, appraised equipment he was able to locate at Telecasting for Hadar (Bond, 13 Tr. 1151, 1153)

Edmund M. Connery, attorney for the Overmyer organization (Connery, 20 Tr. 1881–84, 23 Tr. 2170; *see* Finding No. 4.4, *infra*)

Peter M. Lynch, former accountant for the Overmyer organization, created a new set of Hadar books (Lynch, 16 Tr. 1510–12; *see* Finding No. 4.7, *infra*)

The following witnesses' testimony was presented by plaintiffs through deposition testimony:

Scott Neely, former vice-president of FNBB (McArdle, 51 Tr. 5174)

William F. Thompson, executive vice-president, FNBB (Pl. Ex. 134, p. 4)

Ralph B. Fifield, head of the National Division West, FNBB (Pl. Ex. 136, p. 10)

John H. Chequer, former commercial lending officer, FNBB (Pl. Ex. 137, p. 7)

J. Francis Fuge, deposit operations officer, FNBB (Pl. Ex. 138, p. 3)

Daniel H. Overmyer, intervening plaintiff in this adversary proceeding (*see* Finding No. 2.3, *infra*)

Ralph Todd, financial consultant to FNBB (Pl. Ex. 140A, p. 4)

Richard D. Hill, chairman and chief executive officer, FNBB (Pl. Ex. 141, p. 6)

James Howell Short, former Credit Department employee, FNBB (Pl. Ex. 142, p. 5)

The following witnesses were called by the defendants:

Eugene I. Winkelman, M.D., head of hepatology section, Department of Gas-

---

1. Hadar, Mr. Overmyer, ISLI, ODS and DHO are hereinafter sometimes collectively referred to as "Overmyer plaintiffs."

troenterology, Cleveland Clinic (Winkelman, 5 Tr. 406)

Howard L. Klein, accountant, audit supervisor, Ernst & Whinney (H. Klein, 28 Tr. 2676)

James R. Bowe, vice-president of engineering and operations, Telecasting (Bowe, 39 Tr. 3681)

Daniel E. Foley, partner, Ernst & Whinney, specialist in privately owned businesses, taxes and bankruptcies (Foley, 41 Tr. 3879–80)

Jerry B. Klein, of Jerry B. Klein, CPA, an accounting firm heavily concentrated in bankruptcy, insolvency and investigative accounting work (J. Klein, 42 Tr. 3985–86)

Karen Hall, employee of Telecasting, responsible for accounts payable and payroll (Hall, 46 Tr. 4417)

John McArdle, former assistant vice-president, FNBB, reviewed bank records on Overmyer loans and accounts and calculated amounts due on outstanding loans (McArdle, 50 Tr. 5052, 5057)

William T. Smith, attorney, representing Hadar, DHO, ODS, Mr. Overmyer (until February 3, 1982) and ISLI in this proceeding

William G. Pearlstein, former legal assistant at Ropes & Gray, involved in discovery at Weathervane Farms, office of the custodial receiver and office of the United States Attorney for the Southern District of New York (Pearlstein, 55 Tr. 5640–42)

Anne M. Jelson, document examiner (Jelson, 55 Tr. 5689)

Richard L. Levine, former director and counsel of the Executive Office for United States Trustees, Department of Justice, member of the Advisory Committee on Bankruptcy Rules of the Judicial Conference of the United States, chairman of the commercial department of Hill & Barlow, a Boston law firm (Levine, 56 Tr. 5709, 5712, 5718)

The following witnesses' testimony was presented by the defendants through deposition testimony:

Daniel H. Overmyer, intervening plaintiff in this adversary proceeding (see Finding No. 2.3, infra)

Ohio Citizens Trust Company, by Harry G. Hart, vice-president of the business development, commercial division (Hart, 43 Tr. 4112–13)

United States Trust Company, by L. Edward Hemphill, account officer (Hemphill, 43 Tr. 4122)

Chemical Bank, by Robert J. Keenoy, assistant branch manager (Keenoy, 43 Tr. 4131)

Republic National Bank, by Jan Kaplan, legal services coordinator (Republic [Kaplan] Dep., FNBB Ex. 229, p. 3)

Edwin Tornberg & Company, by Edwin J. Tornberg, president (Tornberg, 43 Tr. 4139)

Edmund M. Connery, attorney for the Overmyer organization (Connery, 20 Tr. 1881–84, 23 Tr. 2170, 44 Tr. 4154; see Finding No. 4.4, infra)

Emil Thomas Meissner, former business manager, vice-president and controller of Telecasting (Meissner, 44 Tr. 4187)

Michael J. Carrieri, accountant for the Overmyer organization, former head of cost accounting and controller for other companies (Carrieri, 45 Tr. 4271–85)

Stuart K. Strang, Mr. Overmyer's son-in-law, president of Hadar (Strang, 45 Tr. 4369, 4385; see Finding No. 4.3, infra)

Barbara O. Strang, director and officer of various Overmyer entities (B. Strang, 46 Tr. 4437–40; see Finding No. 4.2, infra)

Products Analysis & Structural Testing, by Lawrence F. Wilson, did work for Hadar at Channel 24 in Toledo (PAST Dep., FNBB Ex. 236, p. 6)

Charles E. Slates, of Slates Electric, Inc., licensed contractor, did work for Hadar at Channel 24 in Toledo (Slates, 46 Tr. 4499–4500)

Ernest E. Rety, former chief engineer, possibly former director of engineering at Telecasting (Rety, 46 Tr. 4512)

William J. Shock, vice-president and general manager of Telecasting (Shock, 46 Tr. 4520)

Arthur M. Dorfner, former president and chief operating officer of Telecasting (Dorfner, 47 Tr. 4549)

Peter H. Starr, former president of RT Systems, former consultant to Overmyer entities (Starr, 47 Tr. 4574–75)

Citicom Radio Corporation, by Wake L. Warthen, treasurer (Warthen, 47 Tr. 4585)

William S. Chi, accountant for the Overmyer organization, former assistant secretary and assistant treasurer of Telecasting (*see* Finding No. 4.5, *infra* )

Hundred East Credit Corporation, by J. Walter Corcoran, president (Corcoran, 48 Tr. 4699)

Hundred East Credit Corporation, by Eugene F. Shaw, director of marketing (Shaw, 48 Tr. 4731)

Weathervane Farms, Inc., by Stuart K. Strang, president (*see* Finding No. 4.3, *infra* )

Russell Morton Brown, attorney (Brown, 48 Tr. 4754–55)

Deauville, NDS and NDS of California, by Andrew C. Edgerton, employee of DHO (Edgerton, 48 Tr. 4786)

Bank of N.T. Butterfield & Son Limited and Bank of Butterfield Executor & Trustee Limited, by Kenneth Wallace Morgan, assistant manager (Morgan, 48 Tr. 4799)

Schiff Terhune, Inc., by Lawrence P. McGartland, senior vice-president and director of the property department (McGartland, 48 Tr. 4808)

Shirley C. Overmyer, wife of Daniel H. Overmyer (S. Overmyer, 49 Tr. 4859; *see* Finding No. 4.1, *infra* )

David A. Raible, executive vice-president of Hadar (Raible, 1 Tr. 94; *see* Finding No. 4.6, *infra* )

The plaintiffs called the following rebuttal witnesses:

Eric A. Hanson, accountant with James D. Miller & Co., reviewed records of Mr. Overmyer's accounts with FNBB (Hanson, 59 Tr. 5961–62)

Frank J. Lake, former banker (commercial lending officer), former treasurer of DHO (Lake, 59 Tr. 6020–23)

Jim T. Nichols, former employee of TOC, member of the committee for cash management decisions for TOC (Nichols, 60 Tr. 6073)

Daniel F. Nosal, real estate appraiser with Appraisal Consultants, Inc. (Nosal, 60 Tr. 6109–10)

Edgar W. Lee, vice-president of KLC, Inc. (leasing corporation) (Lee, 61 Tr. 6170)

## 2. The Parties

**2.1. *Plaintiff, Hadar Leasing International Company, Inc.*** Hadar Leasing International Company, Inc. ("Hadar") is an Ohio corporation (Hadar Certificate of Amendment, Raible Ex. 121), which operates from a suite of offices at 3 Park Avenue, New York, New York. (Raible, 4 Tr. 375) Hadar is a Chapter 11 debtor in this Court, in *In re Hadar Leasing International Co., Inc.,* case number B81–03124. Hadar had previously filed its petition under Chapter 11 in the Southern District of New York on March 27, 1981, which case was subsequently transferred to this Court. (Answer and counterclaims of Telecasting to second amended complaint of Hadar ¶ 2) Hadar changed its name from D.H. Overmyer Trucking Company to Hadar Leasing International Company on May 11, 1977, and then to Hadar Leasing International Company, Inc., on August 10, 1979. (Raible, 4 Tr. 340–41) Hadar is purportedly owned by a trust held for Mr. Overmyer's children, but it is controlled by Mr. Overmyer. (Raible, 6 Tr. 569)

**2.2. *Plaintiff, Intermodal Systems Leasing, Inc.*** Intermodal Systems Leasing, Inc. ("ISLI") was a Delaware corporation which became inoperative according to the laws of the State of Delaware on March 1, 1979. (Connery, 23 Tr. 2212–13; Certificate of Nonexistence, FNBB Ex. 63) ISLI was formerly known as D.H. Overmyer Leasing Co., Inc. (ISLI Certificate, Raible Ex. 183; Connery, 23 Tr. 2212–13, 20 Tr. 1869)

**2.3. *Plaintiff, Daniel H. Overmyer.*** Daniel H. Overmyer is a resident of New York whose personal residence is on Hog

Hill Road, Town of Yorktown, Chappaqua, Westchester County, New York. (D. Overmyer, 43 Tr. 4033; Loan Agreement dated 1/31/71, FNBB Ex. 266) Mr. Overmyer controls all of the other plaintiffs. (Raible, 7 Tr. 623)

2.4. *Plaintiff, D.H. Overmyer Co., Inc. (Ohio).* D.H. Overmyer Co., Inc. (Ohio) ("DHO") is an Ohio corporation, which has, since November 16, 1973, been a debtor-in-possession in a Chapter XI proceeding in the Southern District of New York, *In re D.H. Overmyer Co., Inc. (Consolidated Debtors),* Arrangement No. 73 B 1126–1162, 1175 and 1189. (Complaint in *Herzog v. FNBB,* FNBB Ex. 95; Amended Complaint in *DHO v. FNBB,* FNBB Ex. 96, ¶¶ 1, 2, 5) DHO was originally called D.H. Overmyer Warehouse Company, and was started by Mr. Overmyer as a sole proprietorship on October 1, 1947, in Toledo, Ohio. (D. Overmyer Dep., FNBB Ex. 254, p. 12) D.H. Overmyer Warehouse Company, Inc. was incorporated in 1949 or 1950, and began to operate at more than one location in 1949. (D. Overmyer Dep., FNBB Ex. 224, p. 13) DHO currently leases warehouse space in Los Angeles, Nashville, Baltimore, Rochester and Toledo. (D. Overmyer Dep., FNBB Ex. 224, pp. 6–8)

2.5. *Plaintiff, Overmyer Distribution Services, Inc.* Overmyer Distribution Services, Inc. ("ODS") was a Delaware corporation which became inoperative according to the laws of the State of Delaware on March 1, 1975. (Connery, 23 Tr. 2211–13; Certificate of Nonexistence, FNBB Ex. 64) ODS was incorporated in Delaware in May, 1971, and activated in January, 1972. (Connery, 25 Tr. 2446, 23 Tr. 2211–12) ODS was a marketing company which had subleases of space from DHO. (Connery, 23 Tr. 2212) ODS operated the Overmyer warehouses from January 1, 1972, through November, 1973. (Raible Dep., FNBB Ex. 259, pp. 24, 30–31; Connery, 15 Tr. 1388)

2.6. *Defendant, D.H. Overmyer Telecasting Co., Inc.* D.H. Overmyer Telecasting Co., Inc. ("Telecasting") is an Ohio corporation (Telecasting Articles of Incorporation, Tele Ex. 27) Telecasting is the licen-

see of UHF television station WDHO–TV, Channel 24, in Toledo, Ohio. (3/10/81 Telecasting Schedule, Tele Ex. 17, p. 1) Telecasting has been operating as a debtor-in-possession under Chapter 11 (under Title 11, United States Code) in this Court since February.6, 1981.

2.7. *Defendant, The First National Bank of Boston.* The First National Bank of Boston ("FNBB") is a national banking association having its principal place of business in Boston, Massachusetts. (Loan Agreement dated 1/31/71, FNBB Ex. 266)

2.8. *Defendant, Hundred East Credit Corporation.* Hundred East Credit Corporation ("Hundred East") is a Delaware corporation with its principal place of business in New York, New York. (Hundred East Complaint for Relief from Stay, ¶ 4) Hundred East is a sister company to North American Philips Corporation. (Corcoran Dep., FNBB Ex. 244, p. 4) The business of Hundred East is financing equipment to purchasers under conditional sales contracts or leases. (Corcoran Dep., FNBB Ex. 244, p. 4) Hundred East became involved in three transactions involving equipment to be used at Telecasting's studio and transmitter site in Toledo. (Corcoran Dep., FNBB Ex. 244, p. 7; Lease No. H–1043, Pl. Ex. 38; Lease No. H–1044 (2 versions), Pl. Exs. 39, 40; Lease No. H–1045 (3 versions), Pl. Exs. 41, 42, D. Overmyer Ex. 2; Connery, 20 Tr. 1940)

### 3. *Other Overmyer Companies*

3.1. *The Overmyer Company.* The Overmyer Company ("TOC") is a holding company which holds the stock of DHO and ODS and formerly held the stock of Telecasting. (D. Overmyer Dep., FNBB Ex. 224, p. 5; Loan Agreement, FNBB Ex. 266, ¶ 1.4, p. 3)

3.2. *Jeebs Distribution Services, Inc.* Jeebs Distribution Services, Inc. ("Jeebs") is a New York corporation (Jeebs Certificate of Incorporation, Raible Ex. 500) which operates from a suite of offices on the 29th floor of 3 Park Avenue, New York, New York. (Raible, 5 Tr. 459) The name "Jeebs" is formed from the initials of the first names of Mr. Overmyer's children and

wife: *J*ohn, *E*dward, *E*lizabeth, *B*arbara and *S*hirley. (D. Overmyer, 43 Tr. 4035) The name "Jeebs" was also the name of the Overmyer family dog. (B. Strang Dep., FNBB Ex. 235, pp. 27–28) Jeebs was formed to provide management services for Overmyer companies that were not in Chapter XI. (D. Overmyer, 43 Tr. 4034–35)

3.3. *AGG Projects, Inc.* AGG Projects, Inc. ("AGG") is a New Jersey corporation (AGG Certificate of Incorporation, Raible Ex. 553) which operates from the suite of offices on the 29th floor of 3 Park Avenue. (Raible, 5 Tr. 467) AGG was acquired from a group of medical men in order to obtain additional office space on the 28th floor of 3 Park Avenue. (Raible, 5 Tr. 466–67) Thereafter, AGG took over the service company functions that had been performed by Jeebs. (Raible, 5 Tr. 466)

3.4. *Omega Executive Services, Inc.* Omega Executive Services, Inc. ("Omega") is a Delaware corporation (Omega Certificate of Incorporation, Raible Ex. 579) which operates from the suite of offices on the 29th floor of 3 Park Avenue. (Raible, 5 Tr. 473) Omega took over the service company function from AGG because the Internal Revenue Service put a lien on AGG's bank accounts. (Chi Dep., FNBB Ex. 243, p. 120)

3.5. *Intermodal Terminals, Inc.* Intermodal Terminals, Inc. is the owner of the property on Hog Hill Road, Chappaqua, New York, upon which Mr. and Mrs. Overmyer's residence is located. (D. Overmyer Dep., FNBB Ex. 224, p. 3; S. Overmyer Dep., FNBB Ex. 258, p. 4; Connery, 24 Tr. 2342–43; Deeds to Hog Hill Road Property, FNBB Exs. 86 and 87; Carrieri Dep., FNBB Ex. 233, pp. 51–52) Intermodal Terminals, Inc. is held in trust by the Butterfield Bank. (D. Overmyer Dep., FNBB Ex. 224, p. 3; Raible Dep., FNBB Ex. 259, pp. 46–47)

3.6. *Weathervane Farms, Inc.* Weathervane Farms, Inc. is a Delaware corporation, which changed its name on October 31, 1973, from Formodal, Inc. to Weathervane Farms, Inc. (Weathervane Ex. 1) Formodal, Inc. was incorporated on February 6, 1970. (Weathervane Ex. 1) Weathervane Farms, Inc. is owned by the Barbara Overmyer Strang Trust. (Weathervane Dep., FNBB Ex. 246, p. 13) Weathervane Farms, Inc. operates a farm located on Hog Hill Road in Chappaqua, New York on property which is contiguous to Intermodal Terminals, Inc., and occupied by Mr. Overmyer. (Weathervane Dep., FNBB Ex. 246, pp. 3–4, 28) Weathervane Farms, Inc. stores records for the Overmyer organization. (Weathervane Dep., FNBB Ex. 246, p. 14)

3.7. *Deauville Private Rental Homes, Inc.* Deauville Private Rental Homes, Inc. ("Deauville" pronounced DOUGH-vill) is a Delaware corporation which is controlled by Mr. Overmyer. (Connery, 20 Tr. 1882; B. Strang, 46 Tr. 4439) Deauville was formerly known first as D.H. Overmyer Publishing Co., Inc., and then as Overmyer Europe, Ltd. (Deauville Minute Book, FNBB Ex. 261, p. 8) The president of Deauville is Andrew Edgerton. (3/9/81 and 2/1/80 Deauville Minutes, FNBB Ex. 261) Mr. Edgerton designated by Deauville pursuant to Federal Rule of Civil Procedure 30(b)(6) for a deposition of Deauville, was instructed by his attorney to refuse to answer all questions about Deauville except two, the answers to which were "I don't know." (Deauville/NDS [Edgerton] Dep., FNBB Ex. 252, pp. 35–37)

3.8. *National Distribution Services, Inc.* National Distribution Services, Inc. ("NDS") is a Delaware corporation incorporated on July 6, 1971, to engage in the public warehousing business. (Certificate of Incorporation, NDS Ex. 28; Connery, 15 Tr. 1475) National Distribution Services of California is a subsidiary of NDS formed to operate a warehouse in the Los Angeles area. (9/8/77 NDS Minutes, NDS Ex. 42; NDS Dep., FNBB Ex. 252, pp. 12–13) NDS eventually came to be owned by Price Wilson Limited, which sold it to the Overmyer organization. (Connery, 15 Tr. 1475)

3.9. *Peerless Manufacturing Corporation.* Peerless Manufacturing Corporation ("Peerless") is a Delaware corporation incorporated on September 26, 1977 (Certificate of Incorporation, FNBB Ex. 260, p. 11) with its office at 3 Park Avenue. (9/26/77

Peerless Minutes, FNBB Ex. 260; Connery Dep., FNBB Ex. 231, pp. 69–70) Peerless was formed for the sole purpose of acquiring the assets of the Peerless Division of Dover Corporation. (Connery, 15 Tr. 1474; 9/30/77 Peerless Minutes, FNBB Ex. 260, p. 1) The operating and manufacturing facilities of Peerless were located in Louisville, Kentucky. (Connery Dep., FNBB Ex. 231, p. 70) Peerless manufactured industrial space heaters and fireplace equipment. (D. Overmyer Dep., FNBB Ex. 224, p. 117; Connery Dep., FNBB Ex. 231, p. 69; S. Strang Dep., FNBB Ex. 234, p. 24)

3.10. *RT Systems, Inc.* RT Systems, Inc. ("RT Systems") is a publicly held company that is controlled by Mr. Overmyer. (Raible, 4 Tr. 338; Connery Dep., FNBB Ex. 231, pp. 87–89; Raible Dep., FNBB Ex. 259, pp. 5, 70, 81) The board of directors consists of Mr. Overmyer, Mrs. Overmyer, Mr. Strang and Mr. Raible. (Raible Dep., FNBB Ex. 259, p. 81) Freight Delivery Services of Florida, Inc., T.O.F.C. Terminals, Inc. and RT Leasing, Inc. are subsidiaries of RT Systems. (Raible, 1 Tr. 92)

3.11. *Expediter Warehouse Co.* Expediter Warehouse Co. ("Expediter") is a small public warehouse company which leases from DHO a small amount of space not occupied by Telecasting. (Raible Dep., FNBB Ex. 259, pp. 75–76) Mr. Strang is an officer of Expediter. (Raible Dep., FNBB Ex. 259, p. 76)

3.12. *The Butterfield Bank.* The Bank of Butterfield Executor & Trustee Company Limited is a company incorporated under the laws of the Islands of Bermuda. (Indenture of Settlement, FNBB Ex. 253, Ex. A) The Bank of Butterfield Executor & Trustee Company Limited is a wholly owned subsidiary of the Bank of N.T. Butterfield & Son Limited. (Butterfield Dep., FNBB Ex. 253, p. 3) The Butterfield Bank is a trustee of a trust that Mr. Overmyer created for his children by an Indenture of Settlement dated February 5, 1972. (Butterfield Dep., FNBB Ex. 253, pp. 4, 7; Indenture of Settlement, FNBB Ex. 253, Ex. A) Deauville has maintained a checking account at the Butterfield Bank since No-

vember 7, 1973. (Butterfield Dep., FNBB Ex. 253, p. 23)

3.13. *Directors and Officers of Overmyer Entities.* Attached hereto as "Appendix A" are flow charts showing the tenures of the directors and officers of 12 Overmyer companies, based on the minute books of those companies. (Appendix deleted by publisher) (Telecasting Minute Book, Tele Exs. 28 and 29; Hadar Minute Book, Raible Exs. 13–181; ISLI Minute Book, Raible Exs. 182–372; Jeebs Minute Book, Raible Exs. 500–04 and 506–52; AGG Minute Book, Raible Exs. 553–75; Omega Minute Book, Raible Exs. 576–95; Weathervane Farms, Inc. Minute Book, Weathervane Ex. 1; Deauville Minute Book, FNBB Ex. 261; NDS Minute Book, NDS Exs. 14–74; Peerless Minute Book, FNBB Ex. 260)

## 4. Other Overmyer Persons

4.1. *Shirley C. Overmyer.* Shirley Clark Overmyer is married to Daniel Overmyer and is the mother of Barbara, Elizabeth, John and Edward Overmyer. (S. Overmyer Dep., FNBB Ex. 258, p. 3) Over a period of some 30 years, Mrs. Overmyer has been a director and/or officer of probably all the Overmyer companies. (S. Overmyer Dep., FNBB Ex. 258, p. 17) Mrs. Overmyer served as chairman of the board, chief executive officer and vice-president of finance of Telecasting from February 19, 1981, through March 25, 1981. (2/26/81 Telecasting Minutes, Tele Ex. 29)

4.2. *Barbara O. Strang.* Barbara Overmyer Strang lives on the farm on Hog Hill Road, Westchester County, New York, that is owned by Weathervane Farms, Inc. (B. Strang Dep., FNBB Ex. 235, p. 21) Mrs. Strang is married to Stuart Strang. (B. Strang Dep., FNBB Ex. 235, p. 4) Mrs. Strang has served as a director and officer of Overmyer entities since 1973. (B. Strang Dep., FNBB Ex. 235, pp. 5–30) Mrs. Strang is a director of Hadar. (B. Strang Dep., FNBB Ex. 235, p. 30)

4.3. *Stuart K. Strang.* Stuart K. Strang also lives on the farm owned by Weathervane Farms, Inc. (S. Strang Dep., FNBB Ex. 234, pp. 3–4) Mr. Strang's background includes a high school education, some years

in the army as a private first class, work as a driver/helper for a moving company, work for a builder and a roofing company and work making bicycle seat covers. (S. Strang Dep., FNBB Ex. 234, pp. 4–8) Then Mr. Strang met and married Barbara Overmyer in 1974. (S. Strang Dep., FNBB Ex. 234, p. 9) Subsequently, Mr. Strang became an officer and director of numerous Overmyer companies. (S. Strang Dep., FNBB Ex. 234, pp. 10–29) Mr. Strang is the president of Hadar. (S. Strang Dep., FNBB Ex. 234, p. 40)

4.4. *Edmund M. Connery.* Mr. Connery is an attorney admitted to practice in 1948 in New York. (Connery, 15 Tr. 1388, 20 Tr. 1860) Mr. Connery joined the Overmyer organization in 1964, as an attorney in the employ of DHO, as its general counsel in which his principal responsibilities were real estate and general corporate work. (Connery Dep., FNBB Ex. 231, pp. 7–8) He was also elected secretary of that corporation. (Connery Dep., FNBB Ex. 231, p. 8) When ODS was formed in 1972, Mr. Connery worked for that entity and was on its payroll. (Connery, 15 Tr. 1388) Mr. Connery's affiliation with the Overmyer companies continued until November 16, 1973, when the Chapter XI was filed, at which time he went to work for Mr. Herzog, the receiver of DHO, and subsequently returned to the Overmyer organization in 1974. (Connery, 15 Tr. 1388–89) In December, 1975, Mr. Connery left the Overmyer organization to work for Rockwood Computer Corporation where he did legal work in the real estate area. (Connery, 15 Tr. 1390) Prior to his leaving in 1975, Mr. Connery was general counsel for ISLI. (Connery, 20 Tr. 1869) In August, 1977, Mr. Connery returned to work for Mr. Overmyer at 3 Park Avenue and established himself as an "independent" attorney, because he felt that that would be in his "best interest." (Connery, 15 Tr. 1390) Since that time and to the present, Mr. Connery has done legal work for all of the Overmyer entities at 3 Park Avenue, including legal work for Mr. Overmyer personally. (Connery, 15 Tr. 1390–91) Mr. Connery established his "independent" attorney status under a fee arrangement he entered into in 1977 by which he was initially paid by Jeebs, then AGG and presently Omega (Connery, 15 Tr. 1391), which pays him weekly with two checks (Connery, 20 Tr. 1900). Omega also pays for the salary of Mr. Connery's secretary, his office supplies, rent, phone and malpractice insurance. (Connery, 22 Tr. 2159) Even though Mr. Connery characterizes himself as an "independent" attorney, he nevertheless maintains his office in the same suite of offices occupied by the Overmyer organization. (Connery Dep., FNBB Ex. 231, pp. 21–22) Since 1977, Mr. Connery has done legal work for all of the Overmyer companies at 3 Park Avenue, including the warehouse company, Telecasting, Peerless, NDS, a few entities formed in the television area (Connery, 15 Tr. 1391–92) and RT Systems (Connery, 15 Tr. 1393). Hadar is the only leasing company for which Mr. Connery has performed legal services. (Connery, 15 Tr. 1392)

4.5. *William S. Chi.* William Chi lives in Scarsdale, New York. (Chi Dep., FNBB Ex. 243, p. 3) Mr. Chi works for DHO in the accounting department, and first went to work for Mr. Overmyer in 1967. (Chi Dep., FNBB Ex. 243, pp. 3, 5) Mr. Chi also worked for Telecasting after 1978. (Chi Dep., FNBB Ex. 243, p. 6) Mr. Chi's duties included writing checks for Telecasting, signing leases with Hadar and preparing monthly financial reports. (Chi Dep., FNBB Ex. 243, p. 12) Mr. Chi served as a director of Telecasting from March 20, 1978, through February 19, 1981, and as assistant treasurer from March 20, 1978, through March 25, 1981. (3/20/78 and 2/26/81 Telecasting Minutes, Tele Ex. 29)

4.6. *David A. Raible.* Mr. Raible lives at 292 Lafayette Avenue, Brooklyn, New York. (Raible, 1 Tr. 87) Mr. Raible is a graduate of the Wharton School, University of Pennsylvania. (Raible, 1 Tr. 87) Mr. Raible began employment with the Overmyer organization in July, 1970, as operations manager of the Woodbridge, New Jersey warehouse facility of DHO. (Raible, 1 Tr. 88) Subsequently, he moved to the headquarters offices, then located at 201

East 42nd Street in Manhattan, New York. (Raible, 1 Tr. 88) In February, 1972, he moved to Minnesota where he was the general manager of a warehouse for DHO. (Raible, 1 Tr. 89) Up until 1973, Mr. Raible's experience was in the warehousing business. (Raible, 4 Tr. 327) In November, 1973, he became associated with ISLI. (Raible, 4 Tr. 328, 1 Tr. 90) He ultimately became president of ISLI and was an officer of ISLI from May, 1975, to 1980. (Raible, 1 Tr. 92, 4 Tr. 329–30) In 1974, Mr. Raible began to work for Jeebs. (Raible, 1 Tr. 91) Since sometime in 1976, Mr. Raible has been first vice-president and then executive vice-president of Hadar. (Raible, 4 Tr. 328, 1 Tr. 94–95) Mr. Raible is president of RT Systems and several of the subsidiaries of RT Systems: Freight Delivery Service of Florida, Inc., T.O.F.C. Terminals, Inc. and RT Leasing, Inc. (Raible, 1 Tr. 92) Mr. Raible is also employed by DHO in a general management capacity, although he does not hold a title. (Raible, 1 Tr. 93) He is the president of Jeebs and an officer and director of AGG and Omega. (Raible, 1 Tr. 93–94) He was also an officer and director of Telecasting from 1975 to February 19, 1981. (8/26/75 and 2/26/81 Telecasting Minutes, Tele Ex. 29) Mr. Raible testified truthfully both at trial and in his deposition.

4.7. *Peter M. Lynch.* Peter M. Lynch lives at 139–24 Laurelton Parkway, Rosedale, New York. (Lynch, 16 Tr. 1507) He is employed by AFS International Intercultural Programs, Inc. in New York, New York. (Lynch, 16 Tr. 1507) Mr. Lynch obtained an associate certificate corporate accountant degree in 1964. (Lynch, 16 Tr. 1508) He worked for the Overmyer organization from March, 1970, through August, 1978. (Lynch, 16 Tr. 1509) From 1970 through December, 1973, he worked for DHO, first in the accounting department in charge of the Canadian books, and then in the quote department or operations department. (Lynch, 16 Tr. 1509–10) From 1974 through the latter part of 1976, he worked for Jeebs as an accountant. (Lynch, 16 Tr. 1511) He then worked for Telecasting up through February, 1978. (Lynch, 16 Tr. 1511) From then until he left the Overmyer organization in August, 1978, he worked for AGG. (Lynch, 16 Tr. 1511–12, 1575) In August, 1981, Mr. Lynch was contacted by Mr. Connery and asked to return to the Overmyer organization to create a set of books for Hadar. (Lynch, 16 Tr. 1579–80) He started that assignment on August 11, 1981, working at night and on weekends. (Lynch, 16 Tr. 1579–80)

5. *The FNBB/DHO Term Loans*

5.1. *The Principal and Interest.* Pursuant to a loan agreement dated January 31, 1971, FNBB renewed a 1969 loan of $6,000,-000 to DHO. (Loan Agreement, FNBB Ex. 266, p. 2, ¶ 1.1) This loan was evidenced by a promissory note dated February 16, 1971. (Promissory Note, FNBB Ex. 267) Interest on the loan was agreed on at the rate of one percent above FNBB's prime commercial rate, as long as the loan was not overdue, payable the last day of each month (Loan Agreement, FNBB Ex. 266, p. 2, ¶ 1.1; Promissory Note, FNBB Ex. 267) and three percent above FNBB's prime commercial rate but no less than nine percent on all overdue payments of principal and interest (Promissory Note, FNBB Ex. 267). DHO agreed to repay $150,000 of the principal amount on the first day of each month starting May 1, 1971, and to pay the balance of the principal amount on December 31, 1971. (Loan Agreement, FNBB Ex. 266, p. 2, ¶ 1.1.1)

5.2. *The Pledge of Telecasting Stock.* DHO, TOC and Mr. Overmyer pledged all the stock of Telecasting to FNBB to secure the loan. (Loan Agreement, FNBB Ex. 266, pp. 2–3, ¶¶ 1.2 and 1.3)

5.3. *Cost of Collection.* DHO agreed to pay to FNBB or any other holder the cost of collection, including reasonable attorneys' fees:

The Company (DHO) covenants that if default be made in any payment of the Note, it will pay to the Bank or to any other holder thereof, to the extent permitted under applicable law, such further amount as shall be sufficient to cover the cost and expenses of collection including

reasonable compensation to the attorneys and counsel of the holder thereof for all services rendered in that connection.

(Loan Agreement, Ex. 266, p. 21, ¶ 6.3) The loan agreement provided that it was to be governed by and construed in accordance with Massachusetts law. (Loan Agreement, FNBB Ex. 266, p. 25, ¶ 14)

5.4. *The Guarantee of Payment.* Mr. Overmyer, personally, and TOC guaranteed payment of the loan and performance of all other obligations of DHO (including payment of the cost of collection):

The Individual Guarantor [Mr. Overmyer] and Overmyer [TOC] hereby jointly and severally unconditionally guarantee payment of the Note and the performance of all other obligations of the Company under this Agreement, including any and all renewals, refundings, extensions or modifications of any thereof (all of the aforesaid being hereinafter called the "Obligations"). The Individual Guarantor and Overmyer agree that, without the necessity of any reservation of rights against the Individual Guarantor or Overmyer and without notice to or further assent by the Individual Guarantor or Overmyer:

(a) the covenants and agreements of the Company contained in this Agreement may, from time to time, be amended, modified, waived or terminated;

(b) the Obligations of the Company may, from time to time, in whole or in part, be renewed, extended, modified, accelerated in accordance with the terms thereof, compromised or released by the Bank;

(c) the Bank may exercise or refrain from exercising any right, remedy or power (including, without limitation, any power of sale) in law or in equity or otherwise, with respect to the Obligations or any lien (legal or equitable) held, given or intended to be given therefor; and

(d) any balance or balances of funds with the Bank at any time standing to the credit of the Company may, from time to time, in whole or in part, be surrendered or released by the Bank;

all as the Bank may deem advisable and all without impairing, abridging, releasing or affecting the guarantee provided for herein. The Individual Guarantor and Overmyer waive any and all notice of the creation, renewal or extension of the Obligations and also waive presentment, protest, demand for payment and notice of default. This guarantee is a guarantee of payment and not of collectibility and is in no way conditional or contingent. In the event the Note shall not have been paid in full when due and payable (whether at maturity or by reason of notice given as provided hereunder), the Individual Guarantor and Overmyer will promptly, upon receipt of written or telephone notice from the Bank, pay to the Bank the then remaining balance of the principal amount of the Note, with interest accrued thereon to the date of payment by the Individual Guarantor as shall then be due and payable and unpaid.

(Loan Agreement, FNBB Ex. 266, pp. 4–5, ¶ 2) DHO pledged as additional security $6,000,000 of key-man insurance on the life of Mr. Overmyer. (Loan Agreement, FNBB Ex. 266, pp. 3–4, ¶ 1.4; Overmyer Credit File, Neely Ex. A, p. 12)

5.5. *Ownership of Assets.* DHO, TOC and Mr. Overmyer warranted to FNBB that DHO owned ISLI, Hadar (formerly known as D.H. Overmyer Trucking Co. [Ohio]), D.H. Overmyer Company of Canada, Ltd., D.H. Overmyer Company (Quebec) Ltd. and Overmyer Canada, Ltd., as well as Overmodal Terminals, Inc., Standard Warehouse Co., Inc., Servicenter, Inc., Southwest Warehouse Co., Inc., Wilkinson Storage Corporation, Merchants & Manufacturers Warehouse, Inc., R–T Realty Corp., Freight Delivery Service, Inc. and Overmyer A.G. (Loan Agreement, FNBB Ex. 266, p. 6, ¶ 3.2 and Ex. B) DHO, TOC and Mr. Overmyer agreed:

Neither the Company nor any Subsidiary nor WDHO will sell, lease, or otherwise transfer or dispose of all or any substantial part of its properties or assets, or

consolidate or merge with any other corporation, firm or other entity (other than leases in the ordinary course of business). (Loan Agreement, FNBB Ex. 266, p. 14, ¶ 5.7)

Except with the prior written approval of the Bank, neither the Company nor any Subsidiary nor WDHO shall enter into any transaction whatsoever with D.H. Overmyer, or any member of his family, or any firm, corporation or other entity . . . of which Mr. Overmyer is an officer, director or partner, or in which Mr. Overmyer and members of his family own beneficially 5% or more of the outstanding capital stock.

(Loan Agreement, FNBB Ex. 266, pp. 14–15, ¶ 5.8)

5.6. *Intercompany Indebtedness.* DHO, TOC and Mr. Overmyer warranted to FNBB that the only existing indebtedness of Telecasting as of January 31, 1971, was real estate taxes, accrued wages, accrued federal and state income taxes and trade payables. (Loan Agreement, FNBB Ex. 266, p. 8, ¶ 3.4) TOC and Mr. Overmyer agreed to cause Telecasting to refrain from making any advances or loans to DHO or any subsidiary of DHO or anyone else without FNBB's permission. (Loan Agreement, FNBB Ex. 266, p. 16, ¶ 5.10)

5.7. *Waiver of Notice.* DHO, TOC and Mr. Overmyer waived presentment, demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance or enforcement of the note. (Promissory Note, FNBB Ex. 267) The provision of the loan agreement regarding ten days notice of default related solely to acceleration of the due date of the principal amount of the loan and was optional with FNBB. (Loan Agreement, FNBB Ex. 266, p. 20, ¶ 6.1) This latter provision has no application to any of the events involved in this case.

5.8. *The First Amendment.* By a first amendment to the loan agreement dated June 30, 1971, when DHO borrowed $4,000,-000 from James Talcott, Inc. at an interest rate of seven and one-half percent over prime, FNBB extended the maturity date of the loan from December 31, 1971, to December 31, 1972. (First Amendment to Loan Agreement, FNBB Ex. 268, pp. 1–2, ¶ 1; McArdle, 54 Tr. 5609) Since December 31, 1972, was a Sunday and January 1, 1973, was a holiday, the effective maturity date became January 2, 1973. (McArdle, 51 Tr. 5181–82) Since DHO had made two principal payments of $150,000 each on the February 16, 1971 promissory note (McArdle, 50 Tr. 5073–75; Promissory Note, FNBB Ex. 267), DHO made a new note to FNBB in the principal amount of $5,700,000. (Promissory Note, FNBB Ex. 269) This note also added a floor of seven percent on the interest rate when the loan was not overdue. (Promissory Note, FNBB Ex. 269) In all other respects, the terms remained the same. (*Compare* First Amendment to Loan Agreement and Promissory Note, FNBB Exs. 268–69, *with* Loan Agreement and Promissory Note, FNBB Exs. 266–67) Mr. Overmyer and TOC expressly reaffirmed their guarantees. (First Amendment to Loan Agreement, FNBB Ex. 268, p. 3, ¶ 4)

5.9. *The Additional $500,000 Loan.* Pursuant to a security agreement dated December 8, 1971, FNBB loaned an additional $500,000 to DHO. (Security Agreement, FNBB Ex. 270) This additional loan was evidenced by a promissory note also dated December 8, 1971, and due March 8, 1972, in the principal amount of $500,000. (Promissory Note, FNBB Ex. 271) Like the February 16, 1971 promissory note, this note did not include the floor of seven percent on the interest rate when the loan was not overdue. (Promissory Note, FNBB Ex. 271) Otherwise the terms were the same as those of the $5,700,000 loan. (*Compare* Security Agreement and Promissory Note, FNBB Exs. 270–71, *with* First Amendment to Loan Agreement and Promissory Note, FNBB Exs. 268–69) The security agreement contained a guarantee of payment by Mr. Overmyer and TOC similar to that in the loan agreement:

The Individual Guarantor [Mr. Overmyer] and Overmyer [TOC] hereby jointly and severally unconditionally guarantee payment of the Loan and the interest there-

on, including any and all renewals, refundings, extensions or modifications of any thereof (all of the aforesaid being hereinafter called the "Obligations"). The Individual Gurantor [sic] and Overmyer agree that, without the necessity of any reservation of rights against the Individual Guarantor or Overmyer and without notice to or further assent by the Individual Guarantor or Overmyer:

(a) the Obligations of the Company may, from time to time, in whole or in part, be renewed, extended, modified, accelerated in accordance with the terms thereof, compromised or released by the Bank;

(b) the Bank may exercise or refrain from exercising any right, remedy or power (including, without limitation, any power of sale) in law or in equity or otherwise, with respect to the Obligations or any lien (legal or equitable) held, given or intended to be given therefor; and

(c) any balance or balances of funds with the Bank at any time standing to the credit of the Company may, from time to time, in whole or in part, be surrendered or released by the Bank; all as the Bank may deem advisable and all without impairing, abridging, releasing or affecting the guarantee provided for herein. The Individual Guarantor and Overmyer waive any and all notice of the creation, renewal or extension of the Obligations and also waive presentment, protest, demand for payment and notice of default. This guarantee is a guarantee of payment and not of collectibility and is in no way conditional or contingent. In the event the Loan shall not have been paid in full when due and payable, the Individual Guarantor and Overmyer will promptly, upon receipt of written or telephone notice from the Bank, pay to the Bank the then remaining balance of the principal amount of the Loan, with interest accrued thereon to the date of payment by the Individual Guarantor as shall then be due and payable and unpaid.

(Security Agreement, FNBB Ex. 270, pp. 2–4, ¶ 3)

5.10. *Renewal of the Additional $500,000 Loan.* On March 8, 1972, FNBB renewed the $500,000 term loan to DHO and DHO made a new note extending the maturity date to January 2, 1973. (Promissory Note, FNBB Ex. 272) The March 8, 1972 promissory note established a floor of seven percent on the interest rate when the loan was not overdue. (Promissory Note, FNBB Ex. 272)

5.11. *ODS Guaranty of DHO Obligations.* On May 8, 1973, ODS executed a guaranty of all obligations of DHO to FNBB on a standard FNBB guaranty form. (Guaranty, FNBB Ex. 337) The form included a waiver of suretyship defenses similar to those in the loan agreement and the security agreement:

[E]ach of the undersigned waives presentment, protest, notice of acceptance of this guaranty, notice of any loan made, extension granted or other action taken in reliance hereon and all demands and notices of every kind in connection with this guaranty or the Obligations, assents to any renewals, extension or postponement of the time of payment of any of the Obligations or any other indulgence with respect thereto, regardless of the length and number of such renewals, extensions, postponements or indulgences, to any substitution, exchange or release of collateral therefor and to the addition or release of any other person primarily or secondarily liable thereon; and agrees to the provisions of any instrument, security or other writing evidencing any of the obligations. Failure of the Bank in any one instance to make any demand or otherwise to proceed against any or all of the undersigned shall not constitute a waiver of the Bank's right to proceed in respect to any or all other defaults by the Obligor. The undersigned shall not assert any right arising from payment or other performance hereunder until all of the Obligations shall have been fulfilled.

(Guaranty, FNBB Ex. 337, ¶ 2) In addition, ODS agreed to pay all costs of collecting

DHO's obligations to FNBB, including reasonable attorneys' fees:

> The undersigned, jointly and severally, guaranty to the Bank the payment of any and all expenses paid or incurred by the Bank (including reasonable attorneys' fees) in connection with the collection of all sums and Obligations guarantied hereunder, whether such collection be from the Obligor or from one or more of the undersigned.

(Guaranty, FNBB Ex. 337, ¶ 3B) The guaranty provided that it was to be governed by Massachusetts law. (Guaranty, FNBB Ex. 337, ¶ 5)

5.12. *The Pledge of $2.9 Million of Telecasting Payables.* In the late summer of 1973, FNBB received some Telecasting financials and discovered that Telecasting was carrying approximately $2.9 million of intercompany payables on its books in violation of either paragraph 3.4 or paragraph 5.10 of the January 31, 1971 loan agreement. (Neely Dep., Pl. Ex. 133, pp. 161–63) Mr. Neely told Mr. Overmyer that FNBB wanted these payables assigned as additional collateral and Mr. Overmyer agreed. (Neely Dep., Pl. Ex. 133, p. 163) As a result, on September 17, 1973, Mr. Overmyer, Telecasting, ODS, DHO, TOC, ISLI, D.H. Overmyer Communications Co., Inc. (an Ohio corporation) and D.H. Overmyer Communications Co., Inc. (a Delaware corporation) assigned to FNBB a total of $2,912,012.41 of payables supposedly due from Telecasting to the other six corporations. (9/17/73 Letter, Pl. Ex. 143) As agreed in the assignment (9/17/73 Letter, Pl. Ex. 143, p. 2), five of the six payee corporations had the payable reduced to a negotiable promissory note, and assigned and delivered the note to FNBB. (Promissory Notes, FNBB Exs. 339–343) For some unexplained reason, the note to ISLI was for $36.26 more than the amount of the assigned payable, and the note to DHO was for $76,258.16 less than the amount of the assigned payable. (*Compare* Promissory Notes, FNBB Exs. 340, 343, *with* 9/17/73 Letter, Pl. Ex. 143, p. 1) No note was assigned by ODS. (*Compare* Promissory Notes, FNBB Exs. 339–43, *with* 9/17/73

Letter, Pl. Ex. 143, p. 1) Corporate authorizations were delivered to FNBB by each corporation except ODS. (Corporate Authorizations, FNBB Exs. 344–49) The pledge agreement provided: "The pledges by the present guarantors shall secure the respective guaranties of such guarantors." (9/17/73 Letter, Pl. Ex. 143, p. 2) The "present guarantors" included TOC and Mr. Overmyer (9/17/73 Letter, Pl. Ex. 143, p. 2; Loan Agreement, FNBB Ex. 266, pp. 4–5, ¶ 2; First Amendment to Loan Agreement, FNBB Ex. 268, p. 3, ¶ 4; Security Agreement, FNBB Ex. 270, pp. 2–4, ¶ 3); their "pledges" included the stock of Telecasting (Loan Agreement, FNBB Ex. 266, p. 3, ¶ 1.3; Security Agreement, FNBB Ex. 270, p. 2, ¶ 2); and their "guaranties" included guaranties of the obligations of ODS, including the assigned accounts loan and the overdraft. (Guaranties, FNBB Exs. 323–24)

5.13. *Payments.* From August, 1971, through February, 1973, DHO made 19 payments on the $5,700,000 promissory note, reducing the principal amount due on that note to $2,850,000. (Promissory Note, FNBB Ex. 269; McArdle, 50 Tr. 5085–87, 5095) In accordance with the normal procedure of FNBB, each payment was written on the back of the note. Each time a payment was made, the principal amount shown on the front of the note was reduced. (McArdle, 50 Tr. 5073–74, 5085–87; Promissory Note, FNBB Ex. 269) DHO made no payments on the $500,000 promissory note. (McArdle, 51 Tr. 5172; *cf.* Promissory Note, FNBB Ex. 272)

5.14. *Compensating Balances.* As additional consideration for the various loans, DHO, from time to time, agreed to maintain compensating balances on deposit in its commercial accounts at FNBB, and agreed to pay various amounts to FNBB as compensation when it failed to maintain the agreed balances. (Letters and Memorandum, FNBB Exs. 363–70; Lake, 59 Tr. 6034) In particular, DHO agreed on February 16, 1971, in connection with the loan agreement of that date, to maintain compensating balances of at least $1,000,000. (2/16/71 Letter, FNBB Ex. 367)

5.15. *Management Fee.* On February 16, 1971, DHO agreed to pay quarterly to FNBB a management fee at the annual rate of $100,000, as additional compensation for services to be rendered under the loan agreement of that date. (2/16/71 Letter, FNBB Ex. 367) At least one such quarterly payment was actually made by DHO. (FNBB Response to DHO/ODS/ISLI Request for Admission No. 28)

5.16. *Demand for Payment.* On May 2, 1974, FNBB made demand on DHO, TOC and Mr. Overmyer for payment of the term loans. (5/2/74 Letters, FNBB Exs. 273–74) On November 26, 1975, FNBB made demand on ODS for payment of the term loans. (11/26/75 Letter, FNBB Ex. 359)

5.17. *Amount Due on Term Loan.* As of March 31, 1982, the amount due on the two outstanding term loans, including $3,350,-000.00 principal and $8,373,754.53 interest, was $11,723,754.53. (Computer Printout, FNBB Ex. 275, p. 9; Chart, FNBB Ex. 362; McArdle, 51 Tr. 5178–79) The correctness of this figure is buttressed by the fact that although he could have calculated the amount due on the term loan, Mr. Hanson, plaintiffs' accounting expert, never did so and was never asked to do so. (Hanson, 59 Tr. 6014–15) In a report to Mr. Overmyer as president of DHO, Mr. Hanson stated: "Based on our initial review, we conclude that the bank has sufficient documentation to support the unpaid principal balance of the loan made to D.H. Overmyer Co., Ohio of $3,350,000." (1/20/81 Letter, FNBB Ex. 441, p. 1) Calculation of the amount due, starting from the $3,350,000 principal amount, is a matter of arithmetic. (McArdle, 51 Tr. 5188–89; Computer Printout, FNBB Ex. 275)

6. *The Overmyer Lockbox Systems*

6.1. *General Description of a Lockbox System.* A lockbox system consists of one or more post office boxes (or "lockboxes") in one or more cities to which a company directs some or all of its customers to mail their payments and to which it gives one or more banks direct access in order to speed the collection of the company's receivables. (McArdle, 52 Tr. 5258–60) The first step in setting up a lockbox system is a study of the company's customer base to determine from where the customers will be mailing the checks, together with the use of studies by Phoenix Hoecht of mail times from one city to another to determine how many lockboxes and what cities will produce fastest receipt of customers' checks at reasonable cost. (McArdle, 52 Tr. 5258–59) The company then enters into an agreement with a bank in each chosen city, authorizing that bank to receive and process the checks sent to the post office box, and describing what the bank is to do with the contents of each envelope. (McArdle, 52 Tr. 5259) The company also sends each postmaster a letter authorizing the postal service to permit the bank in question to have access to the post office box. (McArdle, 52 Tr. 5259–60) Thereafter, the company directs its customers to send all payments to the proper lockbox, generally by sending them return envelopes addressed to the company at that post office box address, alternatively by simply indicating that that is the address to which to mail payments. (McArdle, 52 Tr. 5260) Several times each day, employees of each bank pick up the mail, remove and photocopy the enclosed checks, immediately deposit those checks to the company's account and mail the photocopies of the checks and whatever else is in the envelopes to the company for processing by its accounting department. (McArdle, 52 Tr. 5261; *see* Lake, 59 Tr. 6055) A lockbox system saves a company several days on its collections over the time it would take for all customer checks to be mailed to the company's offices, the accounting department to process the payments, and the checks then to be deposited into the bank either by mail or by messenger. (McArdle, 52 Tr. 5261–63) The Overmyer organization set up a lockbox system so that its collection department would be able to check on the speed of collections and work on any problems. (D. Overmyer Rule XI–4 Testimony, FNBB Ex. 440, pp. 216–17)

6.2. *The DHO Lockbox System.* In July, 1969, DHO established a lockbox system in four cities: Boston, Atlanta, St.

Louis and Los Angeles. (McArdle, 52 Tr. 5264–65; Chart, FNBB Ex. 290) DHO, through its treasurer, Mr. Lake, duly authorized FNBB, Trust Company of Georgia, The First National Bank in St. Louis and Crocker Citizens National Bank to service the lockboxes, and duly authorized the postmaster in each city to permit the bank in that city to have access to the post office box in question. (Authorization Letters, FNBB Exs. 291–298) As of that time, the DHO lockbox system consisted of Post Office Box 3110 in Boston, Post Office Box 50010 in Atlanta, Post Office Box 14303 in St. Louis and Post Office Box 60945 in Los Angeles. (Authorization Letters, FNBB Exs. 291–298; Chart, FNBB Ex. 290; McArdle, 52 Tr. 5265) In October, 1971, DHO authorized FNBB to operate (and the postmaster to permit FNBB access to) a second post office box in Boston (number 3304) as part of its lockbox system. (Authorization Letters, FNBB Exs. 303–04; McArdle, 52 Tr. 5282) On April 1, 1972, the number of the DHO lockbox in Los Angeles was changed from 60945 to 80142. (3/20/72 Letter, FNBB Ex. 319; McArdle, 52 Tr. 5291–92)

6.3. *Transfer of Collections to FNBB.* At the inception of the DHO lockbox system, the regional lockbox banks in Atlanta, St. Louis and Los Angeles transferred collections made through the regional lockboxes to FNBB by wire transfer on a daily basis. (McArdle, 52 Tr. 5266, 5273) Each day, FNBB deposited the money that was transferred, as well as the collections made through the Boxton lockbox, to DHO mother account number 517–4187 at FNBB. (McArdle, 52 Tr. 5265–66) In May, 1971, DHO changed to the use of a depository transfer system. (McArdle, 52 Tr. 5273) Each regional lockbox bank supplied to FNBB depository transfer checks drawn on DHO's account at that regional bank and with the payee printed right onto the check as "The First National Bank of Boston for the credit of D.H. Overmyer Co., Inc." (McArdle, 52 Tr. 5275; Depository Transfer Check, FNBB Ex. 299) Each day, FNBB learned by telephone precisely how much was available in DHO's account at each regional bank, an FNBB employee filled out a depository transfer check for precisely that amount, and the depository transfer check was deposited to DHO's account at FNBB and collected in the same manner as an ordinary check through the Federal Reserve System. (McArdle, 52 Tr. 5274–78) On May 11, 1971, by letter and vote of the board of directors, DHO authorized each of the regional lockbox banks to honor the depository transfer checks, even though the only signature they bore was "D.H. Overmyer Co., Inc." pre-printed onto the check. (Authorizations, FNBB Exs. 300–02) The advantage of the depository transfer system was that it permitted DHO to play the "float," since the same money would be carried as a balance both in DHO's account at FNBB and in DHO's account at the regional bank until the depository transfer check cleared. (McArdle, 52 Tr. 5278) In this way, DHO could use the same money both to offset the regional banks' charges for the lockbox service and the charges by FNBB (such as the compensating balance requirement). (McArdle, 52 Tr. 5278–79) Starting in November, 1971, collections effected through the DHO lockbox system were deposited to DHO mother account number 526–1722 at FNBB, rather than the old mother account number 517–4187. (McArdle, 52 Tr. 5282; 11/8/71 Memorandum, FNBB Ex. 305)

6.4. *The ODS Lockbox System.* In December, 1971, ODS established a lockbox system with the same four banks as DHO, consisting of two lockboxes in Boston (Post Office Boxes Nos. 3307 and 3308), one in Atlanta (Post Office Box No. 102058), one in St. Louis (Post Office Box No. 14635) and one in Los Angeles (Post Office Box No. 54837). (McArdle, 52 Tr. 5285–86; Chart, FNBB Ex. 306) In each case, ODS duly authorized the relevant bank to service the lockbox, and duly authorized the relevant postmaster to permit that bank to have access to it. (Authorizations, FNBB Exs. 307–18) On April 1, 1972, the number of the ODS lockbox in Los Angeles was changed from 54837 to 80083. (3/23/72 Letter, FNBB Ex. 320; McArdle, 52 Tr.

5292) When the ODS lockbox system first began to operate, collections by the regional banks were transferred daily to FNBB by depository transfer check and deposited into ODS mother account number 524–9890. (McArdle, 52 Tr. 5286–870)

### 7. The Overmyer Zero Balance Disbursement Systems

7.1. *General Description of a Zero Balance Disbursement System.* A zero balance disbursement system consists of one or more commercial checking accounts called zero balance accounts and a commercial checking account called the mother account. (Chart, FNBB Ex. 276; McArdle, 51 Tr. 5206–07) All deposits are made to the mother account. (McArdle, 51 Tr. 5206–07) The zero balance accounts should never have positive balances. (McArdle, 51 Tr. 5207) When checks are written on the zero balance accounts, the bank, as authorized by the customer, clears them, thereby creating overdrafts, and each day automatically transfers from the mother account to each zero balance account the exact amount necessary to cover the overdraft and return the balance to zero, hence the name "zero balance account." (McArdle, 51 Tr. 5206–08) Checks can also be written on the mother account or not, as the customer chooses. (McArdle, 51 Tr. 5207–08) The advantage of a zero balance disbursement system is that it permits the company's treasurer to segregate various categories of expense by using a separate account to pay each, while at the same time giving him the ease of not having to transfer money constantly from one account to another and having only one account balance about which to worry. (McArdle, 51 Tr. 5206–07)

7.2. *The First DHO Zero Balance Disbursement System.* On September 19, 1969, the first Overmyer zero balance disbursement system was opened at FNBB with DHO special account number 517–4187 as the mother account and DHO payroll account number 514–6112 as the zero balance account. (McArdle, 51 Tr. 5209; Chart, FNBB Ex. 277) On August 5, 1969, DHO had authorized FNBB to pay checks on DHO payroll account number 514–6112,

thereby creating overdrafts, and automatically to transfer sufficient funds to cover the overdrafts out of DHO special account number 517–4187. (FNBB Ex. 280) In March, 1970, DHO opened a new payroll account number 479–4300 as a second zero balance account feeding from special account number 517–4187, and then in April, 1970, closed payroll account number 514–6112. (McArdle, 51 Tr. 5210; 3/9/70 Memorandum, FNBB Ex. 281; Chart, FNBB Ex. 277)

7.3. *The Second DHO Zero Balance Disbursement System.* In November, 1971, at DHO's request, a second DHO zero balance disbursement system was opened to replace the first one with a new DHO account number 526–1722 as the mother account, and with the existing zero balance DHO payroll account number 479–4300 as one of the zero balance accounts in the new system, and a new DHO freight account number 526–7318 as the other. (11/8/71 Memoranda, FNBB Exs. 283–84; Chart, FNBB Ex. 282; McArdle, 51 Tr. 5215)

7.4. *The ODS Zero Balance Disbursement System.* In November, 1971, ODS authorized a zero balance disbursement system at FNBB to begin in January, 1972, with ODS account number 524–9890 as the mother account and ODS payroll account number 524–4877 and ODS casual payroll account number 524–5878 as the zero balance accounts. (McArdle, 51 Tr. 5218–19; 11/12/71 Authorization Letter, FNBB Ex. 286; 12/21/71 Memorandum, FNBB Ex. 287; Chart, FNBB Ex. 285)

7.5. *The Combined Overmyer Zero Balance Disbursement System.* In August, 1972, the Overmyer organization opened a zero balance disbursement system at FNBB that, from time to time, included accounts of ODS, DHO, TOC, Telecasting and D.H. Overmyer Co., Inc. (Florida), a subsidiary of DHO. (McArdle, 51 Tr. 5221–24; Chart, FNBB Exs. 288A–C) As established in August, 1972, and formally authorized on August 15, 1972, this zero balance disbursement system had ODS treasurer's account number 529–1308 as the mother account and seven zero balance accounts: ODS

account number 524–9890 (the former ODS mother account), ODS payroll account number 524–4877 and ODS casual payroll account number 524–5878 (the former ODS zero balance accounts), DHO account number 526–1722 (the second DHO mother account), DHO special account number 517–4187 (the first DHO zero balance account), DHO payroll account number 479–4300 (a zero balance account in both DHO systems) and D.H. Overmyer Co., Inc. (Florida), account number 522–1768. (McArdle, 51 Tr. 5222–23; 8/15/72 Authorization, FNBB Ex. 278; 8/15/72 ODS Minutes, FNBB Ex. 279; 8/2/72 Letter, FNBB Ex. 334; Chart, FNBB Exs. 288A–C) By authorization of January 18, 1973, the Overmyer organization added four more zero balance accounts to the system: ODS payroll account number 438–9200, DHO payroll account number 506–4450, Telecasting payroll account number 506–6435 and TOC payroll account number 503–3005. (McArdle, 51 Tr. 5223–24; 1/18/73 Authorization, FNBB Ex. 289; Chart, FNBB Exs. 288A–C) Thereafter, the Overmyer organization closed DHO special account number 517–4187, DHO payroll account number 479–4300, D.H. Overmyer Co., Inc. (Florida) account number 522–1768 and TOC payroll account number 503–3005. (McArdle, 51 Tr. 5224; Chart, FNBB Exs. 288A–C)

### 8. The FNBB/ODS Assigned Accounts Loan

8.1. *The Principal and Interest.* Pursuant to a loan and security agreement dated May 26, 1972, FNBB agreed to make a demand loan to ODS of either $1,500,000 or an amount equal to 80 percent of ODS's 60-day accounts receivable, whichever was less. (Loan and Security Agreement, FNBB Ex. 321, p. 1, §§ 1.6 and 1.7) Interest on the loan was agreed on at a rate of two percent above FNBB's base (or prime) rate and, in addition, a service charge of $1,250.00 per month was agreed on. (Loan and Security Agreement, FNBB Ex. 321, p. 2, §§ 5.2 and 5.3)

8.2. *The Security and FNBB's Rights with Respect Thereto.* ODS assigned to FNBB "[a]s security for the payment and performance of all liabilities" all its accounts receivable then in existence or thereafter arising. (Loan and Security Agreement, FNBB Ex. 321, p. 2, § 7.1[a]) By a separate security agreement of the same date, DHO pledged to FNBB, as additional security for the loan to ODS, $927,162.69 of its accounts receivable, all of which arose before January 1, 1972, when ODS began operations, and all of which were, therefore, already more than 120 days old. (Security Agreement, FNBB Ex. 322, pp. 1, 4; McArdle, 53 Tr. 5311) Section 8 of the loan and security agreement provided for ODS to continue to collect its accounts, but to hold the proceeds in trust for FNBB and to turn them over to FNBB immediately:

> Until the Bank requests that debtors on accounts receivable of the Borrower be notified of the Bank's security interest the Borrower shall continue to collect them. In this event the Borrower shall hold the proceeds received from collection in trust for the Bank without commingling the same with other funds of the Borrower and shall turn the same over to the Bank, or to such other bank as may be approved by the Bank, immediately upon receipt in the identical form received.

(Loan and Security Agreement, FNBB Ex. 321, p. 3, § 8; *see also* Security Agreement, FNBB Ex. 322, p. 2, § 3) Section 8 also gave FNBB the right to notify ODS's customers of the assignment:

> The Borrower shall at the request of the Bank notify the account debtors of the security interest of the Bank in any account and the Bank may itself at any time so notify account debtors.

(Loan and Security Agreement, FNBB Ex. 321, p. 3, § 8; *see also* Security Agreement, FNBB Ex. 322, p. 2, § 3) In addition, section 10.2 gave FNBB the right to collect or sell the ODS receivables with or without notice to ODS:

> Insofar as collateral shall consist of accounts receivable . . . . the Bank may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose or realize

upon collateral as the Bank may determine, whether or not liabilities or collateral are then due and for the purpose of realizing the Bank's rights therein, the Bank may receive, open and dispose of mail addressed to the Borrower and endorse notes, checks, drafts, money orders, documents of title or other evidences of payment, shipment or storage or any form of collateral on behalf of and in the name of the Borrower.

(Loan and Security Agreement, FNBB Ex. 321, p. 3, § 10.2; *see also* Security Agreement, FNBB Ex. 322, p. 3, § 6)

8.3. *Cost of Collection.* ODS also agreed to pay the cost of collection, including reasonable attorneys' fees:

The Borrower shall pay to the Bank on demand any and all expenses, including reasonable counsel fees, incurred or paid by the Bank in protecting or enforcing its rights upon or under liabilities or collateral.

(Loan and Security Agreement, FNBB Ex. 321, p. 4, § 13) The loan and security agreement provided that it was to be governed in all respects by Massachusetts law. (Loan and Security Agreement, FNBB Ex. 321, p. 4, § 14)

8.4. *Application of Proceeds of Collection or Sale of Receivables.* The loan and security agreement permitted FNBB to apply the proceeds of collection or sale of the receivables to whatever obligations of ODS it chose, including overdrafts:

After deducting all of said expenses [of collection] the residue of any proceeds of collection or sale of liabilities or collateral shall be applied to the payment of principal or interest on liabilities in such order of preference as the Bank may determine, proper allowance for interest on liabilities not then due being made, and any excess shall be returned to the Borrower and the Borrower shall remain liable for any deficiency.

(Loan and Security Agreement, FNBB Ex. 321, p. 4, § 13)

"Liabilities" means any and all liabilities of the Borrower to the Bank of every kind and description, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument.

(Loan and Security Agreement, FNBB Ex. 321, p. 1, § 1.1)

8.5. *Statements of Account.* The loan and security agreement provided for FNBB to render to ODS a monthly statement of account, and provided that it became conclusively binding unless objected to within 30 days:

At least once each month the Bank shall render a statement of account for the Borrower's Loan Account which statement shall be considered correct and accepted by the Borrower and conclusively binding upon the Borrower unless it notifies the Bank to the contrary within thirty (30) days of the sending of said statement by the Bank to the Borrower.

(Loan and Security Agreement, FNBB Ex. 321, p. 2, § 3.1)

8.6. *Guaranties of ODS Obligations.* On the day the loan and security agreement was executed, Mr. Overmyer and TOC executed guaranties of all obligations of ODS on the same FNBB form that was used for the ODS guaranty of the obligations of DHO. (Guaranties, FNBB Exs. 323–24; *see* Requested Finding No. 511, *supra*)

8.7. *The Mechanics of the Assigned Accounts Loan.* On May 26, 1972, Mr. Connery, acting on behalf of ODS, authorized FNBB to deposit the $1,500,000 proceeds of the assigned accounts to the ODS bank account at FNBB (*i.e.* ODS account number 524–9890, the ODS mother account). (Authorization, FNBB Ex. 325) On May 31, 1972, five days later, Mr. Lake, on behalf of ODS, requested that each day FNBB automatically advance to ODS and deposit to ODS account number 524–9890 the exact amount of receivables collected that day, so that the loan balance would remain steady at $1,500,000. (5/31/72 Letter, FNBB Ex. 326; McArdle, 53 Tr. 5319)

8.8. *The Agency Account System.* In order to effectuate the provision of section 8 of the loan and security agreement that ODS would hold collections in trust and pay them over to ODS, on May 26, 1972, ODS and FNBB entered into an agency account agreement with each of the regional lockbox banks. (Agency Account Agreements, FNBB Exs. 327–29) Although the copies of these agreements that are in evidence are unexecuted, the agreements were in fact executed. (Agency Account Agreement Amendments, FNBB Exs. 330–32, 1st sentence; *see* McArdle, 53 Tr. 5327–28) The effect of the agency account agreements was to require the regional lockbox banks to deposit the proceeds collected through the regional ODS lockboxes into agency accounts, *i.e.* accounts of ODS as agent for FNBB, so that the money could be withdrawn only by or with the permission of FNBB. (Agency Account Agreements, FNBB Exs. 327–29, pp. 1 and 2, ¶¶ 1 and 2; McArdle, 53 Tr. 5320–23)

> Funds on deposit in the Agency Account may be withdrawn only by, and shall be the property of, the Bank and funds in or credits to the Agency Account shall be transferred to the Bank by wire or otherwise as the Bank may direct.

(Agency Account Agreements, FNBB Exs. 327–29, p. 2, ¶ 1) Use of an agency account system is a standard banking procedure for policing an assigned accounts loan. (McArdle, 53 Tr. 5323)

8.9. *Initial Operation of the Assigned Accounts Loan.* Starting May 26, 1972, the proceeds of all the ODS and DHO lockboxes went to the Factoring Division of FNBB where they were applied to reduce the principal amount of the loan. The Factoring Division then re-advanced the same amount to bring the loan back to $1,500,000, and deposited that amount into the ODS mother account number 524–9890. (McArdle, 52 Tr. 5297–98, 53 Tr. 5330–31; 5/31/72 Letter, FNBB Ex. 326) None of the collections were deposited to the DHO mother account number 526–1722, and as a result DHO account number 526–1722 became overdrawn. (McArdle, 53 Tr. 5331) In order to correct this situation, the combined Over-

myer zero balance disbursement system was established in August, 1972. (McArdle, 53 Tr. 5329–30) At about the same time, on July 18, 1972, the agency account agreements were amended to add DHO as a party, direct the deposit of DHO collections into the agency accounts and authorize the use of depository transfer checks to transfer collections to FNBB. (Agency Account Agreement Amendments, FNBB Exs. 330–32) Starting in August, 1972, the proceeds collected through all of the ODS and DHO lockboxes each day were directed to the Factoring Division of FNBB where they were applied to reduce the ODS assigned accounts loan. The Factoring Division then reestablished the loan by depositing a like amount into the combined mother account, ODS treasurer's account number 529–1308, and that mother account fed zero balance accounts operated by DHO, ODS, D.H. Overmyer Co., Inc. (Florida), TOC and Telecasting. (McArdle, 53 Tr. 5332–33; Combination of Charts, [left to right] FNBB Exs. 306, 290, 333, 288A, 288B and 288C)

8.10. *The Additional Advance of $1,500,-000 on the Assigned Accounts Loan.* On August 31, 1972, at the request of Mr. Overmyer, Mr. Neely of FNBB agreed to advance to ODS on the assigned accounts loan an additional $1,500,000 to clean up an overdraft on the ODS books for the ODS audit, and then reduce the loan back to $1,500,000 by applying against it the first $1,500,000 of receivables collected in September and not readvancing the funds to the ODS mother account. (Neely Dep., Pl. Ex. 133, pp. 98–100 and Ex. H; Responses to Requests of DHO/ODS/ISLI for Admissions from FNBB Nos., 53–54)

8.11. *Increase of the Assigned Accounts Loan to $1,650,000.* On May 21, 1973, at the request of ODS, Mr. Neely agreed to increase the amount of the assigned accounts loan to $1,650,000. (McArdle, 53 Tr. 5337–41; 5/21/73 Memorandum, FNBB Ex. 335; Account Status Report, FNBB Ex. 336)

8.12. *Demand for Payment.* On November 26, 1975, FNBB made demand on TOC, ODS and Mr. Overmyer with copies to DHO

for payment of the assigned accounts loan. (11/26/75 Letters, FNBB Exs. 359–61)

8.13. *Amount Due on Assigned Accounts Loan.* During November, 1973, FNBB applied collections of ODS and DHO receivables against the assigned accounts loan until it was reduced to $81,777.68. (McArdle, 53 Tr. 5392–93; 11/73 Statement of Account, FNBB Ex. 356) FNBB was under no obligation to reduce the amount of the assigned accounts loan further, or even to have reduced it at all. (Loan and Security Agreement, FNBB Ex. 321, p. 4, § 13) Statements of Account showing the $81,-777.68 figure were rendered to ODS, and ODS never notified FNBB of any alleged error in the figure. (McArdle, 53 Tr. 5356–63; Statements of Account, FNBB Exs. 351, 356, 357; Pearlstein, 55 Tr. 5660–63) Pursuant to the terms of the loan and security agreement, the $81,777.68 figure became binding on ODS. (Loan and Security Agreement, FNBB Ex. 321, p. 2, § 3.1) Moreover, the notations on the original of the November, 1973 statement of account sent to ODS and copied during discovery at the Weathervane Farms barn show that the Overmyer accounting department reconciled the amounts of the collections to the Overmyer books. (11/73 Statement of Account, FNBB Ex. 357, pp. 2–3; McArdle, 53 Tr. 5394–97; Pearlstein, 55 Tr. 5660–63; *see also* Handwritten Note, FNBB Ex. 418, p. 2) Starting from the principal balance of $81,777.68 on January 1, 1974, and applying the terms of the assigned accounts loan (a matter of arithmetic), the amount due on the assigned accounts loan as of March 31, 1982, was $171,947.76. (Computer Printout, FNBB Ex. 350, p. 6; Chart, FNBB Ex. 362; McArdle, 53 Tr. 5369)

9. *The ODS Overdraft*

9.1. *The Creation of the Overdraft.* The combined Overmyer mother account, ODS treasurer's account number 529–1308, was consistently overdrawn by amounts ranging up to about $1,000,000 from August, 1972, through August, 1973. (Neely Dep., Pl. Ex. 133, pp. 84–86, 101–04, 108 and Exs. I and J; Connery, 24 Tr. 2350–53; 11/29/73 Overmyer Testimony, FNBB Ex. 440, pp. 234–35; Lake, 59 Tr. 6056–57) Every couple days Mr. Neely called Mr. Overmyer and told him to reduce the overdraft. Each time Mr. Overmyer said that he would. (Neely Dep., Pl. Ex. 133, p. 92)

9.2. *Interest on the ODS Overdraft.* On August 28, 1973, Mr. Santarelli of FNBB wrote to Mr. Lake of the Overmyer organization and informed him that although FNBB had been charging six percent flat interest on the overdraft, thereafter it would charge the base (or prime) rate plus one percent with a floor of six percent. (8/28/73 Letter, FNBB Ex. 338) Thereafter, FNBB charged prime plus one percent, and ODS never complained about the increase in the charge. (McArdle, 53 Tr. 5345–47, 54 Tr. 5600) Moreover, the Overmyer organization voluntarily continued to write checks that caused overdrafts and increased the overdraft on ODS treasurer's account number 529–1308 from $1,122,-390.40 on August 31, 1973, to $3,981,385.15 on November 30, 1973. (McArdle, 53 Tr. 5347–49; Lake, 59 Tr. 6059–60) The conduct of ODS constituted an acceptance of the terms set forth in Mr. Santarelli's August 28, 1973 letter, and rendered that letter a written contract.

9.3. *Demand for Payment.* On November 26, 1975, FNBB made demand on TOC, ODS and Mr. Overmyer with copies to DHO for payment of the overdraft on ODS treasurer's account number 529–1308. (11/26/75 Letters, FNBB Exs. 359–61).

9.4. *Amount Due on Overdraft.* After DHO filed a Chapter XI petition in the Southern District of New York on November 16, 1973, FNBB began on November 23, 1973, to apply all collections of ODS and DHO receivables to reduce the overdraft on the combined Overmyer mother account. (McArdle, 53 Tr. 5381, 5387–89, 5393) For several months, a group of persons under the supervision of an FNBB consultant, Mr. Ralph Todd, worked to effect collection of the ODS and DHO receivables. (McArdle, 53 Tr. 5388–89) In mid 1974, FNBB engaged a company owned by Mr. George Friedlander, First Exeter Corporation, to try to collect those accounts that remained

open. (McArdle, 53 Tr. 5389; 9/12/74 Agreement, FNBB Ex. 355) Mr. McArdle used as an opening principal balance an overdraft of $3,981,385.15 as of November 30, 1973, which he took directly from the monthly bank statement for ODS Treasurer's account number 529–1308. (McArdle, 53 Tr. 5371–72; Computer Printout, FNBB Ex. 352, p. 7; 11/30/72 Bank Statement, FNBB Ex. 353) The Overmyer organization received these bank statements monthly (Bank Statements, FNBB Ex. 394; Pearlstein, 55 Tr. 5664–65) and reconciled them to the Overmyer books through at least October 31, 1973. (Status of Bank Reconciliations, FNBB Ex. 72, pp. 3, 5, FNBB Ex. 417, pp. 2, 4; Pearlstein, 55 Tr. 5684–85) Mr. McArdle took all interest and principal payments from the bank statements and checked all entries after January 1, 1974, against basic documentation kept by FNBB. (McArdle, 53 Tr. 5379–82) FNBB and the DHO receiver, Mr. Herzog, did not keep basic support from November 16, 1973, through December 31, 1973. (McArdle, 53 Tr. 5381–82) Any items after January 1, 1974, for which Mr. McArdle could not find support he resolved in favor of the Overmyer organization, and any items he found wrong he corrected. (McArdle, 53 Tr. 5382–83) In addition, the figures were reconciled by FNBB with the DHO receiver in 1974. (McArdle, 53 Tr. 5382) After giving credit for all collections and applying the prime plus one percent interest rate, the amount due on the overdraft as of March 31, 1982, was $6,230,742.07. (Computer Printout, FNBB Ex. 352, p. 27; Chart, FNBB Ex. 362; McArdle 53 Tr. 5397)

### 10. Miscellaneous Overmyer Contentions

10.1. *Stock Warrant Agreement.* FNBB sought to receive warrants for 100,000 shares of TOC stock. (Response to Request of DHO/ODS/ISLI for Admissions from FNBB No. 41) On October 13, 1969, TOC sent to FNBB a letter drafted by FNBB's counsel agreeing to issue common stock purchase warrants for the right to purchase up to 100,000 shares of TOC common stock for $7.50 per share, expiring December 31, 1974. (Overmyer Ex. 7, pp. 8–

10) There is no evidence that such warrants were ever issued.

10.2. *Executor of Mr. Overmyer's Will.* There is no evidence that FNBB required Mr. Overmyer to appoint the Old Colony Division executor of his will as a condition for extending credit. There is no evidence even that Mr. Overmyer appointed the Old Colony Division his executor.

10.3. *Collection of Telecasting Receivables Through the DHO Lockbox System.* Some Telecasting receipts were collected through the lockbox at The First National Bank in St. Louis. (McArdle, 53 Tr. 5466) These Telecasting receipts were transferred to FNBB and applied in the same manner as any other receipts, *i.e.* after May 26, 1972, they were used to pay down the ODS assigned accounts loan. (McArdle, 54 Tr. 5488–89) FNBB did not see the checks collected through the St. Louis lockbox, did not receive copies of the items that were deposited in St. Louis and did not find out about the Telecasting receipts being part of what was collected there until after the Warehouse XI was filed. (McArdle, 53 Tr. 5467, 54 Tr. 5491–92) In any event, on July 10, 1970, the board of directors of Telecasting had authorized The First National Bank in St. Louis to deposit Telecasting checks that were mailed to the DHO St. Louis lockbox number 14303 into the DHO account, the proceeds of which were transferred daily to Boston. (7/10/70 Minutes, Tele. Ex. 28; 8/13/70 Authorization Letter, FNBB Ex. 371) Telecasting checks were mailed to the DHO St. Louis lockbox number 14303 only because Telecasting instructed its customers to mail them there. (Dorfner Dep., FNBB Ex. 240, pp. 13–16; *see* McArdle, 52 Tr. 5260)

10.4. *Dishonoring of Overmyer Checks.* In October and November, 1973, FNBB began to dishonor Overmyer checks that created overdrafts on the combined Overmyer mother account, ODS treasurer's account number 529–1308. (Responses to Requests of DHO/ODS/ISLI for Admissions from FNBB Nos. 68 and 75) The Overmyer organization submitted to Mr. Todd, a con-

sultant for FNBB, lists of checks that they thought it was very important to pay. (Todd Dep., Pl. Ex. 140B, pp. 72–73, 76, 80; Overmyer Dep., Pl. Ex. 139B, pp. 155–57) Mr. Todd discussed the list with Mr. Kirby of the Overmyer organization. (11/29/73 Overmyer Testimony, FNBB Ex. 440, p. 236; Overmyer Dep., Pl. Ex. 139B, p. 175) Mr. Todd had FNBB dishonor some checks that had already been mailed out before his approval was sought. (Overmyer Dep., Pl. Ex. 139B, pp. 168–70) There is no evidence that he ever approved a check and later caused FNBB to dishonor it.

10.5. *Inequitable Conduct.* There is no evidence that FNBB ever engaged in any conduct with respect to the Overmyer organization that would make it inequitable for FNBB to collect the Overmyer obligations in full or would provide the Overmyer organization with any manner of defense, setoff, counterclaim or other claim. It was the opinion of both Mr. Lake, a banker and former Overmyer treasurer, and Mr. McArdle, a former FNBB assistant vice-president, that although a comprehensive banking arrangement with all the various terms that existed between FNBB and the Overmyer organization is not an everyday arrangement, there is nothing objectionable about it if FNBB and the customer agree to it. (Lake, 59 Tr. 6040–44; McArdle, 54 Tr. 5582–88) With a treasurer of Mr. Lake's education and banking experience (Lake, 59 Tr. 6020–24), and with Mr. Overmyer's experience as the owner of a national bank (D. Overmyer Dep., FNBB Ex. 224, p. 86; D. Overmyer Financial Statements, U.S. Trust Ex. 1, pp. 16, 18) and an offshore bank (Overmyer Organization Chart, Connery Ex. 8), the Overmyer organization obviously had a full and complete understanding of the nature of the banking arrangements it agreed to with FNBB.

10.6. *Precipitating Cause of the Warehouse XI.* From 1967 through 1973, DHO sold and leased back almost all of its warehouse facilities. (Connery, 24 Tr. 2344–45) The substantial proceeds of the sale and lease backs were used to cover the deficit created by the operations of the company. (Connery, 24 Tr. 2345–47) In late 1973, DHO ran out of properties to sell and lease back, and the other operations of the company were unable to produce enough cash to support the Overmyer operations. (Connery, 24 Tr. 2346) As a result, DHO and 37 of its subsidiaries filed a Chapter XI petition in the Southern District of New York on November 16, 1973 (the "Warehouse XI").

11. *Admission of the Amount Due*

11.1. *Admission by the Overmyer Accountants.* During discovery, counsel for FNBB found and copied at the office of the United States Attorney for the Southern District of New York a handwritten note from Mr. Joseph Abrams ("Joe A."), an Overmyer accountant (4/19/74 Overmyer Letter, FNBB Ex. 420, p. 2), to Mr. Bernard Gutilla ("Bernie"), the Overmyer controller (Connery, 24 Tr. 2295–96; Lynch, 17 Tr. 1658; 4/19/74 Overmyer Letter, FNBB Ex. 420, p. 2), stating that the debt due from DHO and ODS to FNBB as of February, 1974, exclusive of interest, was $7,038,-359.80, plus $81,777.68 for the assigned accounts loan, a total of $7,120,137.48. (Handwritten Note, FNBB Ex. 418; Pearlstein, 55 Tr. 5684–88) The $81,777.68 is the same figure used by Mr. McArdle in calculating the amount due on the assigned accounts loan. (Computer Printout, FNBB Ex. 350, p. 1; McArdle, 53 Tr. 5355) The $7,038,359.80 consisted of $3,350,000 due on the term loans, plus $2,500,000 transferred by FNBB from the overdraft to the assigned accounts loan on December 31, 1973, for internal accounting purposes, plus $1,038,359.80 overdraft as shown by the bank statement for ODS treasurer's account number 529–1308, plus $150,000 due on receiver's certificates. (Handwritten Note, FNBB Ex. 418, p. 2; *see* McArdle, 53 Tr. 5386–87) The $3,350,000 was the principal balance used by Mr. McArdle in calculating the amount due on the term loans, after adjustment for the two $150,000 payments made in 1973. (Computer Printout, FNBB Ex. 275, p. 2; McArdle, 51 Tr. 5182, 5185) The overdraft figures are from the same set of bank statements that Mr. McArdle used. (McArdle, 53 Tr. 5380–81)

11.2. *Admission by Mr. Overmyer.* In sworn testimony before the United States Bankruptcy Court for the Southern District of New York on November 29, 1973, 13 days after the Warehouse XI was filed, Mr. Overmyer admitted that the principal amount due on the term loan was about $3,200,000, that the principal amount due on the assigned accounts loan was $1,650,000, that there was a very large overdraft, and that the total amount owed by the Overmyer organization to FNBB was approximately $7,000,000 or $8,000,000. (11/29/73 Overmyer Testimony, FNBB Ex. 440, pp. 212, 216, 230–32, 234–38)

12. *The 1973 Fraudulent Conveyances*

12.1. *Transfer of ISLI, Hadar and Canadian Operations.* Sometime after August 13, 1973, Mr. Overmyer and Mr. Connery transferred ISLI, Hadar, D.H. Overmyer Company of Canada Limited, D.H. Overmyer Company (Quebec) Ltd. and Overmyer Canada, Ltd., and the other nine corporations named in Finding No. 5.5., *supra,* first from DHO to TOC, then from TOC to Mr. Overmyer, and then from Mr. Overmyer to a trust for his children of which the trustee was The Bank of Butterfield Executor & Trustee Company Limited in Hamilton, Bermuda (the "Bermuda Trust"), and created back dated minutes of DHO and TOC purporting to show that the transfer was made on February 8, 1972. (*Compare* 2/8/72 DHO Minutes, FNBB Ex. 73, *and* 2/8/72 TOC Minutes, FNBB Ex. 74, *with* 8/13/73 DHO Minutes, FNBB Ex. 78) The DHO minute book contains numerous minutes dated after February 8, 1972, agreeing to guarantee obligations of one or another of the subsidiary corporations purportedly transferred to the Bermuda Trust on that day. (11/2/72 DHO Minutes, FNBB Ex. 76; 3/27/73 DHO Minutes, FNBB Ex. 77; 8/13/73 DHO Minutes, FNBB Ex. 78) It also contains numerous minutes after that date expressly referring to one or another of the purportedly transferred companies as a "subsidiary" of DHO. (3/23/72 DHO Minutes, FNBB Ex. 79, p. 2; 9/6/72 DHO Minutes, FNBB Ex. 80, p. 2; 10/20/72 DHO Minutes, FNBB Ex. 81, p. 2; 4/20/73 DHO Minutes, FNBB Ex. 82, pp. 2, 5; 1/22/73 DHO Minutes, FNBB Ex. 83, pp. 2, 3, 4, 5, 6) A June 1, 1972, Overmyer organization chart shows every company that was purportedly transferred from DHO to TOC to Mr. Overmyer to the Bermuda Trust on February 8, 1972, as still being owned by either DHO or TOC on June 1, 1972. (*Compare* Organization Chart, Raible Ex. 5, Connery Ex. 8, *with* 2/8/72 DHO Minutes, FNBB Ex. 73) Mr. Connery's explanation that the June 1, 1972 organization chart was inaccurate when it was made because it was prepared for internal Overmyer use only (Connery Dep., Ex. 231, p. 198) is not credible. The ISLI minute book contains minutes of a January 22, 1973 meeting of the board of directors in which there is a reference to "its [ISLI's] parent company, D.H. Overmyer Co., Inc. (Ohio)." (1/22/73 ISLI Minutes, Raible Ex. 323, pp. 2, 5) Both these minutes and the January 22, 1973 DHO minutes include a secretary's certificate signed by Mr. Connery, stating the parent-subsidiary relationship. (1/22/73 ISLI Minutes, Raible Ex. 323, p. 5; 1/22/73 DHO Minutes, FNBB Ex. 83, pp. 5, 6) The waiver of notice for the April 18, 1972 annual meeting of stockholders in the ISLI minute book shows DHO as the stockholder. (4/18/72 ISLI Waiver of Notice, Raible Ex. 304) The corresponding document for ISLI for 1973 is missing from the ISLI minute book, and the corresponding documents for Hadar for both 1972 and 1973 are missing from the Hadar minute book. (*Cf.* ISLI Minute Book for April, 1973, between Raible Exs. 325–326; 4/18/72 Hadar Minutes, Raible Exs. 117–18; Hadar Minute Book for April, 1973, between Raible Exs. 120–21) ISLI stock certificate number 4 in the ISLI minute book was issued to DHO on February 16, 1972, eight days after the purported transfer to the Bermuda Trust. (Stock Certificate No. 4, Raible Ex. 372) Although the deed of addition adding to the Bermuda Trust the companies purportedly transferred by DHO on February 8, 1972, is dated April 14, 1972, the Bermuda treasury stamp affixed to it is dated December 10, 1973. (Deed of Addition, Butterfield Dep., FNBB Ex. 253, pp. 4, 9–10, Ex. D, p. 1) Mr.

Overmyer's testimony that the transfer to the Bermuda Trust occurred in 1971 or 1972 (D. Overmyer Dep., FNBB Ex. 224, p. 24) and Mr. Connery's testimony that the transfer was made in February, 1972 (Connery, 24 Tr. 2303, 2312–13) are not credible. The minute book of TOC contains an action by consent of the sole shareholder, Mr. Overmyer, dated February 9, 1972, agreeing that the price for the transfer of ISLI, Hadar and the various other companies to Mr. Overmyer was to be a note for $182,000 from Mr. Overmyer to TOC, with $35,000 payable on or before July 15, 1973, and the balance on February 8, 1977, with seven percent interest. (2/9/72 TOC Minutes, FNBB Ex. 85) Mr. Overmyer had never paid the note (D. Overmyer Dep., FNBB Ex. 224, p. 28), although TOC has been a debtor-in-possession under Chapter XI since December 15, 1975. (Application, FNBB Ex. 430) Mr. Overmyer and Mr. Connery transferred ISLI, Hadar, the Canadian operations and the other companies to the Bermuda Trust for an inadequate consideration and with deliberate, actual intent to hinder, delay and defraud FNBB in collection of the obligations of TOC, DHO, ODS and Mr. Overmyer. Regardless of when it occurred, the transfer violated paragraphs 5.7 and 5.8 of the loan agreement. (Loan Agreement, FNBB Ex. 266, pp. 14–15, ¶¶ 5.7 and 5.8)

12.2. *Transfer of Intermodal Terminals, Inc.* The TOC minute book contains an action by consent of the sole shareholder, Mr. Overmyer, dated February 8, 1972, purporting to transfer all the stock of Intermodal Terminals, Inc. to Mr. Overmyer in exchange for a release of $167,630.64 of notes payable to Mr. and Mrs. Overmyer, a release of TOC's guarantee of those notes and payment by Mr. Overmyer to TOC of $50,-000, plus seven percent interest, no later than July 31, 1973. (2/8/72 TOC Minutes, FNBB Ex. 84) Since the transfer of Intermodal Terminals, Inc. was made at the same time as the transfer of ISLI, Hadar and the other companies (Connery, 24 Tr. 2332), the minutes transferring Intermodal Terminals, Inc. are also back dated. By two deeds dated February 7, 1972, Mr. Ov-

ermyer (in one deed) and Mr. and Mrs. Overmyer (in the other) conveyed two parcels of land in Yorktown, New York, to Intermodal Terminals, Inc. for $10.00 each. (Deeds, FNBB Exs. 86–87) The real estate conveyed by the deeds is Mr. Overmyer's residence. (Connery, 24 Tr. 2342–43) One of these deeds was recorded on August 16, 1973 (Deed, FNBB Ex. 87, p. 3), and the other on September 27, 1973 (Deed, FNBB Ex. 86, p. 4). These deeds were also back dated. The stock of Intermodal Terminals, Inc. was transferred to the Bermuda Trust by the same deed of addition as the stock of ISLI and Hadar—the deed of addition that was purportedly made on April 14, 1972, even though the Bermuda treasury stamp is dated December 10, 1973. (Deed of Addition, Butterfield Dep., FNBB Ex. 253, pp. 4, 9–10, Ex. D, p. 1) Mr. Overmyer and Mr. Connery transferred the Overmyer residence to Intermodal Terminals, Inc., and transferred Intermodal Terminals, Inc. to the Bermuda Trust for nominal consideration and with deliberate, actual intent to hinder, delay and defraud FNBB in collection of the obligations of TOC, DHO, ODS and Mr. Overmyer.

12.3. *The Transfers of Weathervane Farms, Inc. and Deauville Private Rental Homes, Inc.* Mrs. Overmyer purportedly purchased all the stock of Formodal, Inc. and Overmyer Europe Ltd. from Mr. Overmyer on May 26, 1973. (Deauville Stock Certificate No. 3, Deauville Minute Book, FNBB Ex. 261; Weathervane Stock Certificate No. 3, Weathervane Minute Book, Weathervane Ex. 1) May 26 is Mrs. Overmyer's birthday. (Insurance Application, Schiff Terhune Ex. 4, p. 2) On May 29, 1973, Mrs. Overmyer purportedly donated 20 percent of the stock of each corporation to the corporation, the corporation purportedly resold the 20 percent to the Harrison M. Overmyer Trust for $100,000, and Mrs. Overmyer purportedly transferred the remaining 80 percent to the Barbara M. Overmyer (now Barbara Overmyer Strang) Trust. (5/29/73 Weathervane Minutes, Weathervane Ex. 1; 5/29/73 Deauville Minutes, FNBB Ex. 261; Deauville Stock

Certificates Nos. 4 [indicating issuance to Shirley C. Overmyer] and 5, Deauville Minute Book, FNBB Ex. 261; Organization Chart, Connery Ex. 7) Mrs. Overmyer's checks, however, although dated May 26, 1973, bear on front and back stamps with the date "101573" and "15 OCT," indicating that they were not deposited until October 15, 1973. (Checks, Deauville Minute Book, FNBB Ex. 261, pp. 97–98; Weathervane Minute Book, Weathervane Ex. 1, pp. 54–55 and following Stock Certificate No. 2) The fact that the documentation for the transfers of Weathervane Farms, Inc. and Deauville Private Rental Homes, Inc. was back dated is conclusively shown by a confidential memorandum from Mr. Connery to Mr. Overmyer dated September 25, 1973:

> Shirley needs to purchase the capital stock of Formodal, Inc. from you. 100 shares par value at $10 per share—$1,000
>
> She also needs to purchase all the capital stock of Overmyer Europe Ltd. formerly the Overmyer Publishing Company now named Deauville Private Rental Homes Inc. Have her make two checks payable to you in the amount of $1,000 each and indicate on the reverse side the following:
>
> On reverse side of first check:
>
> To purchase all of the outstanding capital stock of Overmyer Europe Ltd., formerly D.H. Overmyer Publishing Co. Inc.
>
> On reverse side of second check:
>
> To purchase all of the outstanding capital stock of Formodal Inc.
>
> The checks should be made payable to you and endorsed by you for deposit to the Ohio company with instructions to Accounting that the appropriate cash receipt should be credited through your personal drawing account.

(9/25/73 Memorandum, Weathervane Minute Book, Weathervane Ex. 1, p. 53; Deauville Minute Book, FNBB Ex. 261, p. 96) On October 31, 1973, Mr. Connery, using his home address rather than his office address, effected a change of name of Overmyer Europe, Ltd. to Deauville Private Rental Homes, Inc., and a change of name of For-modal, Inc. to Weathervane Farms, Inc. (11/2/73, 10/5/73 and 10/30/73 Letters, 10/31/73 Certificate, Deauville Minute Book, FNBB Ex. 261, pp. 40, 42, 47, 53–56; 10/31/73 Certificate, 11/2/73 and 10/5/73 Letters, Weathervane Minute Book, Weathervane Ex. 1, pp. 3–6, 18, 20) Mr. Overmyer and Mr. Connery transferred Weathervane Farms, Inc. and Deauville Private Rental Homes, Inc. to the Harrison M. Overmyer Trust and the Barbara M. Overmyer (Strang) Trust with deliberate, actual intent to hinder, delay and defraud FNBB in the collection of the obligations of TOC, DHO, ODS and Mr. Overmyer.

13. *The Pre-1976 ISLI–Telecasting Leases*

13.1. *Leasing Pattern Established.* In 1966, Telecasting commenced a pattern of leasing its equipment from D.H. Overmyer Leasing Co., Inc., which subsequently changed its name to Intermodal Systems Leasing, Inc. ("ISLI"). (Raible, 9 Tr. 796) Telecasting leased virtually all of its telecasting equipment from ISLI. (Raible, 3 Tr. 205) Mr. Overmyer directed that this leasing pattern be established. (Raible, 9 Tr. 796) ISLI leased equipment primarily to DHO and Telecasting. (Raible, 3 Tr. 204–05) Telecasting leased both its equipment and the land in Jerusalem Township upon which its transmitter and tower are located from ISLI. (Raible, 3 Tr. 205; ISLI Transmitter Lease, Pl. Exs. 1A and 1B; ISLI Equipment Leases, FNBB Ex. 105–40)

13.2. *Rental, Renewal and Purchase Option Terms of ISLI Leases.* Under the terms of the leases between Telecasting and ISLI, there was a substantial reduction in the amount of monthly rent at the termination of the initial lease period. (Raible, 10 Tr. 891–92; H. Klein, 29 Tr. 2764–67; 11/73 ISLI Memo, FNBB Ex. 10; 7/13/71 ISLI Memo, Raible Ex. 607) ISLI maintained a renewal and purchase option policy which provided that a lease covering equipment would be renewed for an initial 36-month period at a price of ten percent of the equipment cost; if the equipment was costly, such as a transmitter or antenna, for a second 36-month renewal period at five percent of the equipment cost; and at the end

of the last renewal period, for a purchase option at one dollar per lease. (H. Klein, 28 Tr. 2751, 29 Tr. 2764–65; 11/73 ISLI Memo, FNBB Ex. 10; *see* 4/28/77 Unsigned Raible Letter to Dorfner, FNBB Ex. 391)

13.3. *Renewal Leases with ISLI.* ISLI maintained control over the leases with Telecasting by using inventory cards. (9/12/73 Memo Cohen to Dorfner with Photocopies of Inventory Cards, FNBB Ex. 141) Leases that expired between September, 1971, and August 31, 1973, were either renewed or had purchase options exercised. (9/12/73 Memo, FNBB Ex. 141) Renewal terms or purchase options for these expired leases were indicated in red on photocopies of the inventory cards. (9/12/73 Memo, FNBB Ex. 141; H. Klein, 28 Tr. 2731–32) The renewal terms and purchase options, as stipulated on the inventory cards, were based on the renewal policy of ISLI. (H. Klein, 28 Tr. 2746–47, 29 Tr. 2764–67)

13.4. *Telecasting's Monthly Rental on Equipment Leases as of December, 1975.* Telecasting was paying ISLI in December, 1975, $13,534.56 per month for all of the equipment that Telecasting was leasing from ISLI. (H. Klein, 28 Tr. 2755–57) This amount included $582.82 of sales tax resulting in a net rental of $12,951.74. (H. Klein, 28 Tr. 2756) This rental payment had remained unchanged since 1974. (H. Klein, 28 Tr. 2756) Although changes in lease terms had occurred since 1974, no adjustments to the amount invoiced by ISLI were ever made. (H. Klein, 28 Tr. 2757) Based on an analysis prepared by Mr. Howard Klein, the monthly rentals on the equipment leases with ISLI in force as of December, 1975, should have been $12,277.77. (H. Klein, 28 Tr. 2754; Summary of Lease H–1002, FNBB Ex. 101) The $12,277.77 computed by Mr. Klein was based on the monthly rentals from leases and renewals that were substantiated by documentation from Telecasting's files. (H. Klein, 28 Tr. 2749) There was a difference of approximately $700 between the ISLI invoiced amount and the amount computed by Mr. Klein. (H. Klein, 28 Tr. 2756) The difference was caused by the fact that ISLI did not adjust its monthly rental amount between November, 1974, and December, 1975. (H. Klein, 28 Tr. 2757)

13.5. *Recomputed Monthly Rental Based on ISLI's Renewal and Purchase Option Policy.* ISLI discontinued the practice of revising the monthly rental to Telecasting on leased equipment in November, 1974. (H. Klein, 28 Tr. 2756) Mr. Klein prepared an analysis indicating that, if ISLI's renewal and purchase option policy had been continued, only six leases would still have been outstanding on December 31, 1976, since the terms of the ISLI leases were beginning to expire and the one dollar purchase options were becoming available. (Analysis of Lease Renewals, FNBB Ex. 102) Mr. Klein computed Telecasting's monthly rental at $8,662.85 as of January 1, 1976, if ISLI had continued to apply its renewal and purchase option policy to the leases. (Summary of Lease H–1002, FNBB Ex. 101; H. Klein, 28 Tr. 2749–52, 2754)' Mr. Klein extended his analysis to July 1, 1976, and December 31, 1976, resulting in monthly rentals of $2,503.48 and $1,935.81, respectively. (H. Klein, 28 Tr. 2754; Analysis of Lease Renewals, FNBB Ex. 102)

14. *The Original Service Company*

14.1. *Creation of Jeebs.* On March 8, 1974, Mr. Connery formed a new corporation for Mr. Overmyer, Jeebs Distribution Services, Inc. (Connery, 22 Tr. 2164–65; 3/8/74 Jeebs Waiver of Notice of First Meeting, Raible Ex. 503; 3/8/74 Jeebs Minutes of Meeting of Incorporators, Raible Ex. 506, p. 1; 3/8/74 Jeebs Filing Receipt, Raible Ex. 500, p. 5) So eager was Mr. Overmyer to get the new enterprise off the ground, that he had already opened its first bank account at Manufacturers Hanover Trust Company on February 28, 1974. (2/28/74 Jeebs Banking Resolution, Raible Ex. 507, p. 4)

14.2. *The Service Company Function.* Jeebs was formed to provide management services to the Overmyer companies that were not in Chapter XI. (D. Overmyer, 43 Tr. 4034–35; Raible Dep., Ex. 259, pp. 62–64) Jeebs entered into a service agreement to provide tax, accounting, insurance and

administrative services to Telecasting for $1,500.00 per month on March 1, 1974, a week before Jeebs even existed. (*Compare* 3/1/74 Telecasting Minutes, Tele Ex. 29, pp. 3–4; *with* 3/8/74 Jeebs Waiver of Notice of First Meeting, Raible Ex. 503; 3/8/74 Jeebs Minutes of Meeting of Incorporators, Raible Ex. 506, p. 1; *and* 3/8/74 Jeebs Filing Receipt, Raible Ex. 500, p. 5) On September 5, 1974, an FNBB credit officer examined the books of Telecasting and learned that $576.00 per week was being paid to Mr. Overmyer as salary, and $1,500.00 per month was being paid to Jeebs, neither of which provided any services. (9/5/74 Memo, Pl. Ex. 146)

14.3. *ISLI Lease Payments Made To Jeebs.* Starting at least as early as 1975, Mr. Overmyer directed that Telecasting make lease payments to Jeebs rather than ISLI. (H. Klein, 36 Tr. 3420–21; Raible, 10 Tr. 907–11) A number of Telecasting voucher requests record directions to pay money to Jeebs on account of lease obligations. (H. Klein, 38 Tr. 3557–59; ISLI Mailgrams, FNBB Exs. 14–15; Invoices to Telecasting and Telecasting Voucher Requests, FNBB Exs. 216 and 217)

### 15. Dilatory Bankruptcy Tactics In 1975–1976

15.1. *TOC XI Filed To Frustrate FNBB's Collection Efforts.* In an attempt to realize upon its collateral, FNBB gave notice of its intention to sell all of the outstanding capital stock of Telecasting at an auction sale scheduled for December 17, 1975. (Notice of Auction Sale, FNBB Ex. 430, p. 3) In order to block this foreclosure, on December 15, 1975, TOC, a holding company without any active operations for cash flow (Complaint, FNBB Ex. 432; D. Overmyer Affidavit, FNBB Ex. 438, p. 5, ¶ 14), filed a petition in the Bankruptcy Court for the Southern District of New York for an arrangement pursuant to Chapter XI of the Bankruptcy Act ("TOC XI"). (Application for Injunction, FNBB Ex. 430; D. Overmyer, 57 Tr. 5886–87) TOC and its chief executive officer, Mr. Overmyer, thereby sought and obtained an order from the Bankruptcy Court enjoining that sale. (12/15/75 Order, FNBB Ex. 430, p. 4)

15.2. *Telecasting XI Filed To Frustrate FNBB Efforts To Preserve Station Assets.* After its attempt to sell Telecasting's stock was frustrated by the TOC XI, FNBB prosecuted an action commenced in the Court of Common Pleas of Lucas County, Ohio, in which it sought to have a receiver appointed to take over the operations of Telecasting and to remove them from Mr. Overmyer's control. (D. Overmyer Affidavit, Exhibit to Telecasting Chapter XI Petition, FNBB Ex. 431) Following an extensive and protracted trial, Common Pleas Judge Robert Franklin announced he was persuaded that the appointment of a receiver was warranted, and that he intended to order such relief. (Application, Exhibit to Telecasting Chapter XI Petition, FNBB Ex. 431) Thereupon, on August 24, 1976, Mr. Overmyer caused Telecasting, then an allegedly solvent and successful company, to file a petition in the Bankruptcy Court for the Southern District of New York for an arrangement under ,Chapter XI of the Bankruptcy Act ("Telecasting XI"). (Original Petition, FNBB Ex. 431) This petition was filed to divest the Ohio Court of Common Pleas of jurisdiction and to frustrate its decision to appoint a receiver to protect Telecasting's assets. (Original Petition with Exhibits, FNBB Ex. 431)

### 16. Assignment if ISLI Leases To Hadar

16.1. *The Assignment.* An agreement dated December 8, 1975, transferred from ISLI to D. H. Overmyer Trucking Company, which later changed its name to Hadar, 30 equipment leases between Telecasting and ISLI. (Raible, 3 Tr. 205–07; 12/8/75 Agreement, Pl. Ex. 48) These leases covered substantially all of the broadcasting and studio equipment used by Telecasting as of December, 1975. (Raible, 4 Tr. 350–51) The assignment of the ISLI leases to Hadar was ordered by Mr. Overmyer. (Raible, 4 Tr. 345) ISLI assigned the 30 leases to Hadar when Hadar was an inactive company with no significant assets. (Raible, 4 Tr. 348) The assignment provided for no security interest to ISLI in case of default by Hadar. (12/8/75 Agreement, Pl. Ex. 48)

Telecasting was never given the opportunity to purchase the 30 leases from ISLI. (Raible, 4 Tr. 345–46, 352)

16.2. *Assignment Price.* ISLI sold and assigned its 30 leases with Telecasting to Hadar for $466,000 payable on an installment basis over three years. (12/8/75 Agreement, Pl. Ex. 48) Hadar rewrote these 30 leases as a single lease, lease ML–2, and charged Telecasting $16,790.40 per month over the same three-year period, a total of $604,454. (H. Klein, 29 Tr. 2806–08) At all times during this three-year period, Telecasting's $16,790.40 monthly payment to Hadar exceeded Hadar's agreed payment to ISLI. (H. Klein, 29 Tr. 2813) At the end of the three-year period, Telecasting had paid approximately $140,000 more to Hadar than Hadar was purportedly obligated to pay to ISLI. (H. Klein, 29 Tr. 2813–14) However, Hadar never made a payment to ISLI during this three-year period or thereafter through March 31, 1981. (H. Klein, 29 Tr. 2812; Raible, 4 Tr. 350, 352) Hadar's amended schedules, filed November 23, 1981, show a claim of $335,698 by ISLI against Hadar based on the assignment. (Raible, 11 Tr. 1039; 12 Tr. 1061)

16.3. *Transmitter Site Lease Not Assigned.* The ISLI lease of the transmitter site was not the subject of any assignment from ISLI to Hadar. (Raible, 12 Tr. 1128, 9 Tr. 854–55) On its books, Hadar allocated the full $466,000 purchase price to equipment. (Lynch, 17 Tr. 1650–1651) Mr. Lynch did not allocate any portion of the purchase price to real estate. (Lynch 17 Tr. 1651) He recorded payments with respect to the transmitter site as if ISLI still owned the property. (Lynch, 17 Tr. 1651)

16.4. *The Back Dating of the Assignment.* The agreement assigning the ISLI leases to Hadar, which was "made as of December 8, 1975" (one week *before* the TOC XI was filed [12/15/75 Temporary Restraining Order, FNBB Ex. 430, p. 4] ), refers to a promissory note "of even date" payable to ISLI. (12/9/75 Agreement, Pl. Ex. 48, p. 1) The promissory note, however, is dated "August 25, 1976," (8/25/76 Promissory Note, Pl. Ex. 48A), one day *after* the

Telecasting XI was filed (Petition, FNBB Ex. 431, p. 2). Mr. Dorfner, president of Telecasting, was not even informed that an assignment was to be made until April, 1976, when he was sent a letter that was back dated to December 8, 1975. (12/8/75 Letter Time-stamped 4/23/76, Raible Ex. 606) Throughout the first eight months of 1976, Telecasting continued to make lease payments instead to Jeebs. (Lynch, 16 Tr. 1594–95; Raible, 6 Tr. 501–02) Payments to Jeebs made by Telecasting from January through August, 1976, with certain exceptions, were for the leases that had purportedly already been assigned to Hadar. (H. Klein, 38 Tr. 3555–59) On January 9, 1976, for example, Mr. Overmyer ordered Telecasting: "Want you to wire $5,000 to Jeebs today.... 'charge any account you want.' " (1/9/76 Telecasting Voucher Request, FNBB Ex. 216; H. Klein, 38 Tr. 3558) Telecasting's payments to Jeebs during the period September, 1975, to March, 1976, were recorded on Jeebs' books as being made on behalf of ISLI rather than Hadar. (H. Klein, 37 Tr. 3451, 38 Tr. 3560–61) ISLI sent Telecasting invoices for the ISLI leases right through July, 1976. (7/1/76 ISLI Invoice No. 50353, FNBB Ex. 216; Raible, 10 Tr. 873, 875–76) On May 6, 1976, Mr. Dorfner testified in the action for appointment of a receiver brought by FNBB in Toledo that Telecasting leased its equipment from ISLI. (Dorfner Toledo Testimony, 57 Tr. 5901–02) Telecasting's board of directors (Mr. and Mrs. Overmyer, Mr. and Mrs. Strang, Mr. Dorfner and Mr. Raible) did not authorize Telecasting to enter into leases with Hadar until August 9, 1976, even assuming that the minutes are accurately dated. (8/9/76 Telecasting Minutes, FNBB Ex. 29, pp. 1–2) Hadar did not open a bank account until August 30, 1976 (List of Officers and Directors, FNBB Ex. 8, p. 2; Raible, 9 Tr. 803; 8 Tr. 745–46), six days after the Telecasting XI was filed (Petition, FNBB Ex. 431, p. 2). Telecasting made its first payment to Hadar ($11,000.00) on August 31, 1976. (Hadar Cash Receipts and Cash Disbursements Register, Pl. Ex. 113, p. 3) The pricing of lease ML–2 was not determined until September, 1976. (Raible,

10 Tr. 887–89; 9/16/76 Letter, FNBB Ex. 11) Mr. Dorfner expressed displeasure at that time because the proposed new Hadar lease price was greater than the ISLI price. (Raible, 10 Tr. 889) The assignment of the ISLI leases to Hadar was made sometime after the Telecasting XI was filed. The Overmyer organization created numerous back dated documents to make it appear otherwise.

16.5. *The Assignment Was A Fraud On ISLI Creditors.* As of the end of 1975, ISLI still had unpaid creditors with regard to some of the Telecasting equipment. (Raible, 12 Tr. 1135) Mr. Overmyer directed that the ISLI leases and equipment be transferred from ISLI to Hadar, but he never instructed that the unpaid obligations of ISLI should also be assigned to Hadar. (Raible, 12 Tr. 1135, 1138–1139) Hadar never paid ISLI for the assignment. (Raible, 12 Tr. 1137) Rather, money that Hadar obtained during 1976 was paid over to Jeebs. (Raible, 12 Tr. 1138) All of these transactions, the assignment, the nonpayment by Hadar to ISLI and the payment by Hadar to Jeebs instead, were directed by Mr. Overmyer. (Raible, 12 Tr. 1138) In order to conceal the assignment to Hadar, Mr. Overmyer continued to send ISLI checks to vendors of equipment covered by the ISLI leases after September, 1976. (7/10/79 Memo and 6/29/79 Letter, Raible Ex. 771, p. 3; Raible, 9 Tr. 802, 12 Tr. 1136–37) As a result of not having funds, ISLI could not pay its creditors and those creditors remain unpaid to date. (Raible, 12 Tr. 1139)

16.6. *Telecasting's Obligations and ISLI's Cost For the 30 Assigned Leases Through December 31, 1975.* Through January 1, 1976, Telecasting had total lease obligations to ISLI from the 30 leases of $1,773,446. (H. Klein, 28 Tr. 2753; Summary of Lease H–1002, FNBB Ex. 101, p. 3) The $1,773,446 was computed from the lease files that were maintained at the station. (H. Klein, 28 Tr. 2752–53, 2770–86; Summary of Lease H–1002, FNBB Ex. 101) The total cost of the equipment was $1,321,201. (H. Klein, 28 Tr. 2753; Summary of Lease H–1002, FNBB Ex. 101, p. 3)

16.7. *Comparison Between ISLI Leases and Hadar Leases.* Telecasting was being invoiced by ISLI for $13,534.56 per month as of December, 1975. (*See* Finding No. 13.4, *supra*) Hadar charged Telecasting $16,790.40 per month, beginning January, 1976, for the same equipment. (H. Klein, 29 Tr. 2806; Raible, 10 Tr. 889) ISLI had a renewal and purchase option policy for its leases. (11/73 Memo, FNBB Ex. 10) Hadar does not have a renewal or purchase option policy. (Raible, 8 Tr. 686–87, 695; Connery, 20 Tr. 1938)

16.8. *Renewal of Lease ML–2.* Lease ML–2 between Hadar and Telecasting expired on December 31, 1978. (Lease ML–2, Pl. Ex. 48B) Title did not pass to Telecasting at that time. (H. Klein, 29 Tr. 2812–13) Because lease ML–2 had no provision for a purchase option or renewal policy, a new lease was written and labeled "Lease H–1002." (H. Klein, 29 Tr. 2813) Lease H–1002 covered the same equipment as lease ML–2 for an additional ten-year period at the same rate as lease ML–2, $16,790.40 per month. (H. Klein, 29 Tr. 2813; Lease H–1002, Pl. Ex. 2)

16.9. *Telecasting Obligations Through January 31, 1981, for the 30 Assigned Leases.* Telecasting has been invoiced by ISLI and Hadar for the equipment relating to the 30 leases since 1966. (Summary of Lease H–1002, FNBB Ex. 101) ISLI charged Telecasting $1,773,446 on the 30 leases through December 31, 1975. (H. Klein, 29 Tr. 2818; Summary of Lease H–1002, FNBB Ex. 101) Hadar charged Telecasting another $1,024,214 on leases ML–2 and H–1002 through January 31, 1981. (H. Klein, 29 Tr. 2818; Summary of Lease H–1002, FNBB Ex. 101) In total, Telecasting was charged $2,797,660 by ISLI and Hadar for equipment relating to the 30 assigned leases for the period 1966 through January 31, 1981. (H. Klein, 29 Tr. 2818; Summary of Lease H–1002, FNBB Ex. 101)

16.10. *Future Charges Relating to H–1002.* Lease H–1002 runs through December 31, 1988. (Lease H–1002, Pl. Ex. 2) Additional lease charges for the period Feb-

ruary 1, 1981, to December 31, 1988, for which Telecasting is purportedly obligated to Hadar, total $1,595,088. (H. Klein, 29 Tr. 2819–20; Summary of Lease H–1002, FNBB Ex. 101) Total charges that Telecasting will have paid to ISLI and Hadar for the period 1966 through 1988 will be $4,392,748. (H. Klein, 29 Tr. 2820; Summary of Lease H–1002, FNBB Ex. 101) Over a 24-year period Telecasting will have paid $4,392,748 for equipment that had an original cost of $1,321,201, and at the end of lease H–1002 on December 31, 1988, the equipment will still belong to Hadar. (H. Klein, 29 Tr. 2820–21)

17. *The Hadar Lease Fraud in General*

17.1. *Form and Terms of the Hadar Leases.* The Hadar lease form was designed by Mr. Connery. (Connery, 20 Tr. 1934–36, 1870) The Hadar leases place all responsibilities on the lessee for maintenance, repair, upkeep, payment of insurance premiums and all other burdens of use of the equipment covered by the leases. (Connery, 20 Tr. 1936; Raible, 4 Tr. 331) The Hadar lease form provides, among other provisions, that: (i) Hadar warrants nothing (¶ 4, Pl. Ex. 2); (ii) claims for defects or unsatisfactory equipment must be made only against supplier (¶ 6, Pl. Ex. 2); (iii) lessee indemnifies Hadar for all claims arising out of Hadar's ownership, selection and leasing of equipment (¶¶ 3 and 10, Pl. Ex. 2); (iv) if there is any defect in the equipment, lessee may claim against the vendor but must continue to pay rent to Hadar (¶ 6, Pl. Ex. 2); (v) lessee must pay for insurance payable to Hadar (¶ 11, Pl. Ex. 2; Raible, 6 Tr. 528); and (vi) for any default Hadar may take possession of the equipment and thereby terminate all lessee's rights (¶ 16, Pl. Ex. 2). Mr. Raible, the executive vice-president of Hadar, did not need to refer to all the terms and conditions of the Hadar lease, since Telecasting undertook all burdens under the Hadar leases and that was the manner in which Hadar did business with Telecasting. (Raible, 4 Tr. 334)

17.2. *The 20 Percent Deposit.* Hadar charged a deposit, generally 20 percent, on most of its leases to Telecasting. (Raible, 2 Tr. 199–200; H. Klein, 29 Tr. 2811) The Overmyer organization calculated the amount of deposits, exclusive of the Hundred East leases, as $188,077.19. (3/16/81 Memo, Raible Ex. 802) These deposits were made by Hadar into its regular bank account, rather than being segregated in a separate account. (Raible Dep., FNBB Ex. 259A, p. 352, 529) Hadar does not have any of the money left. (Raible Dep., FNBB Ex. 259A, p. 352)

17.3. *The Two Percent Commitment Fee.* Hadar charged Telecasting a standard two percent commitment fee. (Raible Dep., FNBB Ex. 259A, pp. 353–54) Mr. Overmyer, chairman of the board of Telecasting (3/10/81 Telecasting Schedules, Tele Ex. 17, p. 11), instructed Mr. Raible to charge the two percent commitment fee. (Raible Dep., FNBB Ex. 259A, p. 355) Mr. Raible, executive vice-president of Hadar (Raible, 4 Tr. 328), did not know at the time of his deposition what the commitment fee was for. (Raible Dep., FNBB Ex. 259A, p. 354)

17.4. *No Rental Reduction or Purchase Option.* None of the Hadar leases provided for reduced rentals for renewal terms or for an option to purchase the equipment at the conclusion of the initial term of the lease. (Connery, 20 Tr. 1938) At the close of the initial lease term, it is Hadar's regular practice to renew the lease at the same monthly payment as before. (Raible, 8 Tr. 695) It is unusual for renewal terms under a lease to be at the same rental amount. (Bond, 14 Tr. 1306) Hadar never entered into a lease with Telecasting under which title to the property covered by the lease passed to Telecasting at the end of the lease. (Raible, 8 Tr. 686–87) It is common to have a purchase option at the end of the lease term when the original cost of the equipment is recovered within the initial term of a lease. (Bond, 14 Tr. 1306–07) Hadar once contemplated renewal and purchase options, but never implemented them. (*See* 4/28/77 Unsigned Letter Raible to Dorfner, FNBB Ex. 391; 10/9/77 Hadar Letter and Schedule of Telecasting Lease Obligations, FNBB Ex. 31)

17.5. *Numbering of Hadar Leases.* Hadar numbers leases consecutively starting with H–1001 and adds the designation "A" to the number to indicate a renewal. (Raible, 4 Tr. 297, 2 Tr. 126) For unexplained reasons, leases H–1003, H–1018, H–1019, H–1020, H–1021, H–1022, H–1023, H–1024, H–1025, H–1026, H–1027, H–1043, H–1044, H–1045 and H–1046 are all out of chronological order. (Leases, Pl. Exs. 2–46, Tele Exs. 5–10, D. Overmyer Ex. 2)

17.6. *Person to Contact: William Schock, President.* Hadar leases H–1004A, H–1005A, H–1006A, H–1008A, H–1009A, H–1010A, H–1011A, H–1012A, H–1013A, H–1018A, H–1032A, H–1044, H–1045, H–1047, H–1048, H–1049 and H–1050, all of which are dated prior to February 6, 1981, describe the person to contact as William Schock, President. (Leases, Pl. Exs. 4–6, 8–13, 18, 27, 39–46) Mr. Schock did not become president of Telecasting until February 6, 1981. (2/6/81 Telecasting Minutes, Tele Ex. 29)

17.7. *Negotiation and Execution of Leases.* Telecasting personnel determined the need for equipment, prepared specifications, sought out manufacturers of equipment it desired and often obtained quotes for such equipment. (Raible, 4 Tr. 334–35, 6 Tr. 523) The Hadar leases are typed by Mr. Raible's secretary, reviewed by Mr. Raible as an officer of Hadar and then hand-carried within the same suite of offices at 3 Park Avenue to Mr. Chi for execution on behalf of Telecasting. (Raible 4, Tr. 374–75, 2 Tr. 195–96, 5 Tr. 454–55) Hadar retained all four copies of each lease. (Raible, 8 Tr. 669–72; Leases, Pl. Exs. 2–46) No copy of the lease was provided to personnel at the television station in Toledo. (Raible, 2 Tr. 195–96, 8 Tr. 669–72)

17.8. *Discrepancies in Signatures.* Mr. Chi signed the following leases after the lease period had begun: H–1004, H–1004A, H–1005, H–1005A, H–1010, H–1011, H–1012, H–1014, H–1047, H–1048 and H–1049. (Leases, Pl. Exs. 4, 5, 10–12, 14, 43–45) He did not know why he signed leases after the lease date. (Chi Dep., FNBB Ex. 243, pp. 31, 32, 37) Mr. Chi also signed leases H–1003, H–1004, H–1005, H–1010, H–1011 and H–1012 which are dated prior to March 20, 1978, when he became assistant treasurer of Telecasting, although he did note on all except H–1003 that he signed it on April 7, 1978. (*Compare* Leases, Pl. Exs. 3–5, 10–12; *with* 3/20/78 Telecasting Minutes, Tele Ex. 29) Lease H–1019 was never signed at all by either Hadar or Telecasting. (Lease H–1019, Pl. Ex. 19)

17.9. *Lack of Investigation of Leases by Telecasting.* Mr. Chi testified that he signed the leases between Telecasting and Hadar on behalf of Telecasting as a convenience, because he was the only Telecasting employee working in New York. (Chi Dep., FNBB Ex. 243, p. 14) He made no investigation as to the propriety of the leases prior to signing. (Chi Dep., FNBB Ex. 243, pp. 14–17) Mr. Chi did not check with the station personnel prior to signing the leases to ensure that the equipment was at the station. (Chi Dep., FNBB Ex. 243, pp. 21, 22, 33, 34, 35, 36, 38, 41, 42) He relied on Mr. Raible to establish the proper price on the leases. (Chi Dep., FNBB Ex. 243, p. 68) The following leases were signed by Mr. Chi as a representative of Telecasting: H–1002, H–1003, H–1004, H–1004A, H–1005, H–1005A, H–1006, H–1006A, H–1007, H–1008, H–1008A, H–1009, H–1009A, H–1010, H–1010A, H–1011, H–1011A, H–1012, H–1012A, H–1013, H–1013A, H–1014, H–1015, H–1016, H–1017, H–1018, H–1020, H–1027, H–1028, H–1029, H–1030, H–1031, H–1032, H–1032A, H–1033, H–1034, H–1035, H–1036, H–1037, H–1038, H–1039, H–1040, H–1041, H–1042, H–1043, H–1044, H–1045, H–1047, H–1048, H–1049, H–1050. (Leases, Pl. Exs. 2–46) Mr. Chi signed two versions of lease H–1044: one with a monthly rental of $50,492.88, and the other at "not less than" $31,557.53. (Leases, Pl. Exs. 39, 40) He signed three versions of lease H–1045: one with a monthly rental of "not less than" $5,781.13, one at $9,249.97 and one at "not less than" $5,413.63. (Leases, Pl. Exs. 41, 42, D. Overmyer Ex. 2)

17.10. *Leases Starting Before the Equipment Became Operational.* The following leases had inception dates before Telecasting began using the equipment:

Lease H–1015 began in May, 1978, but the equipment was not delivered and installed until October, 1978, and April, 1979. (Lease H–1015, Pl. Ex. 15; H. Klein, 30 Tr. 2894–95)

Lease H–1020 began in May, 1977, but the lease between Design Space and Hadar for the same equipment did not begin until March, 1978. (Summary of Leases, FNBB Ex. 142)

Lease H–1043 began in December, 1979, but the lease between Hadar and Hundred East did not begin until May, 1980. (Summary of Leases, FNBB Ex. 142)

Leases H–1044 and H–1045 were first invoiced by Hadar to Telecasting in January, 1981. (1/1/81, 2/1/81 and 3/1/81 Invoices, Pl. Ex. 101) A significant amount of the equipment had not been installed as of January 1, 1982. (H. Klein, 32 Tr. 3052–53)

Lease H–1050 began in June, 1980, but the lease between Hadar and Motorola did not begin until November, 1980. (H. Klein, 32 Tr. 3068–69)

17.11. *Hadar's Delinquency In Paying Vendors.* Hadar was consistently delinquent in paying its obligations during 1977–1980. (Raible, 8 Tr. 711; 5/23/78, 5/31/78 and 1/25/79 Memos, Raible Exs. 413, 417, 436) Mr. Overmyer's approval was required prior to paying any obligation. (Raible, 6 Tr. 547–48, 568–69, 8 Tr. 711, 9 Tr. 837) The following vendors obtained legal or collection agency assistance in order to collect the amount that Hadar owed them (H. Klein, 30 Tr. 2914):

Lease H–1002—General Electric (G.E. Settlement Agreement, Pl. Ex. 123)

Lease H–1010—Jamieson (Legal Letters from Ray Andersen, Shield, Trotti and Hemphill, Raible Exs. 633, 634, 636, 637)

Lease H–1013, H–1032, H–1041—General Television Network (Legal Letter from Spangler, Nathanson, Heyman, McCarthy & Durfee, Raible Ex. 660)

Lease H–1015—Barry Equipment Co. (Legal Letter from Singler & Christenson, Raible Ex. 681)

Lease H–1017—A.G.A. Corporation (Collection Letter No. 3, Raible Ex. 687)

Lease H–1019—Hood Electrical Contractors

Lease H–1034—Tiffin Scenic Studios (Summons, Raible Ex. 717)

Lease H–1036—Q–TV (Legal Letters from Abberley, Kooiman, Marcellino & Clay, Raible Dep. Exs. 725, 729; Collection Letters from Dunn & Bradstreet, Inc., Raible Exs. 728, 730)

Lease H–1038—Toledo Sash Co. (Legal Letter from Wilkowski, Bloom and Simko, Raible Ex. 733)

Lease H–1039—City Loan Business Service Co. (Legal Letter from John P. Evans, Raible Ex. 737)

17.12. *Unpaid Vendors.* The following creditors' claims that relate to equipment purchased by Hadar and leased to Telecasting are included by Hadar on its amended schedules:

| Lease No. | Vendor | Schedule | Page | Line |
|---|---|---|---|---|
| H-1002 | RCA | A–3 | 2 | 22 |
| H-1002 | GE | A–3 | 1 | 8 |
| H-1002 | GE | A–2 | 1 | 3 |
| H-1004 A | Pitney Bowes | A–3 | 2 | 18 |
| H-1005 A | G.T.N. | A–2 | 1 | 4 |
| H-1006 A | Lipsner Smith | A–2 | 1 | 7 |
| H-1007 | IBM | A–3 | 1 | 11 |
| H-1008-A | Design Space | A–3 | 2 | 25 |
| H-1010-A | Jamieson Film | A–3 | 1 | 13 |
| H-1013-A | G.T.N. | A–2 | 1 | 4 |
| H-1015 | Barry Equipment | A–2 | 1 | 1 |
| H-1018-A | G.T.N. | A–2 | 1 | 4 |
| H-1019 | Hood Electrical | A–3 | 1 | 10 |
| H-1020 | Space Rental | A–3 | 2 | 25 |
| H-1021 | Ohio Citizens | A–2 | 1 | 9 |
| H-1032 | G.T.N. | A–2 | 1 | 4 |
| H-1037 | Philips Appliance | A–3 | 2 | 19 |
| H-1040 | Station Business Systems | A–3 | 2 | 26 |
| H-1041 | G.T.N. | A–2 | 1 | 4 |
| H-1043 | Hundred East | A–2 | 1 | 5 |
| H-1044 | Hundred East | A–2 | 1 | 6 |
| H-1045 | Hundred East | A–2 | 1 | 6 |
| H-1050 | Motorola | A–2 | 1 | 8 |

(Amended Schedules, FNBB Ex. 177; H. Klein, 31 Tr. 2982–3020, 32 Tr. 3026–89)

17.13. *The Overmyer Formula.* Hadar used a standard formula in computing the lease terms with Telecasting. (Raible, 2 Tr. 199; Raible Dep., FNBB Ex. 259A, pp. 349–52) The formula is as follows: Hadar's purchase price was multiplied by 100 percent plus 20 percent times the number of

years the lease was to run; 20 percent of the resultant amount was charged as a deposit; and the remainder was divided into equal monthly payments over the term of the lease. (Raible, 2 Tr. 199–200; H. Klein, 29 Tr. 2811) This formula was derived by Mr. Overmyer and has been denoted the "Overmyer Formula." (Raible, 10 Tr. 970–72) Leases with Telecasting that conformed to the Overmyer Formula are H–1003, H–1004, H–1005, H–1006, H–1011, H–1012, H–1013, H–1014, H–1017, H–1018, H–1027, H–1028, H–1029, H–1030, H–1031, H–1032, H–1034, H–1035, H–1036, H–1037, H–1038, H–1039, H–1043, H–1047, H–1048, H–1049 and H–1050. (Summary of Leases, FNBB Ex. 142) Leases that applied the mathematical calculations of the Overmyer Formula, but used the incorrect cost or deposit, or some other variation, in deriving the monthly rental payments are H–1008, H–1010, H–1019, H–1020, H–1033, H–1040, H–1041, H–1044 and H–1045. (Summary of Equipment Leases, FNBB Ex. 142; H. Klein, 32 Tr. 3047–50, 3055–56) Only five leases, H–1002, H–1007, H–1009, H–1015 and H–1021, did not apply the Overmyer Formula or a variation of the Overmyer Formula. (Summary of Equipment Leases, FNBB Ex. 142) Mr. Bond, Hadar's witness, in his experience in the leasing of equipment, had never heard of a formula such as the Overmyer Formula being used to calculate rents. (Bond, 14 Tr. 1335–36) When the Overmyer Formula is applied to a three-year lease with a cash purchase price actually paid by Hadar, Hadar obtains a 47 percent rate of return. (H. Klein, 29 Tr. 2835; Bond, 14 Tr. 1336–40)

17.14. *Leases of Financed Equipment.* In many instances, Hadar did not pay cash for equipment that it leased to Telecasting, but obtained financing from vendors. (H. Klein, 29 Tr. 2849) Only 2.7 percent of the cost of equipment that Hadar leased to Telecasting consisted of cash payments, whereas 97.3 percent of the equipment was obtained by Hadar over time through financing arrangements. (H. Klein, 29 Tr. 2849) The largest equipment acquired by Hadar for cash was lease H–1012 for $28,368. (H. Klein, 29 Tr. 2853) All other significant equipment that Hadar obtained for use by Telecasting was acquired by financing arrangements. (H. Klein, 29 Tr. 2849; Summary of Leases, FNBB Ex. 142) When Hadar applied the Overmyer Formula to equipment that it obtained through financing arrangements, it used the fully loaded cost (the cost of equipment plus financing charge) in calculating the monthly rental charge to Telecasting. (Raible, 8 Tr. 688; H. Klein, 29 Tr. 2847–48) When the fully loaded cost is used in the Overmyer Formula instead of the original equipment cost, it results in Telecasting paying a higher rental to Hadar. (H. Klein, 29 Tr. 2845–46) When the fully loaded cost was used by Hadar, Telecasting's monthly payment to Hadar usually exceeded Hadar's monthly payment to the vendor. (Summary of Leases, FNBB Ex. 142) Under such circumstances, Hadar's rate of return is infinite. (H. Klein, 30 Tr. 2897–98)

17.15. *Leases for Petty Amounts.* The following 21 leases were written by Hadar for equipment that had a cost of less than $5,000:

| Lease No. | Cost |
| --- | --- |
| H–1003 | $3,954 |
| H–1004 | $1,954 |
| H–1007 | $3,987 |
| H–1009 | $4,298 |
| H–1011 | $4,289 |
| H–1014 | $4,515 |
| H–1017 | $4,000 |
| H–1018 | $2,450 |
| H–1027 | $4,701 |
| H–1028 | $2,173 |
| H–1029 | $1,760 |
| H–1030 | $ 550 |
| H–1031 | $1,072 |
| H–1034 | $2,809 |
| H–1035 | $4,921 |
| H–1037 | $ 374 |
| H–1038 | $1,770 |
| H–1042 | $2,794 |
| H–1047 | $ 236 |
| H–1048 | $1,600 |
| H–1049 | $ 395 |

(Summary of Leases, FNBB Ex. 142) Telecasting could have purchased all of this equipment; there was no advantage to leas-

ing it from Hadar. (Raible, 8 Tr. 704–06) Mr. Overmyer was responsible for Telecasting leasing rather than purchasing such equipment. (Raible, 9 Tr. 795–96)

17.16. *No Recourse for Defective Equipment.* Hadar leased to Telecasting a computer system that Hadar leased from Station Business Systems. (Lease H–1040, Pl. Ex. 35; H. Klein, 31 Tr. 2923) The computer system was a disaster. (Meissner Dep., FNBB Ex. 232, pp. 16–17) The system never got close enough to completion even to attempt a conversion. (Meissner Dep., FNBB Ex. 232, pp. 16–17) Station Business Systems acknowledged that the computer system would not perform as promised, and the lease between Hadar and Station Business Systems was cancelled in January, 1980. (H. Klein, 31 Tr. 2933; 1/31/80 Letter, FNBB Ex. 160) Station Business Systems allowed Hadar to keep the system free of charge until May 1, 1980, to allow for a smooth transition. (H. Klein, 31 Tr. 2933) Hadar continued to invoice Telecasting for the computer system through August, 1980, although the system was removed in May, 1980. (H. Klein, 31 Tr. 2943) Hadar issued

a credit to Telecasting in August, 1980, but only for payments made by Telecasting subsequent to May 1, 1980. (H. Klein, 31 Tr. 2943–44) Hadar's obligation to Station Business Systems was terminated effective January 31, 1980, but Telecasting was required to keep paying Hadar for the defective equipment through May 1, 1980. (H. Klein, 31 Tr. 2944)

17.17. *Unused and Unusable Equipment Covered by Lease H–1002.* Much of the equipment covered by Hadar lease H–1002 has been replaced by equipment covered by the Hundred East transactions and major new equipment purchases made since March 25, 1981. (Bowe, 40 Tr. 3821–29; List of New Equipment, Tele Ex. 25) No credit was given to Telecasting for equipment covered by lease H–1002 which was replaced by new purchases of equipment. (Bowe, 40 Tr. 2923) The following table summarizes the status of equipment covered by lease H–1002 that is in storage, missing, replaced, discarded, sold or otherwise not in use. The references are to the former ISLI leases.

| Lease No. and FNBB Exhibit | Description of Equipment | Status of Equipment |
|---|---|---|
| 0910730 (FNBB ex. 110) | ABTO Film Camera | In storage (Bowe, 39 Tr. 3729) |
| 1108010 (FNBB Exs. 122–123) | Microwave Equipment | In storage (Bowe, 39 Tr. 3749) |
| 1317010 (FNBB Ex. 126) | Two calculators and one adding machine | In storage (Bowe, 39 Tr. 3752) |
| 1828010 (FNBB Ex. 127) | Microwave antenna and related equipment | In storage (Bowe, 39 Tr. 3753) |
| 1105011 (FNBB Ex. 107) | Video switcher | In storage (Bowe, 39 Tr. 3726) |
| 1104010 (FNBB Exs. 115, 116) | RCA equipment | In storage (Bowe, 39 Tr. 3737) |
| 1084010 (FNBB Exs. 112, 113 and 114) | Most of the GE 30 kilowatt transmitter and related equipment | In storage (Bowe, 39 Tr. 3733) |
| 1084020 (FNBB Exs. 124–125) | GE antenna, transmission line, etc. | In storage (Bowe, 39 Tr. 3751) |
| 112973 (FNBB Ex. 140) | Conversion of equipment to ABTO system | In storage (Bowe, 39 Tr. 3768) |

| Lease No. and FNBB Exhibit | Description of Equipment | Status of Equipment |
|---|---|---|
| 1107010 (FNBB Exs. 120, 121) | Three oscilloscopes | In storage (Bowe, 39 Tr. 3747) |
| 0717700 (FNBB Ex. 105) | One visual sync generator | Missing (Bowe, 39 Tr. 3722) |
| 1317010 (FNBB Ex. 126) | One adding machine | Missing (Bowe, 39 Tr. 3752) |
| 119690 (FNBB Ex. 130) | IBM typewriter | Missing (Bowe, 39 Tr. 3756) |
| 1120690 (FNBB Ex. 131) | IBM typewriter | Missing (Bowe, 39 Tr. 3757) |
| 0517710 (FNBB Ex. 139) | IBM Model C typewriter | Missing (Bowe, 39 Tr. 3767) |
| 119710 (FNBB Ex. 109) | Olivetti calculator | Missing (Bowe, 39 Tr. 3728) |
| 1029700 (FNBB Ex. 137) | Most of the audio divide pads | Replaced (Bowe, 39 Tr. 3764) |
| 114020 (FNBB Ex. 117) | RCA color monitor | Not being used (Bowe, 39 Tr. 3742) |
| 0401700 (FNBB Ex. 133) | Partitions | Discarded (Bowe, 39 Tr. 3759) |
| 1026700 (FNBB Ex. 136) | Swivel chair | Discarded (Bowe, 39 Tr. 3764) |
| 1827011 (FNBB Ex. 108) | Two B & W studio cameras | Sold (Bowe, 39 Tr. 3727) |
| 1105011 (FNBB Ex. 107) | Cameras and associated equipment (cables and tripods) | Sold (Bowe, 39 Tr. 3726) |
| 1084020 (FNBB Exs. 124, 125) | Antenna | Sold, with proceeds to Hadar (Bowe, 39 Tr. 3751) |
| 1104010 (FNBB Exs. 115, 116) | TR5 recorder | Sold (Bowe, 39 Tr. 3740) |
| 0403700 (FNBB Ex. 134) | Office equipment | Difficult to determine status as no identifying marks are found (Bowe, 39 Tr. 3760) |
| 1106010 (FNBB Exs. 118, 119) | Microwave equipment | Stayed at former location (Bowe, 39 Tr. 3743 |
| 1104010 (FNBB Exs. 115, 116) | RCA equipment | Is being stored or was replaced (Bowe, 39 Tr. 3737) |
| 1107010 (FNBB Exs. 120, 121) | Probes | In storage for last two years (Bowe, 39 Tr. 3747–48) |

17.18. *Obsolete, Unused and Unusable Equipment Covered by Other Hadar Leases.* The following table summarizes the status of equipment covered by Hadar leases, other than lease H–1002, that is obsolete, missing, inoperative, in storage or otherwise not in use.

| Hadar Lease No. | Description of Equipment | Status of Equipment |
| --- | --- | --- |
| H–1003 (Pl. Ex. 3) | Office equipment, microwave oven and coffee maker | Not at station (Bowe, 40 Tr. 3781–82) |
| H–1004 (Pl. Ex. 4) | Postage meter | Not at studio (Bowe, 40 Tr. 3783) |
| H–1006 (Pl. Ex. 6) | Film cleaning and conditioning unit | In storage since 1981 (Bowe, 40 Tr. 3785–86; Photo of stored equipment, Tele Ex. 36) |
| H–1007 (Pl. Ex. 7) | Five IBM typewriters | Not being used – location unknown (Bowe, 40 Tr. 3788) |
| H–1008 (Pl. Ex. 8) | Mobile office trailer | Last used by Telecasting in Fall, 1980 (Bowe, 40 Tr. 3789) |
| H–1009 (Pl. Ex. 9) | Office equipment: five calculators; six metal bookcases; fire fighter file cabinet; six file cabinets and two typewriters | Three calculators, one bookcase, fire fighter file cabinet, all six file cabinets being used; remainder being stored or location unknown (Bowe, 40 Tr. 3790) |
| H–1010 (Pl. Ex. 10) | Jamieson Model 23 film processor and desitometer | Not being used (Bowe, 40 Tr. 3791–92; Photo of stored equipment Tele Ex. 37) |
| H–1012 (Pl. Ex. 12) | Film camera and related equipment | In storage and not in use (Bowe, 40 Tr. 3795) |
| H–1013 (Pl. Ex. 13) | ENG equipment and test equipment | Panasonic recorders not in existence; rest in storage (Bowe, 40 Tr. 3797) |
| H–1019 (Pl. Ex. 19) | Temporary emergency generator | Not in use (Bowe, 40 Tr. 3802–03) |
| H–1020 (Pl. Ex. 20) | New mobile office trailer | Last one used in Fall, 1980. Telecasting does not have mobile office trailer any longer (Bowe, 40 Tr. 3803) |

| Hadar Lease No. | Description of Equipment | Status of Equipment |
|---|---|---|
| H–1021 (Pl. Ex. 21) | Four AMC automobiles (2 jeeps and 2 Matador station wagons) | Located in the studio parking lot; replacements have been purchased (Bowe, 40 Tr. 3803–04; List of new equipment, Tele Ex. 25) |
| H–1027 (Pl. Ex. 22) | 18,000 watt standby generator | Not in use. Sold to Raceway Park, with Hadar receiving proceeds when new generator was installed. (Bowe, 40 Tr. 3804–05) |
| H–1029 (Pl. Ex. 24) | Lighting equipment and lamps | Lamps not in use since they have life expectancy of 300 hours (Bowe, 40 Tr. 3806) |
| H–1031 (Pl. Ex. 26) | Flow meters and plumbing devices used in connection with heat exchanger at Telecasting | Not in use (Bowe, 40 Tr. 3807–08) |
| H–1032–A (Pl. Ex. 27) | ¾ video equipment, recorders, editors, test equipment console | Not used. Wrong equipment purchased by Hadar (Bowe, 40 Tr. 3809) |
| H–1033 (Pl. Ex. 28) | Miscellaneous parts for GE transmitter, switches, relay meters, plugs and resistors totaling 50–60 items | Would not rent replacement parts if given a free choice (Bowe, 40 Tr. 3810) |
| H–1039 (Pl. Ex. 34) | Sharp 810 plain paper copier | Not being used. Does not know the location of the copier and it has not been used at the station since sometime prior to January, 1981. (Bowe, 40 Tr. 3814) |
| H–1040 (Pl. Ex. 35) | Computer system | No longer in existence. Replaced. (Bowe, 40 Tr. 3815) |
| H–1041 (Pl. Ex. 36) | JVC color camera, JVC recorder and associated equipment, including battery kit | Camera used only as back-up; recorder good only for parts; battery kit not in existence as life of kit is at best two years (Bowe, 40 Tr. 3816) |

| Hadar Lease No. | Description of Equipment | Status of Equipment |
| --- | --- | --- |
| H–1042 (Pl. Ex. 37) | Two RCA UHF isolators two RCA oscillators | Equipment never used because a necessary exciter was never purchased. Being stored. (Bowe, 40 Tr. 3817) |
| H–1047 (Pl. Ex. 43) | A B & K multimeter | Not in use, replaced by newer equipment. (Bowe, 40 Tr. 3818) |
| H–1049 (Pl. Ex. 45) | Two chairs | Could not locate (Bowe, 40 Tr. 3820) |

Mr. Bond, Hadar's witness, confirmed that many of the items covered by the purported leases could not be located at the television station (Bond, 13 Tr. 1183, 1193, 1194, 1197–99, 1207–10), although Bond made an item-by-item examination at the station and was assisted by the cooperation of station personnel (Bond, 13 Tr. 1153, 14 Tr. 1289–90).

17.19. *Catch-Up Invoicing.* Hadar did not always invoice Telecasting for leases on a timely basis. (6/1/80, 7/1/80 Hadar Invoices, Pl. Ex. 101; 4/6/78 Letter, FNBB Ex. 4; 8/31/79 Hadar Invoice, FNBB Ex. 156; H. Klein, 29 Tr. 2823, 2829–30) Leases not invoiced on a timely basis were leases H–1003, H–1004A, H–1005A, H–1006A, H–1015, H–1019, H–1047, H–1048 and H–1049. (H. Klein, 29 Tr. 2829–30) In the case of each of these leases, Hadar omitted to invoice Telecasting for a period of months, and then invoiced Telecasting for the omitted months on a catch-up invoice. (H. Klein, 29 Tr. 2829–30) In some instances, the catch-up invoice was for more than the original cost of the leased equipment, indicating that Telecasting was able to make payments in excess of the equipment cost, and financing by a lease was not necessary. (H. Klein, 29 Tr. 2830)

17.20. *Back Dated Hadar Invoices.* Hadar's invoices to Telecasting for leases H–1001 and H–1002 for January, February, March, April and May, 1977, are on Hadar, 3 Park Avenue letterhead. (1/1/77, 1/18/77, 2/1/77, 2/18/77, 3/1/77, 3/18/77, 4/1/77, 4/18/77, 5/1/77 and 5/18/77 Invoices, FNBB Ex. 101) Hadar's name was not changed from D.H. Overmyer Trucking Co. to Hadar Leasing International Company until May 5, 1977. (5/6/77 Hadar Minutes,

Raible Ex. 134) Moreover, Hadar did not move into the 3 Park Avenue office until May 28, 1977. (5/24/77 Letter, Raible Ex. 389) The invoices on Hadar, 3 Park Avenue letterhead bearing dates prior to the name and address changes were created subsequent to those changes and back dated. (Raible, 9 Tr. 847–48)

17.21. *Duplicate Invoices.* Two different sets of Hadar invoices have turned up: one from Hadar's files and the other from Telecasting's files. (H. Klein, 30 Tr. 2900) The invoices differ in the following ways:

(1) There were two invoices dated October 1, 1977, for lease H–1011. The total amount invoiced per Telecasting's record was $7,309.00, as compared with $1,571.61 per Hadar's records.

(2) There are two different invoices typed for leases H–1004 through H–1013, dated February 1, 1978.

(3) An invoice dated May 1, 1978 for $11,-059.78, relating to lease H–1016, was found in Telecasting's records, but not in Hadar's records.

(4) An invoice dated May 1, 1978, for $399.94, relating to lease H–1020, was located in Telecasting's files, but not in Hadar's files.

(5) Invoices dated May 1, 1978, June 1, 1978 and July 1, 1978, relating to the "month-to-month" adjustment per letter of April 6, 1978, are typed differently in Hadar's records than in Telecasting's records.

(6) An invoice dated August 31, 1979, billing Telecasting for 16 months on lease H–1015 and 12 months on the "month-to-month" adjustment, and giving Telecasting

credit for four months and 21 days on lease H–1019, was found in Telecasting's files, but not in Hadar's files.

(7) Invoices dated August 1, 1978, through August 1, 1979, relating to the "month-to-month" adjustment were not located in Telecasting's files.

(8) Adjustment invoices dated September 1, 1979, October 1, 1979, and November 1, 1979, for $5,171.50, relating to leases H–1015, H–1019 and the "month-to-month" adjustment were found in Telecasting's files, but not in Hadar's files.

(9) An invoice dated May 28, 1980, for a Camera Mart rental was not in Telecasting's records.

(10) An invoice dated September 1, 1980, for installation charges was not in Telecasting's files.

(11) Invoices dated January 1, 1981, February 1, 1981, and March 1, 1981, for $52,250, which relate to the Hundred East equipment, differ as to lease numbers. Telecasting's copies of the invoices give the lease numbers as H–1044 and H–1045. Hadar's copies of the invoices also list lease H–1043. (H. Klein, 30 Tr. 2895, 2900–08; Summary of Differences in Invoices, FNBB Ex. 156)

17.22. *Ohio Sales Taxes.* Hadar collected Ohio sales tax with respect to the leases between Hadar and Telecasting, but failed to file tax returns or pay over to the State of Ohio the taxes it collected. (Connery, 21 Tr. 2009) Nothing was done by Hadar to credit Telecasting with the amounts of sales taxes paid by Telecasting to Hadar and then illegally detained by Hadar. (Connery, 21 Tr. 2010)

17.23. *Hadar's Use of Telecasting's Credit.* Hadar furnished Telecasting's financial statements to vendors upon request. (Raible, 8 Tr. 708–09) The following vendors received copies of Telecasting financial statements in connection with providing financing to Hadar: RCA, General Television Network, Camera Mart, Ohio Citizens, Hundred East Credit Corporation, Barry Equipment and Continental Bank. (Raible, 8 Tr. 709–711)

17.24. *Lack of Business Advantage to Telecasting.* If he were free to decide whether or not to sign one of the Hadar leases, and if his company were in Telecasting's position, Mr. Raible would not be willing to sign it. (Raible, 4 Tr. 356–57; Raible, 10 Tr. 966–67) Many of the items Telecasting leased from Hadar could have been purchased by Telecasting. (Raible, 8 Tr. 705–06) Design Space, a Hadar creditor, informed Hadar that it would prefer to deal directly with Telecasting. (Raible, 11 Tr. 1045) Telecasting derived no business advantage from entering into the leases with Hadar. (Raible, 8 Tr. 704–06, 10 Tr. 955–956)

18. *Particular Hadar Lease Scams*

18.1. *Back Dating of Lease H–1003.* Lease H–1003 purports to be dated February 1, 1978. (Lease H–1003, Pl. Ex. 3) On the equipment list attached to lease H–1003, however, there are two items purchased by Hadar in September, 1979, included as part of lease H–1003. (H. Klein, 29 Tr. 2828) The date originally typed on lease H–1003 was July 1, 1980, but it was covered by a sticker and the date February 1, 1978, typed on instead. (Raible, 8 Tr. 747–52, 9 Tr. 793–94; *see also* Hadar Lease Schedule, Raible Ex. 791, p. 2)

18.2. *Invoices on Lease H–1015 in Excess of the Cash Price for the Equipment.* Hadar invoiced Telecasting for $32,448 in May, 1978, as a deposit for two permanent generators relating to lease H–1015. (H. Klein, 30 Tr. 2893; 5/1/78 Invoice, Pl. Ex. 101) In August, 1979, Hadar invoiced Telecasting for another $52,648. (H. Klein, 30 Tr. 2895) These two payments totaled $85,096. The two generators had a cash price of $75,336. (H. Klein, 30 Tr. 2896) The two generators were installed at the station in October, 1978, and April, 1979. (H. Klein, 30 Tr. 2895) Telecasting made sufficient payments to Hadar in lump sums more than adequate to pay cash for the equipment, as opposed to financing the purchase through Hadar.

18.3. *Lack of Refund on Cancellation of Lease H–1016.* Lease H–1016 was cancelled prior to execution. (H. Klein, 31 Tr.

2999) Hadar had invoiced Telecasting for the 20 percent deposit, two percent commitment fee and sales tax, a total charge of $11,059.78. (H. Klein, 31 Tr. 2999) Hadar never issued a credit to Telecasting when the lease was cancelled. (H. Klein, 31 Tr. 2999)

18.4. *Lease H–1018 for a Price Increase.* Lease H–1018 states that it is for two motorized zoom lenses. (Lease H–1018, Pl. Ex. 18) The motorized zoom lenses were replacements for two manual lenses that were originally part of the package covered by lease H–1013. (H. Klein, 31 Tr. 3003) The lease price that Hadar charged Telecasting on lease H–1018 was based on the price increase resulting from the change to motorized lenses. (H. Klein, 31 Tr. 3003) Hadar never actually made any payments to the vendor due to the change. (H. Klein, 31 Tr. 3003)

18.5. *Two Versions of Lease H–1019.* In discovery, Hadar produced a copy of lease H–1019 that was identical to lease H–1021, covering four motor vehicles. (*Compare* Lease H–1019, Chi. Ex. 19; *with* Lease H–1021, Pl. Ex. 21; *see* Chi Dep., FNBB Ex. 243, pp. 40–41) During discovery, the attorneys and accountants for Telecasting and FNBB deduced that the real lease H–1019 covered a temporary emergency generator that Hadar had leased from Hood Electrical Contractors, Inc. for lease to Telecasting. (See Raible Dep., FNBB Ex. 259A, pp. 447–52; H–1019 Hood File Folders, Raible Exs. 691–92; 6/29/78 and 1/24/79 Hood Memos, Raible Exs. 693, 695; 3/10/79 Hood Invoice, Raible Ex. 694) After repeated requests by counsel (e.g., Raible Dep., FNBB Ex. 259A, p. 452) and an order of this Court (Motion To Compel Production With Order, FNBB Ex. 154, ¶ 5), the Overmyer organization finally produced an unsigned lease numbered H–1019 for a term of 14 months, describing the leased equipment as "See Attached List." (Lease H–1019, Pl. Ex. 19) No list was attached, nor was any produced. (Raible, 9 Tr. 841; *see* Lease H–1019, Pl. Ex. 19) The rental between Hadar and Hood Electrical Contractors, Inc. was on a month-to-month basis. (Raible Tr. 843–44; H. Klein, 30 Tr.

2878) The temporary generator which is the subject of lease H–1019 was at the transmitter site for exactly 14 months and nine days. (H. Klein, 30 Tr. 2877–78) It was only after the generator was removed that Hadar knew it would be there for 14 months. (Raible, 9 Tr. 844) Lease H–1019 could only have been written for 14 months after the temporary generator was removed from the site. (H. Klein, 30 Tr. 2880–81; *see* Raible, 9 Tr. 844) The invoices for lease H–1019 in Telecasting's files show that Hadar charged Telecasting 19 months' rent and later gave Telecasting a credit for four months and 21 days. (*See* 8/31/79 Invoice, FNBB Ex. 156) The invoices offered by Hadar in this case charge Telecasting on lease H–1019 for 22 months, which is eight months in excess of the lease term. (2/1/78–11/1/79 Invoices, Pl. Ex. 101; H. Klein, 30 Tr. 2878–79)

18.6. *Lease H–1021 for Telecasting's Own Vehicles.* Lease H–1021 covers four vehicles: two AMC Jeep Cherokees and two AMC Matadors. (Lease H–1021, Pl. Ex. 21) The two AMC Jeep Cherokees were financed by Hadar through Ohio Citizens Trust Company. (Security Agreement, Pl. Ex. 77, pp. 4–5) The two AMC Matadors were obtained by Hadar through a transfer of ownership from Telecasting to Hadar. (5/26/78 Memo, Pl. Ex. 77; 5/23/78 Memo, Pl. Ex. 77; H. Klein, 30 Tr. 2872–73) Mr. Raible was unable to explain how the price of $30,352 stated in the lease or the $1,096 monthly rental payment was derived (Raible, 8 Tr. 691) Mr. Klein, the Telecasting accounting expert, demonstrated how the $30,352 price relates to the cost of the four vehicles (H. Klein, 30 Tr. 2864–68) and how the monthly rental payment of $1,096 was computed using a variation of the Overmyer Formula based on the cost of the four vehicles. (H. Klein, 30 Tr. 2868–72) Although Telecasting arranged for the acquisition of the two AMC Matadors by bartering advertising time, Hadar obtained title for these two vehicles without consideration to Telecasting, and then leased the two vehicles to Telecasting. (H. Klein, 30 Tr. 2872–74)

18.7. *Continuation of Lease H–1027 After Sale of the Equipment.* The temporary generator covered by lease H–1027 was replaced in October, 1978. (H. Klein, 30 Tr. 2886) In December, 1978, Mr. Rety, an employee of Telecasting, arranged the sale of the temporary generator for $2,500. (12/12/78 Letter, Pl. Ex. 103) The proceeds of the sale went to Hadar, rather than Telecasting (12/12/78 Letter, Pl. Ex. 103) Lease H–1027, however, continued in force after the generator was sold through its termination date of January 31, 1979. (H. Klein, 30 Tr. 2885) The total cost to Hadar for the temporary generator was $4,700 less the $2,500 resale resulting in a net cost to Hadar of $2,200. (H. Klein, 30 Tr. 2890) Hadar's profit for this one-year financing was $3,695, or one and one-half times its net investment. (H. Klein, 30 Tr. 2890)

18.8. *Lease H–1028 for Roof Repairs That Were ISLI's Responsibility.* Hadar lease H–1028 covers repair of a roof on a building at Telecasting's transmitter site. (Raible, 8 Tr. 706–07) Paragraph six of the lease between ISLI and Telecasting for the transmitter site makes ISLI, not Telecasting, responsible for maintenance and repair of that roof. (Raible, 8 Tr. 708) Moreover, lease H–1028 includes as part of the lease, the cost of removal and disposal of existing sheet metal roofing. (Lease H–1028, Pl. Ex. 23)

18.9. *Lease H–1033 for Spare Parts.* Lease H–1033 covers various spare parts purchased by Hadar from Harris Corporation and leased to Telecasting. (Lease H–1033, Pl. Ex. 28) The terms for lease H–1033 were computed using the Overmyer Formula based on a cost of $7,660.10. (H. Klein, 32 Tr. 3032) Based on the attachment to lease H–1033, the total cost of the equipment listed was $6,600.47. (H. Klein, 32 Tr. 3032) The price of the spare parts actually purchased by Hadar and used by Telecasting was $14,258.91. (H. Klein, 32 Tr. 3032) It is not customary in the television industry to lease replacement parts. (Bond, 14 Tr. 1309)

18.10. *The 50 Percent Deposit on Lease H–1040.* The lease between Hadar and the vendor of the equipment covered by lease H–1040, Station Business Systems, Inc. ("SBS"), required that Hadar pay $2,000 down, $5,000 upon installation, $5,000 within 90 days of installation and, beginning on July 1, 1979, $1,000 per month for 12 months. (H. Klein, 31 Tr. 2927) By applying the Overmyer Formula to lease H–1040 and using the standard 20 percent deposit, a deposit of $6,019.20 would result, which would not be sufficient to cover the initial Hadar start-up costs of $12,000. (H. Klein, 31 Tr. 2928) Lease H–1040 actually required a deposit of 50 percent. (Lease H–1040, Pl. Ex. 35) Hadar was able to increase the deposit by $9,000 to $15,048, more than enough to pay for the equipment, by departing from the Overmyer Formula. (H. Klein, 31 Tr. 2926, 2929)

18.11. *Claim for Hadar's Nonpayment for the Equipment Covered by Lease H–1040 Recorded on Telecasting's Books.* SBS is litigating a claim of $9,225 against Hadar and Telecasting. (H. Klein, 31 Tr. 2936) When the lease between Hadar and SBS was cancelled on January 31, 1980, the total obligation due SBS was $18,352. (H. Klein, 31 Tr. 2935) Payments of $7,127 by Hadar and $2,000 by Telecasting reduced the balance due to $9,125. (H. Klein, 31 Tr. 2930–31, 2935–36) In addition to the $2,000 Telecasting paid directly to SBS, Telecasting was invoiced by Hadar for $26,334. (Summary of Equipment Leases, FNBB Ex. 142) The Overmyer organization has recorded the SBS claim of $9,225.23 both on Hadar's books and on Telecasting's books. (H. Klein, 31 Tr. 2936; 12/3/81 Hadar Schedules, FNBB Ex. 177, p. 18; Hadar Journal Entry 3–05, Pl. Ex. 115F; Telecasting Journal Entry 1–17, FNBB Ex. 161)

19. *The Hundred East Leases*

19.1. *Equipment Cost to Hadar.* The cash prices of the equipment obtained by Hadar through Hundred East for lease to Telecasting were $88,825 for lease H–1043, $1,818,878 for lease H–1044 and $330,350 for lease H–1045, a total of $2,238,053. (H. Klein, 32 Tr. 3042, 3046; Conditional Sales Contract, Raible Ex. 758, p. 5) Because Hadar chose to finance the purchase, it was

forced to agree to pay financing charges that increased the prices to \$123,111.60, \$3,029,522.88 and \$554,988.48, respectively, a total of \$3,707,622.96. (H. Klein, 32 Tr. 3041–42, 3045–47; Conditional Sales Contracts, Raible Ex. 753, pp. 3, 7, Raible Ex. 758, pp. 1, 5) Because of the amounts involved, the contracts between Hadar and Hundred East provided for a deposit equal to one monthly payment, \$2,051.86 on lease H–1043, \$31,557.53 on lease H–1044 and \$5,781.13 on lease H–1045. (Finance Plan, Raible Ex. 752, p. 3; Conditional Sales Contracts, Raible Ex. 753, p. 3, Raible Ex. 758, p. 1)

19.2. *Imposition of Leases H–1044 and H–1045 on Telecasting.* Because of the high cost of the equipment involved, Hundred East was not willing to sell the second and third packages (leases H–1044 and H–1045) on the basis of Hadar's credit. (Hundred East [Corcoran] Dep., FNBB Ex. 244, pp. 29–31) Hundred East required assignments of the Hadar leases with Telecasting so that Telecasting's credit would stand behind the transactions. (Hundred East [Corcoran] Dep., FNBB Ex. 244, pp. 30–32) For that reason, the Overmyer organization created leases at "not less than" the required monthly payment from Hadar to Hundred East and created corporate minutes of Hadar and Telecasting approving those leases and providing that the actual price would be set by the board of directors of Hadar. (Raible, 9 Tr. 860–61; Lease H–1044, Pl. Ex. 40; Lease H–1045 [2 versions], D. Overmyer Ex. 2, Pl. Ex. 41; 10/25/79 and 1/25/80 Telecasting Minutes, Tele Ex. 29; 10/26/79 Hadar Minutes, Raible Ex. 158; 1/25/80 Hadar Minutes, Raible Ex. 162; 3/11/80 Hadar Minutes, Raible Ex. 168) As a director of Telecasting, Mr. Raible voted to approve such leases because he knew that the terms of the lease would be dictated by Mr. Overmyer in any event. (Raible, 10 Tr. 974–75) When the real leases were prepared, the actual monthly rentals were \$50,492.88 on lease H–1044 and \$9,249.97 on lease H–1045. (Leases, Pl. Exs. 39, 42)

19.3. *Deposit on Lease H–1043.* The rental for lease H–1043 was computed by applying the Overmyer Formula to the fully loaded financial price. (Raible, 11 Tr. 985–88) As a result, Telecasting paid a deposit of \$51,460.02, including sales tax on lease H–1043. (Raible, 11 Tr. 986) For an additional \$37,000, Telecasting could have purchased the equipment for cash directly from the supplier, American Data. (Raible, 11 Tr. 985–88)

19.4. *The Pricing of Leases H–1044 and H–1045.* The Overmyer Formula was not used to compute the rental for leases H–1044 and H–1045. (Raible, 9 Tr. 863, 10 Tr. 983–84; H. Klein, 32 Tr. 3048) Had the Overmyer Formula been applied to the loaded cost of \$3,029,523 on lease H–1044, a total lease obligation of \$7,876,759 would have resulted. (H. Klein, 32 Tr. 3047; Raible, 9 Tr. 862) This would have resulted in a 20 percent deposit of \$1,575,352 and 96 monthly payments of \$64,639.67. (H. Klein, 32 Tr. 3047–48; Raible, 9 Tr. 862–63, 11 Tr. 983) Had the Overmyer Formula been used for lease H–1045, the deposit of \$1,575,352 would have almost equaled the \$1,818,878 cash price of the equipment. (H. Klein, 32 Tr. 3048) Even Mr. Overmyer was unwilling to write a lease at so exorbitant a rate. (Raible, 9 Tr. 865) As a result, Mr. Overmyer set the rentals for leases H–1044 and H–1045 at levels derived by applying a multiplier of 1.6, as if they were three-year leases, rather than 2.6, which would normally apply to eight-year leases, and omitting the deposit altogether. (Raible, 9 Tr. 864–65, 10 Tr. 984)

19.5. *Telecasting's Lease Obligations.* Telecasting was obligated to pay Hadar \$246,223.20 on lease H–1043, \$4,847,316.48 on lease H–1044 and \$887,997.12 on lease H–1045, a total of \$5,981,536.80, or \$2,273,913.84 more than Hadar was obligated to pay Hundred East. (Leases H–1043, H–1044, H–1045, Pl. Exs. 38, 39, 42; see Finding No. 19.1, *supra.*) At the end of the terms of the three leases, Hadar, not Telecasting, will own the equipment. (H. Klein, 32 Tr. 3043–46)

19.6. *Post-Petition Lease Modification.* Sometime in March, after the Telecasting 11 was filed, Mr. Overmyer decided to

change the price for the three Hundred East packages combined to a flat total of $50,000 per month, starting January 1, and had Mr. Connery prepare back dated minutes for Telecasting and Hadar purporting to show that the change was made before the filing. (Raible, 11 Tr. 989–90; Chi Dep., FNBB Ex. 243, p. 47; 1/5/81 Telecasting Minutes, Tele Ex. 29; 1/5/81 Hadar Minutes, Pl. Ex. 47; Connery, 23 Tr. 2236–37) One effect of the change was to accelerate the date payments were to begin to January 1, 1981, even though the equipment was not installed. (*Compare* 1/5/81 Telecasting Minutes, Tele Ex. 29; *and* 1/5/81 Hadar Minutes, Pl. Ex. 47; *with* Lease H–1044, Pl. Ex. 39; H. Klein, 32 Tr. 3052–53) The purpose of accelerating the starting date was to try to explain the huge overpayment by Telecasting to Hadar.

19.7. *Double Invoicing on Lease H–1043.* Hadar invoiced Telecasting twice on lease H–1043 during January, February and March, 1981. (Invoices, Pl. Ex. 101; H. Klein, 32 Tr. 3051–52) The regular monthly invoice that lists numerous leases includes a $3,430.71 charge for lease H–1043; another invoice separately charges $50,000 on leases H–1043, H–1044 and H–1045 combined. (Invoices, Pl. Ex. 101; H. Klein, 32 Tr. 3051–52)

19.8. *The $234,138 or $400,000 Deposit.* Mr. Connery directed Messrs. Shock, Chi and Taub to make adjustments to the books of account of Telecasting, including changing the overpayment of Hadar in part into a "deposit on new leases" of $234,138. (2/23/81 Connery Memo, Connery Ex. 40) The $234,138 "deposit on new leases" was exactly six times Hadar's monthly payments to Hundred East covered by leases H–1043, H–1044 and the original version of H–1045. (Connery Dep., FNBB Ex. 231, pp. 359–63; Hundred East Contracts, Raible Ex. 752, p. 1; Raible Ex. 753, p. 3; Original Lease H–1045, D. Overmyer Ex. 2) Mr. Connery claims that Mr. Overmyer and Mr. Raible stormed into his office to ask him why he selected $234,138 as the Hundred East deposit figure, and to inform him that the correct figure which they had agreed on was $400,000. (Connery Dep., FNBB Ex.

231, pp. 360–63) On March 19, 1981, Mr. Overmyer testified that the $400,000 deposit represents eight monthly payments of $50,000 on an aggregate lease executed in 1979 for equipment financed by Hundred East. (D. Overmyer, Meeting of Creditors 3/19/81, 43 Tr. 4088–89) In his deposition, Mr. Overmyer claimed that he and Mr. Raible agreed on the $400,000 deposit figure sometime in late 1980, early 1981. (D. Overmyer Dep., FNBB Ex. 224, pp. 93–95) However, according to Mr. Raible, he did not enter into any agreement with Mr. Overmyer regarding the $400,000 deposit, nor did he ever tell Mr. Connery that any such agreement existed. (Raible, 11 Tr. 1011) The Court finds that Mr. Overmyer's and Mr. Connery's testimony about the purported deposit is unbelievable and was made up from the very beginning in an effort to explain the huge overpayment by Telecasting to Hadar.

19.9. *Hundred East Leases Intentionally Misrepresented.* In a January 2, 1981, affidavit filed in the Southern District of New York, Mr. Overmyer swore that lease H–1044 provided for rental payments in the same amount that Hadar was obligated to pay Hundred East. (D. Overmyer Affidavit, FNBB Ex. 458, ¶ 8) In fact, it was never intended by Mr. Overmyer that the rental in the original lease of "no more than $31,557.53" would be charged by Hadar. (Connery, 23 Tr. 2191; Raible, 9 Tr. 860–61) Thus, Mr. Overmyer's sworn statements were intentionally misleading, as was Mr. Overmyer's contention that lease H–1044 was beneficial to Telecasting and would improve its value to FNBB. (Affidavit, FNBB Ex. 438, ¶ 9) In his deposition in this case, Mr. Overmyer denied that he was aware of the Hadar board of directors having the right to set the actual rental. (D. Overmyer Dep., FNBB Ex. 224, p. 102)

19.10. *Hadar Has No Interest in the Equipment.* Hundred East foreclosed Hadar's interest (if any) in the equipment leases prior to the commencement of Hadar's Chapter 11. (12/8/81 Application for Authority To Install New Transmitter, ¶ 9; 3/16/81 Letter, FNBB Ex. 429; 3/26/81

Summons and Verified Complaint in *Hundred East v. Hadar,* filed 3/26/81, FNBB Ex. 426) Under all the circumstances, it would be unconscionable and a fraudulent transfer to grant Hadar any interest in lease payments from Telecasting or in any residual value of the equipment.

20. *The Inter-Company Account Between Telecasting and Hadar.*

20.1. *The Inter-Company Balance Between Telecasting and ISLI.* The accountants for Telecasting and ISLI were able to reach agreement in early 1976 that the books of both companies showed a balance due from ISLI to Telecasting of $5,019.09 as of October 22, 1975. (H. Klein, 37 Tr. 3441–42; 1/27/66 Memo, FNBB Ex. 60) An analysis of the activity between Telecasting and ISLI for the period October 22, 1975, through December 31, 1975, demonstrates that ISLI owed Telecasting $8,616.47 as of December 31, 1975. (H. Klein, 37 Tr. 3441–45)

20.2. *Hadar's First Eight Months; Payments Primarily to Jeebs.* During the first eight months after the purported effective date of the assignment from ISLI to Hadar, Hadar invoiced Telecasting a total of $172,323.19. (1/1/76–8/31/76 Invoices, Pl. Ex. 101; Hadar Journal Voucher 76–3, Pl. Ex. 115A) During that period Telecasting made only one payment directly to Hadar, $11,000 in August, 1976. (Hadar Journal Voucher 76–1, Pl. Ex. 115A; Summary, FNBB Ex. 218; Lynch, 17 Tr. 1644–45) Mr. Lynch knew that Telecasting had made payments to Jeebs on account of the leases; but, instead of examining the Jeebs' books kept at 3 Park Avenue to determine the actual amount of such payments, he improperly plugged a figure that would make the balance come out to zero as of August 31, 1976 ($172,323.19 – $11,000.00 = $161,323.19). (Lynch, 17 Tr. 1647–49; Hadar Journal Voucher 76–6, Pl. Ex. 115A) The actual amount paid by Telecasting to Jeebs during the first eight months of 1976 was $244,761.97, giving a balance of $83,438.78 due from Hadar and Jeebs to Telecasting as of August 31, 1976 ($244,761.97 + $11,000.00 – $172,323.19 = $83,438.78). (H. Klein, 37 Tr. 3447–52)

20.3. *Total Lease Charges by Hadar.* Hadar invoices and lease obligations for the period January 1, 1976, through January 31, 1981, totaled $2,618,315.29. (H. Klein, 37 Tr. 3487) This amount excludes charges pertaining to leases H–1044 and H–1045, the Hundred East equipment and installation charges of $20,153.10 and $249,116.15. (H. Klein, 37 Tr. 3483) The Hundred East equipment had not been installed as of January 31, 1981, and, therefore, no payments were yet due. (H. Klein, 32 Tr. 3053; Lease H–1044, Pl. Ex. 39) Telecasting never agreed to pay Hadar for installation of equipment. (*See* Lynch, 18 Tr. 1707–08) Moreover, Hadar never paid any of the installation charges other than $18,321 to Slates Electric. (H. Klein, 37 Tr. 3484–85; *see* Lynch, 18 Tr. 1702–03; Raible, 10 Tr. 973; H. Klein, 38 Tr. 3579–81, 3656–57) Sometime after the Overmyer organization filed this Chapter 11 on behalf of Telecasting on February 6, 1981, Mr. Raible sent to Telecasting an invoice for $249,116.15 of installation charges "incurred" by Hadar with regard to Telecasting equipment. (Raible, 10 Tr. 972; Connery, 23 Tr. 2271–75; 2/3/81 Invoice, Pl. Ex. 100) This invoice was prepared after February 23, 1981, since Mr. Connery advised former counsel for Telecasting on that day: "Invoice will be submitted and I will advise you of the amount." (2/23/81 Connery Letter, FNBB Ex. 62, p. 4) The invoice was back dated to February 3, 1981, to make it appear that it had been rendered before the Chapter 11 was filed, and to create fictitious charges to try to offset the huge overpayment that Mr. Connery knew had been made by Telecasting to Hadar. (*See* Meissner Dep., FNBB Ex. 232, p. 45)

20.4. *Amount Hadar Owes Telecasting.* Since the Hadar leases were fraudulent shams designed solely to bleed money out of Telecasting, the amount due from Hadar to Telecasting is the difference between (1) the total payments that Telecasting made to or on behalf of Hadar, and (2) the total payments that Hadar made to or on behalf of Telecasting. (H. Klein, 37 Tr. 3496–98;

Summary, FNBB Ex. 220) Telecasting paid $3,191,909.01 to or on the behalf of Hadar for the period January 1, 1976, through January 31, 1981. (H. Klein, 37 Tr. 3487; Summary, FNBB Ex. 218) This amount consists of: $2,779,368.26 payments that Telecasting made directly to Hadar; $244,761.97 payments that Telecasting made to Jeebs on the account of leases; $82,562.64 payments that Telecasting made to GE on obligations of ISLI and Hadar; $19,626.95 miscellaneous payments that Telecasting made on behalf of Hadar; and $65,589.19 petty cash withdrawals from Telecasting for use by Hadar. (Summary, FNBB Ex. 218) The following payments were made by Hadar to or on behalf of Telecasting: $496,683.24 representing Hadar payments to vendors on equipment leased to Telecasting; $36,137.21 representing Hadar payments for equipment purchased or services rendered to Telecasting which were not covered by a lease; $73,-048.74 representing Hadar payments to Hundred East for interim interest payments pertaining to equipment of leases H–1044 and H–1045; and $65,800 representing Hadar payments directly to Telecasting. (H. Klein, 37 Tr. 3497–98) The total of the foregoing payments is $671,-688.99. (H. Klein's Summary, FNBB Ex. 220) Subtracting $671,688.99 from $3,191,-909.01, Hadar owes Telecasting $2,520,-240.02. (H. Klein, 31 Tr. 3498; Summary, FNBB Ex. 220)

20.5. *Hadar's Proof of Claim.* Hadar filed a proof of claim based on the patently unwarranted assumption that the balance between Telecasting and Hadar on September 1, 1979, was zero. (Lynch, 18 Tr. 1736; Connery, 22 Tr. 2130–31; Hadar Proof of Claim, Raible Ex. 604, p. 2) Even Hadar's own post-petition set of books shows that as of that date, Hadar owed Telecasting $376,-835.04. (Hadar 1979 General Ledger, Account 0621, Pl. Ex. 114)

20.6. *Hadar Agreement to Assign Leases to Telecasting.* By minutes dated February 9, 1981, Hadar agreed to assign all of the leases to Telecasting for an amount not in excess of the balance due and owing on the purchase price. (2/9/81 Hadar Minutes,

Raible Ex. 173) This agreement has never been rescinded or withdrawn by Hadar. (Hadar Response to Telecasting/FNBB Request for Admission No. 1)

21. *Overmyer Business Tactics*

21.1. *Mr. Raible Signed Hadar Checks Without Understanding the Transaction.* Mr. Raible signed two Hadar checks on October 2, 1979, without understanding the transactions, at the request of Mr. Chi. (Hadar Requests for Payment, Nos. 1323 and 1324, Carrieri Ex. 2) The first check transferred $650 from Hadar to NDS. (Hadar Request for Payment, No. 1323, Carrieri Ex. 2) The second check transferred $5,000 from Hadar to Weathervane Farms, Inc. "to cover Expediter $5,000.00 check, which bounced twice, causing an OD [overdraft] due to tax check disbursements." (Hadar Request for Payment, No. 1324, Carrieri Ex. 2)

21.2. *Insufficient Funds for Hadar Check to Slates.* Mr. Slates, of Slates Electric, Inc., ordered his employees to cease work for Hadar and removed the necessary supplies from the premises, because Hadar did not meet its payment obligations. (Slates, 46 Tr. 4504; PAST Dep., FNBB Ex. 236, p. 21) Mr. Slates attended a meeting at which Hadar offered him a check for $20,925, if he would return the supplies and resume work. (Slates, 46 Tr. 4506–08; 11/14/80 Unexecuted Agreement, PAST Ex. 12) There were insufficient funds in Hadar's account to cover the check. (Slates, 46 Tr. 4507)

21.3. *Problems Created by Telecasting's New York Office.* The books and records of Telecasting were maintained in New York through August, 1979. (Meissner Dep., FNBB Ex. 232, p. 6) When the books were moved to Toledo, Mr. Meissner, former business manager, vice-president and controller of Telecasting, was unable to substantiate the balances in the general ledger. (Meissner Dep., FNBB Ex. 232, pp. 5, 7–8) Payments in excess of $1,000 per day had to be made by the New York office. (Meissner Dep., FNBB Ex. 232, p. 28) Mr. Meissner had no control over what bills were paid

by the New York office. (Meissner Dep., FNBB Ex. 232, pp. 29–30) When Telecasting's bank accounts were maintained in New York, the Toledo station was constantly hounded by local creditors about delinquent payments. (Meissner Dep., FNBB Ex. 232, p. 11) Mr. Meissner had difficulties reconciling Telecasting's bank statements with the general ledger, because checks had been written and were being held in New York. (Meissner Dep., FNBB Ex. 232, pp. 15–16) Information supplied to Mr. Meissner from New York was inaccurate. (Meissner Dep., FNBB Ex. 232, pp. 15–16, 24)

21.4. *Mr. Overmyer Ordered Payment to Calfee, Halter & Griswold Stopped.* On Thursday, October 29, 1981, Mr. Overmyer and Mr. Connery requested an Omega check for $5,000 made payable to Calfee, Halter & Griswold. (Omega Request for Payment, No. 1584, Carrieri Ex. 33, p. 2) Mr. Overmyer ordered that the check not be mailed until Friday, October 30, 1981. (Omega Request for Payment, No. 1584, Carrieri Ex. 33, p. 3) On Monday, November 2, 1981, Mr. Overmyer ordered payment stopped on the check, before the check could possibly have cleared. (Omega Request for Payment, No. 1584 Carrieri Ex. 33, p. 2) As a result, Calfee, Halter & Griswold required payment by bank check or wire transfer only. (*See* Omega Request for Payment, No. 1584, Carrieri Ex. 33, pp. 1, 2, 5, 6 and 7)

21.5. *Other Overmyer Stop Payment Scams.* On July 3, 1980, Mr. Raible wrote a letter to Mr. Todd, of Texcom Computer Leasing Services, enclosing Hadar's check for $3,562 (two lease payments) and the proposed IBM System 43 lease for execution. (Raible Letter, FNBB Ex. 29) At the same time, Mr. Chi wrote to Chemical Bank stopping payment on the $3,562 check to Texcom. (Chi Letter, FNBB Ex. 30) On May 21, 1981, Barry Mansfield, of Lansco, personally went to the Overmyer offices to demand a check. (Note, Carrieri Ex. 43, p. 4) As a result, Mr. Overmyer approved an Omega check for $500 to Lansco. (Omega Request for Payment No. 1292, Carrieri Ex. 43, p. 2) On May 27, 1981, Mr. Overmyer ordered that payment on the check to Lansco be stopped. (Carrieri Ex. 43, pp. 2, 3 and 5)

21.6. *Checks Written and Held.* On August 14, 1979, a Hadar check to Barry Equipment for the lump sum of $7,644 was voided, per Mr. Overmyer's instructions. (Hadar Request for Payment No. 1273, Carrieri Ex. 2) Three separate checks were written instead, each for $2,548, to be held pending Mr. Overmyer's instructions for their release. (Hadar Request for Payment No. 1273, p. 2, Carrieri Ex. 2) The first check was not mailed until August 21, 1979, and the second and third checks were not mailed until August 22, 1979. (Hadar Request for Payment No. 1273, Carrieri Ex. 2) Mr. Chi requested and approved a Telecasting check dated February 23, 1981, payable to Warner Bros., Inc., in the amount of $6,998.33, which check was "to be held by Mr. Chi—not for immediate release." (Telecasting Request for Payment No. 1002, Carrieri Ex. 22)

21.7. *Failure to File Tax Returns.* According to the Hadar and Telecasting agreements, the service companies agreed to prepare and file federal and state tax returns, including sales and franchise taxes. (Hadar Service Agreements, Raible Exs. 9–11; Telecasting Service Agreements, 3/1/74, 11/1/80 Telecasting Minutes, Tele Ex. 29, Raible Exs. 773, 774) Federal and state income tax returns for Hadar have not been filed since August 31, 1971. (Raible Dep., FNBB Ex. 259, pp. 140–141, 151–152) Federal income tax returns for Telecasting have not been filed since 1975. (Connery, 21 Tr. 2009–10) Hadar collected sales taxes from Telecasting, but neither filed returns nor paid them over to the State of Ohio. (Connery, 21 Tr. 2009; Hadar Response to Telecasting/FNBB Request for Admission No. 29)

21.8. *Fictitious Address for Leased Car.* Mr. Overmyer's 1965 Mustang was registered in Connecticut at his direction. (Raible Dep., FNBB Ex. 259, p. 191) Mr. and Mrs. Overmyer's former address was on Perkins Road in Greenwich, Connecticut.

(Raible Dep., FNBB Ex. 259, p. 192) The 1965 Mustang was not registered at that address. (Raible Dep., FNBB Ex. 259, p. 192) Instead, the Mustang was registered at a fictitious address made up by using the street address for the Overmyer organization in New York, but changing the city and state: Overmyer Trucking Co., 3 Park Avenue, Greenwich, Connecticut, 06830. (Registration Card, Raible Ex. 377; Raible Dep., FNBB Ex. 259, p. 194)

21.9. *Defrauding United Way.* During 1980 and 1981, certain Telecasting employees consented to payroll deductions for charitable contributions to United Way. (Hall, 46 Tr. 4418, 4422; Consent Forms, Tele Exs. 38, 39) Although the pledges were deducted from the employees' take-home pay, Telecasting, under the control of Mr. Overmyer, did not forward the pledges for 1980 ($356) to United Way. (Hall, 46 Tr. 4420–22) United Way attempted to collect the $356 due from Telecasting. (4/24/81 Letter, Tele Ex. 38) On July 10, 1981, United Way filed a proof of claim with this Court for the $356 due it. (Proof of Claim, Tele Ex. 40) During the first quarter of 1981, while Mr. Overmyer continued to control Telecasting, the amounts pledged to United Way by Telecasting employees were deducted from their pay, but not paid over to the charity. (Hall, 46 Tr. 4422–24) After Mr. Overmyer was removed from control by this Court, the payroll deductions were paid to United Way as charitable contributions by Telecasting employees. (Hall, 46 Tr. 4425) For 1981, $371.28 remains unpaid to United Way. (Hall, 46 Tr. 4428; 1/14/82 Letter, Tele Ex. 39)

21.10. *PAST's Change of Claim.* During the period September, 1980, to February, 1981, Mr. Wilson of PAST submitted invoices to Telecasting for services performed in connection with the installation of the Hundred East equipment. (Invoices, PAST Ex. 16) On March 11, 1981, Mr. Strang wrote a letter to Mr. Wilson of PAST, asking him to submit new invoices, charging Hadar instead of Telecasting for the same services. (Letter, PAST Ex. 15) This was done on the same date, March 11, 1981, as this Court's order appointing a fiscal agent for Telecasting. (3/11/81 Order) On March 17, 1981, Mr. Wilson complied with Mr. Strang's request and sent a new set of invoices charging Hadar. (Invoices, PAST Ex. 16; Wilson, 46 Tr. 4482–86)

21.11. *Mr. Overmyer's Bad Business Reputation.* Mr. Overmyer's reputation with regard to paying his bills is bad. (Raible, 8 Tr. 713) Knowing what he knows about Mr. Overmyer, Mr. Raible did not know if he would have loaned money to Hadar. (Raible, 8 Tr. 713)

## 22. The Hadar Conduit

22.1. *Hadar's Funds Came from Telecasting.* Hadar's cash receipts from all sources totaled $3,074,967.31 for the period January 1, 1976, to January 31, 1981. (Cash Receipts and Cash Disbursements Summary, FNBB Ex. 182) Of this total, $2,803,918.36 (91.18 percent) came from Telecasting. (Cash Receipts and Cash Disbursements Summary, FNBB Ex. 182) Only .56 percent of Hadar's cash receipts came from sources other than Overmyer companies. (Cash Receipts and Cash Disbursements Summary, FNBB Ex. 182)

22.2. *Hadar's Funds Went to Other Overmyer Entities.* During the fiscal year 1977, Hadar obtained $460,209.70 from Telecasting and disbursed $424,100 to Jeebs. (Cash Receipts and Cash Disbursements Summary, FNBB Ex. 182) During the fiscal year 1978, Hadar obtained $579,823.20 from Telecasting and disbursed $519,400.15 to Overmyer companies (primarily Jeebs and AGG). (Cash Receipts and Cash Disbursements Summary, FNBB Ex. 182) During the fiscal year 1979, Hadar obtained $854,675.77 (94.2 percent of Hadar's receipts) from Telecasting, disbursed only $174,639.66 to vendors of equipment leased to Telecasting and disbursed $685,081.02 to Overmyer companies (primarily AGG). (Cash Receipts and Cash Disbursements Summary, FNBB Ex. 182) During the fiscal year 1980, Hadar obtained $731,605.09 (92.5 percent of Hadar's receipts) from Telecasting, disbursed only $142,768.96 to ven-

dors and disbursed $545,168.35 to Overmyer companies (primarily AGG). (Cash Receipts and Cash Disbursements Summary, FNBB Ex. 182) During the seven months ended March 31, 1981, Hadar obtained $166,604 from Telecasting, disbursed only $24,907.64 to vendors and disbursed $95,100 to Overmyer companies. (Cash Receipts and Cash Disbursements Summary, FNBB Ex. 182) Of its total cash receipts from 1976 to 1981, $3,074,967.31, Hadar disbursed only $496.683.24 to vendors of equipment leased to Telecasting and $36,137.21 to vendors of equipment and services that Telecasting used which were not covered by leases. (Cash Receipts and Cash Disbursements Summary, FNBB Ex. 182) Of its total cash receipts from 1976 to 1981, Hadar disbursed $34,704.83 to vendors of equipment or services for the offices at 3 Park Avenue, $39,328.16 to vendors of the yacht and cars that Hadar leased to Jeebs and the Overmyer family, $19,051.20 for insurance premiums on the Overmyer family cars and other miscellaneous items and $23,918.39 for maintenance and repairs on Jeebs' yacht. (Cash Receipts and Disbursements Summary, FNBB Ex. 182) All of the above payments were approved by Mr. Overmyer. (Raible, 6 Tr. 568–69; Raible, 9 Tr. 837–38) Over the years 1976 to 1981, Hadar disbursed $2,297,349.52, 74.7 percent of its total cash receipts, to Overmyer entities. (Cash Receipts and Cash Disbursements Summary, FNBB Ex. 182) Among these disbursements were $1,142,312 to AGG, $654,600 to Jeebs, $85,272 to NDS, $8,000 to Gulf Manufacturing, $90,000 to Peerless, $35,050 to Omega and $63,000 to Mr. Overmyer. (Cash Receipts and Cash Disbursements Summary, FNBB Ex. 182)

22.3. *The Matching Checks Scheme.* Mr. Overmyer directed Mr. Chi to transfer funds from Telecasting to Hadar to cover what Mr. Overmyer considered to be "critical requirements of some kind." (Overmyer Dep., FNBB Ex. 224, pp. 115–16) Mr. Overmyer's practice was to tell Mr. Chi the amount needed by some Overmyer company other than Hadar or Telecasting; Mr. Chi would write a Telecasting check to Hadar, and Hadar would write a check to the other Overmyer company in precisely the amount of the "critical requirement." (Overmyer Dep., FNBB Ex. 224, pp. 115–17; Raible, 7 Tr. 719–20, 10 Tr. 930–31; Chi Dep., FNBB Ex. 243, pp. 76–81; H. Klein, 34 Tr. 3189–90) Mr. Chi usually delivered Telecasting checks to Mr. Carrieri together with a Hadar deposit slip that Mr. Chi had already made out. (Carrieri Dep., FNBB Ex. 233, p. 54) Mr. Chi's denial that this happened and subsequent lack of memory about the subject (Chi Dep., FNBB Ex. 243, pp. 90–91) are not credible. Matching checks were written to Overmyer companies, Overmyer family members, vendors of leased equipment and many others. (Schedule of Matching Checks, FNBB Ex. 188) The practice of siphoning money out of Telecasting by means of matching checks began at least as far back as July 11, 1977, and continued until March 10, 1981, one day before this Court appointed a fiscal agent to prevent further misappropriation of Telecasting's funds. (Schedule of Matching Checks, FNBB Ex. 188; H. Klein, 34 Tr. 3215)

22.4. *Matching Checks to RCA Then to Jeebs, NDS, Peerless and Sugarman.* Hadar took $60,000 of Telecasting funds in order to write RCA a matching check as a down payment on RCA equipment for lease to Telecasting. (Telecasting Checks to Hadar, FNBB Ex. 26; Schedule of Matching Checks, FNBB Ex. 188, Sheet 16; 1/20/78 Letter, Raible Ex. 744; Raible, 11 Tr. 992–93, 995; Hadar Cash Receipts Journal, Raible Ex. 490, p. 14) Hadar stopped payment on the $60,000 check to RCA. (Draft Letters, Raible Ex. 745) The $60,000 was not returned to Telecasting, however; instead, Hadar used the $60,000 to make payments to Jeebs, NDS, Peerless and Mr. Sugarman. (Schedule of Matching Checks, FNBB Ex. 188, p. 16; Raible, 11 Tr. 995–97)

22.5. *Matching Checks to Other Equipment Vendors.* By use of checks from Telecasting to Hadar and matching checks to the vendor, the Overmyer organization paid $500 to Jamieson Film Company for the equipment covered by lease H–1010, $700 to Barry Equipment Company for the equip-

ment covered by lease H–1015, $891 to IBM for the equipment covered by lease H–1007 and $2,000 to Hood Electrical for the equipment covered by lease H–1019. (Schedule of Matching Checks, FNBB Ex. 188, Sheet 16; H. Klein, 34 Tr. 3205–07)

22.6. *Matching Checks to Overmyer Family and Overmyer Family Companies.* By use of checks from Telecasting to Hadar and matching checks to the payee, the Overmyer organization paid $1,584.21 to Mr. Strang, $23,000 to T.O.F.C. (a subsidiary of RT Systems) $3,200, $2,900 and $2,100 to Manning Telecasting (of which Mr. Overmyer's daughter, Elizabeth, is president), $5,100 and $1,950 to Strang Telecasting (of which Mr. Strang is president), and $1,600 and $950 to the Citizens Committee to Eliminate Waste and Inefficiency in Government (a committee founded by Mr. Overmyer.) (Schedule of Matching Checks, FNBB Ex. 188, pp. 16 and 17; H. Klein, 34 Tr. 3207–09; Raible, 9 Tr. 824–25; Overmyer Dep., FNBB Ex. 139A, p. 69)

22.7. *The Hadar Conduit.* Hadar was a mere conduit by which Mr. Overmyer could and did covertly misappropriate Telecasting's funds.

### 23. *The Service Company Fraud*

23.1. *The Telecasting Service Agreements.* The minutes of a board of directors meeting held March 1, 1974, reflect that it was unanimously voted Telecasting should retain Jeebs to render tax, accounting, insurance and administrative services for a monthly fee of $1,500 less the cost Telecasting had already incurred for the salary of Mr. Lynch. (3/1/74 Telecasting Minutes, Tele Ex. 29, pp. 3–4) A new service agreement entered into by and between Jeebs and Telecasting provided that Telecasting pay to Jeebs $2,600 per month from June 1, 1975, to December 31, 1977, for services performed by Jeebs. (12/1/75 Service Agreement, Raible Ex. 773) Subsequently, Telecasting agreed to pay AGG $5,900 per month during the period January 1, 1978, to August 31, 1979, for services rendered. (1/1/78 Service Agreement, Raible Ex. 774) Thereafter, Telecasting agreed to pay Jeebs $10,000 each month during the period Sep-

tember 1, 1979, to October 31, 1980. (9/1/79 Service Agreement, Raible Ex. 774) Finally, a service agreement by and between Omega and Telecasting provided that Telecasting pay $10,000 per month commencing November 1, 1980, for the duration of the contract. (11/1/80 Telecasting Minutes, Tele Ex. 29)

23.2. *Telecasting's Lack of Need for the Services.* The only services provided by the service companies to Telecasting were "accounting, office staffing, office assistance," and "liaison services with New York people." (D. Overmyer Dep., FNBB Ex. 224, pp. 58, 59) These support services could all have been performed in Toledo instead of New York. (D. Overmyer Dep., FNBB Ex. 224, pp. 58–59) The primary reason for Telecasting having a New York office was that, had it been in Toledo, the chairman and chief executive officer, Mr. Overmyer, would have had to move back to Toledo. (D. Overmyer Dep., FNBB Ex. 224, p. 60) Mr. Meissner did not know what services Telecasting was getting from AGG for $10,000 per month. When he asked Mr. Chi, Mr. Chi just laughed. (Meissner Dep., FNBB Ex. 232, pp. 38–43) Mr. Arthur Dorfner, president of Telecasting until 1980 and chief operating officer until 1979, could not recall any services provided to Telecasting by Jeebs, AGG or Omega. (Dorfner Dep., FNBB Ex. 240, pp. 16–18)

23.3. *The Hadar Service Agreements.* Hadar had service agreements with Jeebs, AGG and Omega by which it was to pay Jeebs $2,000 each month from January 1, 1976, through August 31, 1977, and $5,000 each month thereafter for the duration of the agreement (Jeebs Service Agreement, Raible Ex. 9); AGG $10,000 each month from May 1, 1978, through August 31, 1979, and $25,000 each month thereafter for the duration of the agreement (AGG Service Agreement, Raible Ex. 10); and Omega $10,000 each month beginning November 1, 1980, for the duration of the agreement (Omega Service Agreement, Raible Ex. 11).

23.4. *Lack of Services to Hadar.* In actuality, the service companies provided few services to Hadar. Service company per-

sonnel might have taken one day each month to type invoices to Telecasting, one day to deal with receipts from Telecasting and one day to negotiate acquisitions of property for lease to Telecasting. (Raible Dep., FNBB Ex. 259, pp. 181–83) Telecasting personnel did most of the work involved in selecting new equipment, including obtaining quotations from vendors. (Raible, 4 Tr. 334–35, 6 Tr. 523) After June, 1980, every AGG employee not related to Mr. Overmyer was removed from the AGG payroll, except Mr. Hicks and Mr. Connery's secretary, Mabel Trow-Abraham. (AGG Payroll Register, Raible Ex. 498) The Omega payroll consisted solely of members of the Overmyer family, the Overmyer attorneys, Messrs. Connery and Conway, and hired help to work at the farm owned by Weathervane Farms, Inc. (H. Klein, 35 Tr. 3286–87)

23.5. *The Hadar Service Agreements Are Back Dated Fabrications.* The original journal vouchers for June, 1978, that were identified during Mr. Lynch's testimony recorded Hadar's obligation to the service companies as $2,000 per month to Jeebs from September, 1977, through June, 1978 (6/78 Telecasting Journal Voucher 6–5, FNBB Ex. 59), whereas the service agreements produced by Hadar in this adversary proceeding show obligations of $5,000 per month to Jeebs from September, 1977, through April, 1978, and $10,000 per month to AGG for May and June, 1978 (Jeebs Service Agreement, Raible Ex. 9; AGG Service Agreement, Raible Ex. 10). For the fiscal year ended August 31, 1979, Hadar recorded management and professional service fees of $20,014 on its financial statements prepared at the time (8/31/79 Profit & Loss Statement, FNBB Ex. 38); whereas the service agreements produced in this adversary proceeding show an obligation of $10,000 per month, or $120,000, to AGG (AGG Service Agreement, Raible Ex. 10). The Hadar service agreements produced in this case are back dated frauds created in an effort to justify the incredible amounts of money siphoned out of Telecasting through Hadar by the service companies.

23.6. *The RT Systems Service Agreements.* By an agreement dated November 1, 1978, RT Systems agreed to pay Jeebs $4,500 each month for 1977, and $8,000 each month from January 1, 1978, to March 31, 1978. (Service Agreement, Connery Ex. 23) In another agreement dated November 1, 1978, with AGG, RT Systems agreed to pay AGG $8,000 each month, beginning April 1, 1978. (Service Agreement, Connery Ex. 24) A third agreement was made with Omega by which RT Systems agreed to pay Omega $12,000 each month beginning December 1, 1980. (Service Agreement, Connery Ex. 25)

23.7. *Unwarranted Rent Payments by RT Systems and DHO.* Both the Hadar service agreements and the RT Systems service agreements provided that the service companies would provide office space at 3 Park Avenue. (Hadar-Jeebs Service Agreement, Raible Ex. 9, p. 4; Hadar-AGG Service Agreement, Raible Ex. 10, p. 4; Hadar-Omega Service Agreement, Raible Ex. 11, p. 4; RT Systems-Jeebs Service Agreement, Connery Ex. 23, p. 3; RT Systems-AGG Service Agreement, Connery Ex. 24, p. 3; RT Systems-Omega Service Agreement, Connery Ex. 25, p. 3) For years, however, RT Systems paid $3,165.25 each month to the Overmyer service companies for the rent at 3 Park Avenue. (TOFC Vouchers, Connery Ex. 26, pp. 1, 2, 7, 15, 17–20, 25 and 26; FDS Vouchers, Connery Ex. 30, pp. 32, 37–39 and 41; Raible, 8 Tr. 727–29) In 1980, while in Chapter XI in New York, DHO made three monthly payments of $2,500 each for the 3 Park Avenue rent. (AGG Cash Receipts Ledger, Raible Ex. 498, pp. 11–13) Beginning in October, 1980, and continuing at least through 1981, DHO made monthly payments of $3,390 or more for the 3 Park Avenue rent. (AGG Cash Receipts Register, Raible Ex. 498, pp. 14–15; DHO Checks, Carrieri Ex. 57; Raible, 8 Tr. 722–26; Chi Dep., FNBB Ex. 243, pp. 124–25) The base rent is substantially covered by RT Systems and DHO. (Raible, 9 Tr. 832) Hadar paid the rent on the 29th floor of 3 Park Avenue in January, 1981. (Hadar Request for Payment No. 1149, Carrieri Ex. 62) Telecasting paid the rent for February, 1981, after the Overmyer organi-

zation filed its Chapter 11 petition in this Court. (Telecasting Request for Payment No. 005, Carrieri Ex. 22) While in Chapter XI in New York and Chapter 11 in this Court, the Overmyer organization caused Telecasting to pay at least $56,232.78 to Cross & Brown (the landlord of 3 Park Avenue) via Chemical Bank checks. (H. Klein, 33 Tr. 3103)

23.8. *Sources of AGG Funds.* AGG obtained its funds from the following sources:

| | |
|---|---|
| $1,421,605.74 | Hadar and Telecasting |
| 645,684.55 | RT Systems and Subsidiaries |
| 359,627.37 | Other Overmyer Companies |
| 89,509.96 | Mr. Overmyer |
| 51,881.65 | Miscellaneous |
| $2,568,309.27 | Total Receipts |

(H. Klein, 35 Tr. 3297–98) Receipts from other Overmyer companies included $78,010 from the debtor-in-possession, DHO. (Sources and Uses of AGG Funds, FNBB Ex. 191, p. 15) Out of the total receipts from Hadar of $1,150,811.66, $743,573.44 represents matching checks from Telecasting to Hadar and Hadar to AGG. (H. Klein, 35 Tr. 3300–01; Schedule of Matching Checks, FNBB Ex. 188)

23.9. *Sources of Omega's Funds.* Omega obtained its funds from the following sources:

| | |
|---|---|
| $188,549.37 | RT Systems and Subsidiaries (TOFC and FDS) |
| 50,383.93 | Telecasting and Hadar |
| 86,910.57 | Total Development |
| 60,823.71 | D.H. Overmyer Co. (Canada) |
| 15,580.00 | Jeebs |
| 8,783.78 | Mr. Overmyer |
| 21,523.03 | Other Sources |
| $432,554.39 | Total Receipts |

(H. Klein, 35 Tr. 3276–77; Sources and Uses of Omega Funds, FNBB Ex. 192) Out of total receipts from Hadar of $35,050, $20,-550 represents matching checks from Telecasting to Hadar and Hadar to Omega. (H. Klein, 35 Tr. 3278)

23.10. *Omega Funds Received from D.H. Overmyer Co. (Canada) Ltd.* Omega received $60,823.71 from D.H. Overmyer Co. (Canada) Ltd. ("DHO Canada"). (H. Klein, 35 Tr. 3277) A portion of the $60,823.71 represents DHO Canada's payment for services rendered by Mr. Edgerton since September, 1980. (H. Klein, 35 Tr. 3279; Deauville/NDS [Edgerton] Dep., FNBB Ex. 252, p. 17) During the period Mr. Edgerton rendered services to DHO Canada, he was employed by the debtor-in-possession, DHO, not by Omega. (Deauville/NDS [Edgerton] Dep., FNBB Ex. 252, p. 17) The remaining portion of the receipts pertained to "loans" that DHO Canada made to Omega. (H. Klein, 35 Tr. 3279–80)

23.11. *Use of Service Company Funds.* The funds of the service companies were used primarily to pay Mr. Overmyer's personal expenses, to fund his litigation and to maintain him in his suite of offices in New York City. For example, Omega disbursed funds for the following purposes:

| | |
|---|---|
| $ 51,231.15 | Personal expenses of Mr. Overmyer |
| 10,180.37 | Payments to IRS on account of Mr. Overmyer |
| 68,908.85 | Related Overmyer Companies |
| 184,719.07 | Lawyers and court costs |
| 116,731.16 | Payroll and consulting (primarily Messrs. Connery and Conway) |
| 60,196.56 | Payments to Cross & Brown, landlord of 3 Park Avenue |
| 18,851.96 | Office expenses |
| 80,725.17 | Miscellaneous payments |
| $591,544.29 | Total |

(H. Klein, 35 Tr. 3283, 3287; Sources and Uses of Omega Funds, FNBB Ex. 192)

23.12. *Obligations of Jeebs, AGG and Omega Directly to Telecasting.* AGG had receipts of $270,794.08 from Telecasting. (Summary, FNBB Ex. 191, p. 13; H. Klein, 34 Tr. 3296–97) Assuming the validity of the only executed agreement between Telecasting and Jeebs, Telecasting's obligation was $5,000 per month, which would produce a total obligation of only $170,000 for the 34 months the agreement was purportedly in effect (January 1, 1978, through October 31, 1980). (Service Agreement, Raible Ex. 774, pp. 2–4) Even if the unsigned September 1, 1979 service agreement between Telecasting and Jeebs with regard to the obligations of AGG could be considered to have gone

into effect and to have been valid, and even if payments to AGG could be considered to have been made pursuant to it, with 20 months at $5,000 per month under the AGG service agreement, plus 14 months at $10,000 per month under the Jeebs service agreement, the total obligation for 34 months would still be only $240,000. (Service Agreement, Raible Ex. 774, pp. 5–7) In the latter case, Telecasting overpaid AGG by $20,794.08; in the former, Telecasting overpaid AGG by $90,794.08. Omega had receipts from Telecasting of $15,333.93. (Summary, FNBB Ex. 192, p. 1) Assuming the validity of its service agreement with Telecasting at $10,000 per month from November, 1980, through February, 1981, the total obligation was $40,000. (11/1/80 Service Agreement, Tele Ex. 29) On that assumption, Telecasting underpaid Omega by $24,666.04. Because of the substantial gaps in the records of Telecasting that were turned over by the Overmyer organization pursuant to this Court's order and in the Jeebs records produced during discovery, it is impossible to determine how much Telecasting paid to Jeebs. (H. Klein, 34 Tr. 3239–43)

23.13. *Obligations of Jeebs, AGG and Omega to Telecasting Through Hadar.* Assuming the validity of the service agreement between Hadar and Jeebs at $2,000 per month from January 1, 1976, through August 31, 1977, and $5,000 per month from September 1, 1977, through April 30, 1978, the total obligation of Hadar to Jeebs was $80,000. (Service Agreement, Raible Ex. 9) Even based on the books prepared by Mr. Lynch for Hadar, Jeebs concededly owes Hadar $731,223.76 on the assumption that the service agreement was valid (or $811,223.76 if it was not). (3/31/81 Hadar Trial Balance, Pl. Ex. 116A, p. 2; Lynch, 18 Tr. 1720) The books of Jeebs produced by the Overmyer organization were so incomplete as to make it impossible for Mr. Klein to verify this figure. (H. Klein, 34 Tr. 3239–43) Of the amount owed by Jeebs to Hadar, $60,000 is for amounts paid by matching checks of Telecasting to Hadar and Hadar to Jeebs. (Summary of Matching Checks, FNBB Ex. 188, p. 1; H. Klein, 34

Tr. 3204) Assuming the validity of the service agreement between Hadar and AGG at $10,000 per month from May 1, 1978, through August 31, 1979, and $25,000 per month from September 1, 1979, through October 31, 1980, the total obligation of Hadar to AGG was $510,000. (Service Agreement, Raible Ex. 10) Even based on the books prepared by Mr. Lynch for Hadar, AGG concededly owes Hadar $582,513.89 on the assumption that the service agreement was valid (or $1,092,513.89 if it was not). (3/31/81 Hadar Trial Balance, Pl. Ex. 116A, p. 2; Lynch, 18 Tr. 1723–25) The correct total amount due from Jeebs to Hadar is $1,142,311.66 (not $1,092,513.89) if · the service agreement is invalid, or $632,311.66 if it is valid. (H. Klein, 34 Tr. 3293–94) Of the amount owed by AGG to Hadar, $743,573.44 is for amounts paid by matching checks of Telecasting to Hadar and Hadar to AGG. (Summary of Transfers, FNBB Ex. 188, p. 1; H. Klein, 34 Tr. 3204) Assuming the validity of the service agreement between Hadar and Omega at $10,000 per month from November 1, 1980, through March 31, 1981, the total obligation of Hadar to Omega was $50,000. (Service Agreement, Raible Ex. 11) Based on the books prepared by Mr. Lynch for Hadar, Omega concededly owes Hadar $4,007.98 on the assumption that the service agreement was valid (or $54,007.98 if it was not). (3/31/81 Hadar Trial Balance, Pl. Ex. 116A, p. 2; Lynch, 18 Tr. 1726) The correct accounting is that Hadar owes Omega $14,950.00 on the assumption that the service agreement is valid, and Omega owes Hadar $35,050.00 if it is not. (Omega Schedule, FNBB Ex. 192, p. 1; H. Klein, 35 Tr. 3278) Of the amount owed by Omega to Hadar, $20,550 is for amounts paid by matching checks of Telecasting to Hadar and Hadar to Omega. (Summary of Transfers, FNBB Ex. 188, p. 1; H. Klein, 34 Tr. 3212–13) The last two matching checks to Omega were on February 18 and March 10, 1981, after the Overmyer organization filed the Chapter 11 petition for Telecasting in this Court. (Summary of Matching Checks, FNBB Ex. 188, p. 17)

23.14. *Service Company Assets.* Jeebs owns a valuable leasehold on the 29th floor of 3 Park Avenue. (Connery Dep., Ex. 231, pp. 386–87; Raible Dep., Ex. 259, pp. 68–69) Mr. Connery estimated the value of that leasehold at $300,000. (Connery Dep., FNBB Ex. 231, p. 387) Jeebs also owns the lease on Apartment 22G at 4 Park Avenue, which is occupied by Elizabeth Overmyer, Mr. Overmyer's daughter. (Raible Dep., FNBB Ex. 259, p. 69; Omega Requests for Payment, Carrieri Ex. 36, pp. 2–4, 8–21) The rent on 4 Park Avenue for December, 1980, and January, 1981, was paid by checks from Telecasting to Hadar, which were used to fund matching checks from Hadar to Chemical Bank, which were, in turn, used to purchase bank checks payable to Century Operating Corporation. (Summary of Matching Checks, FNBB Ex. 188, last page; H. Klein, 34 Tr. 3210–11; Hadar Requests for Payment Nos. 1156 and 1157, Carrieri Ex. 62) The leases on the 29th floor of 3 Park Avenue and apartment 22G at 4 Park Avenue belong in equity to Telecasting.

23.15. *The Purchase of the Overmyer Farm by Weathervane Farms, Inc.* On August 15, 1978, Weathervane Farms, Inc. acquired a large parcel of real estate in the Towns of New Castle and Yorktown in Westchester County, New York, from the Estate of Mabel M. Gabriel for $800,000. (Deed, FNBB Ex. 204) The property, on which Mr. and Mrs. Strang reside, consists of 263 acres containing four houses and a barn, and is contiguous to the property of Intermodal Terminals, Inc., on which Mr. Overmyer resides. (Weathervane Dep., FNBB Ex. 246, pp. 3–4, 28) At the closing on August 15, 1978, Mr. Strang delivered checks of Weathervane Farms, Inc. to the Estate of Mabel M. Gabriel in the amounts of $261,000, $764.20 and $493.33. (Checks 1002, 1003 and 1006, Weathervane Ex. 7, pp. 2, 4; Check Stubs 1002, 1003 and 1006, Weathervane Ex. 4; H. Klein, 36 Tr. 3360) He also delivered a Hadar check for $4,550. (Hadar Cash Disbursements Register MHT, Carrieri Ex. 3, p. 2, Check No. T012; H. Klein, 36 Tr. 3383) Mr. Strang had no idea where the money to cover these checks came from. (Weathervane Dep., FNBB Ex. 246, p. 26)

23.16. *Funds from Telecasting, Hadar, AGG and Omega.* Weathervane Farms, Inc. has been making payments on a $500,-000 mortgage and on the real estate taxes since August, 1978. (Weathervane Dep., FNBB Ex. 246, pp. 26–27; Carrieri Dep., FNBB Ex. 233, pp. 140–41) Out of total cash receipts of $738,919.46 shown on the books of Weathervane Farms, Inc., through March 31, 1981, $7,087.74 came from Telecasting, $55,647.66 came from Hadar, $94,-646.25 came from AGG, and $25,846.34 came from Omega. (Summary, FNBB Ex. 205, p. 1; H. Klein, 36 Tr. 3370, 3375, 3380) The books of Telecasting, Hadar, AGG and Omega, some of which cover different periods, show higher amounts of $8,025.74 from Telecasting, $60,448.00 from Hadar, $118,-146.25 from AGG and $47,266.34 from Omega. (H. Klein, 36 Tr. 3380–81) Of the money received by Weathervane Farms, Inc. from Hadar, $34,575.66 constituted matching checks from Telecasting to Hadar and Hadar to Weathervane Farms, Inc. (H. Klein, 36 Tr. 3377)

23.17. *Source of Funds for the Purchase.* From July 26, 1978, through August 16, 1978, Weathervane Farms, Inc. had cash receipts of $271,390.01, consisting of $176,-618.01 from NDS, $70,000 from Expediter, $22,500 from AGG and $2,272 from Hadar. (Weathervane Cash Receipts Journal, Weathervane Ex. 2; H. Klein, 36 Tr. 3359) During that period, $270,513.53 was used to purchase the farm. (Weathervane Cash Disbursements Journal, Weathervane Ex. 2; H. Klein, 36 Tr. 3360) Mr. Klein looked for an NDS check for $166,780.26 that made up part of the $176,618.01, but found that no copy of the check was included with the deposit slip, that the records of NDS produced by the Overmyer organization contained a gap at that period of time and that there was no general ledger, disbursements journal, bank statement, check, check stub or correspondence that would verify the money came from NDS. (H. Klein, 36 Tr. 3360–61)

23.18. *From Where Did the Other Funds of Weathervane Farms, Inc. Really Come?*

The books of Weathervane Farms, Inc. show cash receipts of $183,168.01 from NDS. (Summary, FNBB Ex. 205, p. 1; H. Klein, 36 Tr. 3370) The accounting records of NDS that were produced during discovery by the Overmyer organization do not include the records of the $183,168.01 supposedly disbursed to Weathervane Farms, Inc., or show from where it came. (H. Klein, 36 Tr. 3360–61, 3363–64, 3372) NDS's books did show that at the time the Overmyer organization acquired NDS, NDS wired $325,000 into a new NDS bank account at Continental Bank in Garden City, Long Island, New York; that during the following two weeks four wire transfers totaling $160,000 were made to the Jeebs bank account at Bank Leumi on Fifth Avenue; and that in the following two months $24,000 more was wired to Jeebs. (H. Klein, 36 Tr. 3362–63; NDS Disbursement Journal, NDS Ex. 12, pp. 1–4; 10/28/77, 11/1/77, 11/2/77 and 11/9/77 Wire Transfer Instructions, NDS Ex. 9, pp. 15, 16, 17, 30) The Jeebs records with regard to the receipt and disposition of the $184,000 were never produced by the Overmyer organization. (H. Klein, 36 Tr. 3363) The Overmyer organization also failed to produce receipt and disbursement records of NDS for an April 24, 1978, mailing of the operating funds of the Atlanta warehouse to New York, which was ordered by Mr. Overmyer and caused the resignation of one of the directors of NDS. (4/26/78 Letter, NDS Ex. 56; H. Klein, 36 Tr. 3364) NDS obtained $85,272 of its funds from Hadar and $24,200 from AGG. (H. Klein, 36 Tr. 3364–65) Of the $85,272 received from Hadar, $69,950 came from Telecasting by matching checks from Telecasting to Hadar and Hadar to NDS. (H. Klein, 36 Tr. 3365) Neither Telecasting nor Hadar did any business with NDS. (Deauville/NDS [Edgerton] Dep., FNBB Ex. 252, pp. 13, 25) The books of Weathervane Farms, Inc. also show receipt of $236,850 from Expediter. (Summary FNBB Ex. 205, p. 1; H. Klein, 36 Tr. 3370) The only financial records produced by Expediter for the relevant time period of July, 1978, through February 1980, were balance sheets and income statements. (H.

Klein, 36 Tr. 3366–67) These showed that Expediter had very limited income and was in a constant cash overdraft position (H. Klein, 36 Tr. 3367–68), making it most unlikely that $236,850 could really have come from Expediter. The detailed cash receipts and cash disbursements journals and general ledgers that are necessary to do a detailed study of the sources and applications of Expediter's funds to determine where the $236,850 really came from were suppressed by the Overmyer organization in direct violation of an order of this Court. (H. Klein, 36 Tr. 3367–69, 3372; Motion To Compel Granted 2/3/72, FNBB Ex. 154, p. 2, ¶ 12) The Overmyer organization also failed to produce financial records of Peerless for the period October, 1977, through March, 1978, during which period bank statements of Peerless showed $4,690,000 of deposits and $4,822,000 of withdrawals, including wire transfers of $4,125,000 for which there was no support. (H. Klein, 36 Tr. 3373–74) For other periods of time, the Overmyer organization produced huge volumes of detailed Peerless financial records. (H. Klein, 36 Tr. 3374–75) Peerless received a total of $90,784 from Hadar, of which $78,084.75 represented matching checks from Telecasting to Hadar and Hadar to Peerless. (Hadar Sources and Applications, FNBB Ex. 182, p. 4; Summary of Matching Checks, FNBB Ex. 188, p. 1) Peerless also received $6,000 directly from Telecasting. (Meissner Dep., Ex. 232, p. 38) Telecasting never purchased any heaters or fireplace equipment from Peerless. (D. Overmyer Dep., FNBB Ex. 224, p. 117) During the same period of early 1978, AGG had bank accounts at Barclay's Bank and Continental Bank that were never recorded on the books of account of AGG. (H. Klein, 36 Tr. 3372–73) The Overmyer organization has turned over very few financial records of Telecasting for the period November, 1977, through June, 1978. The cash receipts and cash disbursements records are missing, and almost none of the cancelled checks and check stubs were turned over. (H. Klein, 36 Tr. 3373) Under the circumstances, it is a reasonable inference that the money for the purchase of the farm owned by Weather-

vane Farms, Inc. was taken from Telecasting without consideration and with deliberate, actual intent to hinder, delay and defraud FNBB in the collection of obligations of TOC, DHO, ODS and Mr. Overmyer.

23.19. *Ownership of Jeebs and AGG.* Weathervane Farms, Inc. owns either 80 or 85 percent of the Jeebs stock. (H. Klein, 36 Tr. 3379; 3/9/74 Jeebs Minutes, Raible Exs. 509, 510; Stock Certificate, Jeebs Minute Book, Raible Ex. 552; Connery, 25 Tr. 2404) Mr. Connery owns either five percent or 5.26 percent of the Jeebs stock. (3/19/74 Jeebs Minutes, Raible Exs. 509, 510; Stock Certificate, Jeebs Minute Book, Raible Ex. 550; Connery, 25 Tr. 2404) In October, 1974, in testimony under oath in the Southern District of New York, Mr. Connery lied about the ownership of Jeebs. He testified that Weathervane Farms, Inc. owned 100 percent of the stock. (Connery, 22 Tr. 2162, 2165–66) Jeebs owns 100 percent of the stock of AGG. (H. Klein, 36 Tr. 3379; Organization Chart, Connery Ex. 7) Ownership of AGG by Jeebs, however, has never been evidenced by Mr. Connery by the formal issuance of stock certificates. (Stock Certificates, AGG Minute Book, Raible Exs. 573–75) Mr. Connery and Mr. Overmyer used the multilevel corporate structure of having Weathervane Farms, Inc. own Jeebs and Jeebs own AGG, in an effort to isolate Weathervane Farms, Inc. from liability for the large debts of Jeebs and AGG to Hadar and Telecasting, with deliberate, actual intent to hinder, delay and defraud the honest creditors of Telecasting in general, and FNBB in particular in its efforts to collect the obligations of TOC, DHO, ODS and Mr. Overmyer. Moreover, there is such a unity of interest and ownership among Jeebs, AGG, Omega, Weathervane Farms, Inc. and Mr. Overmyer that the separate personalities of the five no longer exist and, if their acts are treated as those of each of them alone, inequitable results would follow.

24. *Mr. Overmyer's Personal Expenses*

24.1. *The Bond in the Fidelity Deposit Case.* On January 23, 1978, Hadar's bank account at Continental Bank was used to purchase a $50,000 cashier's check to purchase a bond to stay execution of the judgment obtained by Fidelity & Deposit Company of Maryland against Mr. and Mrs. Overmyer, personally, in November, 1974. (Hadar Cash Disbursements Register, Pl.Ex. 113, Continental Bank, 1/23/78; 1/23/78 Hadar Minutes, Raible Ex. 136; *see* Finding No. 36.12, *infra*) This cashier's check, plus wire transfers of $10,000 to RT Systems, $20,000 to NDS, $11,000 to Jeebs and $19,000 to Peerless, were matched by deposits of $50,000 from Peerless plus $60,-000 from Telecasting. (Hadar Cash Disbursements Register, Pl.Ex. 113, Continental Bank, 1/23/78, 1/26/78 and 1/27/78; Hadar Cash Receipts Register, Pl.Ex. 113, Continental Bank, 1/5/78 and 1/24/78) This $50,000 cashier's check for Mr. Overmyer's personal expenses is a further offshoot of the $60,000 matching check scheme that was first intended to cover the down payment for RCA, but later diverted to related parties. (*See* Finding No. 22.4, *supra*; H. Klein, 34 Tr. 3201–03) Hadar minutes dated July 24, 1979, reflect a unanimous consent of the directors (Mr. and Mrs. Strang) to acknowledge and confirm to the Internal Revenue Service that this cashier's check represented a loan made to Mr. Overmyer. (7/24/79 Hadar Minutes, Raible Ex. 153) Hadar minutes dated January 23, 1978, record a meeting "to consider the application of the use of the company's excess funds" and a vote to use "the amount of $50,000 out of surplus corporate funds" for the bond for Mr. and Mrs. Overmyer, and to accept in return "the five (5) year non-interest bearing note of Daniel H. Overmyer in favor of this Company." (1/23/78 Hadar Minutes, Raible Ex. 136, pp. 1, 2) On January 23, 1978, the prime rate of FNBB was eight percent. (Computer Printout, FNBB Ex. 275, p. 5) One week after Mr. Overmyer took $50,000 from Hadar to pay for the bond, the directors voted to borrow $8,000 from Ohio Citizens Trust Company at 13.35 percent interest. (2/1/78 Hadar Minutes, Raible Ex. 138) As of January 9, 1978, Hadar owed Jamieson Film Co. $9,875 with respect to lease H–1013. (1/9/78 Raible Memorandum, Raible Ex. 487; Raible Dep., FNBB Ex. 259, p. 235)

Despite Mr. Raible's efforts to have this obligation paid and despite a lawsuit by Jamieson, the amount remained completely unpaid on June 29, 1978, and has not been paid in full to this day. (1/9/78, 5/31/78 and 6/29/78 Raible Memoranda, Raible Exs. 487–89; Raible Dep., FNBB Ex. 259, pp. 235–40; H. Klein, 30 Tr. 2917–18) Mr. Overmyer and Mr. Connery created the January 23, 1978, Hadar minutes in 1979, after the Internal Revenue Service began investigating, in order to make it appear that the $50,000 was a loan rather than income to Mr. Overmyer.

24.2. *The Fees of Gilman, McLaughlin & Hanrahan.* The firm of Gilman, McLaughlin & Hanrahan was retained by Mr. Overmyer to represent him in *The First National Bank of Boston v. Daniel H. Overmyer,* Civil Action No. 13892. (2/18/81 Letter, Tele Ex. 11) An agreement was reached between Mr. Hanrahan and Mr. Overmyer by which Mr. Overmyer would pay a $75,-000 retainer fee to Mr. Hanrahan, of which $60,000 was payable on February 23, 1981, with the balance payable not later than ten days thereafter. (2/18/81 Letter, Tele Ex. 11) At the request of Mr. Overmyer and with Mr. Chi's approval (Chi Dep., FNBB Ex. 243, p. 54; Carrieri Dep., FNBB Ex. 233, pp. 94–95; Telecasting Request for Payment No. 020, Carrieri Ex. 22), a Telecasting check dated February 17, 1981, in the amount of $15,000 was used to acquire an official check from Chemical Bank payable to Gilman, McLaughlin & Hanrahan. (Telecasting Request for Payment No. 020, Carrieri Ex. 22) An additional $338.20 was debited to Telecasting's account to be added to $9,661.80 of other funds to acquire a second cashier's check in the amount of $10,000 to Gilman, McLaughlin & Hanrahan. (Telecasting Request for Payment No. 020, pp. 2–5, Carrieri Ex. 22; Carrieri Dep., FNBB Ex. 233, pp. 92–93) Another check dated February 23, 1981, in the amount of $15,000 was requested by Mr. Overmyer and Mr. Chi, and approved by Mr. Chi, to acquire another official check from Chemical Bank payable to Gilman, McLaughlin & Hanrahan. (Telecasting Request for Payment No. 39551, Carrieri Ex.

22) On March 4, 1981, Telecasting check number 1038 was used to acquire another official Chemical Bank check payable to Gilman, McLaughlin & Hanrahan, this one in the amount of $5,000. (Hadar Journal Voucher 3–9, p. 4, Pl.Ex. 115F) In total, $35,338.20 of Telecasting funds was paid directly to Gilman, McLaughlin & Hanrahan.

24.3. *Weston Hurd Fees.* On July 24, 1981, Mr. Overmyer took $5,000 out of Omega Executive Services to pay Weston, Hurd, Fallon, Paisley & Howley to act as his personal counsel in this Court. (Omega Request for Payment for Check No. 1173, Carrieri Ex. 45, pp. 2–4)

24.4. *Mr. Overmyer's Use of Telecasting's Petty Cash.* Mr. Overmyer obtained petty cash from Telecasting by having Mr. Chi request Mr. Carrieri to prepare a petty cash voucher to be signed either by himself or by Mrs. Overmyer. (Carrieri Dep., FNBB Ex. 233, pp. 87, 89; Telecasting Request for Payment No. 004, pp. 1–2, Carrieri Ex. 22; Chi 205 Exam, 47 Tr. 4599–4600, 4601–02; S. Overmyer Dep., FNBB Ex. 258, pp. 93–94) Mr. Carrieri then made out a Telecasting check to himself, cashed it, and gave the money to Mr. Chi to take to Mr. Overmyer. (Carrieri Dep., FNBB Ex. 233, pp. 87–88; Telecasting Request for Payment No. 004, p. 1, Carrieri Ex. 22) Except for some small amounts such as $20, $25 or $40, Mrs. Overmyer never received any of this cash. (S. Overmyer Dep., FNBB Ex. 258, pp. 66, 93) Mr. Chi instructed the Overmyer accountants to book all the petty cash payments to Mr. and Mrs. Overmyer to account number 0561, the Hadar account, on Telecasting's books. (Chi 205 Exam, 47 Tr. 4597–98; *see* Telecasting Request for Payment No. 004, p. 1, Carrieri Ex. 22) They were then booked to account number 0621, Mr. Overmyer's personal account, on Hadar's books. (Carrieri Dep., FNBB Ex. 233, p. 89; Hadar Journal Voucher 8–10, Pl.Ex. 115E; Hadar Journal Voucher 12–4, Pl.Ex. 115F) During calendar year 1980 alone, Mr. Overmyer took $37,235 in cash out of Telecasting through this petty cash scheme. (Hadar Journal Voucher 8–10,

Pl.Ex. 115E; Hadar Journal Voucher 12–4, Pl.Ex. 115F; Lynch, 17 Tr. 1617–23, 18 Tr. 1741–43) The practice continued after the filing of the Chapter 11 petition in this Court. Between February 10, 1981, and February 27, 1981, Mr. Overmyer took $2,085 from the Telecasting estate through Hadar petty cash. (Telecasting Requests for Payment, Carrieri Ex. 22, Checks Nos. 004 [$200 out of $389], 006 [$100 out of $400], 007 [$590], 016 [$170 out of $335.14], 39552 [$400], 1013 [$400] and 1019 [$225 out of $273.22]) Now that his use of Telecasting's money has been stopped by this Court, Mr. Overmyer uses the petty cash of Omega instead. (Carrieri Dep., FNBB Ex. 233, p. 88; H. Klein, 35 Tr. 3284–85; Sources and Uses of Omega Funds, FNBB Ex. 192)

24.5. *Matching Checks of $13,000 Paid from Telecasting to Mrs. Overmyer.* On October 17, 1979, Telecasting wrote checks of $6,000 and $7,000 to Hadar, and Hadar wrote matching checks of $6,000 and $7,000 to Mrs. Overmyer. (Summary of Matching Checks, FNBB Ex. 188, p. 15; H. Klein, 34 Tr. 3208; Carrieri Dep., FNBB Ex. 233, pp. 64–65) Mrs. Overmyer did not remember ever receiving this money. (S. Overmyer Dep., FNBB Ex. 258, p. 75)

24.6. *Service Company Payments to Overmyer Family Members.* The books of AGG and Omega show payments to or on behalf of members of the Overmyer family from May, 1978, through October, 1981, as follows:

| | AGG | Omega |
|---|---|---|
| Daniel H. Overmyer | $ 245,033.62 | $ 60,270.22 |
| Shirley C. Overmyer | 196,319.05 | 4,007.94 |
| Stuart K. Strang | 1,572.29 | –0– |
| Barbara Overmyer Strang | 20,243.08 | –0– |
| Elizabeth Overmyer | 41,024.00 | 5,721.00 |
| John Overmyer | 3,122.50 | 400.00 |
| Edward Overmyer | 2,495.85 | 416.00 |
| TOTAL: | $ 509,810.39 | $ 70,815.16 |

(Summary of Disbursements to Family Members, FNBB Ex. 193; H. Klein, 35 Tr. 3276, 3305–07, 3311–13) As of November 17, 1981, John Overmyer was 19, and Edward was 17 years old. (S. Overmyer Dep., FNBB Ex. 258, p. 3) Neither provided any services to AGG or Omega. (H. Klein, 35 Tr. 3313) From May, 1978, through Janu-

ary, 1979, AGG paid to Mr. Overmyer consulting fees totaling $31,000; thereafter it paid him no more consulting fees. (Summary of AGG Sources and Applications of Funds, FNBB Ex. 191, Section 3—Monthly Disbursements, pp. 18–21; H. Klein, 35 Tr. 3307–11) Conversely, AGG paid Mrs. Overmyer only $275.22 in consulting fees prior to January, 1978, but from January, 1978, through October, 1980, it paid her $91,-276.97 in consulting fees. (Summary of AGG Sources and Applications of Funds, FNBB Ex. 191, Section 3—Monthly Disbursements, pp. 18–21; H. Klein, 35 Tr. 3307–11) Mrs. Overmyer never received the money shown on the AGG books as being paid to her. (S. Overmyer Dep., FNBB Ex. 258, pp. 35–36, 72–75) Mr. Overmyer started having checks made out to Mrs. Overmyer in January, 1979, to conceal the amount of income that he was receiving from AGG.

24.7. *Hadar Family Leases.* Hadar entered into six leases with entities other than Telecasting: leases H–1022, H–1023, H–1026 and H–1046 are for automobiles operated by various Overmyer family members; lease H–1024 is for a Russian sable coat worn by Mrs. Overmyer; and lease H–1025 is for a yacht to Jeebs. (Summary of Family Leases, FNBB Ex. 167; Leases H–1022 to H–1026, H–1046, Tele Exs. 5–10) Mr. Overmyer controlled use of the yacht. (Raible, 4 Tr. 310–11) Mr. Overmyer testified that Mr. Raible decided Hadar should acquire the yacht. (D. Overmyer Dep., FNBB Ex. 224, pp. 59–60) This testimony was not true. In fact, after Mr. Raible decided that Hadar *could* acquire the yacht, Mr. Overmyer decided that Hadar *would* acquire it. (Raible Dep., FNBB Ex. 259A, p. 389) The family leases were all written at rates less than the Overmyer Formula (H. Klein, 32 Tr. 3057–58), even though the borrowing resolutions for the automobile loans for leases H–1026 and H–1046 provided that the automobiles were to be leased "under terms and conditions which will yield this Company [Corporation] not less than its average rate of return on similar investments" (8/30/79 Hadar Minutes, Raible Ex. 156, p. 1; 2/22/80 Hadar Minutes,

Raible Ex. 165, p. 1). Not that it mattered. Hadar never received payment either from Mrs. Overmyer or from Jeebs with regard to the family leases. (H. Klein, 30 Tr. 2862) On top of that, Hadar paid for the maintenance and storage of the yacht. (H. Klein, 33 Tr. 3144)

24.8. *Mr. Overmyer's Personal Account with Hadar.* Mr. Overmyer's personal account with Hadar, account number 0620, shows a balance forward of $327,298.88 owed by Hadar to Mr. Overmyer on August 31, 1975, and a closing balance of $144,000.78 owed by Hadar to Mr. Overmyer on March 31, 1981. (Hadar General Ledger, Pl.Ex. 114, 1981 Account No. 0620 and 1976–1978 Account No. 0620) The opening balance represents a contribution to capital that was made before Mr. Raible's association with Hadar. (Raible Dep., FNBB Ex. 259, p. 201) Mr. Overmyer claims that it was a loan, but there was no note, no agreement as to interest and no agreed due date. No interest has been requested or paid, repayment has never been requested and Mr. Overmyer was never concerned about repayment even when Hadar sold all of its assets in 1973. (D. Overmyer Dep., FNBB Ex. 224, pp. 85–89) If it really were a legitimate loan, there would have been no need to create notes covering a $50,000 "loan" on January 23, 1978, and a $35,000 "loan" on March 6, 1981 (2/23/78 Hadar Minutes, Raible Ex. 136; 3/6/81 Hadar Minutes, Raible Ex. 174), because those sums would simply have been reductions of the "loan" from Mr. Overmyer to Hadar. (*Cf.* D. Overmyer Dep., FNBB Ex. 224, p. 85) In the initial set of schedules filed by Hadar, the Overmyer organization compounded the situation by listing the opening balance on Mr. Overmyer's account of $327,298.88 and the closing balance on his account of $144,000 (rounded), as if they were two separate claims of Mr. Overmyer. (8/81 Hadar Schedules, Raible Ex. 6, p. 20) After inquiry about the double counting on November 10, 1981, during Mr. Raible's deposition (*see* Raible Unredacted Dep., FNBB Ex. 262E, pp. 401–02), the Overmyer organization filed new schedules listing only the closing balance of $144,000 (12/3/81 Hadar

Schedules, Carrieri Ex. 60, p. 18). The $327,298.88 was a contribution to capital, not a loan. Moreover, whatever its nature, the $327,298.88 obligation was extinguished in its entirety on August 30, 1968, when it was assigned to DHO to offset in part an obligation of Mr. Overmyer to ISLI in the amount of $410,446.12. (8/30/68 Hadar Minutes, Raible Ex. 88) Hadar's practice of setting off Mr. Overmyer's obligations against the $327,298.88 opening balance was improper; Mr. Overmyer is liable to Hadar for at least the amount of $183,298.10 ($327,298.88 minus $144,000.78) that was improperly set off.

24.9. *Mr. Overmyer's Personal Account with Telecasting.* Mr. Overmyer has owed Telecasting $14,956.07 on his personal drawing account at least since 1973, and has never paid a penny of it. (Chi 205 Exam, 47 Tr. 4609; Ernst & Whinney Telecasting Financials, FNBB Ex. 222, p. 5; Foley, 42 Tr. 3975)

25. *The General Electric Settlement Fraud*

25.1. *The General Electric Lawsuit.* General Electric Company filed suit in New York state court on September 3, 1976, against ISLI for recovery of the balance due on equipment purchased from General Electric Company by ISLI that was covered by lease H–1002 and was previously the subject of ISLI lease number 0800030171 to Telecasting. (Raible, 7 Tr. 656–57; 6/19/79 Settlement Agreement, Pl.Ex. 123, p. 2; H. Klein, 33 Tr. 3099–3101; ISLI Lease File, FNBB Ex. 111) Subsequently, General Electric Company joined Hadar as a defendant because of the assignment of the leases from ISLI to Hadar, and at the time the lawsuit was settled, both Hadar and ISLI were defendants. (Raible, 7 Tr. 657–58) On September 14, 1978, General Electric Company obtained a judgment against ISLI in the Supreme Court of the State of New York, County of New York. (6/19/79 Settlement Agreement, Pl.Ex. 123, p. 2) On September 27, 1978, General Electric Company filed a petition for reclamation of the equipment in the Telecasting XI. (6/19/79 Settlement Agreement, Pl.Ex. 123,

p. 3) In actuality, Telecasting had been paying rent to ISLI and Hadar, and was not behind in its payments. (Raible Dep., FNBB Ex. 259, p. 98) Although Telecasting never stopped paying rent (Raible Dep., FNBB Ex. 259, p. 99), ISLI and Hadar did not pay General Electric, which resulted in an indebtedness of $200,000 (Raible Dep., FNBB Ex. 259, p. 99).

25.2. *The Settlement.* The litigation was ultimately settled by a June 19, 1979, settlement agreement to which Telecasting was a party. (Raible, 7 Tr. 658; Connery, 25 Tr. 2383; 6/19/79 Settlement Agreement, Pl.Ex. 123) The settlement agreement provides that Telecasting is to pay General Electric Company the sum of $150,-000 plus 13 percent interest, payable in a single initial payment of $30,000 and 36 equal monthly payments of $4,043.28. (6/19/79 Settlement Agreement, Pl.Ex. 123) A document attached to the settlement agreement purports to transfer to General Electric Company from Hadar all of its rights to payments from Telecasting for the equipment sold by General Electric Company to ISLI. (6/19/79 Settlement Agreement, Pl.Ex. 123; Connery, 25 Tr. 2384-85) At the same time Telecasting was making settlement payments to General Electric Company, Hadar was charging Telecasting rentals for the General Electric equipment. (Raible, 7 Tr. 659, 12 Tr. 1119; Connery, 15 Tr. 1467) Telecasting's payments to General Electric (Raible, 7 Tr. 659, 12 Tr. 1119), including the $30,000 down payment called for in the settlement agreement (H. Klein, 33 Tr. 3095) and the monthly payments to General Electric of $4,043.28 (H. Klein, 33 Tr. 3098), total $82,562.64. (H. Klein, 33 Tr. 3098-99) Mr. Overmyer caused Telecasting to become a party to the settlement agreement, to make the settlement payments and to pay rent to Hadar for the equipment. (Raible, 12 Tr. 1118) Telecasting, ISLI and Hadar were represented in the settlement negotiations and closing by Mr. Connery, who represented all three entities. (Raible, 7 Tr. 663-64; Connery, 25 Tr. 2384, 2456) Despite Telecasting making payments to General Electric for the equipment, Hadar received title to the equipment (Raible, 11

Tr. 1041-42), and never gave Telecasting credit for the double payments to General Electric or for the rental payments to Hadar (Raible, 12 Tr. 1119, 7 Tr. 660; Connery, 15 Tr. 1467-68). To date, Hadar's proof of claim has not been amended to reflect the double payments Telecasting made to General Electric Company (Connery, 20 Tr. 1933-34), even though Mr. Raible, Hadar's chief operating officer, admitted at the very outset of his deposition on October 29, 1981, that "Telecasting definitely is due a credit." (Raible Unredacted Dep., FNBB Ex. 262B, p. 184).

26. *The Studio Lease Fraud*

26.1. *1969 Studio Lease.* On May 19, 1969, Telecasting and DHO entered into a lease commencing June 1, 1969, and terminating May 31, 1986. (6/1/69 Studio Lease, FNBB Ex. 225) The 1969 lease covers the property upon which Telecasting's studio is located at 300 South Byrne Road in Toledo. (Connery, 21 Tr. 1981-82) The monthly rental called for by the 1969 lease was very favorable to Telecasting. (Dorfner Dep., FNBB Ex. 240, p. 20) The rental was $1,312.50 per month for the first five years from June, 1969, to May, 1974; $1,575 per month for the second five years from June, 1974, to May, 1979; and $1,837.50 per month for the following seven-year period from June, 1979, to May, 1986. (6/1/69 Studio Lease, FNBB Ex. 225; Foley, 41 Tr. 3893; Connery, 21 Tr. 1982) The former president and chief operating officer of Telecasting from 1965 through March, 1980, Mr. Arthur Dorfner, confirmed that the 1969 lease had not expired as of December, 1981. (Dorfner Dep., FNBB Ex. 240, pp. 3-4, 8-9, 20-21)

26.2. *The Invisible Interstate-Telecasting and Mid American-Telecasting Leases.* After the execution of the 1969 lease, DHO, in the mid 1970's, leased the studio property to Interstate which, in turn, entered into another purported lease with Telecasting. (Raible, 7 Tr. 606-10) Subsequently, DHO leased the property to Mid-American, which entered into yet another purported lease with Telecasting. (Raible, 7 Tr. 606-12) In 1977, Mr. Overmyer ordered Mr. Dorfner to

undertake renegotiation of the property lease despite the existence and validity of the 1969 lease (Dorfner Dep., FNBB Ex. 240, pp. 21–22), which Mr. Dorfner believed still to be valid and in effect. (Dorfner Dep., FNBB Ex. 240, p. 23) Mr. Dorfner "went through the motions of attempting to discuss it" with Mr. John Adams, the principal administrator of DHO, the landlord of the property. (Dorfner Dep., FNBB Ex. 240, p. 23) Mr. Overmyer, on March 8, 1977, in the Telecasting XI, testified as follows:

Q. Now, what kind of a lease payment is made by Telecasting to Interstate?

A. The lease payment that is made by Telecasting to Interstate is the same lease payment that was made by Telecasting to the D.H. Overmyer Company. The lease, I think, was originally a ten-year lease. It was executed in 1968 or 1969 and it may have options, I don't know. The lease rental was $1,700 a month.

Q. For the studio?

A. For the studio.

(D. Overmyer, 43 Tr. 4108–10) A valid lease between Telecasting and either Interstate or Mid-American remains unseen. (Foley, 42 Tr. 3982, 3963, 3967)

26.3. *More Purported DHO-Telecasting Leases.* DHO later entered into two more purported leases with Telecasting. (Connery, 21 Tr. 1986–87, 1990; 6/80 DHO-Telecasting Lease, Tele Ex. 19; 11/20/80 DHO-Telecasting Lease, Tele Ex. 20) The June, 1980 lease, on a one-sheet, month-to-month rental agreement form for warehouse space, recites that it is to be effective on a month-to-month basis, commencing June 1, 1980, at a rental of $11,000 per month. (6/80 DHO-Telecasting Lease, Tele Ex. 19) The November, 1980 lease, on a four-sheet form, recites that it is to be effective from December 1, 1980, to November 30, 1981, at a rental of $7,000 per month. (11/20/80 DHO-Telecasting Lease, Tele Ex. 20)

26.4. *Alternative Available Premises.* Mr. Emil T. Meissner, former business manager, vice-president and controller of Telecasting from February, 1979, to March 1, 1981 (Meissner Dep., FNBB Ex. 232, p. 5), had a discussion with Mr. Overmyer during this period about the excessive rent charged Telecasting for the studio. (Meissner Dep., FNBB Ex. 232, p. 54) Mr. Meissner had investigated available properties in the Toledo area, and found that he could lease more space across the street in a definitely superior building for only $2,500 to $2,700 per month. (Meissner Dep., FNBB Ex. 232, pp. 55–56) The excessive rent for the studio was not reduced as a result of Mr. Meissner's discussion with Mr. Overmyer. (Meissner Dep., FNBB Ex. 232, p. 57)

26.5. *Excessive Rental Charges to Telecasting.* Rental payments for the period September 1, 1974, to November 30, 1978, were made to Interstate; for the period December 1, 1978, to February 28, 1980, to Mid American; and for the period from January, 1981, to February 17, 1981, to DHO. (Foley, 41 Tr. 3948) No evidence of rental payments by Telecasting for the period March, 1980, to January, 1981, could be located. (Foley, 41 Tr. 3952–53) Telecasting voucher request number 132236, dated January 15, 1979, for payment to Mid American, formerly Interstate Distribution, recites as a description of the request "Rental on Station Building for the month of Feb. 1979 Amt. Billed * 7,000.00 (* Approved amount per contract dated May 19, 1969 and 1,575.00 for period June 1974 through May 1979)." (Ernst & Whinney Work Papers, FNBB Ex. 223, p. 40) The amount of rent that Telecasting paid for the studio premises from September 1, 1974, to February, 1981, was $357,962.50. (Foley, 41 Tr. 3892, 3950; Ernst & Whinney Work Papers, FNBB Ex. 223, pp. 2–3) Based upon the rental payments provided for in the 1969 lease, Telecasting should have paid $128,362.50 in rent during that period. In other words, Telecasting overpaid rent in an amount of $229,600. (Foley, 41 Tr. 3895; Ernst & Whinney Work Papers, FNBB Ex. 223, pp. 2–3)

26.6. *The Studio Lease Case Was a Deliberate Fraud on the Court.* Mr. Overmyer, in sworn testimony in 1977, although claiming that payment was to be made to

Interstate, stated that Telecasting was making to Interstate the "same lease payment that was made by Telecasting to the D.H. Overmyer Company." (D. Overmyer, 43 Tr. 4108–10) Mr. Connery knew that the 1969 lease between Telecasting and DHO was still valid, did not expire until 1986 and provided for a rental of $1,837.50 per month. (Connery, 21 Tr. 1981–84; 2/17/81 Connery Letter to Balantzow, Tele Ex. 18, p. 3) The Chapter 11 petition of Telecasting, which Mr. Overmyer and Mr. Connery caused to be filed in this Court, stated that Telecasting's studio rent was paid in full. (Connery, 21 Tr. 1990, 1976–77; 2/17/81 Connery Letter to Balantzow, Tele Ex. 18, p. 3) Mr. Connery helped Mr. Daniel Zimmerman, counsel for DHO, to prepare and present to this Court on August 8, 1981, an application to assume or reject an executory contract (the "Studio Lease Case"), in which DHO claimed rentals from Telecasting totaling $98,000 for a period for which Mr. Connery knew no rent was due. (Connery, 21 Tr. 1980–93, 23 Tr. 2180) The prosecution of the Studio Lease Case and the continued efforts of DHO's counsel to obtain a judgment from the Court, despite trying to withdraw from this adversary proceeding, constitute a willful fraud on this Court.

27. *Other Improper Telecasting Payments*

27.1. *Telecasting Payments to Hadar Vendors.* Telecasting made the following payments to vendors either for items that it was leasing from Hadar, or for items that members of the Overmyer family were leasing from Hadar:

*Lease H–1002*—Telecasting paid to General Electric $82,567.64 during the period September 1, 1978, to January 31, 1981. (Summary of First Set of Assumptions, FNBB Ex. 218; H. Klein, 33 Tr. 3091–3101; *see* Findings Nos. 25.1–25.2, *supra*)

*Leases H–1020 and H–1008*—Telecasting made several payments to Design Space International for obligations to Design Space International for mobile office trailers that Hadar had obtained and leased to Telecasting. (H. Klein, 31 Tr. 3005–07; Summary of Equipment Leases, FNBB Ex. 142)

*Leases H–1021, H–1026 and H–1046* —Telecasting made several payments to Ohio Citizens (H. Klein, 31 Tr. 2669) for Hadar obligations to Ohio Citizens for two AMC vehicles that Hadar obtained and leased to Telecasting (H. Klein, 31 Tr. 2969; Summary of Equipment Leases, FNBB Ex. 142). This is the same lease that covers two of Telecasting's own vehicles. (*See* Finding No. 18.6, *supra*) These payments also covered Hadar obligations with respect to two of the cars leased by Hadar to Mrs. Overmyer. (H. Klein, 37 Tr. 3480–81)

*Leases H–1022, H–1023 and H–1025* —Telecasting made seven payments totaling $4,881.24 to Continental Bank for two cars leased to members of the Overmyer family and the yacht leased to Jeebs and used by Mr. Overmyer. (H. Klein, 37 Tr. 3474–75, 3479–80)

*Lease H–1034*—Telecasting paid $2,940.07 to Tiffin Scenic Studios, as payment in full, including the costs assessed against Hadar in a lawsuit, for the drapery system that Hadar had leased to Telecasting. (H. Klein, 31 Tr. 2965–66; 2968–69)

*Lease H–1037*—Telecasting paid Philips Appliance directly for the air conditioner that it was leasing from Hadar. (Raible, 10 Tr. 949–50; H. Klein, 29 Tr. 2836–40) Mr. Shock and Mr. Meissner had to hand deliver a check to Philips Appliance with an apology for the delay in payment, because Philips Appliance was an advertiser of the station and had threatened to cancel its advertisement if the Telecasting debt was not cleared. (Raible, 10 Tr. 949–50)

*Lease H–1039*—Telecasting paid directly to City Loan the two-month advance rental payment required by the lease agreement between Hadar and City Loan. (H. Klein, 31 Tr. 2947–48) After Telecasting paid the $435.28 deposit to City Loan, Hadar leased the equipment to Telecasting and required Telecasting to pay Hadar a deposit of $2,620. (H. Klein, 31 Tr. 2947)

*Lease H–1040*—Telecasting paid to Station Business Systems the $2,000 down payment that was required to be paid by Hadar based on the lease between Hadar and Sta-

tion Business Systems. (H. Klein, 31 Tr. 2927–31) After Telecasting paid the required down payment to Station Business Systems, Hadar leased the equipment to Telecasting, and required Telecasting to pay Hadar a deposit of $15,048. (H. Klein, 31 Tr. 2926)

*Leases H–1043, H–1044 and H–1045* —Telecasting made several installment payments to Hundred East, totaling $20,-610.27, for equipment that Hadar was leasing to Telecasting. (H. Klein, 33 Tr. 3102)

27.2 *Weathervane Farms Storage Charges.* The barn located on the Weathervane Farms premises is used to store documents for various Overmyer-related entities with Weathervane Farms, Inc. charging those companies a rental fee. (S. Strang Dep., FNBB Ex. 246, pp. 15, 50) An agreement between Telecasting and Weathervane Farms, Inc., effective June 15, 1979, provided for the lease of 875 square feet in Building No. 2 of Weathervane Farms, Inc., at a rate of $3.20 per square foot per year, with the total charge being $233.33 per month for the period ending October 31, 1980. (Rental Agreement, FNBB Ex. 247) A second agreement dated November 1, 1980, was entered into between the parties, providing for an increase in the space rented from 825 square feet to 1,200 square feet, bringing the total monthly payments to $320. (Rental Agreement, FNBB Ex. 247) While the two rental agreements show square footage rented to Telecasting by Weathervane Farms, Inc. to be 875 and 1,200, the documents that were obtained from the 3 Park Avenue office and the studio in Toledo, as well as from Weathervane Farms, Inc., are now being stored in various file cabinets that cover a floor area of approximately 32 square feet. (H. Klein, 36 Tr. 3376–77) Mr. Raible, based on his considerable experience in estimating warehouse space requirements (Raible Dep., FNBB Ex. 259, pp. 51–52), estimated that the necessary space to store all of these documents was approximately 100 square feet, including allowance for normal aisle space and the capability of opening drawers. (Raible, 11 Tr. 1037) It was Mr. Raible's opinion that Telecasting was billed for more space than was necessary to store its documents. (Raible, 11 Tr. 1038) Telecasting paid a total of $8,025.74 to Weathervane Farms, Inc. for the rental of barn space. (H. Klein, 36 Tr. 3381) Based on 100 square feet of storage space, the correct charge from June 15, 1979, through January 31, 1981, is only $520.

### 28. *Bankruptcy Finding*

28.1. *Insolvency.* From August 31, 1977, through February 6, 1981, the assets of Telecasting consisted of some or all of the following categories:

(a) cash and short-term investments;

(b) trade accounts receivable;

(c) other receivables;

(d) unamortized film contract rights;

(e) prepaid expenses;

(f) escrow deposit;

(g) leasehold improvements and equipment; and

(h) receivables from affiliates.

(Ernst & Whinney Statements of Assets and Liabilities, FNBB Ex. 222, p. 2) Telecasting's receivables from affiliates may not be assigned any material value, because they are principally owing from affiliates in bankruptcy. (Ernst & Whinney Statements of Assets and Liabilities, FNBB Ex. 222, p. 5; Foley, 41 Tr. 3883–84) The fair salable value of Telecasting's assets may be equal to or less than their book values, but it is not greater than their book values due to (1) the specialized nature and limited market for its owned equipment and leasehold improvements (Bond, 13 Tr. 1181, 1188), (2) the cost and expense involved in collecting receivables, (3) the liabilities and restrictions inherent in film contract rights (Ernst & Whinney Statements of Assets and Liabilities, FNBB Ex. 222, p. 5), and (4) the difficulty or impossibility of retrieving prepaid expenses. The maximum fair salable values of Telecasting's assets as of August 31, 1977, 1978, 1979 and 1980, and February 6, 1981, were:

(a) $838,779;

(b) $986,785;

(c) $2,897,306;

(d) $2,625,398; and

(e) $1,952,492, respectively.

(Ernst & Whinney Statements of Assets and Liabilities, FNBB Ex. 222, p. 9) The liabilities of Telecasting as of each of the foregoing dates were equal to or greater than:

(a) $4,991,907;

(b) $5,590,826;

(c) $7,951,171;

(d) $8,710,038; and

(e) $9,702,082, respectively.

(Ernst & Whinney Statements of Assets and Liabilities, FNBB Ex. 222, p. 9; J. Klein, 42 Tr. 3997–99) The liabilities of Telecasting exceeded the fair salable value of its assets as of each of the foregoing dates by more than the following amounts:

(a) $4,153,128;

(b) $4,604,041;

(c) $5,053,865;

(d) $6,084,910; and

(e) $7,749,590, respectively.

(Ernst & Whinney Statements of Assets and Liabilities, FNBB Ex. 222, p. 9; J. Klein, 42 Tr. 3997–99, 4004) From August 31, 1977, continuously through February 6, 1981, Telecasting was hopelessly insolvent. (J. Klein, 42 Tr. 4002)

28.2 *Insufficient Capital To Operate Telecasting's Business and Incurrence of Debt Beyond Its Ability To Pay.* From August 25, 1976, through November 30, 1980, Telecasting derived approximately $15,000,000 in revenues, and disbursed all except $175,000 of such revenues for operating expenses. (J. Klein, 42 Tr. 4005) During the Telecasting XI, Telecasting expended substantially all of its revenues, and simultaneously incurred millions of dollars of indebtedness for which it had no source of payment. (Ernst & Whinney Statements of Assets and Liabilities, FNBB Ex. 222; J. Klein, 42 Tr. 4006–07; *compare* Telecasting Chapter XI Petition, FNBB Ex. 431; *with* Telecasting Chapter 11 Statement of Affairs, Tele Ex. 17) From August 24, 1976, through November 30, 1980, Telecasting's cash balances were totally inadequate to pay its bills. (J. Klein, 42 Tr. 4007) Tele-

casting was late in making payroll tax deposits, and had to reverse checks that had been issued due to lack of funds. (J. Klein, 42 Tr. 4007–08) Telecasting needed from $200,000 to $300,000 cash per month to fund its ongoing operations adequately, but had only between $740 and $137,000 cash on hand. (J. Klein, 42 Tr. 4009–11) Given a 60-day collection period, on average, for Telecasting's receivables and a weekly payroll of approximately $45,000 in addition to its other expenses and small cash balances, Telecasting suffered tremendous hardships to meet payrolls and operating costs. (J. Klein, 42 Tr. 4008) It is inconceivable that Telecasting's management, headed by Mr. Overmyer, was not aware of such hardships and Telecasting's incurrence of debt it could not repay from August 25, 1976, through February 6, 1981.

28.3. *Actual Intent to Defraud.* Mr. Overmyer filed the Telecasting XI to prevent FNBB from having a state court receiver appointed for Telecasting to prevent waste and wrongful transfers of assets. (D. Overmyer Affidavit, FNBB Ex. 431) FNBB, as well as the creditors listed on Telecasting's Chapter XI petition, have been creditors of Telecasting from August 24, 1976, to date. (*Compare* Telecasting Chapter XI Petition, FNBB Ex. 431; *with* Telecasting Chapter 11 Statement of Affairs, Tele Ex. 17) Thereafter, Telecasting entered into purported leases with Hadar for unfair consideration and without disclosure to or approval by the Bankruptcy Court in New York. (Connery, 20 Tr. 1895–96, 21 Tr. 1967–68) All of the various obligations and payments incurred by Telecasting to other Overmyer companies after the filing of the Telecasting XI were incurred with actual intent to defraud FNBB.

28.4. *No Basis For Relief From the Automatic Stay.* The vast majority of equipment covered by the purported leases is specialized and has a very thin market. (Bond, 13 Tr. 1154, 1180–81) There is no evidence in the record showing depreciation or lack of maintenance of the equipment. Hadar did not show any loss arising out of the continuation of the automatic stay.

888

There is no evidence to show that Hadar would be any better off if it had possession of the specialized equipment. Indeed, if Hadar were to prove that the purported leases are valid, it appears that Hadar would ultimately be better off without relief from the stay, because it would then be able to assert an administration claim against Telecasting for its use of the equipment for the entire duration of the Telecasting 11. Clearly, the equipment covered by the purported leases is necessary to an effective reorganization. It comprises substantially all of the equipment used by Telecasting in the operation of its business, and is specialized. (Bond, 13 Tr. 1155; Raible, 4 Tr. 350–51)

28.5. *No Basis To Accelerate Time To Accept or Reject Purported Leases.* Hadar does not have a customer for the equipment covered by the purported leases it is seeking to enforce. (Raible, 4 Tr. 297) Some of the equipment is no longer manufactured, and some of its manufacturers have gone out of business. (Bond, 14 Tr. 1286) In any event, there is a very thin used equipment market in the broadcasting industry, because television equipment is specially built and fabricated for use by a given broadcasting facility. (Bond, 13 Tr. 1180–81, 14 Tr. 1249–50) The vast majority of the components covered by the purported leases is specialized. (Bond, 13 Tr. 1154) Hadar offered no evidence to show any depreciation of the equipment covered by the leases, and offered no evidence showing it will suffer any prejudice if Telecasting is not compelled now to accept or reject the purported leases.

28.6. *No Basis for Reclamation.* Hadar offered no evidence showing that it demanded in writing reclamation of any goods within ten days after Telecasting received them from Hadar.

### 29. The Overmyer-Connery Control Machine

29.1. *Mr. Overmyer's Use of a Deceptive Corporate Network To Disguise His Control.* Mr. Overmyer exercises control through a series of related corporations headquartered at 3 Park Avenue. (Con-

nery, 20 Tr. 1868–69; Organization Charts, Connery Exs. 4–10) These corporate entities were established with the assistance of Mr. Connery (Connery, 15 Tr. 1388–92, Connery, 22 Tr. 2165, Connery, 23 Tr. 2302–06; Connery Dep., FNBB Ex. 231, pp. 92–93), and, at least since the time Mr. Overmyer filed the Warehouse XI in 1973, were structured so that Mr. Overmyer could claim to have neither any legal nor equitable interest in the companies. He could also contend that his only relationship with some of the companies was as an unpaid "consultant." (D. Overmyer Dep., FNBB Ex. 224, pp. 36–38; D. Overmyer Dep., Pl. Ex. 139A, pp. 18–20, 32–33, 41–42, 45–46, 96–97, Pl. Ex. 139B, pp. 151–52; 1/4/79 Letter, FNBB Ex. 209) He and his agents made such representations on numerous occasions, including filings with federal agencies such as the Federal Communications Commission. (1/4/79 Letter, FNBB Ex. 209; Application of Manning Telecasting, FNBB Ex. 211)

29.2. *Pervasive Overmyer Control.* Mr. Overmyer made the decision to have so many corporations at 3 Park Avenue, and was the controlling force behind all of those corporations. (Raible, 8 Tr. 733) Mr. Overmyer controls all decisions made on behalf of Overmyer organizations with offices at 3 Park Avenue (Lynch, 16 Tr. 1585–86; Connery, 20 Tr. 1867–68), as he has always ultimately done, except for the period Mr. Herzog was acting as receiver of some of the warehouse companies (Connery, 20 Tr. 1868–69). In particular, Mr. Overmyer controls, and has controlled, DHO (Raible, 4 Tr. 338, 7 Tr. 614–15, 623), RT Systems (Raible, 4 Tr. 338), Interstate Distribution Services (Raible, 6 Tr. 580–82), Mid American Warehouse, Inc. (Raible, 7 Tr. 605), Jeebs (Raible, 7 Tr. 622), AGG (Raible, 7 Tr. 622), Omega (Raible, 7 Tr. 623), Deauville Private Rental Homes, Inc. (Raible, 8 Tr. 733), Weathervane Farms, Inc. (Connery, 20 Tr. 1867–68; Starr Dep., FNBB Ex. 241, pp. 11–14), Intermodal Terminals, Inc. (Lynch, 16 Tr. 1585–86; Connery Dep., FNBB Ex. 231, pp. 20–21), and, to the extent they have any existence, ISLI and ODS (Raible, 7 Tr. 621–22). Until March, 1981, Mr. Overmyer con-

trolled Telecasting. (Raible, 7 Tr. 622) Mr. Overmyer made all of the major decisions in connection with Telecasting in the non-broadcasting area, and would on occasion make broadcast decisions as to the selection of programming. (Connery, 21 Tr. 2013–14) He made any important decisions about the acquisition of equipment by Hadar for use by Telecasting (Raible, 1 Tr. 338–39), and made the ultimate decision whether to lease or purchase equipment for Telecasting (Raible, 9 Tr. 795). Mr. Overmyer also directed and supervised the General Electric, ISLI, Hadar and Telecasting settlement. (Raible, 7 Tr. 658) In all of his controlled entities, Mr. Overmyer separates operating functions, bookkeeping functions and the receipt and disbursement of funds. (Raible, 7 Tr. 619–20) Mr. Overmyer individually controls each of those functions in all of his controlled entities. (Raible, 7 Tr. 620–21)

29.3. *Giving Apparent Authority To Individuals Actually Controlled By Mr. Overmyer.* Upon establishment or activation of these corporations, Mr. Overmyer installed members of his family or employees of his organization into the positions which would normally evidence authority and control over the corporation's activities, *i.e.,* the officerships and directorships. (*See, e.g.,* Organization Charts, Connery Dep., Ex. 10) The employees continued to report to Mr. Overmyer on all subjects, however. (Raible, 7 Tr. 620–21; Connery, 20 Tr. 1867–69; Starr Dep., FNBB Ex. 241, pp. 11–14, 17–18) The Overmyer family members, moreover, engaged in little or no activity in their putative roles as corporate executives. (*See* Connery Dep., FNBB Ex. 231, pp. 227–32) For example, Barbara Overmyer Strang, Mr. Overmyer's daughter, and Stuart K. Strang, her husband, were at various times directors and senior officers of Deauville Private Rental Homes, Inc., one of the Overmyer companies. (Organization Charts, Connery Dep., Ex. 10; Deauville Minute Book, FNBB Ex. 261) But neither of them had any knowledge regarding the nature or extent of Deauville's business activities (B. Strang Dep., FNBB Ex. 235, p. 23), and Mr. Strang was not even aware of whether he *was* a director or officer of Deauville (S.

Strang Dep., FNBB Ex. 234, p. 24). Mrs. Shirley C. Overmyer is designated as one of the directors of RT Systems, a publicly held company controlled by Mr. Overmyer. (S. Overmyer Dep., FNBB Ex. 258, pp. 21–22) Although she claimed to have attended meetings of RT Systems' board of directors, she did not know whether RT Systems owned any assets, how many employees it had, what its fiscal year was or whether it had any contractual relationships with other Overmyer entities; she could not identify any officers of RT Systems; and she had no knowledge of its most recent revenues or even whether it had made a profit last year. (S. Overmyer Dep., FNBB Ex. 258, pp. 22–26) Mr. Raible, who has served upon boards of directors since December of 1975 with Mr. Overmyer, candidly admitted that he had never cast a vote contrary to that cast by Mr. Overmyer (Raible, 4 Tr. 362–63), and that, although designated president of Jeebs, president of AGG and vice-president of Omega, he reports in all such capacities directly to Mr. Overmyer (Raible, 6 Tr. 569). Mr. Overmyer personally assumed the tax liability of AGG (which had been threatened against Mr. Raible) on the basis of a sworn affidavit that he had at all times been the one and only individual who ever controlled AGG or had responsibility for paying its bills. (Raible, 8 Tr. 731; 8/17/81 D. Overmyer Affidavit, Raible Ex. 809)

29.4. *Overmyer Family Member's Apparent Authority Is Misleading.* The Strangs were the only directors of the plaintiff Hadar. (12/8/75 Hadar Minutes, Raible Ex. 131; 8/81 Hadar Schedules, FNBB Ex. 176, Item 21[a]) In addition, Mr. Strang has been Hadar's nominal president and treasurer for the past several years, and Mrs. Strang has been its secretary for a similar period. (12/8/75, 5/8/77, 3/13/78 and 11/1/78 Hadar Minutes, Raible Exs. 131, 135, 140, 145) Mrs. Strang, however, could not even recall that she was an officer or director of Hadar, until she was shown corporate documents reflecting that designation (B. Strang Dep., FNBB Ex. 235, p. 30), and she knew virtually nothing about its business activities. Indeed, although

Mrs. Strang was also an officer and director of Telecasting in 1981, she was even unaware as to whether Telecasting was a customer of Hadar. (B. Strang Dep., FNBB Ex. 235, p. 31) Mr. Strang could not even recall such elemental matters as why Hadar had loaned Mr. Overmyer money at interest rates substantially below market at the same time Hadar had to borrow money from a bank at market rates (S. Strang Dep., FNBB Ex. 234, pp. 51–55), or whether Hadar ever had any excess cash (S. Strang Dep., FNBB Ex. 234, p. 51). He had no knowledge of the events concerning the "settlement" entered into by Hadar, ISLI, GE and Telecasting. (S. Strang Dep., FNBB Ex. 234, pp. 33–37) He had no knowledge why Hadar had changed its name. (S. Strang Dep., FNBB Ex. 234, p. 50) He was not aware of how the rentals between Telecasting and Hadar concerning the Hundred East equipment were established. (S. Strang Dep., FNBB Ex. 234, pp. 72–73) Further, Mr. Strang not only had no knowledge regarding whether Hadar had ever met its obligations with regard to the filing of corporate income tax returns, but he also expressed virtually no concern on the topic at all. (S. Strang Dep., FNBB Ex. 234, pp. 39–41) And, although he was Hadar's president, he did not know who had decided to have Hadar file a Chapter 11 petition or when that decision was made. (S. Strang Dep., FNBB Ex. 234, p. 98) Although he signed the petition, he was not even aware of who or what Hadar's shareholders were at the time of filing, and his sworn representation to the Bankruptcy Court for the Southern District of New York was, therefore, erroneous. (S. Strang Dep., FNBB Ex. 234, pp. 81–83)

29.5. *Control Exercised Through Trusts.* Mr. Overmyer's scheme of establishing a structure, which would purport to remove him from apparent responsibility or control over his operating entities, was extended by placing the stock of many of the corporations in purported trusts in which he vigorously abjured either legal or equitable interests. (D. Overmyer Dep., Pl. Ex. 139A, pp. 18–20, 32–33, 41–42, 45–46, 96–97, Pl. Ex. 139B, pp. 151–52) The distinction between appearance and reality found in the Overmyer corporate network was repeated in these trust arrangements, however. For example, Mrs. Barbara Overmyer Strang is named as the trustee of one of the principal trusts (Organization Charts, Connery Exs. 5, 6, 7 and 10), but Mrs. Strang was not even aware of what its assets were or where the trust was located (B. Strang Dep., FNBB Ex. 235, p. 16). Mrs. Shirley Overmyer was likewise the trustee of another purported trust, but she had no knowledge regarding how long it had been in existence or what assets it might hold. (S. Overmyer Dep., FNBB Ex. 258, p. 38) Further, Mrs. Overmyer had never carried out any duties or responsibilities in her capacity as trustee of that trust. (S. Overmyer Dep., FNBB Ex. 258, pp. 38–39) And Mrs. Strang, a principal beneficiary of that alleged trust, had never heard of it. (B. Strang Dep., FNBB Ex. 235, p. 15)

29.6. *Use of Misleading Corporate Records.* Mr. Overmyer and Mr. Connery perpetuated this deceptive scheme of figurehead control by preparing documents (usually unanimous consent forms) that would reflect desired corporate activity. (Connery Dep., FNBB Ex. 231, pp. 49–51) Those documents were thereafter presented to the appropriate token officers or directors for execution. (Connery, 24 Tr. 2288–89) Contrary to the appearance of corporate regularity that was thereby created, neither the Overmyer employees inserted into the positions of apparent authority (*see, e.g.,* Raible, 7 Tr. 614–15; Chi, 47 Tr. 4609–13) nor the Overmyer family members in fact exercised independent judgment or responsibility (Starr Dep., FNBB Ex. 241, pp. 11–14). Although the Strangs made feeble assertions that they normally made some evaluation of the corporate actions thus presented, their almost complete lack of recall regarding either the substance or the purpose of the actions belies that testimony. (*See generally* S. Strang and B. Strang Deps., FNBB Exs. 234–35) Further, both Strangs admittedly signed at least one such document, a set of purported minutes of a meeting of Hadar's shareholders (6/6/79 Hadar

Stockholders' Meeting Minutes, Raible Ex. 148), which was demonstrably and objectively false at the time they signed it. (Connery, 24 Tr. 2291–92) Their testimony is, therefore, not to be believed. A more accurate picture of the normal course of activities in the Overmyer organization was undoubtedly provided by Mrs. Overmyer, who candidly testified that she quite often signed documents presented to her for that purpose by her husband, without examining them and without making any evaluation or even any inquiry into their nature, purpose or effect. (S. Overmyer Dep., FNBB Ex. 258, pp. 56–57, 95)

29.7. *Mr. Overmyer's Control of Hadar Was Typically All Encompassing.* No decision involving any substantial amount of money would be made with respect to Hadar without his knowing about it, agreeing to it or directing it. (Raible, 6 Tr. 547–48) Although Mr. Raible was described as Hadar's executive vice-president and chief operating officer (Raible, 6 Tr. 503), his authority was completely illusory (Raible, 1 Tr. 318; Memos and Letters, Raible Dep., Exs. 390–470). Mr. Raible reported not to Mr. Strang, the president of Hadar, but to Mr. Overmyer (Raible, 6 Tr. 569). Mr. Overmyer's dominance was so pervasive that Mr. Raible could not even pay a bill of Hadar without Mr. Overmyer's approval (Raible, 7 Tr. 711), a restriction repeated with the other Overmyer entities (Raible, 6 Tr. 568–69, 9 Tr. 837).

29.8. *Knowingly False Denial of Control by Mr. Overmyer.* Notwithstanding this reality, Mr. Connery directed the plaintiffs' counsel to deny that Mr. Overmyer controlled or was connected with Hadar. (Connery, 24 Tr. 2282–83) Mr. Connery also asserted that neither control nor beneficial ownership of the corporations could be traced to Mr. Overmyer, because it had to be presumed that the Overmyer employees and family members had exercised independent judgment and evaluation consistent with their nominal titles and positions. (Connery Dep., FNBB Ex. 231, pp. 36–38) These assertions by Mr. Connery were not only false, they were knowingly so. Mr. Overmyer's sworn testimony on this subject, which was offered by the plaintiffs, was at least equally false. When deposed in the Suffolk County, Massachusetts guarantee suit with FNBB, Mr. Overmyer testified as follows:

Q. Do you have any relationship with Hadar, sir?

A. No.

Q. Did you ever have any relationship with Hadar, sir?

A. I do lease an automobile from Hadar.

Q. How long have you leased an automobile from Hadar, sir?

A. Oh, a couple of years.

Q. Do you have any other relationship with Hadar, sir?

A. My wife leases an automobile, too.

Q. Any other relationship with Hadar, sir?

A. No.

. . .

Q. Do you do any work or business by or on behalf of Hadar Equipment Leasing, sir?

A. No.

Q. Have you ever, sir?

A. No.

(Overmyer Dep., Pl. Ex. 139A, pp. 41–42, 45–46) It is clear from the evidence in this case, much of which came from Mr. Overmyer's own employees and relatives, that this testimony was false and that he knew it to be so.

29.9. *Use of the Scheme To Obscure Extraction of Money.* Part of the basis for the Overmyer corporate network was to provide a method of obscuring the money which Mr. Overmyer withdrew from the business activities. Thus, in addition to the false contentions that Mr. Overmyer's only relationship to the corporations was as a consultant, the corollary assertion that this consultancy was unpaid (*see* 1/4/79 Letter, FNBB Ex. 209, Attachment A) was similarly false. Mr. Overmyer drew a regular salary from Telecasting (2/20/81 Letter, Connery Ex. 41), from DHO and from one of the subsidiaries of RT Systems (D. Over-

myer Dep., FNBB Ex. 224, pp. 4–5). Beyond that, he caused to be diverted for his benefit the cash assets available in the other related corporations. Through Hadar, for example, he both "borrowed" money at far less than market rates, and regularly drew funds directly from the available petty cash of Telecasting. (*See* Findings, Nos. 24.1 and 24.4, *supra,* and 32.14, *infra*) Further, the service companies' cash was utilized to pay directly many of Mr. Overmyer's personal expenses. (*See* Finding No. 24.6, *supra*) These expenditures and receipts of cash were reported to the Internal Revenue Service as income to Mr. Overmyer. (Connery, 23 Tr. 2203–08) Further, the corporations were required to write checks payable to Overmyer family members in respect of alleged services that were never performed. (*See* Findings, Nos. 24.5–24.6, *supra*) Mrs. Overmyer, to whom the largest amount of such checks was written, personally never received such checks. (S. Overmyer Dep., FNBB Ex. 258, pp. 67–75, 96–97) She had no idea how money was deposited into the family bank account for which she was the authorized signatory. (S. Overmyer Dep., FNBB Ex. 258, p. 9) She regularly signed large numbers of blank checks on the account and gave them to her husband to use as he desired. (S. Overmyer Dep., FNBB Ex. 258, pp. 7–8, 47–50) In this manner, Mr. Overmyer was able to continue the illusion that he had little personal control over significant amounts of money generated by his business enterprises, and he could thereby attempt to delude actual or potential creditors into believing he derived little of significant value from his operations.

29.10. *Mr. Connery: Principal Agent In the Overmyer Scheme.* Mr. Edmund Connery has served as one of Mr. Overmyer's principal henchmen since he joined the Overmyer organization in 1964. (*See* Finding No. 4.4, *supra*) He has consistently participated in, or made, the important decisions taken by the Overmyer organization. (*See* D. Overmyer Dep., FNBB Ex. 224, pp. 16–17; Connery Dep., FNBB Ex. 231, p. 173, 240–47, 253–54, 382–96) Contrary to his pretense of being an "independent" attorney, Mr. Connery is, in fact, an entirely dependent insider within the Overmyer organization, and provides his services for a fixed annual fee, without restriction or differentiation between Overmyer companies and Overmyer family members. (Connery Dep., FNBB Ex. 231, pp. 25–28, 51–52; Connery, 22 Tr. 2149–60; 9/1/77 Retainer Agreements, Connery Ex. 15) The structure of Mr. Connery's relationship with the Overmyer organization was established as a result of his designs (Connery Dep., FNBB Ex. 231, p. 221), his negotiations and his planning with Mr. Overmyer (Connery, 22 Tr. 2159–60; Connery Dep., FNBB Ex. 231, pp. 14–15, 219–21). Mr. Connery's designation as an "independent" attorney paid by one of the Overmyer service companies was selected in an attempt to avoid the obligation to have his relationship to the Overmyer companies, then under the protection of the bankruptcy courts, approved and supervised by those courts. (Connery Dep., FNBB Ex. 231, pp. 222–23) After structuring himself as a "consultant" supplied by an Overmyer service company, Mr. Connery did not seek or obtain the approval of the Bankruptcy Court, although he was aware of the requirement to do so (Connery Dep., FNBB Ex. 231, pp. 222–23); he knew at the outset that he would be heavily involved in providing services to Telecasting (Connery Dep., FNBB Ex. 231, p. 224); and he knew that his compensation was coming from the funds of Telecasting (*see* Finding No. 23.11, *supra;* Connery Dep., FNBB Ex. 231, pp. 60–61). Mr. Connery also obtained guarantees of payment of his fees from each of the Overmyer companies then under the protection of the Bankruptcy Court for the Southern District of New York (TOC, Telecasting and DHO Unanimous Consents, Connery Exs. 16–18), but he did not advise or seek the approval of that Court for these aspects of his compensation agreement (Connery, 20 Tr. 1898–99). Mr. Connery performed far more than merely legal services for the Overmyer companies, and he was effectively a managing agent of those companies. (Connery Dep., FNBB Ex. 231, pp. 350–76, 382–96; Memos and Letter, Connery Exs.

40, 42–43; Letter, Tele Ex. 21; Letters, FNBB Exs. 42–44; Bond, 14 Tr. 1326–29, 1331–32; Lynch, 17 Tr. 1641–43; Connery, 21 Tr. 1987–88, 23 Tr. 2180, 24 Tr. 2282)

### 30. *Use of the Court System To Deceive FNBB*

30.1. *Mr. Overmyer's Misrepresentations.* The Overmyer organization has, since 1973, been in continuous litigation. (*See* Findings Nos. 7.6, 15.1, 15.2, *supra*) In that time, Mr. Overmyer has deliberately caused to be created intentionally misleading and misrepresentative evidence in the court system in attempts to frustrate FNBB's right to foreclose upon its collateral in order to protect its most valuable asset, the capital stock of Telecasting. (D. Overmyer Affidavit Excerpts, 57 Tr. 5880–95; Applications, Complaints, Orders and Opinions, FNBB Exs. 432–38) In a further effort to thwart FNBB's right to foreclose, Mr. Overmyer tried to recapitalize Telecasting by increasing the authorized common no par value capital stock from 500 to 10,000 shares and by creating a second class of common stock. (11/16/79 and 12/7/79, Telecasting Minutes Tele Ex. 29; Raible, 10 Tr. 911–14) Mr. Overmyer repeatedly filed sworn affidavits replete with duplicitous statements that the Telecasting stock exceeded in value the debts owed to FNBB. (Overmyer Affidavit Excerpts, 57 Tr. 5881, 5885; Opinion, FNBB Ex. 435) Mr. Overmyer's statements were premised upon appraisals made by Mr. Edwin Tornberg at the direction of Mr. Overmyer (D. Overmyer Affidavit Excerpt, 57 Tr. 5891–92), who told him to base his appraisals on Telecasting owning all the equipment used by the station. (Tornberg Dep., FNBB Ex. 230, pp. 9–10) In this adversary proceeding, the Overmyer-controlled plaintiffs have alleged that this premise is not fact. (Hadar complaint) Had Mr. Tornberg's appraisal been based upon the facts as asserted by plaintiffs, the appraised value of the station would have been lowered. (Tornberg Dep., FNBB Ex. 230, p. 11) Mr. Overmyer created and sponsored to several courts misleading appraisals intended to persuade them to assist him in frustrating FNBB's rights. In view of the facts re-garding Mr. Overmyer's continual diversion of Telecasting's assets and his overall scheme to remove his personal assets from the prospective reach of his creditors, including particularly FNBB's claim on his personal guarantees, these sworn statements were knowingly false. (*See* Findings Nos. 13.1–13.5, 14.1–14.3, 15.1–15.2, 16.1–16.10, 17.1–17.21, 18.1–18.11, 19.1–19.10, 20.-1–20.6, 22.1–22.7, 23.1–23.19, 24.1–24.9, 25.-1–25.2, 26.1–26.6 and 27.1–27.2, *supra*) They were, moreover, made with the intention of deceiving the courts to which they were submitted and thereby harming FNBB. At the same time, Mr. Overmyer and his companies were using the judicial system and other means to forestall their creditors, and the revenues generated by the Overmyer enterprises (primarily Telecasting) were being used by Mr. Overmyer to acquire new businesses and properties. (Connery Dep., FNBB Ex. 231, pp. 69–71, 76–77, 192–94, 196; Sugarman Case, FNBB Ex. 65; 2/6/78 Deauville Minutes, FNBB Ex. 261; Raible Dep., FNBB Ex. 259A, pp. 523–24; Weathervane Farms [S. Strang] Dep., FNBB Ex. 246, pp. 25–30, 58–59; *see also* Findings Nos. 23.15–23.19, *supra*) These acquisitions included attempts to obtain additional UHF construction permits from the Federal Communications Commission. (Connery Dep., FNBB Ex. 231, pp. 202–03)

30.2. *Telecasting Paid TOC's Obligations to FNBB.* On June 11, 1980, Judge Lewittes entered an order reaffirming a decision of Judge Babitt, granting FNBB relief from the automatic stay in *In re TOC,* No. 75–B–2427 (S.D.N.Y.), which prevented FNBB from selling the Telecasting stock that was pledged to it. (*In re TOC; FNBB v. TOC,* 2 Bankr.Ct.Dec. 992 [S.D.N.Y.1976], FNBB Ex. 196; *In re TOC; FNBB v. TOC,* No. 75–B–2427 [S.D.N.Y. June 11, 1980], FNBB Ex. 197) On June 20, 1980, Judge Lewittes granted a stay pending appeal on conditions that included payment of interest on the sum of $4,355,558.31. (Order, FNBB Ex. 198, pp. 2–3) Mr. Overmyer directed Mr. Chi to use Telecasting money to make the interest payments and to

charge the payments against an obligation of Telecasting to TOC on the Telecasting books. (Chi 205 Exam, 47 Tr. 4603, 4605–06; see D. Overmyer Creditors' Meeting Testimony, 43 Tr. 4092–95) Mr. Chi instructed Mr. Meissner to debit the entire amount of the payments to the TOC account and not to charge any of it as an interest expense. (Meissner Dep., FNBB Ex. 232, pp. 46–48) It was improper accounting not to allocate the payments between the principal amount of the obligation and the interest thereon, and to debit the principal portion to the TOC account and charge the interest portion to interest expense. (Meissner Dep., FNBB Ex. 232, p. 48; H. Klein, 35 Tr. 3335–36) Moreover, the TOC account, against which Mr. Overmyer directed Mr. Chi to charge the payments and to which Mr. Chi directed Mr. Meissner to make the debits, was the $461,-560.61 inter-company account that was assigned to FNBB on September 17, 1973. (9/17/73 Assignment, Pl. Ex. 143, p. 1; 9/17/73 Note, FNBB Ex. 341; H. Klein, 35 Tr. 3336) A total of $349,761.41 was improperly transferred from Telecasting to TOC in this manner. (H. Klein, 35 Tr. 3333; Summary of TOC Account No. 0615, FNBB Ex. 203, p. 1)

30.3. *Continued Overmyer Misuse of the Bankruptcy Courts.* At the end of October, 1980, the Bankruptcy Court for the Southern District of New York dismissed the Telecasting XI on the ground that Telecasting was not insolvent in 1976 when its petition was filed. (Affidavit, FNBB Ex. 438, ¶ 2) A stay of this order was obtained from the Bankruptcy Court upon the condition that FNBB be furnished current financial information regarding Telecasting's operations and financial status. (Affidavit, FNBB Ex. 438, ¶ 3) The required information was not provided to FNBB, however, and it applied to the Bankruptcy Court for termination of the stay. (Affidavit, FNBB Ex. 438, ¶¶ 5, 17) In January, 1981, Mr. Overmyer opposed termination of the stay and swore that the information was being assembled and would be provided to FNBB. (Affidavit, FNBB Ex. 438, ¶¶ 5–6) Rather than providing accurate financial informa-

tion, the appeal from the dismissal of the Telecasting XI was withdrawn, and on the same day Mr. Overmyer caused Telecasting to file its petition under Chapter 11 of the new Code in this Court (the "Telecasting 11"). (Connery, 21 Tr. 1975; Litigation Chart, FNBB Ex. 419, pp. 16–17) The petition was accompanied by an affidavit of Mr. Overmyer, in which he swore that FNBB had to be restrained from exercising its rights with respect to the stock of Telecasting, or Telecasting would suffer immediate and irreparable harm. (Affidavit, 57 Tr. 5889–90) These sworn assertions were made in an effort to perpetuate Mr. Overmyer's control over Telecasting, and were knowingly false.

31. *Subverting Creditors' Committees*

31.1. *Packing the Creditors' Committee in the Telecasting XI in New York.* The creditors' committee in the Telecasting XI consisted of "Edmund H. Miller of American Research Bureau," "David L. Cowell of Reyner & Gersin," "Stephen L. Duffy of Edwin Tornberg & Co.," "David Sadkin of Schiff Terhune," and "Charles Carroll of Comte Construction." (9/30/76 Order, FNBB Ex. 12) The chairman of this committee, Edmund H. Miller, was, in fact, Mr. Overmyer's personal attorney, and was at that time employed by the Overmyer organization to provide the same services as inside counsel that Mr. Connery now provides. (Raible, 10 Tr. 898–99, 902; Raible Dep., FNBB Ex. 259, p. 112; Connery Dep., FNBB Ex. 231, pp. 35–36; Starr Dep., FNBB Ex. 241, pp. 4, 14–16) Messrs. Cowell, Duffy and Sadkin also all worked for companies controlled by Mr. Overmyer. (Raible, 10 Tr. 899–900, 903; Starr Dep., FNBB Ex. 241, pp. 19–20; Chi Dep., FNBB Ex. 243, pp. 112–15) Mr. Overmyer himself selected all five members of the creditors' committee for the Telecasting XI in New York. (Handwritten Note, FNBB Ex. 13; see Raible, 10 Tr. 904–05)

31.2. *Attempt To Eliminate FNBB Supporters From Telecasting Creditors' Committee.* On February 23, 1981, Mr. Connery wrote to former counsel for Telecasting, instructing him on how to keep supporters

of FNBB off the Telecasting creditors' committee. (2/23/81 Connery Letter, FNBB Ex. 62) Mr. Connery instructed that Viacom's claim for $322,448.88 be listed as "$1.00 disputed" because he believed FNBB to be a substantial lender to Viacom. (2/23/81 Connery Letter, FNBB Ex. 62, p. 1) Mr. Connery also instructed that AS-CAP's claim, which he listed as $65,694.11 and which they asserted as $115,000, be listed as "$1.00 disputed" because he believed that one of FNBB's counsel in this case was also counsel for ASCAP. (2/23/81 Connery Letter, FNBB Ex. 62, p. 2) In addition, Mr. Connery relayed Mr. Overmyer's personal instructions that thought be given to having this Court ratify a settlement agreement with Katz Agency, if that would eliminate Katz from the creditors' committee, because Mr. Overmyer believed that Katz had negotiated with FNBB to purchase the station. (2/23/81 Connery Letter, FNBB Ex. 62, p. 1) Finally, Mr. Connery increased the claim of Fly, Shuebruk from $37,538.97 to $337,538.97, by adding in an accomplishment fee of $300,000 that was purportedly agreed to between Fly, Shuebruk and Mr. Overmyer during the first three months of 1981. (2/23/81 Connery Letter, FNBB Ex. 62, p. 2; Connery, 21 Tr. 2045–47) As of October 16, 1974, the amount of Fly, Shuebruk's claim was only $78,000, of which Telecasting was willing to acknowledge $64,000 and pay it at the rate of $2,000 per month. (10/16/74 Telecasting Minutes, Tele Ex. 29, p. 5) Mr. Connery's testimony that Mr. Overmyer and Fly, Shuebruk reached agreement on a $300,000 accomplishment fee sometime between 1967 and 1974 (Connery, 21 Tr. 2046) is not credible. Mr. Connery and Mr. Overmyer deliberately changed the amounts of claims in the Telecasting 11, in an effort to exclude creditors friendly to FNBB from the creditors' committee and thereby further hinder, delay and defraud FNBB in collection of the obligations of TOC, DHO, ODS and Mr. Overmyer.

31.3. *Payoff of Counsel for the Hadar Creditors' Committee.* Counsel who originally appeared for the creditors' committee in the Hadar Chapter 11 was Mr. Robert Friou, of Wisehart & Koch. (PAST Dep., FNBB Ex. 236, p. 2) Omega paid Mr. Friou $5,000 for his service as counsel for the Hadar creditors' committee. (Checks, Tele Exs. 15, 16; Carrieri Exs. 27–28; Requests for Payment Nos. 1259 and 1228, Carrieri Exs. 25–26) The $5,000 was paid in the form of two checks for $2,500 each, which were personally requested and approved by Mr. Overmyer himself. (Requests for Payment Nos. 1259 and 1228, Carrieri Exs. 25–26; Carrieri Dep., FNBB Ex. 233, pp. 99–104) One of two checks to Wisehart, Friou & Koch expressly stated on the face of it that it was for "Legal Fees/Representation of Hadar Creditors." (Check, Tele Ex. 15, Carrieri Ex. 28) During the time the Overmyer organization was opposing a change of venue in the Hadar Chapter 11 from New York to Cleveland, a number of deliveries were made from the Overmyer offices to Wisehart, Friou & Koch, including two from Mr. Connery's secretary, Mabel Trow-Abraham. (Requests for Payment, Carrieri Ex. 29, p. 13; Carrieri Ex. 30, pp. 6, 10; Carrieri Ex. 31, p. 5; Connery Dep., FNBB Ex. 231, p. 35) Mr. Connery sent the Overmyer receptionist (Raible Dep., FNBB Ex. 259, p. 117) to pick up Hadar's reply brief from Mr. Wisehart of Wisehart, Friou & Koch. (Request for Payment No. 1260, Carrieri Ex. 47, pp. 4–5) Mr. Raible charged a lunch with Mr. Wisehart to Omega petty cash. (Request for Payment No. 1293, Carrieri Ex. 47, p. 11) When Mr. Wilson instructed Mr. Friou to oppose the change of venue, Mr. Friou failed to inform Mr. Wilson of numerous facts that were material to the decision and would have influenced Mr. Wilson to decide to support the change, rather than to oppose it. (PAST Dep., FNBB Ex. 236, pp. 57–61) Mr. Overmyer and Mr. Connery paid Mr. Friou to take a position on behalf of the Hadar Creditors' committee in support of the Overmyer position.

32. *Fictitious Corporate Minutes*

32.1. *Responsibility for Overmyer Minutes.* Except for the time he was not working for the Overmyer organization (December, 1975, through August, 1977), Mr. Con-

nery was responsible for keeping the minute books of all of the Overmyer companies except RT Systems and its subsidiaries. (Connery, 15 Tr. 1389, 1392, 23 Tr. 2217)

32.2. *Creating the TOC Minute Book.* At the time that D.H. Overmyer Cablevision Company, Inc. changed its name to The Overmyer Company and became the parent of DHO and Telecasting, Mr. Connery directed one of his subordinates in the Overmyer legal department, Mr. Bohm, to create numerous back dated corporate minutes for TOC regarding resignations of officers, annual elections of directors and officers, other elections of officers, change of the corporate name and amendment of the bylaws. (11/13/68 Memorandum, Connery Ex. 33)

32.3. *The Meeting in the Wrong Building.* The ISLI minute book contains the first page of the minutes for a November 2, 1973, meeting of the board of directors held at 29 West 34th Street, New York, New York, 10001. (11/2/73 ISLI Minutes, Raible Ex. 334) These minutes are typed on a different typewriter than other ISLI minutes of similar date (*compare, e.g.,* 11/16/73 ISLI Minutes, Raible Ex. 336, *with* 11/2/73 ISLI Minutes, Raible Ex. 334), and ISLI did not move to 29 West 34th Street until sometime in 1974 (D. Overmyer Dep., FNBB Ex. 224, pp. 28–29).

32.4. *Mr. and Mrs. Overmyer Vote as ISLI Directors After Resigning.* On February 12, 1975, and February 18, 1975, Mr. and Mrs. Overmyer waived notice and then voted as "being all of the Directors and a quorum" of ISLI to adopt banking resolutions for two ISLI bank accounts. (2/12/75 and 2/18/75 ISLI Minutes, Raible Exs. 355–58) According to the minute book, however, Mr. and Mrs. Overmyer resigned as directors on February 3, 1975, and Mr. Lynch, Mr. Strang and Mr. Raible were elected in their stead. (2/3/75 ISLI Minutes, Raible Ex. 359)

32.5. *Election and Resignation of Mr. Edgerton as an ISLI Officer and Director.* On April 16, 1981, Mr. Edgerton was elected vice-president and director of ISLI for the sole purpose of executing an agreement of compromise in *Intermodal Systems Leasing,*

*Inc. v. Forsythe,* Civil Action No. C–79 0718 SC (N.D.Cal.). (4/16/81 ISLI Minutes, Raible Ex. 367) His resignation as soon as the agreement was signed was accepted in the very same minutes in which he was elected. (4/16/81 ISLI Minutes, Raible Ex. 367, p. 2) At the time recorded in these minutes, ISLI did not exist. (Certificate, FNBB Ex. 63)

32.6. *Connery Resignation as Hadar Director.* On November 2, 1973, Mr. Connery resigned as a director of D.H. Overmyer Trucking Company (11/2/73 Hadar Minutes, Raible Ex. 130), even though there are no minutes in the minute book electing him director (*cf.* 4/18/72 Hadar Minutes, Raible Exs. 117–18). He suddenly appears as a director in the October 20, 1972 minutes, without ever having been elected. (10/20/72 Hadar Minutes, Raible Exs. 119–20)

32.7. *Mr. and Mrs. Strang Elect Themselves Hadar Directors.* The Hadar minute book contains an action by unanimous consent of the directors, signed by Mr. and Mrs. Strang, electing Mr. and Mrs. Strang directors. (12/8/75 Hadar Minutes, Raible Ex. 131) There are no previous minutes electing the Strangs.

32.8. *Hadar 1975–1977 Minutes.* Mr. Raible went through the minute books of various Overmyer corporations for Mr. Connery, making up current lists of directors and officers. (Raible, 10 Tr. 879; Lists of Directors and Officers, FNBB Ex. 8) These lists must necessarily have been made some time after Mr. Connery returned to employment with the Overmyer organization in August, 1977. (Connery, 15 Tr. 1390) At the time he made up the lists, Mr. Raible was unable to find the Hadar minute book. (Raible, 10 Tr. 881; Lists of Directors and Officers, FNBB Ex. 8, p. 2) He made up a list of officers of D.H. Overmyer Trucking Co., Inc., from a banking resolution dated August 30, 1976. (List of Hadar Officers, FNBB Ex. 8, p. 2; Raible, 10 Tr. 881–82) This banking resolution is not in the Hadar minute book that was produced in discovery. (Raible, 10 Tr. 882; *cf.* Hadar Minute Book, Raible Exs. 131–35) On the other hand, the minute book produced in dis-

covery does contain minutes dated December 8, 1975, January 8, 1976, May 6, 1977, and May 8, 1977. (12/8/75, 1/8/76, 5/6/77 and 5/8/77 Hadar Minutes, Raible Exs. 131, 132, 134 and 135) Since the minute book was missing in 1977, Mr. Connery must have prepared minutes for these four dates sometime after August, 1977, and back dated them.

32.9. *Hadar Name Change.* The Hadar minute book contains minutes of a special meeting of shareholders dated June 6, 1979, changing the name of the company from Hadar Leasing International Company to Hadar Leasing International Company, Inc. (6/6/79 Hadar Minutes, Raible Ex. 148) The minutes recite that "[a]ll shareholders were present at and throughout the meeting." (6/6/79 Hadar Minutes, Raible Ex. 148) This recitation is not true; there was no meeting of shareholders held on June 6, 1979. (Connery, 24 Tr. 2291–92; *see* Strang Dep., FNBB Ex. 234, pp. 59–61; B. Strang Dep., FNBB Ex. 235, pp. 62–64) The directors of Hadar who voted for the name change did not know why the name was changed. (S. Strang Dep., FNBB Ex. 234, pp. 58–59; B. Strang Dep., FNBB Ex. 235, p. 62) It was Mr. Connery's idea to make the change. (S. Strang Dep., FNBB Ex. 234, p. 58) On March 20, 1977, Continental Bank had written to "Hadar Leasing International Co., Inc." asserting that it was liable to Continental Bank on its guarantee of Mr. Rigg's boat loan. (3/30/79 Letter, Connery, Ex. 38) On March 30, 1977, Mr. Connery wrote back on behalf of "Hadar," which he used as a defined term for "Hadar Leasing International Co., Inc.," asserting failure of the bank to perfect its security interest in the boat and offering to bring the loan current and meet the payment schedule, but saying nothing about the discrepancy in names. (3/30/79 Letter, Connery Ex. 38) On May 25, 1979, the Overmyer organization learned that Hadar had been defaulted in an action brought by Continental Bank in January, and that Continental Bank had restrained Hadar's bank account at Manufacturers Hanover Trust Company. (S. Strang Affidavit, Connery Ex. 35, p. 1) A vote to change the name of

Hadar to add "Inc." and make the name the same as the one used by Continental Bank was then recorded in the minute book. (6/6/79 Minutes, Raible Exs. 148–50) The name change was not effected promptly, however. Instead, Hadar moved to set aside the judgment on the basis of a July 6, 1979, affidavit of Mr. Strang asserting that its name was not "Hadar Leasing International Co., Inc." (7/6/79 S. Strang Affidavit, Connery Ex. 35, pp. 1, 3, 5), and Mr. Connery wrote to Manufacturers Hanover Trust Company on July 17, 1979, asserting that the restraining notice was invalid because it was addressed to "Hadar Leasing International Co., Inc." rather than "Hadar Leasing International Company" (7/17/79 Letter, Connery Ex. 37). The name change was not filed with the Secretary of State of Ohio until August 10, 1979. (Certificate, Raible Ex. 125, pp. 2–3) Even as late as September 4, 1979, however, Hadar's attorney was asserting to a New York court, under oath, that the name of Hadar was "Hadar Leasing International Company," not "Hadar Leasing International Co., Inc." (9/4/79 Easton & Echtman Affirmation, Connery Ex. 36, p. 1) Mr. Connery's purpose in adding "Inc." to Hadar's name was to defraud creditors, including Continental Bank, who thought the name was "Hadar Leasing International Company."

32.10. *Alteration of the Jeebs Minute Book.* The Jeebs minute book, as produced by the Overmyer Organization, contains 12 minutes of which the original set was marked with changes and a new set typed. (Jeebs Minute Book, Raible Exs. 493, 507–10, 513–14, 523–32, 535–36, 540–45) It also includes two minutes made up from handwritten notes. (Jeebs Minute Book, Raible Exs. 493, 518–19, 538–39) The handwriting in the book is Mr. Connery's, and he is the one who made the changes. (Connery Dep., FNBB Ex. 231, pp. 321, 322, 330; Connery, 23 Tr. 2220–21) In his deposition, Mr. Connery first testified that he made the changes to the Jeebs minute book in 1977. (Connery Dep., FNBB Ex. 231, pp. 329–30; *see also* Connery Dep., FNBB Ex. 231, p. 320) He then changed the date to the end

of 1978, but added that it was at the time Jeebs acquired AGG. (Connery Dep., FNBB Ex. 231, p. 330) At trial, he changed the date to December, 1979, but again tied it to the time that Jeebs acquired AGG. (Connery, 25 Tr. 2402–03) Jeebs acquired AGG on December 29, 1977. (12/29/77 Jeebs Minutes, Raible Exs. 536, 559; see 12/29.77 AGG Minutes, Raible Ex. 560) Mr. Connery altered three sets of Jeebs minutes dated after Jeebs acquired AGG, including one set of minutes dated one entire year after the latest date Mr. Connery tried to give. (8/25/78 Jeebs Minutes, Raible Exs. 540–41; 12/15/78 Jeebs Minutes, Raible Exs. 542–43; 11/7/80 Jeebs Minutes, Raible Exs. 544–45; Connery Dep., FNBB Ex. 231, pp. 341–42) He also instructed that a new set of minutes be created and dated March 13, 1978, three months after Jeebs acquired AGG. (3/13/78 Jeebs Minutes, Raible Exs. 538–39) In his deposition and again at trial, Mr. Connery testified that he was just making housekeeping changes to correct technical defects in the keeping of the minutes during the time he was absent from the Overmyer organization. (Connery, 25 Tr. 2403; Connery Dep., FNBB Ex. 231, pp. 320–21, 322–23, 325–26, 328, 333–34) The period during which Mr. Connery was not working for the Overmyer organization was from December, 1975, through August, 1977. (Connery, 15 Tr. 1389–91) Of the 12 sets of minutes that Mr. Connery altered, only one set was made during the time he was not working for Mr. Overmyer. (Compare 7/11/77 Jeebs Minutes, Raible Exs. 523–24, with 3/8/74, 3/9/74, 10/15/74, 9/1/77, 10/15/77, 11/8/77, 11/8/77, 12/29/77, 8/25/78, 12/15/78 and 11/7/80 Jeebs Minutes, Raible Exs. 507–10, 513–14, 525–32, 535–36, 540–45) Indeed, many of the minutes he altered were ones that it was his responsibility to prepare in the first place. (Connery, 15 Tr. 1392) One of the items Mr. Connery added to the minutes was a vote authorizing the issuance of 850 shares of Jeebs to Weathervane Farms, Inc., for $850 on March 9, 1974, a date on which Mr. Connery was counsel for the Overmyer organization. (3/9/74 Jeebs Minutes, Raible Ex. 509, p. 2; Connery Dep.,

FNBB Ex. 231, pp. 330–35; Connery, 15 Tr. 1389, 1392) According to the stock certificates, Weathervane Farms, Inc. owns only 800 shares of Jeebs. (Jeebs Certificate No. 1, Raible Ex. 552; Connery Dep., FNBB Ex. 231, p. 335; Connery, 25 Tr. 2404) Although supposedly issued on the same day as the other three certificates, the certificate to Weathervane Farms, Inc. gives the date as "this 9 day of March A.D. 1974," whereas the other three are typed "this 9th day of March A.D. 1974," the signature of Mrs. Overmyer was written with a noticeably different pen, the certificate is in the book out of numerical sequence and it is the only original (as opposed to photocopied) certificate in the book. (Certificate Nos. 2, 3, 4, 1, Raible Exs. 493, 549–52) When first asked about the ownership of Jeebs at his deposition, Mr. Connery was surprised that Weathervane Farms, Inc. owned any interest in Jeebs. (Connery Dep., FNBB Ex. 231, pp. 331–32) Back on October 23, 1974, Mr. Connery had testified that Total Development Company owned Weathervane Farms, Inc., and Weathervane Farms, Inc., in turn, owned 100 percent of Jeebs. (Connery, 22 Tr. 2161–63) This testimony was not true. (Connery, 22 Tr. 2166) According to the minute books, Weathervane Farms, Inc. is now, and has since May 31, 1973, been owned 80 percent by the Barbara M. (Overmyer) Strang Trust and 20 percent by the Harrison M. Overmyer Trust; and Weathervane Farms, Inc. now owns, and has since March 9, 1974, owned either 800 out of 950 or 850 out of 1,000 shares of Jeebs. (Weathervane Certificates Nos. 4 and 5, Weathervane Minute Book, Weathervane Ex. 1; Jeebs Certificates Nos. 1–4, Raible Exs. 549–52; 3/9/74 Jeebs Minutes, Raible Exs. 509–10) Mr. Connery's explanation of his alterations of the Jeebs minute book is not credible. Mr. Overmyer was the original owner of 85 percent of Jeebs. Mr. Overmyer and Mr. Connery transferred it to Weathervane Farms, Inc., with deliberate, actual intent to hinder, delay and defraud FNBB in collection of the obligations of TOC, DHO, ODS and Mr. Overmyer.

**32.11.** *The NDS Transfer of the Chicago Warehouse.* When the Overmyer organization acquired NDS at the end of October, 1977, it agreed to keep the company in operation for a minimum of eight months. (Raible, 10 Tr. 921–22, 923) Less than four months later, on February 16, 1978, the NDS board of directors authorized a sublease of the entire Chicago warehouse to Sears, Roebuck & Co., which in effect took NDS out of the public warehousing business in Chicago. (2/16/78 NDS Minutes, NDS Ex. 53; Raible, 10 Tr. 925) To cover up this transaction, Mr. Connery created a second set of minutes, authorizing the same transaction. It was identical, except for the name of the executive vice-president who was authorized to sign, and except that it was dated August 29, 1978, after the eight-month period had run. (8/29/79 NDS Minutes, NDS Ex. 61)

**32.12.** *Resignation of Mr. Rety and Mr. Steele as Telecasting Directors.* Mr. Connery changed the Telecasting minute book to reflect the dates of resignation of Mr. Rety and Mr. Steele that were reported to him by Mr. Shuebruk, Telecasting's former FCC counsel. (Connery, 23 Tr. 2219)

**32.13.** *Leases H–1043, H–1044 and H–1045.* Both the Telecasting minute book and the Hadar minute book contain actions by unanimous consent dated January 5, 1981, fixing the rental for leases H–1043, H–1044 and H–1045 combined at $50,000 per month, effective January 1, 1981. (1/5/81 Telecasting Minutes, Tele Ex. 29; 1/5/81 Hadar Minutes, Pl. Ex. 47) Mr. Connery did not prepare these unanimous consents until the first week of March, 1981, after Telecasting had filed its Chapter 11 petition. (Connery, 23 Tr. 2236–37) Mr. Connery back dated them to a date before the filing. (Connery, 23 Tr. 2238) The unanimous consents were executed by Mr. Overmyer, Mr. Raible and Mr. Chi, even though they had all resigned as directors on February 19, 1981, before the unanimous consents were prepared or executed. (2/26/81 Telecasting Minutes, Tele Ex. 29; Connery, 23 Tr. 2237–38)

**32.14.** *Mr. Hanrahan's Fees.* Mr. Overmyer and Mr. Connery created Hadar minutes purporting to convert the $35,338.20 that Mr. Overmyer took from Telecasting to pay his personal attorney in Boston into a $35,000 loan from Hadar at eight percent interest for three years. (3/16/81 Hadar Minutes, Raible Ex. 174; D. Overmyer Dep., FNBB Ex. 224, p. 90) On March 6, 1981, the prime rate of FNBB was 18.5 percent. (Computer Printout, FNBB Ex. 275, p. 8)

### 33. Falsifying Books of Account

**33.1.** *Mr. Connery's Alteration of the Telecasting Books of Account.* On February 17, 1981, Mr. Connery instructed Messrs. Chi, Taub, Shock, Meissner and Raible to supply him with certain information by February 19, 1981, including a schedule of accounts payable, the exact amount of Telecasting deposits with Hadar as of January 31, 1981, and the balance due to or from Hadar as of January 31, 1981. (2/17/81 Memo, Meissner Ex. 3, ¶¶ 2, 9, 10; Meissner Dep., FNBB Ex. 232, p. 44) Mr. Meissner put together most of the information, including the amount of deposits, $626,003.47. (Meissner Dep., FNBB Ex. 232, pp. 44–45; Telecasting Journal Voucher 1–17, Chi Ex. 50) Thereafter, Mr. Connery directed Messrs. Shock, Chi and Taub to make adjusting entries to the books of account of Telecasting, including changing the accounting for those of the GE notes that had not yet been paid, adding a $300,000 asset consisting of an "accomplishment fee" payable to Fly Shuebruk, changing the overpayment of Hadar into a "deposit on new leases" of $234,138 and "other receivables" of $391,865, and writing off $321,814.61 of a $440,814.61 obligation to DHO. (2/23/81 Memo, Connery Ex. 40, ¶¶ 2–5) Mr. Connery further advised that there would soon be additional accounts payable to attorneys to be added later. (2/23/81 Memo, Connery Ex. 40, ¶ 6) Mr. Meissner was also sent from New York City a list of persons to be added to the list of creditors. (Meissner Dep., FNBB Ex. 232, pp. 49–50) Mr. Overmyer telephoned Mr. Meissner at home on the Saturday morning after Mr. Meissner's last day of work, and asked Mr.

Meissner to get a balance sheet out. This entailed booking Mr. Connery's adjustments. (Meissner Dep., FNBB Ex. 232, pp. 43–44, 48–49; Telecasting Journal Voucher 1–17, Chi Ex. 50) Mr. Meissner booked all of Mr. Connery's changes as directed, even though he did not understand why a $300,000 unpaid legal fee was being booked as an asset. (Meissner Dep., FNBB Ex. 232, p. 51) The $234,138 "deposit on new leases" was exactly six times the monthly payment by Hadar to Hundred East for the equipment covered by leases H–1043 ($2,051.86) and H–1044 ($31,557.53) and the original version of H–1045 ($5,413.63). (Connery Dep., FNBB Ex. 231, pp. 359–61; Hundred East Contracts, Raible Ex. 752, p. 1, Raible Ex. 753, p. 3; Original Lease H–1045, D. Overmyer Ex. 2) The $440,814.61 obligation to DHO that Mr. Connery directed Mr. Meissner to write down to $119,000 was one of the Telecasting obligations that had been assigned to FNBB on September 17, 1973. (9/17/73 Assignment, Pl. Ex. 143, p. 1)

33.2. *Mr. Connery Recorded GE Settlement On Telecasting's Books.* Mr. Connery ordered Mr. Meissner to record the GE settlement on the books of Telecasting. (Letter, Tele Ex. 16; Connery Dep., FNBB Ex. 231, pp. 353–54) Mr. Connery's entry treats the settlement as if Telecasting purchased the equipment from GE and places the equipment in the balance sheet as an asset. (Connery Dep., FNBB Ex. 231, p. 354; Chi Dep., Ex. 50) At the time, Mr. Connery knew that the settlement documents provided the equipment was to become the property of Hadar and not of Telecasting. (Connery Dep., FNBB Ex. 231, pp. 240–41, 245)

33.3. *Bank Accounts Omitted from AGG's General Ledger.* AGG had activity with the Continental Bank and the Bank of Barclay. (H. Klein, 34 Tr. 3252–53) The activity from these bank accounts was never recorded in AGG's general ledger. (H. Klein, 34 Tr. 3252–54)

33.4. *Creation of False Hadar Books of Account.* In July, 1981, the Hadar Chapter 11 filed in the Southern District of New York was transferred to this Court. (7/13/81 Second Circuit Order; 7/21/81 District Court Order) In early August, Mr. Connery hired a former Overmyer employee, Mr. Lynch, to prepare a new set of books of account for Hadar. (Lynch, 17 Tr. 1649–50; Connery, 23 Tr. 2238, 2242; *compare* Lynch, 16 Tr. 1576–80) The books Mr. Lynch created were used by the plaintiffs at trial in this Court. (Hadar Bank Reconciliations, Pl. Exs. 119A–119G; Hadar Journal Vouchers, Pl. Exs. 115A–115F; Hadar Cash Receipts and Cash Disbursements Register, Pl. Ex. 113; Hadar General Ledger, Pl. Ex. 114; Hadar Trial Balances, Pl. Exs. 116A–116F) Hadar already had a set of books of account in existence. (Carrieri Dep., FNBB Ex. 233, pp. 74–78, 79–81, 116; Lynch, 17 Tr. 1674–75, 1683–85, 18 Tr. 1772–76, 1778–80) Mr. Lynch created journal vouchers, a ledger type summary sheet, a trial balance and a balance sheet and income statement as of April 30, 1977, and also as of June 30, 1978. (Lynch, 18 Tr. 1772–76, 1778–80) There were general ledgers in work sheet format for the fiscal years ended August 31, 1976, August 31, 1977, and August 31, 1978. (Carrieri Dep., FNBB Ex. 233, pp. 76–78) In addition, in late 1980 and early 1981, Mr. Yeh, acting under Mr. Carrieri's supervision and control, posted general ledgers for the fiscal years ended August 31, 1979, and August 31, 1980. (Carrieri Dep., FNBB Ex. 233, pp. 75–76) The Overmyer organization distributed the balance sheets and income statements made from the original set of books to prospective vendors and lenders. (Hadar Balance Sheets and Income Statements, FNBB Exs. 21, 34–40, 206; 6/28/77, 7/13/77, 1/30/78, 6/25/79 and 2/19/80 Transmittal Letters, Raible Exs. 788, 764, 766, 767, 770; Connery, 20 Tr. 1929–30; Connery Dep., FNBB Ex. 231, pp. 163–65; Hadar Schedules, Carrieri Ex. 60, p. 5; Raible Ex. 6, p. 4; Hundred East [Corcoran] Dep., FNBB Ex. 244, pp. 19, 24–25) They also filed them with the FCC. (Overmyer FCC Filings, FNBB Ex. 207, p. 13, FNBB Ex. 208, p. 9, FNBB Ex. 209, p. 9, FNBB Ex. 210, p. 8, FNBB Ex. 211, p. 29) These Hadar financial statements are completely different from the books of account prepar-

ed by Mr. Lynch in 1981, and cannot be tied to them. (H. Klein, 36 Tr. 3390–3401; Summary of Hadar Financial Statements, FNBB Ex. 212; Lynch, 17 Tr. 1676–84, 18 Tr. 1780–83) For example, the Hadar financial statements all have entries for accounts receivable, but Mr. Lynch did not use an account entitled accounts receivable in making the 1981 Hadar books of account. (H. Klein, 36 Tr. 3394, 3398; Lynch, 17 Tr. 1685–86) Another example is that the April 30, 1977 Hadar income statement was prepared on the basis that leases H–1004 and H–1005 did not exist. (*Compare* Lynch, 18 Tr. 1780–83; *and* 4/30/77 Hadar Income Statement, FNBB Ex. 34, p. 2; *with* Lease H–1004, 1/1/77, Pl. Ex. 4, p. 5; *and* Lease H–1005, 3/1/77, Pl. Ex. 5, p. 5) The Court ordered the plaintiffs to produce the original set of Hadar's books of account. (Motion to Compel Production, FNBB Ex. 154, ¶ 6) Nevertheless, the only portion of those books of account that the Overmyer organization produced was a set of journal vouchers prepared by Mr. Lynch in the course of preparing the June 30, 1978 balance sheet and some of the supporting documentation that went with them. (Lynch, 17 Tr. 1685, 18 Tr. 1776–78; 6/78 Hadar Journal Vouchers, FNBB Ex. 59; 6/78 Supporting Documentation, FNBB Ex. 61) These journal vouchers tie to the June 30, 1978 balance sheet that Mr. Lynch prepared in 1978, but they are totally different from the journal vouchers for the same period that he prepared in 1981. (Lynch, 17 Tr. 1685–90, 18 Tr. 1692–98) For example, Mr. Lynch, in 1978, booked the service company management fee as $2,000 per month payable to Jeebs, which is inconsistent with both the Jeebs service agreement and the AGG service agreement that the Overmyer organization produced in this case and Mr. Lynch used in preparing the new set of books in 1981. (Lynch, 17 Tr. 1687–89; *compare* Jeebs Service Agreement, Raible Ex. 9; AGG Service Agreement, Raible Ex. 10; *and* 1981 Hadar Journal Voucher for June, 1978, 6–02, Pl. Ex. 115C; *with* 1978 Hadar Journal Voucher 6–5, FNBB Ex. 59) The Overmyer organization has suppressed the summary sheets and trial balances that

go with the 1978 journal vouchers which were produced; has suppressed other journal vouchers, summary sheets and trial balances prepared by Mr. Lynch; has suppressed support for the Hadar financial statements prepared after Mr. Lynch left the Overmyer organization in 1978; has suppressed the 1976, 1977 and 1978 general ledgers in work sheet format that Mr. Carrieri described; and has suppressed the 1979 and 1980 general ledgers that Mr. Yeh posted under Mr. Carrieri's supervision. (*Cf.* Lynch, 17 Tr. 1674–75, 18 Tr. 1772–76, 1778–80; Carrieri Dep., FNBB Ex. 233, pp. 74–78, 79–81, 116) Mr. Connery and Mr. Overmyer suppressed the existing books of account of Hadar and created an entire set of new books with false entries based on newly manufactured documentation for the deliberate purpose of hindering, delaying and defrauding FNBB in collection of the obligations of TOC, DHO, ODS and Mr. Overmyer.

33.5. *Mr. Connery's Write-Offs of Inter-Company Obligations Due to Hadar.* After Mr. Lynch had prepared a March 31, 1981 trial balance for Hadar, Mr. Connery instructed him to write off receivables of $8,000 from Gulf Manufacturing Corporation, $60,350 from NDS and $42,483.75 from Peerless, and to write off 50 percent of receivables of $731,223.76 from Jeebs and $582,513.89 from AGG, all of which were companies controlled by Mr. Overmyer. (3/31/81 Hadar Trial Balance, Pl. Ex. 116A, pp. 2 and 6; Connery Dep., FNBB Ex. 231, pp. 383–89; Lynch, 18 Tr. 1726–32)

33.6. *The Overmyer Daily Cash Reports.* During late 1980 and 1981, Mr. Carrieri prepared daily cash reports for the Overmyer organization. (Carrieri Dep., FNBB Ex. 233, pp. 83–84) Prior to 1981, Mrs. Narvas, Mr. Chi's assistant (Raible Dep., FNBB Ex. 259, pp. 162–63), prepared the daily cash reports. (Carrieri Dep., FNBB Ex. 233, p. 84) In late 1981, the daily cash report consisted of a single statement covering four Overmyer companies: Omega, DHO, Jeebs and Weathervane Farms, Inc. (Carrieri Dep., FNBB Ex. 233, p. 84; Chi Dep., FNBB Ex. 243, pp. 123–24) In early

1981, the same single statement also included Hadar and Telecasting. (Carrieri Dep., FNBB Ex. 233, pp. 84–86; Chi Dep., FNBB Ex. 243, p. 124) Mr. Carrieri presented the daily cash reports to Mr. Chi. (Carrieri Dep., FNBB Ex. 233, p. 85) Mr. Chi's testimony that he looked only at the figures for DHO, that he did not pass the reports on to Mr. Overmyer, that no one ever reviewed the figures for Telecasting, Hadar, Omega, Jeebs or Weathervane Farms, Inc., and that he just put the reports in his desk and threw them away a couple days later (Chi Dep., FNBB Ex. 243, pp. 123, 125–28) is not credible. The daily cash reports were, in fact, kept for one month before they were disposed of. (Carrieri Dep., FNBB Ex. 233, p. 81) On February 6, 1981, when the Telecasting Chapter 11 was filed, there were daily cash reports in existence that included Telecasting. (Carrieri Dep., FNBB Ex. 233, p. 117) Similarly, on March 27, 1981, when the Hadar Chapter 11 was filed, there were daily cash reports in existence that included Hadar. (Carrieri Dep., FNBB Ex. 233, p. 117) The Overmyer organization has since destroyed all of those reports. (Carrieri Dep., FNBB Ex. 233, pp. 116–17) The creation of a single cash report for Telecasting, Hadar, Omega, DHO, Jeebs and Weathervane Farms, Inc. shows that Mr. Overmyer treated the cash of all six companies as being interchangeably his own.

### 34. *Funding of Litigation*

34.1. *Use of Service Companies To Fund Litigation.* The Overmyer service companies, ultimate recipients of the cash of Telecasting and other assets intended to collateralize FNBB's loans, were used as disbursing agents for payment of the host of lawyers and law firms employed by Mr. Overmyer to effectuate his scheme. (H. Klein, 34 Tr. 3258, 35 Tr. 3283, 3287, 3301) The enormous amounts of money passed through the service companies to Overmyer lawyers ($531,883.85 through AGG and Omega in less than 42 months) are reflective of the degree to which Mr. Overmyer directed his resources to utilizing the judicial system to frustrate and defeat his creditors. (Summary of AGG Projects Cash Receipts and Cash Disbursements, FNBB Ex. 191, part 1; Summary of Omega Cash Receipts and Cash Disbursements, FNBB Ex. 192, part 1; Omega Requests for Payment, Carrieri Ex. 34, pp. 2–3, 6–17; Carrieri Ex. 35, pp. 4–8, 12–15; Carrieri Ex. 36, pp. 27–28; Carrieri Ex. 37, pp. 3–5, 9–13; Carrieri Ex. 38, pp. 2–29; Carrieri Ex. 39, pp. 2–28, 31–32; Carrieri Ex. 40, pp. 2–5; Carrieri Ex. 42, pp. 2–9; Carrieri Ex. 43, p. 6; Carrieri Ex. 44, pp. 2–6; Carrieri Ex. 45, pp. 2–4; Carrieri Ex. 46, pp. 7–8; Carrieri Ex. 48, pp. 2–15; Carrieri Ex. 49, pp. 2–7; Carrieri Ex. 50, pp. 2–3) The lawyers and law firms to whom payments were thus made include many whose only known relationship to the Overmyer companies was their representation of entities under the protection of the Bankruptcy Courts. (*See, e.g.,* Schedule of AGG Legal Expenditures, FNBB Ex. 191, part 2) There is no indication that many of these payments were authorized by, or even disclosed to, the Bankruptcy Court.

34.2. *Use of Bermuda Bank to Pay Levy, Levy and Ruback.* In October and November, 1973, FNBB began to dishonor Overmyer checks that created overdrafts on the combined Overmyer mother account, ODS Treasurer's account number 529–1308. (Responses to Requests of DHO/ODS/ISLI for Admissions from FNBB Nos. 68 and 75) On November 5, 1973, FNBB stopped re-advancing the amount of collections of Overmyer receivables to the ODS mother account under the assigned accounts loan. (McArdle, 53 Tr. 5392; Statement of Account, FNBB Exs. 356–57) On October 31, 1973, Mr. Overmyer and Mr. Connery changed the name of Overmyer Europe, Ltd. to Deauville Private Rental Homes, Inc. (Deauville Minute Book, 11/2/73 and 10/29/73 Letters, FNBB Ex. 261, pp. 40–41) and created back dated corporate minutes purporting to show that the name was changed on April 17, 1973 (Deauville Minute Book, 4/17/73 Minutes, FNBB Ex. 261). A few days later, on November 8, 1973, Mr. Overmyer opened an account at The Bank of N.T. Butterfield & Son, Ltd. in Hamilton, Bermuda, in the name of Deauville Private Rental Homes, Inc., with a deposit

of $40,000. (Butterfield Dep., FNBB Ex. 253, Ex. K, p. 1; Butterfield Bank Statements, FNBB Ex. 255, p. 1) Five days later, on November 13, 1973 (only three days before the Warehouse XI was filed), Mr. Overmyer transferred $35,500 from the Butterfield bank account of Deauville to Levy, Levy and Ruback, his attorneys in the Warehouse XI. (Butterfield Bank Statements, FNBB Ex. 255, p. 2; Connery, 21 Tr. 2030–32; Raible, 9 Tr. 816–17)

34.3. *Use of Bermuda Bank to Pay Gilman, McLaughlin & Hanrahan.* A total of $20,000 was withdrawn from the Bank of Butterfield on February 20, and 23, 1981, for transfer to Coolidge Bank & Trust Company, payable to Gilman, McLaughlin & Hanrahan. (Butterfield Account Statements, FNBB Ex. 255, pp. 33, 35)

34.4. *Use of Bermuda Bank to Pay $40,-000 to Calfee, Halter & Griswold.* On December 7, 1981, the Overmyer organization withdrew another $40,000 from the Bermuda bank account of Deauville Private Rental Homes, Inc., and transferred the funds to Calfee, Halter & Griswold. (*Compare* 12/31/81 Deauville Bank Statement, FNBB Ex. 256; *and* 12/7/81 Debit Advice *with* Fee Disclosure, FNBB Exs. 421, 422, ¶ 3) On the same day, Calfee, Halter & Griswold produced for the deposition of Deauville Private Rental Homes, Inc., in violation of Fed.R.Civ.P. 30(b)(6), one Andrew Edgerton, who was woefully ignorant of the company's affairs, was directed not to answer questions as to his connection with the company and who sent him to testify, and did not even know there was a Bermuda bank account. (NDS/Deauville [Edgerton] Dep., FNBB Ex. 252, pp. 35–37) A week earlier, at his deposition, Mr. Overmyer, the individual who knew the most about Deauville Private Rental Homes, Inc. (Raible, 8 Tr. 734), claimed to know nothing about its business. (D. Overmyer Dep., FNBB Ex. 224, p. 36) In January, Mr. Connery claimed the attorney-client privilege as to the affairs of Deauville Private Rental Homes, Inc. (Connery Dep., FNBB Ex. 231, pp. 213–15) Calfee, Halter & Griswold did not disclose that its fees were coming from Bermuda until December 17, 1981 (Fee Dis-

closure, FNBB Ex. 421), and did not serve the disclosure on counsel for Telecasting and FNBB until December 23, 1981 (Fee Disclosure with Certificate of Service, FNBB Ex. 422, p. 3). Neither the Overmyer organization nor the Butterfield Bank produced the documentation that showed actual transfer of the $40,000 from Bermuda to Calfee, Halter & Griswold. (*Cf.* Deauville Transfer Advices, FNBB Ex. 257; Deauville Bank Statements, FNBB Ex. 256; Deauville Bank Statements, Butterfield Dep., FNBB Ex. 254, Ex. L) There was a concerted effort to conceal the use of the Bermuda account of Deauville from Telecasting, FNBB and this Court.

34.5. *Payments to Russell Morton Brown.* On January 26, 1981, the Overmyer organization wrote a $2,500 check to Hadar and a matching Hadar check to Mr. Russell Morton Brown, who appeared as attorney for Messrs. Raible, Edgerton and Strang and Mrs. Strang as witnesses in this adversary proceeding. (Summary of Matching Checks, FNBB Ex. 188, p. 17; H. Klein, 34 Tr. 3211–12) On January 28, 1981, the Overmyer organization used a $2,500 Telecasting check and a matching Hadar check to Chemical Bank to purchase an official check to Mr. Brown. (Summary of Matching Checks, FNBB Ex. 188, p. 17; H. Klein, 34 Tr. 3212; Hadar Request for Payment No. 1162, Carrieri Ex. 62) Omega made payments of $5,000 and $6,000 to Mr. Brown during February and March, 1981. (H. Klein, 35 Tr. 3288) Mr. Brown, as an attorney, serves Mr. Overmyer regardless of whom he may purport to represent.

35. *Improper Post-Petition Payments*

35.1. *Transfers from New Account to Old Account to Cover Pre-Petition Overdrafts.* On February 13, 17, 19 and 23, 1981, Mr. Chi transferred money ($5,000, $5,000, $6,000 and $4,475, respectively) from the new Telecasting account to the old one, to cover pre-petition overdrafts. (Requests for Payment Nos. 008, 009, 019 and 39553, Carrieri Ex. 22; Telecasting Cash Disbursements Register, Carrieri Ex. 24, pp. 3–4; Chi Dep., FNBB Ex. 243, pp. 92–94)

35.2. *Telecasting Payment for Temporary Omega Employee.* George Levy, of Bookkeepers Unlimited, performed accounting services for Omega on a part-time basis in early 1981. (Carrieri Dep., FNBB Ex. 233, pp. 48–49; Hadar Answers to Interrogatories, FNBB Ex. 263, p. 2, ¶ c) Mr. Levy's services were paid for by Telecasting check number 1025 dated February 27, 1981, in the amount of $129.50. (Telecasting Request for Payment No. 1025, Carrieri Ex. 22; Telecasting Cash Disbursements Register, Carrier Ex. 24, p. 6)

35.3. *Payment of Pre-Petition Petty Cash Vouchers.* Mr. Chi requested and approved Telecasting check number 1019, issued February 26, 1981, to cover petty cash vouchers from January 26, 1981, January 30, 1981, and February 2, 1981, in the amount of $273.22. (Telecasting Request for Payment No. 1019, Carrieri Ex. 22; Telecasting Cash Disbursements Register, Carrieri Ex. 24, p. 6)

35.4. *Payments of Pre-Petition Premiums on Mr. Overmyer's Life Insurance.* On February 25, 1981, two payments were made by Telecasting to Mutual Benefit Life for Mr. Overmyer's life insurance, one for a $1,128.66 invoice dated January 12, 1981, and the other for a $238.98 invoice dated January 29, 1981. (Invoices Stamped Paid for Checks Nos. 1017 and 1018, Carrieri Ex. 22; Telecasting Cash Disbursements Register, Carrieri Ex. 24, p. 6)

35.5. *Payment of Mr. Overmyer's Pre-Petition Expenses.* On February 24, 1981, the following Telecasting checks were issued to cover Mr. Overmyer's expenses incurred from November, 1980, to January 1981:

check number 1006, $121.52 to Mr. Overmyer;

check number 1007, $94.10 to Avis;

check number 1008, $27.60 to Chemical Bank;

check number 1009, $121.94 to Bankers Trust; and

check number 1011, $357.66 to Mr. Overmyer.

(Voucher Tickets for Checks Nos. 1006, 1007, 1008, 1009, 1011, Carrieri Ex. 22; Telecasting Cash Disbursements Register, Carrieri Ex. 24, p. 6) The voucher ticket for checks 1006–1009 is in Mr. Chi's handwriting. (Chi Dep., FNBB Ex. 243, pp. 97–98)

35.6. *Flowers for Mrs. Overmyer.* On December 19, 1980, Mr. Overmyer ordered flowers for Mrs. Overmyer, then hospitalized, with a card reading "B[est] W[ishes] Your husband & children." (Ruth Joyce Invoice Stamped Paid No. 1012, Carrieri Ex. 22, p. 1) The bill was sent to 3 Park Avenue, where someone wrote "Please" on the second page and Mr. Chi signed his approval to the first page. (Ruth Joyce Invoice Stamped Paid No. 1012, Carrieri Ex. 22, pp. 2, 1) The $37.26 bill was finally paid on February 26, 1981, by Telecasting. (Ruth Joyce Invoice Stamped Paid No. 1012, Carrieri Ex. 22, p. 1; Telecasting Cash Disbursements Register, Carrieri Ex. 24, p. 6)

36. *Overmyer Litigation Strategy*

36.1. *Historical Perspective.* As far back as 1969, DHO had a claims policy for its branch managers which was to respond to every claim immediately with a denial of responsibility on some ground or another, and to settle a claim only where the branch manager believed his own personal negligence caused the loss or damage. (Branch Operations Manual, FNBB Ex. 395, pp. 1, 3, 4) A January, 1970 Overmyer litigation status report is 46 pages long and lists 18 cases in a section entitled "UNSATISFIED JUDGMENTS," 20 in a section entitled "ON APPEAL," 51 in a section entitled "AWAITING TRIAL," 42 in a section entitled "PRE–TRIAL STAGE," 91 in a section entitled "PLEADING STAGE," 37 in a section entitled "INACTIVE CASES" and 58 in a section entitled "CLAIMS NOT IN LITIGATION" (a total of 317 cases). (Litigation Status Report, FNBB Ex. 396) The comments on the cases on the status report include the following: on a case at the pre-trial stage:—"Recent discovery of sub's records indicates much of our claims for overpayment cannot be substantiated" (Litigation Status Report, FNBB Ex. 396, p. 17); on inactive cases:—"Our counterclaim is weak—it would be to our advantage to maintain the status quo," "Plaintiffs not

pressing although we have poor defense," and "Cannot find counsel to take case" (Litigation Status Report, FNBB Ex. 396, pp. 37, 37, 38); and on claims not in litigation—"Very weak case" next to which is written "pass," "New counsel must be obtained to institute suit for $4,716.00," "Our prospective cause of action appears extremely weak" next to which is written "pursue," and "Attempting to find basis for suit" (Litigation Status Report, FNBB Ex. 396, pp. 41, 44, 41, 41).

36.2. *The Woodward-Clyde-Sherard Litigation.* After a judgment of foreclosure on one of the warehouses in Albany, New York, was entered in January, 1970, DHO sought a stay pending appeal and leave to assert a post-judgment counterclaim for malpractice. (2/4/70 Status Report, FNBB Ex. 397) In the status report, of which a copy of was sent to Mr. Connery, one of the staff lawyers stated: "I have not yet evaluated the merits of the professional malpractice claim, but my general initial impression is that our claim is weak" and that one thing DHO was trying to accomplish was "to delay as long as possible the payment of the mortgage." (2/4/70 Status Report, FNBB Ex. 397, pp. 2, 1) The status report also stated that the strategy was, if necessary, to pay the mortgage but immediately attach the money paid in order to exert pressure to settle the malpractice counterclaim. (2/4/70 Status Report, FNBB Ex. 397, p. 2) When the District Court denied the stay without a bond, DHO sought a stay without a bond from the Court of Appeals in an effort to delay the foreclosure sale until at least June, 1970, and perhaps October, 1970. (2/16/70 Status Report, FNBB Ex. 398) After the Court of Appeals also refused to grant a stay without the posting of a bond, a memorandum, of which a copy went to Mr. Connery, opined that "[t]here is almost no possibility that the Court of Appeals will reverse the judgment of foreclosure," but that the court might remand and order the District Court to permit the counterclaim to be asserted. (3/30/70 Memorandum, FNBB Ex. 399) The memorandum went on to indicate a possibility that the District Court might then stay foreclosure pending resolution of the counterclaim "(two years?)" if a bond in the full amount of the judgment was posted. (3/30/70 Memorandum, FNBB Ex. 399) On June 9, 1970, the judgment was affirmed, including the denial of leave to assert the counterclaim. *Woodward v. D.H. Overmyer Co.,* 428 F.2d 880 (2d Cir.1970). Judge Friendly noted that DHO had begun the action with a motion to dismiss based on "a contention so utterly trivial and unmeritorious as not to warrant statement here" (428 F.2d at 883), that three weeks later DHO filed a change of venue motion that was "almost certainly ill-founded in a mortgage foreclosure action" (428 F.2d at 883), and that the affidavit of Mr. Connery filed in opposition to plaintiffs' motion for summary judgment "was so far from meeting the requirements of F.R.Civ.P. 56(e) that discussion or citation of authority would be supererogatory (428 F.2d at 885; *see* Connery Dep., FNBB Ex. 231, pp. 7, 13). As for the plea that they be allowed to delay the case further by pleading a counterclaim, Judge Friendly concluded his opinion as follows:

> Defendants complain that they have never had a day in court on their claim of professional malpractice and that the statute of limitations may now bar them from having one. While this sort of contention inevitably strikes a responsive chord in the judicial ear, if ever there were a case where a litigant's plight was of his own making, this is it. Bearing in mind the long delay to which plaintiffs have already been put, we think it clear that the interests of justice require affirmance of the judgment.

428 F.2d at 885. After the Court of Appeals had affirmed the judgment, the same Mr. Russell Morton Brown who is familiar in this adversary proceeding wrote to Overmyer counsel with copies to Mr. Overmyer and Mr. Connery, suggesting that they seek a stay pending disposition of a petition for certiorari to the Supreme Court, and advising that they assert a fraud claim against Woodward-Clyde-Sherard in a state court and ask the court to enjoin Woodward-

Clyde-Sherard from proceeding with the foreclosure until the fraud issues were litigated. (6/16/70 Letter, FNBB Ex. 400) A June 17, 1970 memorandum, copies of which went to Mr. Overmyer and Mr. Connery, indicates that the decision was made to sue in state court and try to attach the money paid to redeem the property, in order to "obtain some settlement leverage." (6/17/70 Memorandum, FNBB Ex. 401) On June 18, 1970, the Overmyer attorney in charge wrote to Mr. Russell Morton Brown, with copies to Mr. Overmyer and Mr. Connery, that they had decided to commence a new action in either the state or federal court, even though "[o]ur position is not strong. The applicable statute of limitations is probably three years, which would have barred lawsuits commenced after April of 1969." (6/18/70 Letter, FNBB Ex. 402, p. 1) On October 26, 1970, the attorney in charge sent a memorandum to Mr. Overmyer with a copy to Mr. Connery, stating they would seek an order of attachment based on the foreign residency of the partners of Woodward-Clyde-Sherard, and use it to attach the redemption funds. (10/26/70 Memorandum, FNBB Ex. 404, pp. 1–2) Across the top, Mr. Overmyer wrote: "E. Connery—Be more Firm—DHO." (10/26/70 Memorandum, FNBB Ex. 404, p. 1) On November 6, 1970, Judge Mansfield allowed a $300,000 attachment with only a $10,000 bond that DHO did not have to collateralize. (11/6/70 Memorandum, FNBB Ex. 405) On November 25, 1970, the attorney in charge sent a status report to Mr. Connery, estimating that it would be two or three months before they had to redeem the property by paying $150,000, and that they would immediately attach the $150,000 on the basis of the order of attachment entered by Judge Mansfield in their action against Woodward-Clyde-Sherard for $650,000. (11/25/70 Status Report, FNBB Ex. 406, p. 2) He estimated the value of their $650,000 lawsuit as "$25,000 to $75,-000." (11/25/70 Status Report, FNBB Ex. 406, p. 2) The record does not show the outcome of the case.

36.3. *The Frick Case.* In *D.H. Overmyer Co. v. Frick Co.,* 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972), DHO defaulted in progress payments on an Ohio construction contract, then gave the contractor 10 percent down and a non-cognovit note to induce it to finish the job and later gave the contractor an Ohio cognovit note in return for spreading out the payment schedule and reduction of the interest rate. 405 U.S. at 179–80, 92 S.Ct. at 779. DHO then defaulted on the cognovit note, brought suit in New York for damages and sought an *ex parte* stay of proceedings by the contractor on the note:

> On July 5 Judge Frankel vacated an ex parte stay he had theretofore granted. On August 7 Judge Mansfield denied Overmyer's motion for reinstatement of the stay. He concluded, "Plaintiff has failed to show any likelihood that it will prevail upon the merits. On the contrary, extensive documentary evidence furnished by defendant indicates that the plaintiff's action lacks merit."

405 U.S. at 181, 92 S.Ct. at 780.

Mr. Russell Morton Brown prosecuted an unsuccessful appeal to the United States Supreme Court on behalf of DHO. 405 U.S. at 175, 92 S.Ct. at 777.

36.4. *The Eveready Heating Case.* In *Eveready Heating & Sheet Metal, Inc. v. D.H. Overmyer Co.,* 476 S.W.2d 153, 154 (Mo.App.1972), the Court found nothing in the testimony at trial to substantiate either of DHO's arguments on appeal.

36.5. *The General Electric Case.* In *General Electric Co. v. D.H. Overmyer Co.,* 452 F.2d 1388 (8th Cir.1972), the Court upheld a jury verdict against DHO of $3,628.10 in actual damages and $50,001 in punitive damages.

36.6. *In re DHO—Orders Terminating Warehouse Leases.* In *In re D.H. Overmyer Co.,* 383 F.Supp. 21 (S.D.N.Y. 1974), the Court affirmed numerous orders terminating leases of warehouses that DHO had sold and leased back. In one case that was appealed, the landlord had won a pre-petition suit for possession, but agreed to let DHO reenter on condition that a consent judgment be paid by December 31, 1973.

The landlord was induced to enter into this stipulation on the specific assurance of the debtor that "there was no bankruptcy contemplated and as they viewed it, it would not violate [his] right to possession at the end of the year if they didn't pay it." Landlord's Motion For Possession (Camden # 2). April 11, 1974, at 14. The stipulation and judgment were signed on October 29, and filed November 9, 1973—only seven days before Overmyer began Chapter XI proceedings.

383 F.Supp. at 26. In another case:

Overmyer's defaults in rent and taxes for the St. Louis property were substantial. The landlord sent notice of default in May and notice of termination in June, 1973. Yet when the landlord thereafter commenced an action for possession, Overmyer entered a general denial, clearly a sham answer meant only to create delay.

383 F.Supp. at 26. As to the Overmyer record in general, the Court stated:

On the record it would appear that for a period of years prior to its filing under the Bankruptcy Act, Overmyer's conduct with respect to many of the landlords formed a pattern of consistent failure to meet its rent, repair, mortgage and tax obligations. Just prior to filing its Chapter XI petitions, Overmyer made promises with respect to remedying these defaults which could only have been made with an intention to deceive. This modus operandi is not new to the Courts.

383 F.Supp. at 24 (citing the *Frick* case). In a last ditch effort to get the orders reversed, DHO argued that Judge Babitt had prejudged the cases before the trials. The District Court's disposition of this contention was: "After reading the transcripts of all the cases on appeal, it is apparent that this argument by Overmyer has absolutely no merit." 383 F.Supp. at 23 n. 3.

36.7. *Herzog v. Interstate.* Interstate Distribution Services, Inc., a company controlled by Mr. Overmyer (Organization Chart, Connery Ex. 7), first failed to carry out a settlement that was agreed to (6/18/76 Letter, FNBB Ex. 407, pp. 1–2), then failed to comply with a stipulation and order of Judge Babitt (7/1/76 and 7/29/76 Letters, FNBB Exs. 408–09), and finally made a highly inflated claim of setoff (8/18/76 Memorandum, FNBB Ex. 410).

36.8. *The Sugarman Case. Sugarman v. Overmyer,* FNBB Ex. 65, formerly Fed.Sec. L.Rep. ¶ 96,554, available on Lexis (S.D. N.Y. 1978), involved an agreement under which Mr. Overmyer was to take over 51 percent of Mr. Sugarman's companies in exchange for supplying $800,000 in working capital, and was to purchase a company in which Mr. Sugarman owned a 51 percent interest for $2,000,000. The Court held that the agreement drafted by Mr. Edmund H. Miller (Mr. Connery's predecessor and, for a time, associate in the Overmyer organization) was so illusory as to be unenforceable. (FNBB Ex. 65, panel 19[2]) The acquiring corporation was to be an Overmyer company called Pinnacle Features, Inc., but as the Court found:

The only representation or warranty undertaken by the purchaser was that it was duly incorporated and in good standing (a representation which was false, for there was no corporation in existence at that time bearing the name Pinnacle Features, Inc.).

(FNBB Ex. 65, panel 10)

As previously noted, at the time of the execution of the Agreement and the delivery of the MHSI stock, there was no corporation in existence by the name of Pinnacle Features, Inc., the named purchaser and sole signatory on the Overmyer side. Later in January, Overmyer caused Pinnacle Telecasting, Inc., a shell corporation in the Overmyer group without assets, rights or activities, to change its name to Pinnacle Features, Inc.

(FNBB Ex. 65, panel 12) The lack of records to prove that Pinnacle Features, Inc.

---

**2.** The Lexis printout that was admitted as FNBB Ex. 65 is one long scroll without numbered pages. It is cited by "panels" that coincide with one screen of text. Panel 1 is the caption and first paragraph, panel 2 the next two paragraphs, panel 3 the next two and one-half paragraphs, etc.

existed did not faze the Overmyer organization when the case came to trial; the evidence might not yet be in existence, but it soon would be:

> After the institution of this litigation, the Overmyer personnel prepared a fictitious, back-dated corporate history of Pinnacle, including minutes of meetings which had not taken place, dating from prior to the existence of the corporation under its present name. This documentary history, taken at face value, would have tended to confirm Overmyer's, and discredit Sugarman's, contentions as to the negotiations and the meaning of the Agreement.

(FNBB Ex. 65, panel 17) Mr. Connery has the responsibility for maintaining the minute books of all the Overmyer companies except RT Systems, Inc. and its subsidiaries. (Connery Dep., FNBB Ex. 231, pp. 104–05) The Court found that the defendants generally, who included not only Mr. Overmyer but also Mr. Connery (FNBB Ex. 65, panel 7), deliberately defrauded Mr. Sugarman:

> Through affirmative misrepresentations and misleading omissions ... the defendants intentionally deceived Sugarman as to material aspects of the transaction.

(FNBB Ex. 65, panel 20)

> It is interesting to note that the same kind of deception was perpetrated subsequent to the execution of the Agreement and the delivery of the stock. After having reviewed the executed Agreement, Sugarman's lawyer Chatz wrote two letters to Overmyer in which he asked, among other points, that a clarification be spelled out that Pinnacle's payments "shall be deposited in the nature of requity and not loans." (Exh. 5). The only reply he received was the letter from Connery stating "There is no inclination to do Anything further in connection with the Agreement along the lines mentioned in the second and third paragraphs of your letter of December 21, 1977." Neither Chatz nor Sugarman was ever told that Overmyer disagreed with their

understanding that payments were to be deposited as equity.

(FNBB Ex. 65, panel 28) The best that can be said for the Overmyer organization was that when the case came to trial, Mr. Connery did not commit perjury. (FNBB Ex. 65, panel 42) But the Court found repeatedly that the testimony of the rest of the members of the Overmyer organization, including Mr. Overmyer himself, was not to be believed. (FNBB Ex. 65, panels 7, 14–15, 40–44)

36.9. *The Locafrance Case.* In *Locafrance United States Corp. v. Interstate Distribution Services, Inc.,* Lucas County Common Pleas No. 79–0443 (October 21, 1980), Locafrance had obtained judgments against Interstate in both a New York Court ($9,922.34) and the Lucas County Court ($30,267.12). (Slip Opinion, Tele Ex. 50, p. 1) Thereafter, the Overmyer organization formed two new corporations, Mid American Warehouse Company and Express Warehouse and Distribution Company, and transferred all of Interstate's operations to the two of them without consideration. (Slip Opinion, Tele Ex. 50, p. 2) Interstate, Mid American and Express are somewhat differently owned, but all are controlled by Mr. Overmyer. (Organization Charts, Connery Exs. 5, 6, 7) The Court granted summary judgment setting aside the transfer as a fraudulent conveyance and awarded punitive damages and attorney's fees because actual malice was proved.

> Under the second test set out in *Columbus Finance* actual malice may be proved where there is intentional, reckless, wanton, willful and gross acts which cause injury to persons or property. Actual malice has been shown here and punitive damages are clearly proper.

> The conduct of defendant Interstate in light of the circumstances can only be considered to fit the above definitions. The acts of defendant Interstate through its officers were certainly intentional and most probably wanton in relation to the rights of the plaintiff. Most simply stated defendant Interstate wound down its operations and created two new corpora-

tions to carry on business exactly as before with the intent to avoid a forthcoming judgment against them. Actual malice has been shown here and punitive damages will be awarded.

When punitive damages are awarded, attorney's fees may also be granted. Both punitive damages and attorney's fees are proper here and are awarded against defendants Interstate Distribution Services, Inc., Express Warehouse, Inc., and Mid-American Warehouse, Inc. An award against all three defendants is compelled by the facts of this case, where, in order to avoid a judgment, transfers were made among companies clearly having a common thread of ownership. Based on the evidence set forth in the trial record and an estimation of time expended after trial, the Court finds that $22,865.75 constitutes a reasonable attorney's fee in this case. The Court further finds that an additional award of $60,000.00 is proper as punitive damages. This Court knows of few other situations more appropriate for such an award. To say that a debtor may act as the defendants did here and pay only the judgments previously awarded would make a mockery of the court and the rights of creditor.

(Slip Opinion, Tele Ex. 50, pp. 5–6)

36.10. *In re DHO—Fee Applications.* In *In re D.H. Overmyer Co.,* 3 B.R. 678 (Bkrtcy.S.D.N.Y. 1980), the Overmyer lawyers acting for the debtor-in-possession objected to the fee applications of the receiver and his attorneys and accountants. In setting out his findings of fact Judge Lewittes began: "Several facts are clear, although disputed quite unreasonably, in my view, by the objectant." 3 B.R. at 684. As to one of the objections, the Court ruled: "Mr. Taub is now in the employ of the objectant. The debtors' objection with respect to Mr. Taub is so patently frivolous that it simply requires no comment." 3 B.R. at 688 n. 68. The Court made clear that none of the objections of the Overmyer lawyers was of any substance:

It should be noted—and this applies to *all* the requests here for compensation—

that to the extent that my allowance of compensation is in an amount less than that requested, such reduction should not be construed in any manner, as an endorsement of any of the clearly inflammatory charges levelled against any of these applicants by the objectant.

3 B.R. at 685 (emphasis in original). Finally, the Court concluded the opinion as follows:

It is beyond dispute that the Receiver, his counsel and accountants, have valiantly toiled in this Court on behalf of the estate in one of the most grueling and arduous Chapter XI cases inaugurated in this District. Unfortunately, these applicants have not only been faced with problems expectantly addressed to their professional skills, but they have been afflicted with an unprecedented collage of innuendo, rumor and invective. The fallout of such has even occasioned the precipitous displacement of my colleague, the learned, distinguished and honorable Bankruptcy Judge from presiding over this case which was originally referred to him.

Regrettably, the burdens and anguish vented upon those who have been touched by this disagreeable aspect of this case, are not compensable by this tribunal.

3 B.R. at 689.

36.11. *In re DHO—The Houston Warehouse.* In *In re D.H. Overmyer Co.,* 12 B.R. 777 (Bkrtcy.S.D.N.Y. 1981), DHO tried unsuccessfully to assert a new affirmative defense on the last day of trial that was neither pleaded nor preserved in the pre-trial order. (12 B.R. at 792 n. 66)

36.12. *The Fidelity Deposit Case.* "This appeal reveals a crass misuse of both the state and federal judicial systems to avoid the payment of a judgment." So the Court began in *Overmyer v. Fidelity & Deposit Co. of Maryland,* 554 F.2d 539, 540 (2d Cir. 1977). The case involved a bonding company that posted an appeal bond for ODS that was guaranteed by Mr. and Mrs. Overmyer, on which the bonding company was forced to pay $25,535.85 in December, 1973. The

facts were everything that the Second Circuit previewed them to be:

Fidelity then commenced an action in the New York State Supreme Court, County of New York, seeking to recover the amount of the judgment plus counsel fees. The defendants in that action were Overmyer Inc. and Daniel H. and Shirley Overmyer. Defendants' motion to dismiss the complaint was denied and Fidelity's cross-motion for summary judgment was granted in an order of Justice Nathaniel T. Helman on November 14, 1974. The Overmyers had questioned the good faith of Fidelity in settling the judgment. However, in an opinion in October, 1974 Justice Helman pointed out:

There is no affidavit by any of the defendants. Their counsel may raise questions, whether of fact or of law in Texas but his own clients are the best source of the answers. No question exists as to plaintiff's obligation when it is named as a judgment debtor and execution is granted against it. This is not a case where it was solely the surety. In any event, defendants contracted to indemnify upon payment, whether plaintiff was liable or not. Defendants have no defense against their contract obligation and their attorney cannot create one by surmise, conjecture and suspicion.

Overmyer appealed from the judgment entered in November, 1974, to the Appellate Division, First Department which unanimously affirmed the judgment on May 20, 1975. Overmyer then moved in the Appellate Division for a stay of enforcement of the judgment. The motion was denied as was another motion to reargue the motion for a stay. Overmyer then applied for leave to appeal to the New York Court of Appeals in both the Appellate Division and the Court of Appeals. Both motions were denied. Overmyer then applied to the United States Supreme Court for an extension of time to petition for a writ of certiorari. This was also denied.

During these appellate maneuverings the Overmyer defendants were also active in the State Supreme Court. On February 21, 1975, they moved by order to show cause to vacate the judgment pursuant to N.Y.C.P.L.R. § 5015(a)(2) upon the grounds of newly discovered evidence. Justice Markowitz denied the motion on April 11, 1975 finding the purported grounds to be without merit.

After the entry of the judgment in November a subpoena to examine Daniel H. Overmyer to determine his financial status was served upon him returnable on January 17, 1975. At his request the return date was postponed until March 17, 1975 at which time Overmyer failed to appear. Fidelity, the judgment creditor, then brought a motion on notice to punish Daniel Overmyer for contempt. On May 6, 1975 Overmyer, who had received notice of this motion, appeared by his attorneys and opposed the motion. Justice George Postel granted the motion and found Overmyer in contempt of court unless he appeared for examination on June 12, 1975. Characteristically, he failed to appear, and on September 30, 1975 after notice Justice Postel signed an order finding Overmyer in contempt of court and imposed a fine of $260. The court directed that the contempt order would be purged and the fine remitted if Daniel Overmyer appeared for examination on October 29, 1975. Although Overmyer paid the fine in installments he did not appear for the October 29, 1975 examination. On June 4, 1976 after his counsel had filed papers in opposition the court once again found Overmyer in contempt directing the sheriff of any county to compel him to appear at the courthouse for examination under oath. Upon the eve of the directed apprehension Overmyer obtained a stay of the enforcement of the judgment and an order directing Fidelity to show cause why Overmyer should not be granted leave to reargue the prior motion to vacate the judgment on the grounds of newly discovered evidence. This "newly discovered evidence" was that Fidelity had influenced Overmyer Inc.'s attorneys in the Texas action

to act against the Overmyer defendants' interest. With respect to this evidence Justice Tyler concluded:

> [U]pon a full presentation of defendants "proof", it is the view of this Court that there is absolutely no basis for a stay, insofar as the newly-discovered evidence is supposed to support it. All that the defendants have presented is a series of allegations that do not lead this Court to the conclusion that the instant motion should be granted. In point of fact, after reviewing the "proof" adduced by defendants, it is the belief of this Court that the instant motion is merely another ploy utilized by Overmyer in an attempt to avoid the full force and effect of a judgment entered in the Court as well as the several orders emanating thereafter.

Unpublished opinion in *Fidelity and Deposit Company of Maryland v. Daniel H. Overmyer, et al.,* Index No. 5920/74 (Sup. Ct.N.Y. County, June 23, 1976) at 5. After hearing argument on both sides, Justice Tyler denied the motion to reargue, vacated the stay and once again directed that Overmyer appear for examination. The sheriff of any county was authorized to apprehend Daniel Overmyer and compel his attendance for examination at the courthouse on June 29, 1976.

In the same opinion of June 23, 1976 Justice Tyler commented:

> This court finds the litany of evasion and noncompliance in which the defendant judgment debtor has engaged to be absolutely incredible. The utter disrespect which Overmyer has shown, not just for the prior order of this court, but for the entire system of jurisprudence by which this court and this society operates is reprehensible.

The efforts of the Overmyers to delay or defeat the day of judgment however did not end. On June 29, 1976 Daniel and Shirley Overmyer brought an action in the Southern District of New York seeking injunctive relief and damages against Fidelity, the State of New York, Justice Tyler, Thomas J. Delaney, the Sheriff of Westchester County and Edward A. Pichler, the Sheriff of New York County.

554 F.2d at 540–42. The Court held that none of the claims asserted by Mr. Overmyer was of any substance. It then concluded as follows:

> 28 U.S.C. § 1912 and Federal Rule of Appellate Procedure 88 authorize this court upon a determination that an appeal is frivolous to award just damages and single or double costs to the appellee. [Citation omitted]
>
> The history of this litigation in the state courts and its continuation in the federal court, even before the Supreme Court had demolished the only semblance of support plaintiffs could muster, serves to illustrate that this appeal was and is frivolous. This court has been utilized, as were earlier the state and district courts, as a device to frustrate the collection of a judgment of a state court. We assess the appellants double costs and in addition $2000 in attorneys' fees.

554 F.2d at 543. The footnote to the final quotation is as follows:

> It has not escaped our attention that appellants were assisted by counsel before both the district court and this court in bringing this sham suit and appeal. We have warned counsel in immigration matters about abusing the process in this court to gain delays in deportation. [Citations omitted] The use of this court solely as a dilatory tactic to avoid paying a judgment is a serious breach of professional ethics. [Citations omitted]
>
> We remind the Bar that under Fed.R. Civ.P. 11 the signature of an attorney on a pleading "constitutes a certificate by him that it is not interposed for delay." We will not countenance attempts to pervert the federal judicial process into a Dickensian court where lawsuits never end.

554 F.2d at 543 n. 4. Mr. Overmyer admitted during the taking of his deposition on December 1 and 2, 1981, that he was the one who decided to take the multitude of appeals that were the subject of condemnation in the *Fidelity & Deposit Co. of Mary-*

*land* case. (D. Overmyer Dep., FNBB Ex. 224, pp. 76–77) Indeed, even after all that the Second Circuit said, Mr. Overmyer took yet another appeal. "This appeal is totally devoid of merit and the issue sought to be litigated here has been previously determined adversely to the appellants in other litigation in which they were involved." *Overmyer v. Fidelity & Deposit Co. of Maryland,* 66 A.D.2d 816, 411 N.Y.S.2d 205 (1978).

36.13. *Confirmation Letters Regarding Notes Payable.* Mr. Connery issued instructions to the accounting department on September 21, 1970, not to send out confirmation letters stating the amount due on one of the company's notes, because in some instances they had withheld payment based on claims of setoff of which the payee was unaware, and because they were intentionally withholding payment in many other cases where the legal department might be able to find "sustainable chargebacks" if suit were even brought. (9/21/70 Memorandum, FNBB Ex. 403)

### 37. Cost of Collection

37.1. *Summary of Collection Effort.* FNBB commenced its efforts to collect the defaulted obligations of DHO, ODS, TOC and Mr. Overmyer in late 1973, after the Warehouse XI was filed. (Levine, 56 Tr. 5744, 5780) Since that date, FNBB has retained the law firms of Ropes & Gray (Boston), Weil, Gotshal & Manges (New York), Baker & Hostetler (Cleveland), Lovett, Hennessey, Stambler & Siebert (Washington) and Eastman, Stichter, Smith & Bergman (Toledo), among others, to collect the defaulted obligations of DHO, ODS, TOC and Mr. Overmyer. (*See* Summary, FNBB Ex. 358) These firms rendered services with the primary goal of foreclosing on the stock of Telecasting which had been pledged as collateral to secure the obligations. (Levine, 56 Tr. 5747–48) These services were rendered in connection with 39 separate proceedings in 10 different forums, a majority of which proceedings were initiated by DHO, ODS, TOC or Mr. Overmyer. (Levine, 56 Tr. 5738) In addition, counsel retained by FNBB rendered legal services in connection with 57 appeals, only one of which was commenced by FNBB, the remainder being commenced by or on the instruction of Mr. Overmyer. (Levine, 56 Tr. 5738; 57 Tr. 5839–5840)

37.2. *Complexity of Collection Effort.* The various legal proceedings in which FNBB was engaged in its efforts to collect the past due obligations and foreclose on the collateral were extremely complex. (Levine 56 Tr. 5747) The factors that made the proceedings so complex were: (1) many of the pleadings were difficult to comprehend (Levine, 56 Tr. 5748); (2) the strategy and tactic of Mr. Overmyer to engage in legal proceedings in multiple forums (Levine, 56 Tr. 5748, 5758–5761, 5764–68); (3) the conduct and obstructionist tactics of Mr. Overmyer, particularly with respect to discovery by FNBB (Levine, 56 Tr. 5748–49, 5770–72; and (4) the large number of appeals taken in the various proceedings (Levine, 56 Tr. 5763–64) The complexity of the case, particularly the use by Mr. Overmyer of multiple forums, necessitated the retention by FNBB of the multiplicity of law firms involved in the collection effort. (Levine, 56 Tr. 5751–5753)

37.3. *Interim Results of Collection Effort.* The results achieved by FNBB in the proceedings in which it has been engaged have been significant. (Levine, 56 Tr. 5803) First, notwithstanding the 57 appeals and the litigation in 10 forums and 39 separate proceedings, FNBB kept its collection efforts on track. (Levine, 56 Tr. 5803) Second, FNBB attained the voting control of the stock of Telecasting, placing FNBB in a position to control Telecasting and ensure preservation of the value of the collateral pledged to secure FNBB's loans. (Levine, 56 Tr. 5803–04) Third, over the past eight years, FNBB has been able to overcome every impediment, roadblock or obstacle Mr. Overmyer has placed in its way. (Levine, 56 Tr. 5804)

37.4. *Nature and Hours of Collection Effort.* From November, 1973, through March 26, 1982, Weil, Gotshal & Manges expended 8,551 hours in connection with the collection effort (Levine, 56 Tr. 5780), Ropes

& Gray expended 16,976 hours (Levine, 56 Tr. 5780) and starting in February, 1981, Baker & Hostetler recorded 8,982 hours (Levine, 56 Tr. 5780). In addition, Lovett, Hennessey, Stambler & Siebert rendered services relating to FCC compliance by WDHO (*see* Summary, FNBB Ex. 358), and Eastman, Stichter, Smith and Bergman rendered services in connection with the various judicial proceedings in the Lucas County Court of Common Pleas in Toledo, Ohio (*see* Summary, FNBB Ex. 358). All of these services were in connection with the collection effort, including the preservation of the value of the pledged stock of Telecasting. (Levine, 56 Tr. 5747–48; *see* Summary, FNBB Ex. 358)

37.5. *Billing for Collection Effort.* The composite hourly billing rates billed by the three principal law firms for the total period during which they were involved in the collection efforts were $104 for Ropes & Gray, $81.50 for Weil, Gotshal & Manges and $84 for Baker & Hostetler. (Levine, 56 Tr. 5783) These composite rates, which are a good indication of the use of the various levels of attorneys within a law firm, reveal that the three principal firms were efficient and cost effective in the use of their personnel. (Levine, 56 Tr. 5783–85) The low composite rates of Weil, Gotshal & Manges and Baker & Hostetler is attributable to effective use of junior attorneys; the higher composite rate for Ropes & Gray is the result of most of the strategizing, negotiation and planning being performed by more senior attorneys at Ropes & Gray. (Levine, 56 Tr. 5784) The manner in which the law firms billed FNBB for their services (*i.e.*, on an hourly basis) and the rates at which FNBB was billed were customary in the communities of Boston, New York and Cleveland for similar work performed by similarly situated firms. (Levine, 56 Tr. 5787, 5795, 5799)

37.6. *Cost of Collection Effort.* Through March 26, 1982, FNBB had incurred and paid legal costs and expenses in attempting to collect the obligations of DHO, ODS, TOC and Mr. Overmyer of $4,059,217.45, plus nonlegal collection expenses of $169,265.33 and FNBB employee out-of-pocket collection expenses of $38,848.13. (Summary, FNBB Ex. 358, tab 1, p. 1, tab 2, p. 1, tab 3, p. 1) The figure of $4,059,217.45 given by Mr. McArdle (McArdle, 53 Tr. 5408) and used on the chart (Chart, FNBB Ex. 362) was for the legal collection costs only (*see* Summary, FNBB Ex. 358, tab 1, p. 1) and inadvertently omitted the nonlegal collection expenses and the FNBB employee out-of-pocket collection expenses. It is, therefore, necessary to adjust the collection expense figure (and the total due and owing figures) by $208,113.46 ($169,265.33 plus $38,848.13). The legal collection expenses consisted of $3,444,301.15 of fees and $614,916.30 of disbursements. (Summary, FNBB Ex. 358, tab 1, p. 1) Of the $3,444,301.15 in fees, $3,218,590.87 were for the three principal law firms involved: $1,769,555 for Ropes & Gray, $694,035.87 for Weil, Gotshal & Manges and $755,000 for Baker & Hostetler. (Summary, FNBB Ex. 358, tab 1, p. 305; Levine, 56 Tr. 5782) In light of all the relevant factors, the collection costs incurred and paid by FNBB were and continue to be reasonable and are, in fact, on the low side of the range of reasonableness. (Levine, 56 Tr. 5825)

38. *Unreasonable and Vexatious Increase of Costs by Overmyer Counsel*

38.1. *The Barn Affair.* The Overmyer organization keeps its old records in various files and file cabinets in the barn and garage owned by Weathervane Farms, Inc. (Pearlstein, 55 Tr. 5645; Photos, FNBB Exs. 379, 388–89; S. Strang Dep., FNBB Ex. 246, pp. 14–15, 20, 50) Discovery was conducted by FNBB representatives at the barn during the winter of 1980–1981. (McArdle, 53 Tr. 5360; Pearlstein, 55 Tr. 5644–45; Photo, FNBB Ex. 387) During the course of that discovery, Messrs. Connery and Conway, counsel for Mr. Overmyer and various Overmyer family members, attempted to delay, obstruct or prevent discovery by a series of tactics that included restricting hours for inspection and copying, locking doors of the basement of the barn and the garage, physically taking away documents that had been selected for copying, rearranging documents, removing

documents from the barn, burning or other physical destruction of documents, assault and battery on an attorney from Ropes & Gray and an attempt by Mr. Overmyer to have the FNBB representatives arrested. (Pearlstein, 55 Tr. 5647–50, 5651–54; Photos, FNBB Exs. 381–86, 390) For example, the FNBB representatives were prevented from examining and copying not only the *Sugarman* opinion, but also eight boxes of documents pertaining to the *Sugarman* case. (Raible, 11 Tr. 1018–21; Barn Inventory, Raible Ex. 374) The abuses continued right into this Court, when counsel brought in on the last day of trial a package of fragments of burned documents that had been removed from the barn in direct violation of an order of the Massachusetts Superior Court. (Rispo, 62 Tr. 6309, 6311–15; Order for Discovery, FNBB Ex. 452, ¶ 2)

38.2. *Instruction To Resist Control Finding.* Mr. Connery, a member of the bar, instructed plaintiffs' counsel in this case to assert to defense counsel and to the Court that Mr. Overmyer was in no way connected with or in control of Hadar. (Connery, 24 Tr. 2282) He knew that this contention was frivolous. (*See* Finding No. 29.8, *supra*) This is not the first time that Mr. Connery has raised defenses that he knew to be totally without merit. (*See, e.g.,* 7/25/78 Letter Calhoun to Connery, Raible Ex. 632; Findings Nos. 36.1 and 36.2 *supra*)

38.3. *No Known Address for Mr. Russell Morton Brown.* Mr. Russell Morton Brown has represented Mr. Overmyer and his various entities for many years. (See, *e.g.,* Findings Nos. 36.2 and 36.3, *supra*) He even has a building pass for 3 Park Avenue. (5/25/79 Letter, Raible Ex. 799) Mr. Brown appeared at depositions on behalf of: Mr. Andrew C. Edgerton, the designated witness for Deauville Private Rental Homes, Inc., and NDS and its subsidiary, on December 7, 1981, (Deauville/NDS [Edgerton] Dep., FNBB Ex. 252); Mrs. Barbara Overmyer Strang personally on November 5, 1981, (B. Strang Dep., FNBB Ex. 235); Mr. Stuart K. Strang personally on November 4–5, 1981 (S. Strang Dep., FNBB Ex. 234); Weathervane Farms, Inc., by its designee, Mr. Strang, on November 20 and

December 8, 1981, (Weathervane Dep., FNBB Ex. 245); and Mr. David A. Raible personally on November 9, 10, 11, 23 and 24, and December 14–16, 1981 (Raible Dep., FNBB Exs. 262A–262K) At the time of the taking of these depositions, Mr. Brown gave his address as 1800 M Street, N.W., Suite 290 North, Washington, D.C., 20036, and Law Building, 315 Third Street, West Palm Beach, Florida, 33401. (Business Card, FNBB Ex. 249) Both addresses were false. When counsel attempted to serve him with motions to compel answers to questions he had instructed witnesses not to answer, he never received them. (Raible Unredacted Dep., FNBB Ex. 262I, pp. 946–47; *see* 12/14/81 Transcript, pp. 21–22) When the court reporters sent him mail, it was returned "addressee unknown." (Envelopes, FNBB Exs. 250–51)

38.4. *Mr. Brown's Obstruction of Mr. Raible's Deposition.* During the taking of Mr. Raible's deposition on November 9, 10, 11, 23 and 24, and December 14, 1981, Mr. Brown, on 106 separate occasions, instructed Mr. Raible not to answer a question. (Raible Dep., FNBB Ex. 262D, pp. 352, 357, 361; FNBB Ex. 262E, pp. 400, 406, 406, 410, 411, 412, 430, 434, 436, 436, 438, 463, 466, 493, 494, 495, 496, 497, 497, 529, 531, 535; FNBB Ex. 262F, pp. 542, 542, 549, 555, 562, 563, 576, 579, 589, 589, 596, 613, 626, 628, 630; FNBB Ex. 262G, pp. 655, 659, 660, 667, 667, 668, 669, 669, 673, 678, 687, 689, 703, 704, 706, 712, 725, 727, 727, 728, 729, 733, 734, 739, 746, 747, 750, 754, 755, 759, 776, 780, 781, 781, 782, 782, 783, 783, 788, 789, 789, 790, 790, 791, 791, 795, 801; FNBB Ex. 262H, pp. 828, 833, 844, 846, 846, 854, 855, 864, 866, 874, 915, 919, 920, 920, 922, 922, 926, 941; FNBB Ex. 262I, p. 950) Telecasting and FNBB were forced to file a motion to compel answers in this Court on December 7, 1981. (Motion To Compel, Raible Ex. 661; Raible Dep., FNBB Ex. 262I, p. 947) By an order dated December 10, 1981, this Court granted the motion to compel. (Order, Raible Ex. 662; Raible Dep., FNBB Ex. 262I, p. 947) Plaintiffs' counsel moved for reconsideration of the order compelling answers. (12/11/81 Motion To Reconsider)

At a hearing on December 14, 1981, the Court heard all counsel, including Mr. Brown, and reaffirmed the order compelling answers. After Mr. Smith asked Mr. Hopkins not to ask the questions to which answers were ordered until after further argument, Mr. Hopkins immediately requested further argument; further argument was had; and the Court again reaffirmed the order. Mr. Hopkins and Mr. Brown then returned to the deposition, while the Court continued to hear other matters. Mr. Brown promptly instructed Mr. Raible not to answer the very first question he had been ordered to answer, and then tried to prevent a return to the Court for a contempt hearing. (Raible Unredacted Dep., FNBB Ex. 262I, pp. 950–52) Mr. Brown's refusal to obey this Court's direct orders necessitated a further hearing that afternoon during which this Court again ordered that the questions be answered and that Mr. Brown stop obstructing discovery. (12/14/81 Transcript of Proceedings, p. 18) Mr. Brown willfully obstructed the deposition of Mr. Raible, because he knew that Mr. Raible would not lie for Mr. Overmyer.

38.5. *Mr. Smith's Obstruction of Mr. Raible's Deposition.* After the Court had put an end to Mr. Brown's tactics, Mr. Smith visited the deposition of Mr. Raible on December 15, 1981, together with two associates of Calfee, Halter & Griswold, plus Mr. Brown. (Raible Unredacted Dep., FNBB Ex. 262J, p. 1056) Even after all of the direct orders of this Court, Mr. Eklund of Calfee, Halter & Griswold, instructed Mr. Raible not to answer three of the questions the Court had ordered answered. Those questions remain unanswered today. (Raible Dep., FNBB Ex. 259A, pp. 502–04; Motion To Compel, Raible Ex. 661, p. 2) The obstructionist tactics of Mr. Brown and Mr. Smith added greatly to the length of the Raible deposition. The transcripts of the November 23 and November 24 sessions, for example, contain 3,886 lines of colloquy and only 3,264 lines of testimony—54 percent colloquy. (Raible Unredacted Dep., FNBB Exs. 262G and 262H) In order to offer a coherent deposition in evidence at trial,

counsel for defendants were required to perform a major editing job. (*Compare* Raible Unredacted Dep., FNBB Exs. 262A–262K, *with* Raible Dep., FNBB Exs. 259–259A)

38.6. *Further Obstruction of Discovery.* Mr. Brown twice instructed Mr. Strang during his deposition to not answer a question. (S. Strang, Dep., FNBB Ex. 234, pp. 84, 91) He instructed Mrs. Strang during her deposition not to answer on seven separate occasions. (B. Strang Dep., FNBB Ex. 235, pp. 42, 44, 65–66, 67, 68, 73, 77) During the Deauville/NDS deposition, Mr. Brown instructed Mr. Edgerton, who was designated to testify on behalf of those entities pursuant to Fed.R.Civ.P. 30(b)(6), not to answer a question on ten separate occasions, including questions as to whether he was a director or officer of Deauville Private Rental Homes, Inc., and as to who had told him to testify on its behalf. (Deauville/NDS [Edgerton] Dep., FNBB Ex. 252, pp. 34, 34, 34, 35, 35, 35, 35, 36, 36, 36)

38.7. *Misinformation Supplied by Mr. Connery to Mr. Bond.* Mr. Connery wrote a letter to Mr. Bond, the Hadar appraisal witness, setting out a computation as to which he stated: "Hadar in the past has used a formula of which the following is an example." (12/15/81 Connery Letter, FNBB Ex. 43, pp. 2–3) The "formula" that Mr. Connery set out used a single mark-up of ten percent instead of 20 percent per year. (12/15/81 Connery Letter, FNBB Ex. 43, p. 3; Connery, 20 Tr. 1949–50) Mr. Connery knew that this was not, in fact, the Overmyer Formula. (Connery, 20 Tr. 1936–37) Mr. Connery's testimony that he did not intend that Mr. Bond rely on this misinformation (Connery, 20 Tr. 1948, 1950) is not credible.

38.8. *Obstruction of the Trial.* During the course of trial, Messrs. Rispo and Smith, Overmyer counsel, attempted on no fewer than six occasions to delay or stop the trial because of alleged illnesses of Mr. Overmyer, without ever providing the Court with any assurance, or even estimate, of when, if ever, these purported illnesses could be cured or controlled sufficiently to

permit Mr. Overmyer to attend the trial. (Arguments, 1 Tr. 35–40, 5 Tr. 383–438, 19 Tr. 1815–22, 25 Tr. 2364–71, 48 Tr. 4692–98, 49 Tr. 4817–51; Affidavit, Overmyer Ex. 4; Affidavits, Overmyer Exs. 1–3 [identification only] ) The Overmyer counsel filed 14 interlocutory appeals, including two interlocutory appeals from the refusals of the Court to stop the trial because of the purported illness. Two of the appeals were presented to the District Court *ex parte* while counsel for the defendants were right in the courtroom trying this case. (The Court, 7 Tr. 596–98) One of these was the only one of the 14 that was allowed. After this episode, the Court ordered that "pleadings filed hereafter, when the attorneys are in the courtroom should be served upon them in the courtroom." (The Court, 7 Tr. 596) Nevertheless, Overmyer counsel applied *ex parte* to the New York Bankruptcy Court for an order removing DHO from the trial in this Court. (Smith, 51 Tr. 5103–04) When Mr. Smith refused to disclose his knowledge of this maneuver, he was called as a trial witness. (Smith, 51 Tr. 5104–05) During his testimony and from an affidavit that he tried to withhold from the Court, it became clear that Mr. Smith had participated actively in the decision to proceed *ex parte,* and that the reason for this extraordinary tactic was the awareness of all Overmyer counsel that they were losing in this Court. (Smith, 51 Tr. 5114–15, 5117, 5120–21; 4/13/82 Findings of Fact and Conclusions of Law, p. 3, ¶ 5) It also became clear that Mr. Smith's initial characterization of the action of the New York Bankruptcy Court was inaccurate and that, in fact, the New York Court had denied the application to rescue DHO from this Court. (*Compare* Smith, 51 Tr. 5137–40, 5141–42, *with* Smith, 51 Tr. 5103) When Mr. Smith testified that the Overmyer counsel intended to present a form of order to the New York Court, this Court once again made clear, over the objection of Calfee, Halter & Griswold, that its order to serve papers on counsel sitting in the courtroom applied to *all* papers that might affect the trial of this adversary

proceeding, wherever counsel might choose to file them. (Smith, 51 Tr. 5150–52; *see* Smith, 51 Tr. 5114) Nevertheless, Overmyer counsel proceeded *ex parte* to present an order to the New York Court in flagrant violation of this Court's order. (The Court, 56 Tr. 5774–77) After notice to all interested parties and a proper hearing, this Court entered findings of fact and conclusions of law on April 13, 1982, to the effect that DHO remains a party, and will be bound by this Court's judgment.

### 39. Amounts Due

39.1. *Amount Due From Hadar To Telecasting.* The amount due from Hadar to Telecasting, the amount that has been extracted by the Overmyer organization and should be restored to Telecasting, is $2,520,-240.02. (H. Klein, 31 Tr. 3498; *see* Finding No. 20.4, *supra* ).

39.2. *Amount Due From DHO, ODS, TOC and Mr. Overmyer to FNBB.* The total amount due from DHO, ODS, TOC and Mr. Overmyer to FNBB, including principal, interest and costs of collection, was $22,393,775.27 ($22,185,661.81 plus $208,-113.46) as of March 31, 1982, $22,409,699.13 ($22,201,585.67 plus $208,113.46) as of April 2, 1982, and $22,425,622.99 ($22,217,509.53 plus $208,113.46) as of April 4, 1982. (McArdle, 53 Tr. 5408, 5412–13, 54 Tr. 5634; Chart, FNBB Ex. 362; Calculation Sheet, FNBB Ex. 375; *see* Findings Nos. 5.17, 8.13, 9.4 and 37.6, *supra.*)

## DISCUSSION

While this case involves a host of legal issues, the most important question is whether any or all of Mr. Overmyer's corporate transfers were fraudulent conveyances.

The Uniform Fraudulent Conveyance Act, adopted in Ohio, New York and Massachusetts, provides in Section 7 that: "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future

creditors, is fraudulent as to both present or future creditors." [3]

Fraudulent conveyance law has ancient origins and its analysis usually begins with *Twyne's case,* 3 Co.Rep. 80b, 76 Eng.Rep. 809 (Star Chamber 1601). In *Twyne's case,* C. sued Pierce on a debt owed by Pierce to C. While the suit was pending, Pierce transferred all his property (mostly sheep) to another creditor, Twyne, in satisfaction of Twyne's claim. However, Pierce continued to possess, sell, brand and shear the sheep. Realizing the difficulty in proving subjective fraudulent intent, the Court reasoned that fraudulent intent can be found where "badges of fraud" are discovered.[4]

In *Twyne's case,* the Star Chamber found:

(1) the transfer was complete and without exception of Pierce's apparel or anything of necessity;

(2) Pierce continued to exercise dominion and control over the sheep and other property;

(3) the transfer was made by a secret trust; and

(4) the transfer was made while the suit by C. was pending.

With the existence of these "badges of fraud," the Star Chamber had little difficulty in concluding that Pierce's conveyance of all his goods to Twyne was made with the intent to defraud C.

An examination of the Overmyer case presently before the Court indicates that fraud and deceit have come a long way since 1601. This Court has heard evidence of and witnessed fraudulent and deceitful manipulation of facts, corporate fictions and the court system. This Court has never encountered such a systematic distortion of truth and the legal system. However, as clever as Mr. Overmyer's system was, it still left numerous "badges of fraud."

1. The transfer of funds or of assets by a debtor for inadequate or non-existent consideration is a "badge of fraud" which raises a presumption that the debtor acted with actual fraudulent intent. In *Scola v. Morgan,* 66 A.D.2d 228, 412 N.Y. S.2d 893 (1979), a transfer of all an individual's major assets to a corporation controlled by his wife, which had no assets before the transfer, was fraudulent as to his creditors where there was no consideration for the transfer. *See also Squire v. Raymond,* 34 Abs. 79, 35 N.E.2d 976 (Ohio App., 1941). Weathervane Farms, Intermodal Terminals and Jeebs did not provide any consideration for the acquisition of their property interests.

(a) The deeds conveying the Overmyer farm from Mr. Overmyer to Intermodal Terminals were recorded in August and September, 1973, for a total consideration of $20. (Deeds, FNBB Exs. 86–87) The deeds themselves, however, were back dated to February 7, 1972. (Deeds, FNBB Exs. 86–87; *see* Findings of Fact 12.2, *supra* pp. 53–54)

(b) The evidence demonstrates that Weathervane Farms, Inc. acquired the Weathervane Farm property from the Estate of Mabel M. Gabriel on August 15, 1978, for a purchase price of $800,000. (Deeds, FNBB Ex. 204; *see* Findings of Fact 23.15, *supra* pp. 116–17) Stuart Strang, Mr. Overmyer's son-in-law, delivered checks totaling $266,807.53 at the closing on August 15, 1978. (Checks 1002, 1003 and 1006, Weathervane Ex. 7, pp. 2, 4; Check Stubs 1002, 1003 and 1006, Weathervane Ex. 4; H. Klein, 36 Tr. 3360; *see* Findings of Fact 23.15, *supra* pp. 116–17) The month preceding this acquisition, Weathervane Farms, Inc. had virtually no assets at all. Mr. Strang has no idea from where the money to cover the checks came. (Weathervane Dep., FNBB Ex. 246, p. 26; *see* Findings of

---

**3.** O.R.C. § 1336.07, 7 N.Y. Debtor and Creditor Law § 276 (McKinney) and Mass.Gen.Laws Ann. c. 109A.

**4.** In taking this important step in fraudulent conveyance law, the Court reasoned that "because fraud and deceit abound in these days more than in former times, it was resolved in this case by the whole Court, that all statutes made against fraud should be liberally and beneficially expanded to suppress the fraud." *Twyne's case, supra* at 815–16.

Fact 23.15, *supra* pp. 116–17) The accounting records of Weathervane Farms, Inc. show cash receipts totaling $271,390.01 between July 26, 1978, and August 16, 1978. (Weathervane Cash Receipts Journal, Weathervane Ex. 2; H. Klein, 36 Tr. 3359; see Findings of Fact 23.17, *supra* pp. 117–18) The testimony of FNBB's expert witness at the trial, Mr. Howard Klein, and the inferences to be drawn from the unexplained gaps in Telecasting's records for 1977 and 1978, show by a preponderance of the evidence that the funds used by Weathervane Farms, Inc. to purchase this property were taken from Telecasting for no consideration whatsoever. (Findings of Fact 23.18, *supra* pp. 118–20) Moreover, payments on the $500,000 mortgage on the Weathervane Farms property have been made directly and indirectly by moneys siphoned from Telecasting. (*See* Findings of Fact 23.16, *supra* p. 117) Weathervane Farms, Inc. received moneys from Telecasting, Hadar, AGG and Omega, which were evidenced by cash receipts, even though Weathervane provided no service for these payments. (Findings of Fact 23.18, *supra* pp. 118–20) At least $34,575.66 of Weathervane's receipts from Hadar were matched by checks from Telecasting to Hadar for no consideration, and it is reasonable to infer that substantially greater amounts were received for no consideration by Weathervane from Telecasting indirectly through Mr. Overmyer's so-called "service companies," AGG and Omega. (Findings of Fact 23.16, 23.18, *supra* pp. 117, 118–20) All of these transactions were completed at Mr. Overmyer's direction, and were fully intended to deprive FNBB of the value of its collateral, Telecasting.

(c) Jeebs owns valuable leasehold assets on the 29th floor of 3 Park Avenue and apartment 22G at 4 Park Avenue. (Connery Dep., Ex. 231, pp. 386–87; Raible Dep., Ex. 259, pp. 68–69; Findings of Fact 23.14, *supra* p. 116) Two rental payments for 4 Park Avenue have been made directly by Telecasting. (Findings of Fact 23.14, *supra* p. 116) The balance of the rental payments were made almost entirely by the purported "service companies," Jeebs, AGG

and Omega. (*See* Findings of Fact 23.7, *supra* pp. 110–11) These companies acquired their funds pursuant to "service" agreements created by Mr. Overmyer between them and Telecasting. (Findings of Fact 23.8, 23.9, *supra* pp. 111–12) From March, 1974, through December 31, 1977, Telecasting was obligated to pay Jeebs between $1,500 and $2,600 per month for its "services." (Findings of Fact 23.1, *supra* pp. 107–08) Thereafter, Telecasting became obligated to pay AGG $5,900 per month for "services rendered" through August 31, 1979. (1/1/78 Service Agreement, Raible Ex. 774; Findings of Fact 23.1, *supra* pp. 107–08) Telecasting's "service" obligation was then transferred back to Jeebs in the amount of $10,000 per month through October 31, 1980. (9/1/79 Service Agreement, Raible Ex. 774; Findings of Fact 23.1, *supra* pp. 107–08) A final "service" agreement obligated Telecasting to pay Omega $10,000 per month for the duration of the contract. (11/1/80 Telecasting Minutes, Tele Ex. 29; Findings of Fact 23.1, *supra* pp. 107–08) In spite of these enormous payments by Telecasting to the "service companies," Arthur Dorfner, the president of Telecasting until 1980 and its chief operating officer until 1979, could not recall *any* services provided to Telecasting from Jeebs, AGG or Omega. (Dorfner Dep., FNBB Ex. 240, pp. 16–18; Findings of Fact 23.2, *supra* p. 108) Hadar was obligated to Jeebs, AGG and Omega in amounts varying between $2,000 to $25,000 per month in the period between 1976 and 1981. (Findings of Fact 23.3, *supra* p. 108) The service agreements with Hadar are back dated fabrications and, like the service agreements made directly with Telecasting, were engineered by Mr. Overmyer to siphon and fraudulently transfer, for his personal use, enormous sums of money from Telecasting for grossly unfair consideration. (Findings of Fact 23.5, *supra* pp. 109–10) The record before this Court demonstrates that the payments on the leaseholds at 3 and 4 Park Avenue came from Telecasting and were transferred by Mr. Overmyer with actual intent to defraud FNBB.

2. A common "badge of fraud" is the retention of possession of property by a debtor after he purported to transfer it. *Takacs v. Kapela,* 264 App.Div. 871, 35 N.Y. S.2d 502 (1942); *Bemet v. Dean,* 246 App. Div. 670, 283 N.Y.S. 172 (1935); *Hombeck v. Vanmetre,* 9 Ohio 153 (1839); *Starr v. Starr,* 1 Ohio 321 (1824). The Overmyer farm, though transferred to Mr. Overmyer's nominee corporation, Intermodal Terminals, Inc., has continuously remained in his possession and control. (Findings of Fact 12.2, 29.1, 29.2, *supra* pp. 53–54, 142–44)

3. A debtor's conveyance of substantial assets to corporations which he dominates and controls is often evidence of actual intent to defraud creditors. *First National Bank of Chicago v. Trebien Co.,* 59 Ohio St. 316, 52 N.E. 834, 837 (1898); *Scola v. Morgan,* 66 A.D.2d 228, 412 N.Y.S.2d 893, 896–97 (1979). The evidence in this case has established conclusively that Mr. Overmyer exercises complete and full control over his corporate nominees, Weathervane, Intermodal and Jeebs. (Findings of Fact 29.1, 29.2, *supra* pp. 142–44) The purpose of Mr. Overmyer's transfers from Telecasting to Weathervane and Jeebs and from himself to Intermodal was to deprive FNBB of the value of its security and guarantee of its loan, and to personally enrich Mr. Overmyer and his immediate family. That purpose, combined with the transfers failing to be supported by fair consideration, enables the inference of an intent by Mr. Overmyer to defraud FNBB.

4. Another "badge of fraud" tending to prove Mr. Overmyer's actual fraudulent intentions is his 1973 transfer of the stock of at least 15 of his nominee corporations, including Weathervane, Intermodal, Hadar and ISLI, to trusts for the benefit of his immediate family. These transfers were made with actual intent to defraud FNBB. The evidence has demonstrated that Messrs. Overmyer and Connery transferred 14 of Overmyer's nominee corporations, including Intermodal Terminals, ISLI and Hadar, to the Bermuda trust between August 13, 1973, and December 10, 1973. (Findings of Fact 12.1, *supra* pp. 50–53)

The deeds and minutes have been back dated by Mr. Overmyer and Mr. Connery, however, such that they purport to show (a) Mr. Overmyer conveyed the Overmyer farm to Intermodal on February 7, 1972; (b) the Intermodal stock was transferred from TOC to Mr. Overmyer the next day, February 8, 1972; (c) that the stock of ISLI, Hadar and 12 other corporate nominees were also transferred from DHO to TOC to Mr. Overmyer on February 8, 1972; and (d) that Mr. Overmyer transferred the stock of all these corporations to the Bermuda trust on April 14, 1972. (*Id.*) It is evident, however, that all of these transactions actually occurred between August 13 and December 10, 1973. (*Id.*) The stock of Weathervane Farms, Inc. was transferred to separate trusts during the same period of September and October, 1973. (Findings of Fact 12.3, *supra* pp. 54–56) Weathervane Farms, Inc. currently holds between 80 and 85 percent of the stock of Jeebs. (Findings of Fact 23.19, *supra* pp. 120–21) The records created by Messrs. Overmyer and Connery purport to reflect that Mrs. Overmyer purchased the stock of Formodal, Inc., Weathervane Farm's predecessor, on May 26, 1973, from her husband, Mr. Overmyer. (Deauville Stock Certificate No. 3, Weathervane Minute Book, Weathervane Ex. 1; Findings of Fact 12.3, *supra* pp. 54–56) She then claims to have transferred 20 percent of the Weathervane stock to Weathervane which, in turn, sold it to the Harrison M. Overmyer trust, and claims to have transferred the other 80 percent to the Barbara M. Overmyer (Strang) trust. (Findings of Fact 12.-3, *supra* pp. 54–56) However, the bank endorsement on Mrs. Overmyer's cancelled check shows that it was not deposited until October 15, 1973, and a confidential memorandum from Mr. Connery to Mr. Overmyer conclusively shows that the transaction could not have occurred prior to September 25, 1973. (Checks, Deauville Minute Book, FNBB Ex. 261, pp. 97–98; 9/25/73 Memorandum, Weathervane Minute Book, Weathervane Ex. 1, p. 53; Findings of Fact 12.3, *supra* pp. 54–55)

■ 5. The timing of Mr. Overmyer's stock transfer evidences his intent to defraud FNBB. Mr. Overmyer made the stock transfers when he knew his accounts were being seriously overdrawn. All of these back dated stock transfers to trusts for the benefit of the Overmyer family actually occurred between August 13, 1973, and December 10, 1973. (Findings of Fact 12.1, 12.2, 12.3, *supra* pp. 50–56) In this same period, between August 31, 1973, and November 30, 1973, Mr. Overmyer caused checks to be drawn on the ODS account with FNBB, increasing its overdraft by $2,858,994.75. (McArdle, 53 Tr. 5347–49; Lake, 59 Tr. 6059–60; Findings of Fact 9.2, *supra* p. 44)

■ 6. Mr. Overmyer's control over the business affairs of Telecasting also exhibits an intent to hinder, delay and defraud creditors. Telecasting's scheme (while controlled by Mr. Overmyer) to hinder, delay and defraud its creditors by, among other things, entering into unconscionable leases that would enable Hadar to seize all of its earnings, may be summarized as follows:

(a) On December 15, 1975, Mr. Overmyer caused TOC to file a Chapter XI petition. Mr. Overmyer admitted in an affidavit attached to the petition that the filing was to prevent FNBB from enforcing its security interest in the capital stock of Telecasting, which had been pledged by TOC. (Application for Injunction, FNBB Ex. 430; *see* Findings of Fact 15.1, *supra* p. 60) The foreclosure had been scheduled for December 17, 1975. (Notice of Auction Sale, FNBB Ex. 430, p. 3; Findings of Fact 15.1, *supra* p. 60)

(b) TOC is still in Chapter XI and has not paid its creditors for more than six years.

(c) FNBB requested the Court of Common Pleas for Lucas County, Ohio, to appoint a receiver for Telecasting to protect its assets until FNBB could get leave to consummate its foreclosure. (Findings of Fact 15.2, *supra* pp. 60–61) When the Court indicated a willingness to appoint a receiver, Mr. Overmyer caused Telecasting to commence a Chapter XI case to avoid the appointment of a receiver. (Findings of Fact 15.2, *supra* pp. 60–61)

(d) Mr. Overmyer then caused Telecasting to enter into the purported leases with Hadar, which had the effect of transferring Telecasting's money to Hadar for no consideration. The unconscionable and fraudulent nature of the leases may be summarized as follows:

i. Telecasting's board of directors authorized Telecasting to lease equipment from Hadar at *whatever price Hadar would determine.* (10/25/79 Telecasting Minutes, Tele Ex. 29) *See Sunbeam Farms, Inc. v. Troche,* 32 U.C.C.Rep. 733 (N.Y. Civil Ct. Bronx Cty. 1981).

ii. Hadar charged Telecasting a two percent commitment fee for many of the purported leases, but no useful services were rendered for such fees. (Findings of Fact 17.3, *supra* pp. 67–68)

iii. Mr. Overmyer, an officer and director of Telecasting, directed that Telecasting should be charged the commitment fees. (Raible Dep., FNBB Ex. 259A, p. 355; Findings of Fact 17.3, *supra* pp. 67–68)

iv. Hadar charged Telecasting rent according to a formula that would repay Hadar the cost of the equipment over the term of the lease and, in addition, provide Hadar a rate of interest far in excess of any rate that would be set in arm's-length bargaining, even though Hadar used Telecasting's moneys and did not invest its own funds. (Findings of Fact 17.13, *supra* pp. 73–74)

v. Additionally, the formula provided for Telecasting to pay Hadar a 20 percent deposit at the commencement of each purported lease. (Raible, 2 Tr. 199–200; Findings of Fact 17.2, 17.13, *supra* pp. 67, 73–74)

vi. The formula was applied to Hadar's fully loaded price when Hadar financed the equipment, thereby charging Telecasting for the cost of Hadar's financing. (Raible, 8 Tr. 688; H. Klein, 29 Tr. 2847–48; Findings of Fact 17.14, *supra* pp. 74–75)

vii. As applied to installment contracts and equipment leases, the formula provided for Telecasting to pay to Hadar at every moment more than Hadar was obligated to

pay to its vendors. (Findings of Fact 17.14, *supra* pp. 74–75)

viii. Hadar generally failed to pay its vendors for the equipment leased to Telecasting. (Findings of Fact 17.11, 17.12, *supra* pp. 71–73)

ix. In some instances, Telecasting itself paid for the very equipment it leased from Hadar. (*See* Findings of Fact 18.6, *supra* pp. 87–88)

x. Raible knew of no instance where leases were not renewed at their original terms. (Raible, 8 Tr. 686–87, 695; Findings of Fact 17.4, *supra* p. 68) Thus, Telecasting was forced to pay for the same equipment over and over again.

xi. The purported leases did not transfer title of the equipment to Telecasting, no matter how many times Telecasting paid for it. (Findings of Fact 17.4, *supra* p. 68)

xii. According to purported lease H–1002 currently relied on by Hadar, Telecasting would have to pay Hadar approximately $4,392,748 for equipment costing Hadar $1,321,201, a markup of over 300 percent. (Findings of Fact 16.10, *supra* p. 66)

xiii. Through January, 1981, Telecasting paid Hadar $2,779,368.26, while Hadar paid only $569,731.98 to the vendors of the equipment subject to the purported leases. (Findings of Fact 20.4, *supra* pp. 97–98)

xiv. In respect of the equipment that was the subject of the settlement with Hundred East, Hadar relies on three additional leases (H–1043, H–1044 and H–1045), whereby Hadar would charge Telecasting approximately $3.67 million, a 62 percent markup. There was no evidence offered at trial of any services provided by Hadar to Telecasting. The markups, therefore, are for no consideration. (Findings of Fact 19.-1–19.10, *supra* pp. 90–95)

xv. Hadar warrants nothing under the leases. (Lease ¶ 4, Pl. Ex. 2; Findings of Fact 17.1, pp. 66–67)

xvi. If there is a defect in equipment, Telecasting may claim against the vendor, but must continue paying rent to Hadar. (Lease ¶ 6, Pl. Ex. 2; Findings of Fact 17.1, *supra* pp. 66–67)

xvii. Telecasting must maintain and repair the equipment at its own expense. (Connery, 20 Tr. 1936; Raible, 4 Tr. 331; Findings of Fact 17.1, *supra* pp. 66–67)

xviii. Telecasting indemnifies Hadar for all claims arising out of Hadar's ownership, selection and leasing of the equipment. (Lease ¶¶ 3 and 10, Pl. Ex. 2; Findings of Fact 17.1, *supra* pp. 66–67)

xix. Telecasting shall maintain insurance payable to Hadar. (Lease ¶ 11, Pl. Ex. 2; Raible, 6 Tr. 528; Findings of Fact 17.1, *supra* pp. 66–67)

xx. For any default, even a nonmonetary default, Hadar may take possession of the equipment and thereby terminate all of Telecasting's rights. (Lease ¶ 16, Pl. Ex. 2; Findings of Fact 17.1, *supra* pp. 66–67) *United States v. Bedford Associates,* 657 F.2d 1300 (2d Cir. 1981); *Pittsfield Weaving Co., Inc. v. Grove Textiles, Inc.,* 32 U.C.C. Rep. 421 (N.H.Sup.Ct.1981); *Fleischman Distilling Corp. v. Distillers Co. Ltd.,* 395 F.Supp. 221 (S.D.N.Y.1975); *Louisiana Power & Light Co. v. Allegheny Ludlum Industries, Inc.,* 517 F.Supp. 1319 (E.D.La. 1981); J. J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code,* § 4–3 at 151 (2d ed. 1980)

(e) Hadar disbursed the money from Telecasting to other Overmyer companies almost immediately after receiving it. *See In re Thomas,* 199 F. 214 (N.D.N.Y.1912). (Findings of Fact 22.3, *supra* pp. 105–06); *see* generally Findings of Fact 22.1–22.7, *supra* pp. 103–07.

(f) While Telecasting was in Chapter XI from August 24, 1976, until February 6, 1981, as debtor-in-possession it incurred millions of dollars of debt it did not pay, which is evident by, *inter alia,* simply comparing Telecasting's Chapter XI petition of August 24, 1976, with its Chapter 11 petition of February 6, 1981. (*See also* Findings of Fact 28.1, *supra* pp. 138–40)

(g) Telecasting was paying moneys to Hadar for no consideration, while having insufficient funds to pay its own new debts. *See Lytle v. Andrews,* 34 F.2d 252 (8th Cir.

1929); *cf. In re Rockaway Soda Water Mfg. Co.,* 226 F. 520 (E.D.N.Y.1915).

(h) At all relevant times from and after August 31, 1977, Telecasting was hopelessly insolvent. (Findings of Fact 28.1, *supra* pp. 138–40)

(i) Telecasting and Hadar treated the purported leases as shams. There were no regular payments, there were no matchings of leases to equipment and there were leases for nonexistent equipment. The sole purpose of the purported leases was to provide documents for Hadar to pull out of a hat, at its whim, to use to hinder, delay and defraud FNBB and Telecasting's creditors.

Based upon the "badges of fraud", as heretofore described, this Court concludes that Mr. Overmyer transferred real property among his corporations, transferred stock to trusts and transferred money out of Telecasting with the actual intent to hinder and delay the claims of FNBB and other creditors.

■ Mr. Overmyer also manipulated the judicial system to prevent FNBB from discovering his fraudulent transactions and to wrongfully deprive FNBB of its valid claims. Mr. Overmyer's pursuit of this scheme has involved (1) the submission of materially false and misleading appraisals of Telecasting's value in an effort to prevent FNBB from enforcing its security interest in Telecasting's capital stock; (2) the submission of sworn affidavits to several courts by Mr. Overmyer, stating that FNBB would not be harmed by further delay in the enforcement of its security interest in Telecasting's capital stock while he continued to fraudulently extract money from Telecasting; (3) the filing of frivolous suits in multiple forums to frustrate FNBB's efforts to protect Telecasting's assets and to enforce its security interests; and (4) to take advantage of the delay and confusion engendered by the existence of multiple forums, pitting one court against another, thereby permitting Mr. Overmyer to siphon funds from Telecasting and to fraudulently convey his own and any other assets FNBB might reach to satisfy its claims.

■ Mr. Overmyer's submission of Edwin Tornberg's appraisal of Telecasting's value was a false and materially misleading representation to the courts and to FNBB. Mr. Tornberg was told by Mr. Overmyer to base his appraisal on the false premise that Telecasting owned all the equipment it used. Mr. Overmyer submitted this appraisal to several courts, even though he knew that virtually all of the property and equipment utilized by Telecasting was subject to purported leases held by Hadar, one of his nominee corporations. Mr. Overmyer intended the courts and FNBB to rely on this appraisal in preventing them from discovering the true facts. These representations alone, to the extent relied upon by the Court and FNBB, amount to an actionable fraud. *See Johnson v. Sachs,* 7 App.Div.2d 939, 181 N.Y.S.2d 862 (1959). False and misleading representations are actionable, even if communicated indirectly, if the statement was intended to be so communicated to the injured party. *Wells v. Cook,* 16 Ohio St. 67 (1865).

Mr. Overmyer intentionally misrepresented in his affidavits that FNBB would not be harmed by delay in the enforcement of its security interest in the capital stock of Telecasting. These statements delayed FNBB's ability to enforce its security interest while allowing Mr. Overmyer to continue to siphon moneys from Telecasting, thereby depriving FNBB of its claim.

Telecasting's Chapter XI is another example of Mr. Overmyer's fraudulent misuse of the judicial system to avoid payment of FNBB's valid claims. FNBB's initial attempt to sell the capital stock of Telecasting was frustrated by TOC's Chapter XI filing in New York. FNBB thereupon prosecuted its action in the Court of Common Pleas in Lucas County, Ohio, in an effort to remove Telecasting from Mr. Overmyer's control by having a receiver appointed. Once the judge indicated that he intended to appoint a receiver for Telecasting, Mr. Overmyer immediately caused Telecasting, which at trial he had claimed to be solvent, to file a petition for an arrangement under Chapter XI in the Southern District of New

York alleging in New York that Telecasting was insolvent. Mr. Overmyer thus divested the Ohio court of jurisdiction and prevented . the appointment of the court-ordered receiver. Mr. Overmyer's actions were taken solely for the purpose of retaining control of Telecasting's operations to enable him to continue fraudulently extracting moneys from Telecasting. Mr. Overmyer's manipulation of the courts gives rise to a claim by FNBB for fraud. *See Kermit Construction Corp. v. Banco Credito y Ahoro Ponceno,* 547 F.2d 1 (1st Cir. 1976); Annot., *Right of Creditor to Recover Damages for Conspiracy to Defraud Him of Claim,* 11 A.L.R.4th 345.

The trial of this adversary proceeding has seen examples of Mr. Overmyer's attempt to pit one court against another. Without notice to any of the parties to this proceeding, DHO petitioned Judge Joel Lewittes, presiding over the TOC and DHO Chapters XI in New York, to declare DHO's intervention and participation in this trial to be a "nullity." Judge Lewittes issued such a declaration without counsel for DHO fully apprising him of the facts or the applicable law. The record in this case is replete with other such instances of dilatory, deceitful and manipulative tactics employed by Mr. Overmyer in attempting to deprive FNBB of its valid claims.

 FNBB is entitled to recover all reasonable attorney fees and other expenses incurred in furtherance of the ultimate goal of collecting an overdue indebtedness, if the parties have agreed that those costs are to be borne by the debtor. In *Leventhal v. Krinsky,* 325 Mass. 336, 90 N.E.2d 545 (1950), the court stated:

> We do not concur in the contention of Leventhal that, as the costs and expense are restricted to those incurred, to quote the language of the note, in "the enforcement and collection hereof," only costs and expense arising out of an action on the note or directly connected therewith can be recovered by Krinsky. The foreclosure proceedings, the suit on the guaranty, and the present suit, brought originally to preserve the mortgaged property

> but now narrowed to establishing the rights of the parties in the fund, are *all based on the indebtedness arising out of the mortgage note, and the aims and object of all of these proceedings were directed to collecting the amount due Krinsky on the note.* All counsel fees reasonably incurred by Krinsky in these efforts to collect the note are legal expense arising out of the collection of the note.

90 N.E.2d at 548. (emphasis supplied) Similarly, in *Covich v. Chambers,* 8 Mass. App. 740, 397 N.E.2d 1115 (1979), the court concluded that the successful defense of actions seeking cancellation and recission was "intrinsic to establishing a default on the note," and that fees attributable to the defense of those actions were recoverable as costs of collection. 397 N.E.2d at 1123.

The decision in the *Levanthal* case makes clear that all reasonable fees paid and expenses incurred by FNBB are recoverable as costs of collection from the obligors. The dockets in actions where FNBB has been involved, of which this Court can take notice, and the unrefuted testimony and analysis of FNBB's expert, Richard L. Levine, Esquire, (hereinafter "Levine") demonstrate that the voluminous filings prepared by FNBB's attorneys were necessitated by the obligors' strategy to delay and obstruct FNBB's efforts to collect the outstanding loans. FNBB's expenses in overcoming these obstacles are, in accordance with the decision in the *Covich* case, recoverable as costs of collection under Massachusetts law.

The costs and fees incurred by FNBB from 1973 to the present are recoverable under federal, as well as Massachusetts law. All actions taken by FNBB in all proceedings relating to collection of the loans and foreclosure of the collateral were reasonably calculated to protect FNBB's rights. In *In re Continental Vending Machine Corp.,* 543 F.2d 986 (2d Cir. 1976), the court stated:

> Talcott would be entitled to compensation for such services as were reasonably necessary to obtain the appointment of a

receiver for the pledged assets, the filing of proofs of claim in the bankruptcy proceeding, the negotiation and arrangement for the sale and liquidation of the security and the taking of such steps as were essential to preserve Continental as a viable business enterprise so that it could be sold as a going concern.

*Id.* at 994. In *Taylor v. Continental Supply Co.,* 16 F.2d 578 (8th Cir. 1926), the court stated: "We think the provision of the notes providing for attorneys' fees covered the cost of legal services to which plaintiff should be put in connection with the collection of its claim by court proceedings." *Id.* at 580. In *Duryea v. Third Northwestern National Bank,* 606 F.2d 823 (9th Cir.1979), the court affirmed an award of attorney fees incurred by a bank in defending an action brought by its debtor to prevent the enforcement of a note. Agreeing with the trial court's opinion that the fees were recoverable because it was "necessary for the Bank to defend against such an action in order to collect on the note," the Court of Appeals concluded that costs of collection included all costs attributable to collecting on the note. *Id.* at 826. As stated by the court in *In re United Merchants and Manufacturers,* 674 F.2d 134 (2d Cir.1982): "the controlling inquiry with respect to recovery of attorneys' fees is whether the creditor reasonably believed that the services employed were necessary to protect his interests in debtor's property." *Id.* at 140. *See also Jaeger v. Canadian Bank of Commerce,* 327 F.2d 743, 745–46 (9th Cir.1964).

■ FNBB incurred expenses when it participated in various reorganization proceedings commenced by the obligors and other Overmyer entities. These expenses, as well as those resulting from actions directly against the obligors, are recoverable as costs of collection under both Massachusetts and federal law.

Massachusetts law governs the loans and the validity and construction of provisions in the loan documents for payment of reasonable attorney fees and other related costs of collection upon default. Determination of whether state or federal stan-

dards of reasonableness apply, however, is of no import in this case. First, the standards applied under Massachusetts and federal law are similar. Second, the collection costs claimed by FNBB are reasonable, regardless of the standard applied.

In *Cummings v. National Shawmut Bank of Boston,* 284 Mass. 563, 188 N.E. 489 (1934), the Supreme Judicial Court of Massachusetts stated:

In determining what is a fair and reasonable charge to be made by an attorney for his services many considerations are pertinent, including the ability and reputation of the attorney, the demand for his services by others, the amount and importance of the matter involved, the time spent, the prices usually charged for similar services by other attorneys in the same neighborhood, the amount of money or the value of the property affected by the controversy, and the results secured. Neither the time spent nor any other single factor is necessarily decisive of what is to be considered as a fair and reasonable charge for such services.

188 N.E. at 492. Fees of $760,000 were deemed reasonable even though fees based on time spent and customary hourly rate would only have been $102,000. *First National Bank of Boston v. Brink,* 372 Mass. 257, 361 N.E.2d 406, 411 (1977). In short, reasonable attorney fees are to be determined "in the light of all relevant circumstances." *Muldoon v. West End Chevrolet,* 338 Mass. 91, 153 N.E.2d 887, 891 (1958).

The leading federal case defining the standards for determining reasonable attorney fees is *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974). In *Johnson,* the court stated that the following 12 factors were to be considered in assessing the reasonableness of attorney fees:

(1) The time and labor required; (2) The novelty and difficulty of the questions; (3) The skill requisite to perform the legal service properly; (4) The preclusion of other employment by the attorney due to the acceptance of the case; (5) The customary fee; (6) Whether the fee is fixed

or contingent; (7) Time limitations imposed by the client or the circumstances; (8) The amount involved and the results obtained; (9) The experience, reputation, and ability of the attorneys; (10) The "undesirability" of the case; (11) The nature and length of the professional relationship with the client; (12) Awards in similar cases.

*Id.* at 717–19. In *Northcross v. Board of Education,* 611 F.2d 624 (6th Cir.1979), the Sixth Circuit Court of Appeals accepted the *Johnson* guidelines, which it had relied upon in *Monroe v. County Board of Education,* 505 F.2d 109 (6th Cir.1974), as "relevant factors" in determining reasonable attorney fees. 611 F.2d at 642. However, the court concluded:

> We have learned through experience ... that merely providing a check list of factors to consider does not lead to consistent results, or, in many cases, reasonable fees. Many of the factors are overlapping, and there is no guidance as to the relative importance of each factor, or indeed, how they are to be applied in a given case. We conclude that an analytical approach, grounded in the number of hours expended on the case, will take into account all the relevant factors, and will lead to a reasonable result. The number of hours of work will automatically reflect the "time and labor involved," "the novelty and difficulty of the question," and "preclusion of other employment." The attorney's normal hourly billing rate will reflect "the skill requisite to perform the legal service properly," "the customary fee," and the "experience, reputation, and ability of the attorney." Adjustments upward may be made to reflect the contingency of the fee, unusual time limitations and the "undesirability" of the case. Thus, applying the approach used in this decision will result in an award reflecting those considerations traditionally looked to in making fee awards, but will also provide a logical, analytical

framework which should largely eliminate arbitrary awards based solely on a judge's predispositions or instincts.

*Id.* at 642–43.

A comparison of the guidelines established in *Cummings, Johnson* and *Northcross* indicates that there is substantial similarity of statement in the Massachusetts and federal court standards. Both tests are consistent with the standards approved by the American Bar Association. In *First National Bank of Boston v. Brink, supra,* the Supreme Judicial Court of Massachusetts held that the trial court had properly applied the factors set forth in Disciplinary Rule 2–106 of the American Bar Association's Code of Professional Responsibility because those factors were consistent with the criteria previously announced by the court in the *Cummings* case. 361 N.E.2d at 411. In *Johnson,* the court also noted that its 12 factors were consistent with Disciplinary Rule 2–106. 488 F.2d at 719.

The costs of collection claimed by FNBB are reasonable. Through the testimony of witness, John McArdle, all legal fee bills and legal and nonlegal expense bills and receipts were offered and admitted into evidence as FNBB Exhibit Nos. 358A, 358B and 358C. (McArdle, 53 Tr. 5401–408) These fee bills and expense bills and receipts, summarized in FNBB Exhibit No. 358, evidence that through March 26, 1982, FNBB incurred and paid legal costs and expenses of $4,059,217.45 as a consequence of its efforts to collect the obligations of DHO, ODS, TOC and Mr. Overmyer. In addition, FNBB incurred nonlegal collection expenses of $169,265.33 and FNBB employee out-of-pocket collection expenses of $38,-848.13. (Summary, FNBB Ex. 358, tab 1, p. 1, tab 2, p. 1, tab 3, p. 1)[5]

The unrefuted expert testimony established that the collection costs incurred and paid by FNBB were reasonable. (Levine, 56 Tr. 5707–5831; 57 Tr. 5833–59) The complexities involved in FNBB's collection

---

**5.** The figure of $4,059,217.45 given by Mr. McArdle (McArdle, 53 Tr. 5408) and used on the collection expenses chart (Chart, FNBB Ex. 362) was for legal collection expenses only.

(*See* Summary, FNBB Ex. 358, tab 1, p. 1) The nonlegal collection expenses and FNBB out-of-pocket collection expenses were inadvertently omitted.

effort, the eight-year period over which FNBB has attempted to collect the loans in 10 courts and in 39 separate proceedings (Levine, 56 Tr. 5738), the 57 appeals taken (only one appeal was commenced by FNBB) (Levine, 57 Tr. 5838–40), the voluminous pleadings and the obstructionist tactics and strategy of the obligors all dictate that the fees expended by FNBB are reasonable, as testified to by Levine.[6] The expert testimony and the references to services rendered, set forth in the fee bills, demonstrate that the substantial costs of collection incurred by FNBB were appropriate for the extent and nature of the services necessarily rendered by counsel for FNBB.[7]

In *Matter of U.S. Golf Corp.,* 639 F.2d 1197 (5th Cir.1981), a case involving the appeal of a disputed award of attorney fees in a bankruptcy proceeding, the court stated: "Because judges are themselves familiar with legal fees, expert testimony is not required, although it may of course be taken." *Id.* at 1202. In this proceeding, FNBB has claimed fees, a substantial part of which were incurred in other forums, where this Court had no opportunity to observe for itself the activities of FNBB's attorneys and the high quality of their representation and professional standards. The expert testimony of Levine thus has aided the Court in understanding the wide range, complexity and number of services which FNBB's attorneys have been obliged to perform in their efforts to collect the loans. *See In re G.W.C. Financial & Ins. Services,* 8 B.R. 122, 126 (Bkrtcy.C.D.Cal. 1981); *Brogna v. Pioneer Petroleum Company,* 344 Mass. 382, 182 N.E.2d 303, 306 (1962); *Cummings v. National Shawnut Bank of Boston,* 284 Mass. 563, 188 N.E. 489, 491 (1934).

The attorney fees incurred by FNBB are reasonable, for they reflect rates and billing practices customary in the community. In this case, FNBB's *attorneys* are not asking this Court to evaluate a fee application or award to *them* fees which the Court deems to be reasonable for the services rendered. Rather, FNBB is seeking a judgment against DHO, ODS, TOC and Mr. Overmyer in the amount of fees actually incurred and paid by FNBB to its attorneys for services rendered in connection with collection of the loans.

The fee bills submitted to FNBB by its various counsel (FNBB Exhibit 358A) and the unrefuted testimony of Levine (Levine, 56 Tr. 5735) reflect that FNBB was billed by its attorneys at an hourly rate customary to the legal communities where the law firms were located. Specifically, Baker & Hostetler billed FNBB at a rate and in a manner consistent with the customary practice in Cleveland. (Levine, 56 Tr. 5799) Weil, Gotshal & Manges billed FNBB at a rate and in a manner consistent with the customary practice in New York. (Levine, 56 Tr. 5794–95) Ropes & Gray billed FNBB at a rate and in a manner consistent with the customary practice in Boston. (Levine, 56 Tr. 5787) With respect to the legal fees incurred by FNBB as a consequence of services rendered by Lovett, Hennessey, Stambler & Siebert (FCC counsel in Washington) and Eastment, Stichter, Smith & Bergman (Toledo counsel), the fees billed were in a manner consistent with the practice of the three principal firms, *i.e.,* at an hourly rate customary in the community. Absent considerations of quality of service and other factors which are considered by courts in awarding fees in excess of hourly rates, these fees incurred by FNBB, by their very nature, are reasonable. Under the tests of reasonableness enunciated in both *Cummings v. National Shawmut Bank of Boston, supra,* and *Northcross v. Board of Education, supra,* respectively, where standard fees based on time spent and customary hourly rates are to be adjusted up-

---

6. Levine and his colleague, Charles Dougherty, spent over 600 hours reviewing the collection efforts of FNBB's counsel, Ropes & Gray, Wiel, Gotshal & Manges and Baker & Hostetler, during the period commencing November, 1973, and ending March 26, 1982.

7. Of the $3,444,301.15 of legal fees incurred by FNBB (excluding disbursements), $3,218,590.87 were for attorney fees billed by Ropes & Gray, Wiel, Gotshal & Manges and Baker & Hostetler.

ward in appropriate cases to reflect contingency and quality factors, it is implicit that fees based solely upon time spent and customary hourly rates are reasonable.

The disbursements paid by FNBB to its attorneys, in addition to nonlegal collection expenses and FNBB employee out-of-pocket collection expenses, are reasonable and recoverable by FNBB. The legal disbursements of $614,916.30, nonlegal collection expenses of $169,265.33 and FNBB employee out-of-pocket collection expenses of $38,848.13 (Summary FNBB Ex. 358, tab 1, p. 1, tab 2, p. 1, tab 3, p. 1), all indisputably billed to and paid by FNBB, are recoverable as "expenses of collection" (Loan Agreement, FNBB Ex. 266, p. 21, ¶ 6.3), "expenses, including reasonable counsel fees, incurred or paid by the Bank in protecting or enforcing its rights upon or under liabilities or collateral" (Loan and Security Agreement, FNBB Ex. 321, p. 4, § 13) and "expenses paid or incurred by the Bank . . . in connection with the collection of all sums and obligations guaranteed hereunder" (Guaranty, FNBB Ex. 323). Moreover, as Levine testified, it is the customary practice for clients to reimburse counsel for all "out-of-pocket" expenses incurred in the course of rendering legal services. (Levine, 56 Tr. 5826)

Levine's testimony confirms the reasonableness of the costs of collection incurred and paid by FNBB. Levine and his colleague, Charles Dougherty, carefully reviewed (1) the dockets in all of the cases related to FNBB and the Overmyer entities; (2) virtually all of the pleadings referred to in those dockets; (3) the transcripts of many of the depositions and hearings; (4) results of discovery; (5) the issues involved; and (6) the fee bills submitted by attorneys to FNBB. In addition, they interviewed the lawyers who represented FNBB in the various proceedings (Levine, 56 Tr. 5735). Levine opined that fees approximately $68,000 in excess of those billed by Ropes & Gray, Baker & Hostetler and Weil, Gotshal & Manges would have been reasonable for the services rendered by those firms in connection with the collection of the loans. (Levine, 56 Tr. 5818)[8]

Levine's computations were conservative and on the "low side" of reasonableness. (Levine, 56 Tr. 5825) In addition, Levine concluded that the 16,976 hours expended by Ropes & Gray (Levine, 56 Tr. 5780), the 8,551 hours expended by Weil, Gotshal & Manges (Levine, 56 Tr. 5780) and the 8,982 hours expended by Baker & Hostetler (Levine, 56 Tr. 5780) were all in furtherance of, reasonably calculated to result in and necessary for the collection of the loans and preservation of the value of the stock of Telecasting (the collateral pledged as security for the loans). (Levine, 56 Tr. 5747–48; 57 Tr. 5854) To illustrate and support this opinion, Levine prepared FNBB's Exhibit 419, a summary of proceedings necessarily engaged in by FNBB counsel in numerous courts. This chart and Levine's explanation of it (Levine, 56 Tr. 5754–62) amply demonstrate the lengths to which FNBB was forced to go to assert its rights and protect its security.

As further evidence of the protracted litigation in which FNBB has been obliged to engage to assert and protect its right to repayment of the loans, this Court

---

**8.** While Richard L. Levine, Esquire testified he did not review or consider approximately 125 hours of Baker & Hostetler's time because the services rendered were considered by Baker & Hostetler to be privileged (Levine, 56 Tr. 5819–20), the services rendered during those hours were rendered in connection with these proceedings and FNBB was billed accordingly. Similarly, Levine testified that he considered 40 hours of Weil, Gotshal & Mange's billed time arguably to be unrelated to the collection efforts, and accordingly did not consider this time in his determination of reasonable fees (Levine, 56 Tr. 5820–21). Levine discounted this time in an effort to be as conservative in his evaluation as possible. Levine computed his own fee for the services rendered by Baker & Hostetler, Ropes & Gray and Weil, Gotshal & Manges, after discounting the 125 hours of Baker & Hostetler's time and 40 hours of Weil, Gotshal & Manges' time. In addition, Levine eliminated $36,000 of Weil, Gotshal & Manges' 1973 billings of $136,000, not because they were improperly billed, but because the original time records for that period were unavailable and Levine wanted to be sure his fee calculation was conservative. (Levine, 56 Tr. 5821–22)

takes judicial notice of the volume and character of filings by the obligors and other Overmyer entities in this adversary proceeding and in the underlying reorganization proceedings of Telecasting. *See In re Ingram,* 5 B.R. 232, 234 (Bkrtcy.N.D.Ga. 1980); *In re Ponn Realty Trust,* 4 B.R. 226, 228 n. 2 (Bkrtcy.D.Mass.1980). This Court also takes judicial notice of what is reflected by the docket in the reorganization proceedings of the original plaintiff in this adversary proceeding, Hadar Leasing International Co., Inc. In *Board of Trustees v. Charley Toppino and Sons, Inc.,* 514 F.2d 700 (5th Cir.1975), the court stated: "It is not error ... for a court to take judicial notice of related proceedings and records in cases before that court." *Id.* at 704. *See also Harrington v. Board of Education,* 649 F.2d 434, 441 (6th Cir.1981). The number of hours expended by Ropes & Gray (16,976), Weil, Gotshal & Manges (8,551) and Baker & Hostetler (8,982) further reflects the complexity and difficulty of the collection efforts engaged in by FNBB.

Each proceeding in which FNBB has attempted to collect its loans, as well as each proceeding in which the Overmyer entities have attempted to frustrate FNBB's efforts to collect the loans, is directly related to FNBB's present claim for costs of collection. This Court further takes notice of proceedings in other courts which "have a direct relation to matters at issue" in this Court. *St. Louis Baptist Temple v. Federal Deposit Ins. Corp.,* 605 F.2d 1169, 1172 (10th Cir.1979). The Court also takes notice of the extensive prior litigation between FNBB and those obligated to repay the loans. *See Howard v. St. Louis-San Francisco Railway Co.,* 361 F.2d 905, 907 (8th Cir.1966). In all of these proceedings, FNBB has asserted and sought to protect its rights and remedies under the loan documents.

Levine's testimony presented the Court with an incisive study of the tenacious collection efforts by FNBB's counsel and the reasonableness of the fees incurred and paid by FNBB to its counsel. On the basis of Levine's thorough analysis and thoughtful testimony and this Court's own review and assessment of fee bills paid by FNBB, this Court can only arrive at the conclusion that the fees paid by FNBB are reasonable.

■ One of the most difficult aspects of the case has been the resolution of defendants' claim against Mr. Overmyer's attorneys under 28 U.S.C. § 1927.[9] While the ability to award such fees is within the Court's inherent powers (*Roadway Express, Inc. v. Piper,* 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 [1980] ), there has been an impressive increase of such awards since 28 U.S.C. § 1927 was amended in 1980. *See United States v. Wilder,* 680 F.2d 59 (9th Cir.1982); *McConnell v. Critchlow,* 661 F.2d 116 (9th Cir.1981); *Durrett v. Jenkins Brickyard, Inc.,* 678 F.2d 911 (11th Cir. 1982); *Barnd v. City of Tacoma,* 664 F.2d 1339 (9th Cir.1982); *United States v. 329.73 Acres of Land, etc.,* 678 F.2d 21 (5th Cir. 1982); *Maneikis v. Jordan,* 678 F.2d 720, (7th Cir.1982); *In re Hartford Textile Corp.,* 659 F.2d 299 (2nd Cir.1981); *Merritt v. International Bro. of Boilermakers,* 649 F.2d 1013 (5th Cir.1981); *Herrera v. Farm Products Co.,* 540 F.Supp. 433 (N.D.Iowa 1982); *Overnite Transportation Co. v. Chicago Industrial Tire Co.,* 535 F.Supp. 114 (N.D.Ill.1982); *Colucci v. New York Times Co.,* 533 F.Supp. 1011 (S.D.N.Y.1982); and *Regional Transp. Authority v. Grumman Flxible Corp.,* 532 F.Supp. 665 (N.D.Ill. 1982). Mr. Overmyer's unreasonable and vexatious use of the court system has already been described in this opinion. (*See* Findings of Fact 15.1–15.2, 29.8, 30.1, 30.3, 31.1–31.3, 36.1–36.13, 38.1–38.8, *supra* ) It is unfortunate that a significant portion of this court misuse was made possible by the

---

9. 28 U.S.C. § 1927. *Counsel's liability for excessive costs*

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

As amended Sept. 12, 1980, Pub.L. 96–349, § 3, 94 Stat. 1156.

active participation of counsel. (*See* Findings of Fact 38.1–38.8, *supra*) This Court has accordingly held counsel liable under 28 U.S.C. § 1927. (*See* Conclusions of Law 54 *infra*)

## CONCLUSIONS OF LAW

(1) DHO, ODS, TOC and Mr. Overmyer validly waived presentment, demand, notice, protest and all other demands and notices in connection with FNBB's enforcement of their obligations.

■■■ (2) There is no legal requirement that a bank give its customer notice before exercising its right to refuse to honor a check for which its customer has insufficient funds.[10]

(3) The contractual obligations of DHO, ODS, TOC and Mr. Overmyer to FNBB are governed by Massachusetts law.

(4) The agreements of DHO, ODS, TOC and Mr. Overmyer to reimburse FNBB for its costs of collection, including attorneys' fees, are valid.

(5) The various agreements between DHO, ODS, TOC and Mr. Overmyer and FNBB are valid and enforceable in all respects in accordance with their terms.

(6) The capital stock of Telecasting was validly pledged to FNBB to secure all the indebtedness of DHO, ODS, TOC and Mr. Overmyer to FNBB.

(7) FNBB had the right to collect the accounts assigned to it by ODS and DHO without notice.

(8) FNBB had the right to apply the proceeds of accounts that it collected to whatever obligations of ODS and in whatever order it chose.

(9) The transfers of ISLI, Hadar, the Overmyer Canadian operations and the other companies named in the TOC minutes dated February 8, 1972, to the Bermuda Trust were fraudulent conveyances as to FNBB and violated the loan agreement.

(10) The transfer of Mr. Overmyer's residence to Intermodal Terminals, Inc. and the transfer of Intermodal Terminals, Inc. to the Bermuda Trust were fraudulent conveyances as to FNBB.

[19] (11) Mr. Overmyer's residence is held in constructive trust for FNBB.

(12) The transfers of Weathervane Farms, Inc. and Deauville Private Rental Homes, Inc. to the Barbara M. Overmyer (Strang) Trust and the Harrison M. Overmyer Trust were fraudulent conveyances as to FNBB.

(13) All dealings of Telecasting with the Overmyer family and other Overmyer companies since 1973 have been frauds on FNBB.

(14) Jeebs was created to defraud FNBB.

(15) Mr. Overmyer and the counsel he has retained to represent himself and his companies have abused the bankruptcy laws of the United States by utilizing them to delay, hinder and defraud FNBB.

■■■ (16) The assignment of the equipment leases by ISLI to Hadar was a fraud on FNBB.

---

**10.** Uniform Commercial Code §§ 4–401 and 4–402:

§ 4–401. *When Bank May Charge Customer's Account*

(1) As against its customer, a bank may charge against his account any item which is otherwise properly payable from that account even though the charge creates an overdraft.

(2) A bank which in good faith makes payment to a holder may charge the indicated account of its customer according to

(a) the original tenor of his altered item; or

(b) the tenor of his completed item, even though the bank knows the item has been completed unless the bank has notice that the completion was improper.

§ 4–402. *Bank's Liability to Customer for Wrongful Dishonor*

A payor bank is liable to its customer for damages proximately caused by the wrongful dishonor of an item. When the dishonor occurs through mistake liability is limited to actual damages proved. If so proximately caused and proved damages may include damages for an arrest or prosecution of the customer or other consequential damages. Whether any consequential damages are proximately caused by the wrongful dishonor is a question of fact to be determined in each case.

(17) Hadar owns no interest in the Telecasting transmitter site.

(18) The Hadar leases are shams designed to conceal the looting of Telecasting by Mr. Overmyer.

(19) The rates of return on the Hadar leases are unreasonable.

(20) Hadar has no remaining interest whatever in the Hundred East equipment.

(21) If Hadar had any interest in the equipment covered by the Hadar leases, it would be contractually obligated to assign that interest to Telecasting for not more than the amount due and owing to vendors, thereby leaving no excess for Hadar.

(22) The service agreements between Telecasting and the service companies and between Hadar and the service companies are shams designed to conceal the looting of Telecasting by Mr. Overmyer.

(23) All assets acquired by Overmyer companies since 1973, including the farm acquired by Weathervane Farms, Inc. and the leaseholds on the 29th floor of Park Avenue and apartment 22G at 4 Park Avenue held by Jeebs, were acquired with assets that belonged to Telecasting, and are held in constructive trust for Telecasting.

(24) Weathervane Farms, Inc., as a stockholder of Jeebs, which is the stockholder of AGG, is responsible for the obligations of Jeebs and AGG to Hadar and Telecasting.

(25) The August 31, 1975, balance forward on Mr. Overmyer's account with Hadar, $327,298.88, constituted equity rather than debt.

(26) The August 31, 1975, balance forward on Mr. Overmyer's account with Hadar, $327,298.88, had been extinguished in 1968.

(27) The June 19, 1979, General Electric settlement was a fraud on the Bankruptcy Court, a misappropriation of Telecasting's assets by Mr. Overmyer and his agents, including Mr. Connery, and a fraudulent conveyance as to FNBB.

(28) The charges imposed by DHO, Interstate and Mid American for the studio premises, other than those provided for in the 1969 lease and the Studio Lease Case prosecuted by DHO, were a fraud on FNBB and a fraud on this Court.

(29) The storage agreements that Mr. Overmyer caused to be imposed on Telecasting by Weathervane Farms, Inc. were shams designed to conceal the looting of Telecasting by Mr. Overmyer, and the payments of money by Telecasting pursuant thereto were fraudulent conveyances as to FNBB.

(30) The Hadar leases are unenforceable because the Bankruptcy Court never approved them.

(31) The Hadar leases are unconscionable.

(32) The service agreements are unconscionable.

(33) The making of the Hadar leases constituted fraudulent conveyances from Telecasting to Hadar.

(34) Telecasting was insolvent from August 31, 1977, through February 6, 1981.

(35) Hadar established no basis for relief from the automatic stay.

(36) Hadar established no basis for accelerating the time within which Telecasting must accept or reject the Hadar leases.

(37) Hadar established no basis for reclamation.

(38) Mr. Overmyer's control of the various Overmyer companies, including TOC, DHO, ODS, Hadar, ISLI, Jeebs, AGG, Omega, Intermodal Terminals, Inc., Weathervane Farms, Inc., Deauville Private Rental Homes, Inc., Peerless, NDS, NDS of California, RT Systems and its subsidiaries and Expediter, is so pervasive that the unity of interest between Mr. Overmyer and these corporations makes it inequitable to treat the corporations as separate legal entities. Mr. Overmyer is, therefore, liable for the obligations of every such corporation, and every such corporation is, therefore, liable for the obligations both of Mr. Overmyer and of every other corporation.

(39) The creation of fictitious corporate records and false books of account, and the destruction of accounting records, by the

Overmyer organization in general and by Mr. Overmyer, Mr. Connery and Mr. Chi in particular, were frauds on FNBB.

(40) Mr. Overmyer, with and through his companies and agents, has deliberately and willfully subverted the judicial process in this and other courts as part of a scheme to obstruct justice and to hinder, delay and defraud FNBB.

(41) Mr. Overmyer has used Jeebs, AGG, Omega and Deauville Private Rental Homes, Inc., as well as secret Bermuda bank accounts, to support his legal maneuvering and thereby aid in defrauding FNBB.

■ (42) Mr. Overmyer and the other officers of Telecasting dominated by him usurped corporate opportunities of Telecasting by having Hadar acquire property for use in Telecasting's business and lease it to Telecasting, rather than having Telecasting acquire it directly.

(43) Mr. Overmyer and the other officers and directors of Telecasting dominated by him failed to carry out their fiduciary obligations to that corporation, and have thereby caused damage to Telecasting and FNBB.

■ (44) Mr. Connery, acting as counsel to Telecasting, failed to carry out his fiduciary obligations to that client, and permitted Telecasting to be defrauded in transactions in which he, as its counsel, was obligated to act to prevent its being harmed. Mr. Connery breached his obligations to Telecasting and its creditors by subverting its interests to those of Mr. Overmyer, which he knew to be inimical to Telecasting.

(45) The plaintiffs failed to introduce sufficient evidence even to create issues of material fact regarding the following affirmative defenses raised by Hadar and adopted by the other plaintiffs, (the numbers of which correspond to the appropriate paragraphs of Hadar's reply to FNBB's counterclaim): (9) acquiescence, etc.; (10) payment and setoff; (14) failure to mitigate, etc.; (15) unclean hands, etc.; (16) wrongful dominion, etc.; (17) res judicata and collateral estoppel; (18) wrongful commingling of funds, etc.; (19) equitable subordination; (20) misrepresentation, wrongful dishonor, etc.; and (21) tortious interference. As a matter of law, therefore, those affirmative defenses are without merit.

(46) As to the following affirmative defenses raised by Hadar and adopted by the other plaintiffs, their merits are primarily, if not entirely, questions of law: (4) defendant's failure to state a claim; (5) prior action pending; (6) failure to plead fraud with particularity; (7) failure to name indispensable parties; (8) limitations/laches; (11) lack of jurisdiction; and (13) "stay." As to all such affirmative defenses, the plaintiffs have failed to establish the merits of any such defense.

(47) Hadar has commingled advances and deposits of Telecasting, thereby converting Telecasting's moneys and entitling Telecasting to the immediate return of all of Telecasting's deposits.[11]

■ (48) Hadar is barred from sharing in any distribution from Telecasting because Hadar has not disgorged to Telecast-

**11.** New York General Obligations Law § 7–101. *Money deposited or advanced for use or rental of personal property; waiver void*

1. Whenever money shall be deposited or advanced on a contract for the use or rental of personal property as security for performance of the contract or to be applied to payments upon such contract when due, such money, with interest accruing thereon, if any, until repaid or so applied, shall continue to be the money of the person making such deposit or advance and shall be a trust fund in the possession of the person with whom such deposit or advance shall be made and shall be deposited in a bank or trust company and shall not be mingled with other funds or become an asset of such trustee.

2. Any provision of a contract whereby a person who has deposited or advanced money on a contract for the use or rental of personal property as security for the performance of the contract waives any provision of this section is absolutely void.

3. This section shall not be applicable to any deposit or advance of money made in connection with the borrowing of securities for any lawful purpose.

ing all funds which were fraudulently transferred to Hadar out of Telecasting.[12]

(49) Hadar has no right, title or interest in or to the property described in the Hadar leases. Title to the property is in Telecasting.

(50) Hadar's proof of claim is fraudulent and is rejected.

(51) Hadar, ISLI, DHO, ODS, TOC and Mr. Overmyer have all been guilty of inequitable and illegal conduct such as to bar them from any equitable relief.

(52) Mr. Connery has actively advanced the fraudulent scheme perpetrated by Mr. Overmyer on FNBB, and has thereby caused damage to FNBB.

(53) Mr. Chi has knowingly participated in the fraudulent scheme perpetrated by Mr. Overmyer on FNBB, and has thereby caused damage to FNBB.

(54) Mr. Connery and Mr. Brown, as counsel for the plaintiffs in this adversary proceeding, have unreasonably and vexatiously multiplied the costs of these proceedings, and they are liable to the defendants for those costs and damages pursuant to 28 U.S.C. § 1927. The Court has determined those damages to be in the amount of $5,000.00.

(55) DHO, ODS, TOC and Mr. Overmyer are indebted to FNBB in the amount of $22,425,622.99, plus interest at the agreed rates as of April 4, 1982, and costs of collection since March 26, 1982.

(56) Hadar, Jeebs, AGG, Omega, Weathervane Farms, Inc., Deauville Private Rental Homes, Inc. and Mr. Overmyer are indebted to Telecasting in the amount of $2,520,240.02. (*See* Findings of Fact 20.4, *supra*)

■ (57) Mr. Overmyer is liable to Telecasting and FNBB for punitive damages in the amount of $100,000 and $150,000, respectively.

The attorneys for the defendants shall prepare and submit forthwith an order consistent herewith.

## JUDGMENT

This action came on for trial before the Court and the issues having been duly tried and a memorandum of opinion including findings of fact, discussion, and conclusions of law having been duly rendered,

IT IS ORDERED AND ADJUDGED that:

1. The claim of the plaintiff Hadar Leasing International Co., Inc. ("Hadar"), against the defendant D.H. Overmyer Telecasting Co., Inc. ("Telecasting"), as set forth in its proof of claim is fraudulent and is hereby denied.

2. All agreements between Telecasting and Jeebs Distribution Services, Inc. ("Jeebs"), AGG Projects, Inc. ("AGG"), Omega Executive Services, Inc. ("Omega"), or Weathervane Farms, Inc., were fraudulent devices and are hereby declared to be void and of no force and effect.

3. All agreements between Hadar and Jeebs, AGG or Omega were fraudulent devices and are hereby declared to be void and of no force and effect.

4. Hadar is hereby declared to own no interest in the Telecasting transmitter site.

5. The plaintiffs Hadar, Daniel H. Overmyer ("Mr. Overmyer"), D.H. Overmyer Co., Inc. ("DHO"), as debtor in possession except as to subparagraph (g), and Intermodal Systems Leasing, Inc. ("ISLI"), are jointly and severally liable to make restitution to Telecasting for fraud, in the following amounts which are cumulative:

 (a) $8,616.47 plus interest for the overpayment by Telecasting to ISLI in 1975;

---

12. Bankruptcy Code § 502(d):

Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 721(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

(b) $2,520,240.02 plus interest for the overpayment by Telecasting to Hadar from 1976 through 1981;

(c) $270,794.08 plus interest for the payments by Telecasting to AGG from 1978 through 1980;

(d) $15,333.93 plus interest for the payments by Telecasting to Omega in 1980 and 1981;

(e) $35,338.20 plus interest for the payments by Telecasting to Gilman, McLaughlin & Hanrahan in 1981;

(f) $2,085.00 plus interest for Telecasting petty cash taken by Mr. Overmyer between February 10, 1981, and February 27, 1981;

(g) $14,956.07 plus interest owed by Mr. Overmyer to Telecasting since 1973 or before;

(h) $229,600.00 plus interest for overpayments by Telecasting to DHO for studio rent from September 1, 1974, to February, 1981;

(i) $8,025.74 plus interest for payments by Telecasting to Weathervane Farms, Inc., for purported storage charges from 1979 through 1981;

(j) $349,761.41 plus interest for money transferred by Telecasting to The Overmyer Company, Inc. ("TOC"), and used to make payments of interest to the defendant The First National Bank of Boston ("FNBB") in 1980;

(k) $129.50 plus interest for a payment by Telecasting to Bookkeepers Unlimited on account of services of George Levy in 1981;

(l) $1,367.64 plus interest for payments by Telecasting for insurance on the life of Mr. Overmyer in 1981;

(m) $722.82 plus interest for payments by Telecasting of Mr. Overmyer's expenses in 1981;

(n) $37.26 plus interest for a payment by Telecasting for flowers for Shirley C. Overmyer in 1981.

6. The interests of Hadar in equipment used by Telecasting are hereby divested and vested in Telecasting subject to any valid and perfected security interests.

7. The June 1, 1969, lease of the Telecasting studio site between DHO and Telecasting is hereby declared to be valid and existing, subject to Telecasting's past overpayments of rent.

8. All right, title, and interest of Weathervane Farms, Inc., in and to the following described property is hereby divested and vested in D.H. Overmyer Telecasting Co., Inc.

ALL THAT CERTAIN piece, plot or parcel of land situate, lying and being on the northerly side of Millwood-Mt. Kisco Road and the westerly side of Hog Hill Road in the Town of New Castle, County of Westchester and State of New York and being more particularly described as follows:

BEGINNING at a point formed by the intersection of the westerly side of Hog Hill Road with the northerly side of Millwood—Mt. Kisco Road, thence in a westerly direction and along the said northerly side of Millwood—Mt. Kisco Road the following courses and distances,

| | | |
|---|---|---|
| S. 62° | 20′ 30″ W. | 83.02 feet, |
| S. 66° | 15′ 30″ W. | 20.01 feet, |
| S. 67° | 47′ 00″ W. | 78.17 feet, |
| S. 66° | 54′ 30″ W. | 50.79 feet, |
| S. 66° | 45′ 10″ W. | 130.38 feet, |
| S. 75° | 36′ 50″ W. | 65.97 feet, |
| S. 75° | 47′ 20″ W. | 137.49 feet, |
| S. 73° | 49′ 55″ W. | 171.25 feet, |
| S. 86° | 15′ 45″ W. | 51.14 feet, |
| S. 60° | 45′ 35″ W. | 101.01 feet and |
| S. 41° | 46′ 15″ W. | 54.81 feet to the |

northerly side of Whitlaw Lane, said Whitlaw Lane being shown on a "Map of Whitlaw Close, etc.," said map being filed in the office of the County Clerk of Westchester, Division of Land Records, as No. 16399, thence in a northwesterly direction, partly along the aforementioned line side of Whitlaw Lane and partly along the dividing line between lands now or formerly of Gabriel and lands shown on the above described map of Whitlaw Close the following courses and distances,

| | | |
|---|---|---|
| N. 64° | 48′ 05″ W. | 107.17 feet, |
| N. 64° | 26′ 15″ W. | 154.19 feet, |

N. 65° 34' 55" W. 132.52 feet, to a point on the northerly side of Whitlaw lane. Said point being 1393.88 feet from the corner formed by Whitlaw Lane to the West and Millwood—Mt. Kisco Road to the northeast thence following the following courses and distances

N. 54° 34' 30" E. 2300.15 feet

to a point thence

S. 65° 04' 55" E. 375.25 feet to a point thence

N. 30° 09' 00" E. 94.16 feet
N. 18° 10' 00" E. 123.86 feet

to a point on the westerly side of Hog Hill Road. Said point being 2,002.01 feet from the corner formed by Hog Hill Road to the northerly side and Millwood—Mt. Kisco Road to the southwesterly side thence following the following courses and distances,

S. 67° 00' 00" E. 40.81 feet,
S. 8° 25' 50" W. 115.08 feet,
S. 9° 11' 10" E. 83.34 feet,
S. 42° 59' 10" E. 286.25 feet,
S. 7° 58' 10" E. 130.94 feet,
S. 13° 57' 50" W. 264.98 feet,
S. 30° 15' 50" W. 192.12 feet,
S. 38° 02' 50" W. 268.62 feet,
S. 16° 02' 50" W. 273.46 feet, and
S. 5° 11' 50" W. 180.23 feet to the

northerly side of Millwood—Mt. Kisco Road and the point or place of BEGINNING.

PARCEL B:

ALL THAT CERTAIN piece, plot or parcel of land situate, lying and being on the northerly side of Whitlaw lane in the Town of New Castle, County of Westchester and State of New York and being more particularly described as follows:

BEGINNING at a point 1393.88 feet West of the corner formed on the westerly side by Whitlaw Lane and on the northerly side by Millwood—Mt. Kisco Road thence in a westerly direction and along the said northerly side of Whitlaw Lane the following courses and distances,

N. 65° 34' 55" W. 66.55 feet,
N. 65° 57' 55" W. 307.43 feet,
N. 65° 10' 00" W. 103.03 feet,
N. 64° 38' 15" W. 94.80 feet,
N. 63° 38' 15" W. 285.00 feet,
N. 72° 01' 15" W. 114.00 feet,
N. 66° 10' 15" W. 46.00 feet,
N. 60° 37' 15" W. 62.70 feet,
N. 68° 42' 15" W. 80.60 feet, and
N. 63° 58' 05" W. 66.52 feet to a corner,

thence in a northerly direction, still along the aforementioned dividing line,

N. 18° 52' 35" E. 59.06 feet,
N. 1° 10' 15" W. 57.00 feet,
N. 5° 20' 05" W. 39.70 feet,
N. 3° 51' 45" E. 122.23 feet,
N. 15° 30' 05" E. 25.29 feet,
N. 9° 58' 50" W. 84.45 feet and
N. 0° 20' 45" E. 113.81 feet to a corner

and lands of Consolidated Edison Co., thence in a northeasterly direction and along the dividing line between lands of Consolidated Edison Co. and lands of Gabriel the following courses and distances,

N. 39° 25' 25" E. 902.06 feet,
N. 24° 31' 11" E. 112.40 feet and
N. 9° 36' 58" E. 414.23 feet to the southerly

side of Saw Mill River Road, thence in a northeasterly direction and along the southerly side of Saw Mill River Road N. 44° 40' 30" E. 104.35 feet to a corner, thence in an easterly direction and through lands of Gabriel and approximately along the Town line between the Towns of New Castle and Yorktown the following courses and distances,

S. 88° 59' 17" E. 1837.73 feet,
S. 81° 00' 10" E. 34.82 feet,
N. 87° 21' 50" E. 62.22 feet,
S. 88° 11' 10" E. 113.00 feet,
S. 89° 33' 10" E. 104.05 feet,
S. 87° 40' 10" E. 112.88 feet,
N. 84° 03' 50" E. 20.10 feet,
S. 88° 56' 10" E. 167.05 feet,
S. 87° 53' 10" E. 63.44 feet,
N. 88° 10' 50" E. 33.02 feet,
N. 69° 38' 50" E. 11.74 feet,

S. 88° 47′ 40″ E. 161.84 feet, and

S. 88° 07′ 40″ E. 193.00 feet to a corner

and the westerly side of Hog Hill Road, thence in a southerly direction and along the westerly side of Hog Hill Road the following courses and distances,

S. 18° 27′ 20″ W. 160.42 feet,

S. 28° 54′ 10″ W. 309.50 feet,

S. 1° 48′ 50″ W. 255.58 feet,

S. 20° 04′ 00″ W. 190.31 feet to a point

on the westerly side of Hog Hill Road said point being a total distance of 1,835.83 feet from the corner formed by Hog Hill Road to the northerly side and Millwood—Mt. Kisco Road to the southwesterly side, thence following the following courses and distances,

S. 18° 10′ 00″ W. 123.86 feet,

S. 30° 09′ 00″ W. 94.16 feet

to a point thence

N. 65° 04′ 55″ W. 375.25 feet,

S. 54° 34′ 30″ W. 2300.15 feet

to the point of BEGINNING.

PARCEL C:

ALL THAT CERTAIN piece, plot or parcel of land situate, lying and being on the southerly side of Saw Mill River Road in the Town of Yorktown, County of Westchester and State of New York and being more particularly described in two (2) parcels as follows:

BEGINNING at a point on the southerly side of Saw Mill River Road said point being determined as follows, starting at a point on the southerly side of Saw Mill River Road said point being formed by the intersection of the dividing line between lands now or formerly of Gabriel and lands of Consolidated Edison Co. with the said southerly side of Saw Mill River Road, thence from starting point, in a northeasterly direction and along the southerly side of Saw Mill River Road N. 44° 40′ 30″ E. 104.35 feet to the aforementioned point of beginning, thence from said point of beginning, in a northeasterly direction and along the southerly side of Saw Mill River Road N. 41° 19′ 50″ E. 471.28 feet to a corner and lands of the City of New York, said lands of the City of New York being shown as Parcel 160, Sheet 15, on maps of New Croton Reservoir, thence in an easterly direction and along the dividing line between lands of City of New York and lands of Gabriel N. 88° 59′ 00″ E. 554.57 feet to a corner, thence still along the aforementioned dividing line N. 21° 50′ 20″ E. 171.48 feet and N. 22° 06′ 10″ W. 413.59 feet to a corner and the southerly side of Dell Avenue, thence in a northeasterly direction and along the southerly side of Dell Avenue the following courses and distances,

N. 43° 56′ 40″ E. 133.90 feet,

N. 40° 07′ 10″ E. 186.22 feet,

N. 41° 15′ 50″ E. 258.22 feet,

N. 49° 26′ 30″ E. 88.58 feet and

N. 57° 50′ 10″ E. 237.07 feet to a corner,

and lands now or formerly of Adam, thence in a southeasterly direction and along the dividing line between lands of Adam and lands of Gabriel S. 34° 53′ 30″ E. 196.79 feet to a corner, thence in a northeasterly direction N. 46° 16′ 30″ E. 227.20 feet and N. 58° 57′ 20″ E. 219.85 feet to a corner, thence in a northwesterly direction, still along the aforementioned dividing line, N. 33° 02′ 20″ W. 152.78 feet to a corner and the southerly side of Dell Avenue, thence in a northeasterly direction and along the southerly side of Dell Avenue the following courses and distances,

N. 58° 55′ 20″ E. 281.76 feet,

S. 88° 36′ 50″ E. 157.46 feet,

N. 47° 33′ 10″ E. 185.48 feet,

N. 30° 17′ 30″ E. 105.27 feet,

N. 38° 00′ 30″ E. 90.62 feet,

N. 49° 43′ 00″ E. 70.52 feet and

N. 37° 32′ 30″ E. 242.23 feet to a corner

and lands now or formerly of Dearborn, thence in a southerly direction and along the dividing line between lands of Dearborn and lands of Gabriel, S. 22° 47′ 00″ E. 111.57 feet, S. 21° 05′ 10″ E. 400.52 feet, S. 22° 12′ 30″ E. 310.32 feet and S. 23° 53′ 10″ E. 113.24 feet to lands now or formerly of Mino, thence still southerly and along the dividing line between lands of Mino and

lands of Gabriel S. 22° 23′ 30″ E. 179.29 feet to a corner and lands now or formerly of Crawford, thence in a westerly direction and along the dividing line between lands of Crawford and lands of Gabriel S. 77° 48′ 40″ W. 425.77 feet N. and 88° 22′ 30″ W. 492.84 feet to a corner, thence in a southerly direction still along the aforementioned dividing line the following courses and distances,

S. 8° 32′ 10″ W. 302.15 feet,
S. 17° 26′ 30″ W. 378.44 feet,
S. 14° 56′ 50″ W. 261.92 feet,
S. 12° 20′ 50″ W. 181.34 feet,
S. 13° 33′ 50″ W. 212.08 feet and
S. 11° 28′ 50″ W. 54.91 feet to a corner,

thence in a westerly direction and through lands of Gabriel and approximately along the Town lines between the Towns of New Castle and Yorktown N. 88° 59′ 17″ W. 1837.73 feet to the southerly side of Saw Mill River Road and the point or place of beginning.

PARCEL D:

ALL THAT CERTAIN piece, plot or parcel of lands situate, lying and being on the westerly side of Seven Bridge Road in the Town of Yorktown, County of Westchester and State of New York and being more particularly described as follows.

BEGINNING at point on the westerly side of Seven Bridge Road said point being formed by the intersection of the dividing line between lands of Central School District No. 4 and lands now or formerly of Gabriel with the said westerly side of Seven Bridge Road, said point also being approximately on the Town line between the Towns of Yorktown and New Castle, thence from said point of beginning, in a westerly direction and along the aforementioned dividing line and approximately along the above described Town line, N. 86° 06′ 00″ W. 245.18 feet, N. 86° 12′ 30″ W. 523.62 feet, N. 86° 34′ 30″ W. 161.99 feet and N. 86° 25′ 00″ W. 406.45 feet to a corner and the easterly side of Hog Hill Road, thence in a northerly and easterly direction and along the easterly side of Hog Hill Road the following courses and distances,

N. 15° 25′ 00″ E. 221.41 feet,
N. 22° 28′ 20″ E. 175.15 feet,
N. 33° 28′ 30″ E. 58.71 feet,
N. 48° 40′ 00″ E. 136.66 feet,
N. 58° 36′ 50″ E. 80.29 feet,
N. 60° 17′ 00″ E. 94.77 feet,
N. 57° 54′ 00″ E. 173.34 feet,
N. 61° 30′ 50″ E. 126.99 feet,
N. 57° 56′ 50″ E. 65.13 feet,
N. 39° 29′ 30″ E. 151.44 feet,
N. 26° 26′ 20″ E. 60.00 feet,
N. 13° 42′ 00″ E. 99.80 feet and
N. 20° 04′ 50″ E. 35.84 feet to a corner

and lands now or formerly of Coleman, thence in an easterly direction and along the dividing line between lands of Coleman and lands of Gabriel S. 60° 08′ 40″ E. 335.63 feet, N. 73° 25′ 20″ E. 63.47 feet, N. 18° 44′ 20″ E. 7.94 feet and S. 68° 14′ 40″ E. 20.20 feet to a corner and the westerly side of Seven Bridge Road, thence in a southerly direction and along the westerly side of Seven Bridge Road the following courses and distances,

S. 4° 11′ 50″ E. 156.84 feet,
S. 19° 31′ 00″ E. 225.68 feet,
S. 0° 58′ 30″ E. 43.56 feet,
S. 1° 21′ 10″ E. 50.00 feet,
S. 0° 42′ 30″ W. 250.17 feet,
S. 3° 04′ 20″ E. 100.04 feet,
S. 1° 21′ 30″ W. 37.99 feet and
S. 4° 14′ 15″ W. 179.00 feet to the point

and place of beginning.

TOGETHER with the appurtenances. This Judgment shall be operative as a conveyance of the above-described property; and, further, the County Clerk of Westchester, Division of Land Records, be and is hereby authorized and directed to accept a certified copy of this Judgment as such conveyance without necessity of any further evidence of transfer or conveyance and duly to record this Judgment in the same manner as a deed.

9. The actions of the plaintiffs are hereby declared to have been part of an inten-

tional scheme to defraud FNBB and to prevent it from obtaining repayment of the debts owed to it by DHO, Overmyer Distribution Services, Inc. ("ODS"), TOC and Mr. Overmyer.

10. It is hereby declared that, by reason of the fraud perpetrated on FNBB by the plaintiffs and related Overmyer entities, FNBB has equitable liens and constructive trusts upon the assets controlled by Mr. Overmyer that have been used as instruments of fraud, to the full extent of the debts owed to FNBB by DHO, ODS, TOC and Mr. Overmyer for which debts the plaintiffs Hadar, Mr. Overmyer, DHO and ISLI are jointly and severally liable to the defendant FNBB in the following amounts which are cumulative:

(a) $11,723,754.53 plus interest at the prime rate of FNBB as from time to time established plus 3% with a minimum of 9% since April 1, 1982;

(b) $171,947.76 plus interest at the prime rate of FNBB as from time to time established plus 2% since April 1, 1982;

(c) $6,230,742.07 plus interest at the prime rate of FNBB as from time to time established plus 1% with a minimum of 6% since April 1, 1982;

(d) $4,267,330.91 plus interest for costs of collection.

11. In order to implement FNBB's equitable rights as aforesaid and as a remedy for the fraud on FNBB, the Court hereby vests the assets in question in nominees of FNBB as provided in paragraphs 12 through 22, inclusive, of this Judgment.

12. All right, title and interest of Intermodal Terminals, Inc., and Shirley C. Overmyer in and to the following described property is hereby divested and vested in GTA Realty, Inc.

All that certain plot, tract or parcel of land together with the buildings and improvements situate thereon lying and being in the Town of Yorktown, County of Westchester, and State of New York, located on Hog Hill and consisting of two parcels as described in the Deed dated October 22, 1968, from M. Francis Crawford also known as Mark Francis Crawford, to Daniel H. Overmyer and Shirley C. Overmyer, his wife as recorded in book 6816, page 419 Westchester County Clerk's Office, White Plains, New York, on October 23, 1968.

KNOWN and designated on the tax map of the Town of Yorktown as Section 19.03 parcel 20, and Section 19.03 parcel 21.

Together with the appurtenances.

All that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate lying and being in the Town of Yorktown, County of Westchester, State of New York, being the same lands located in Town of Yorktown, Westchester County known as a part of Lot 1, Section 19, Parcel 21, and conveyed by J.M. Dryfoos 1120 Park, to Daniel H. Overmyer, 201 East 42nd Street, New York, N.Y. by Deed dated December 15, 1969, and recorded in Book 6904, Page 57–60 on January 20, 1970, in Westchester County Clerk's Office, White Plains, New York, consisting of 12.179 Acres, more or less.

Being Section 19.03 Parcel 21, on Tax Map of Town of Yorktown. Together with the appurtenances.

This Judgment shall be operative as a conveyance of the above-described property; and, further, the County Clerk of Westchester, Division of Land Records, be and is hereby authorized and directed to accept a certified copy of this Judgment as such conveyance without necessity of any further evidence of transfer or conveyance and duly to record this Judgment in the same manner as a deed.

13. The leasehold interests of Jeebs in the premises on the 29th floor of 3 Park Avenue, New York, New York, and in Apartment 22G, 4 Park Avenue, New York, New York, are hereby divested and are vested in GTA Realty, Inc.

14. All right, title, and interest in and to all the outstanding shares of capital stock, or similar evidences of investment, in TOC is hereby vested in Bellerophon, Inc.

15. All right, title, and interest in and to all the outstanding shares of capital stock, or similar evidences of investment, in D.H. Overmyer of Canada, Ltd. ("DHO Canada"), D.H. Overmyer Company (Quebec) Ltd. ("DHO Quebec") and Overmyer Canada, Ltd., is hereby vested in Heracles, Inc.

16. All right, title, and interest in and to all the outstanding shares of capital stock, or similar evidences of investment, in Intermodal Terminals, Inc., is hereby vested in Bilbo Baggins, Inc.

17. All right, title, and interest in and to all the outstanding shares of capital stock, or similar evidences of investment, in Weathervane Farms, Inc., is hereby vested in Medea, Inc.

18. All right, title, and interest in and to all the outstanding shares of capital stock, or similar evidences of investment, in Expediter Warehouse Co. ("Expediter") is hereby vested in Theseus, Inc.

19. All right, title, and interest in and to all the outstanding shares of capital stock, or similar evidences of investment, in Deauville Private Rental Homes, Inc. ("Deauville"), is hereby vested in Perseus, Inc.

20. All right, title, and interest in and to all the outstanding shares of capital stock, or similar evidences of investment, in Freight Delivery Service, Inc. ("FDS"), Hadar, ISLI, Merchants & Manufacturers Warehouse, Inc. ("M & M"), Overmodal Terminals, Inc. ("Overmodal"), Overmyer, A.G., R–T Realty Corp., Servicenter, Inc., Southwest Warehouse Co., Inc. ("Southwest"), Standard Warehouse Co., Inc. ("Standard"), and Wilkinson Storage Corporation ("Wilkinson") is hereby vested in Cadmus, Inc.

21. All right, title, and interest in and to all the outstanding shares of capital stock, or similar evidences of investment, in AGG, Jeebs, National Distribution Services, Inc. ("NDS"), National Distribution Services of California, Inc. ("NDS of California"), Omega and Peerless Manufacturing Corporation ("Peerless") is hereby vested in Siegfried, Inc.

22. Subject to the provisions of paragraph 8 of this Judgment and subject to valid claims of legitimate creditors, all right, title, and interest in and to the assets of AGG, Deauville, DHO, Expediter, Hadar, ISLI, Intermodal Terminals, Inc., Jeebs, NDS, NDS of California, Omega, Peerless, TOC and Weathervane Farms, Inc., is hereby vested in Gawain, Inc.

23. Hadar, Mr. Overmyer, DHO and ISLI, and their officers, agents, servants, employees and attorneys are hereby enjoined from performing any act with respect to AGG, Deauville, DHO Canada, DHO Quebec, Expediter, FDS, ISLI, Intermodal Terminals, Inc., Jeebs, M & M, NDS, NDS of California, Omega, Overmyer, A.G., Overmyer Canada, Ltd., Peerless, R–T Realty Corp., Servicenter, Inc., Southwest, Standard, Weathervane Farms, Inc., and Wilkinson other than in the ordinary course of their businesses or as provided in paragraph 24 of this Judgment.

24. Within two business days of the entry of this Judgment Hadar, Mr. Overmyer, DHO and ISLI are enjoined to turn over to FNBB all assets and records of AGG, Deauville, DHO Canada, DHO Quebec, Expediter, FDS, Hadar, ISLI, Intermodal Terminals, Inc., Jeebs, M & M, NDS, NDS of California, Omega, Overmyer, A.G., Overmyer Canada, Ltd., Peerless, R–T Realty Corp., Servicenter, Inc., Southwest, Standard, Weathervane Farms, Inc., and Wilkinson, the foregoing not being property of the estate of either Mr. Overmyer or DHO.

25. It is hereby declared that the capital stock of Telecasting was validly pledged to FNBB to secure all indebtedness of DHO, ODS, TOC and Mr. Overmyer to FNBB.

26. FNBB shall render monthly accountings to Hadar, Mr. Overmyer, DHO and ISLI by registered or certified mail addressed to each at such address as each may specify in a writing actually received by FNBB, or, if no such address shall be so specified, by filing in this Court as a part of the record in this adversary proceeding, such accountings to show the amounts realized on disposition of the assets listed in paragraphs 12–22, inclusive, of this Judg-

ment and said accountings shall become final and conclusively binding on FNBB, Hadar, Mr. Overmyer, DHO and ISLI unless objected to in this Court within thirty (30) days. Any objection to such accountings, including any objection to the amount realized, shall be tried and heard only in this Court without jury and not in any other court or tribunal. In the event the obligations of Hadar, Mr. Overmyer, DHO and ISLI to FNBB shall at any time become totally satisfied, FNBB shall return to their former owners any of the assets listed in paragraphs 12–22, inclusive, of this Judgment still in its possession and any excess proceeds from the disposition thereof.

27. Mr. Overmyer is liable to Hadar in the amount of $183,298.10 plus interest.

28. Mr. Overmyer is liable to Telecasting for $100,000.00 plus interest as punitive damages for his fraud.

29. Mr. Overmyer is liable to FNBB for $150,000.00 plus interest as punitive damages for his fraud.

30. Edmund M. Connery, Esquire, and Russell Morton Brown, Esquire, are jointly and severally liable to Telecasting in the amount of $5,000.00 plus interest.

31. As to Hadar's claims against Telecasting asserted in this adversary proceeding, Hadar shall take nothing and the claims are hereby dismissed on the merits.

32. It is hereby declared that ODS became inoperative on March 1, 1975, and no longer exists or has capacity to sue or be sued.

33. All claims asserted by Mr. Overmyer, ODS, ISLI and DHO against FNBB are hereby dismissed with prejudice in accordance with the Court's Findings of Fact and Conclusions of Law entered on March 23, 1982.

34. All claims asserted by FNBB against ODS are hereby dismissed with prejudice and without costs.

35. Telecasting's Counterclaim against General Electric Company is hereby dismissed without prejudice and without costs.

36. Telecasting is to have costs against Hadar, Mr. Overmyer, DHO and ISLI.

37. This Judgment adjudicates all the claims of all the parties.